# Exhibit "A"

# Deposition of George R. Chapman

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ALABAMA
 2              JASPER DIVISION
 3
    GEORGE R. CHAPMAN, JR.,
 4       Plaintiff,
 5    VS.          CIVIL ACTION
               NO. 6:09-cv-1748-SLB
 6
 7  WALKER COUNTY, ALABAMA, a
    Governmental Entity; and SHERIFF
 8  JOHN MARK TIREY and TRENTON
    McCLUSKEY, Individuals,
 9       Defendants.
10
11     DEPOSITION OF GEORGE CHAPMAN, JR.
12
13          STIPULATIONS
14       IT IS STIPULATED AND AGREED, by and
15  between the parties, through their respective
16  counsel, that the deposition of GEORGE CHAPMAN,
17  JR. may be taken before Scott Wilmeth, CCR,
18  RPR, State of Alabama at Large, at 2001 2nd
19  Avenue, Jasper, Alabama, on May 11, 2011,
20  commencing at 9:58 a.m.
21       IT IS FURTHER STIPULATED AND AGREED
22  that the reading and signature to the deposition
23  by the witness is waived, said deposition to have
```

**2**

```
 1  the same force and effect as if full compliance
 2  had been had with all laws and rules of court
 3  relating to taking of depositions.
 4       IT IS FURTHER STIPULATED AND AGREED
 5  that it shall not be necessary for any objections
 6  to be made by counsel as to any questions, except
 7  as to form or leading questions, and that counsel
 8  for the parties may make objections and assign
 9  grounds at the time of the trial, or at the time
10  said deposition is offered in evidence, or prior
11  thereto.
12
13
14
15
16
17
18
19
20
21
22
23
```

**3**

```
 1          I N D E X
 2  EXAMINATION BY:              PAGE NO.
 3  Ms. Dowdy------------------------------  5
 4  Mr. Saxon------------------------------ 101
 5  Ms. Dowdy------------------------------ 113
 6  Mr. Saxon------------------------------ 127
 7  Ms. Dowdy------------------------------ 128
 8  Mr. Saxon------------------------------ 128
 9  Ms. Dowdy------------------------------ 129
10  Mr. Saxon------------------------------ 140
11  Ms. Dowdy------------------------------ 144
12  Mr. Saxon------------------------------ 147
13  Ms. Dowdy------------------------------ 148
14
15          E X H I B I T S
16  DEFENDANT'S EXHIBIT NO.            MARKED
17  1 - 9-25-08 Letter from Tucker---------- 28
18  2 - Memo------------------------------- 57
19  3 - 11-7-08 Letter from Tirey----------- 70
20
21
22
23
```

**4**

```
 1  BEFORE:  Scott Wilmeth, CCR, RPR
 2       Commissioner
 3
 4  APPEARING ON BEHALF OF THE PLAINTIFF:
 5     Mr. John D. Saxon
 6     John D. Saxon, P.C.
 7     2119 3rd Avenue North
 8     Birmingham, Alabama  35203
 9
10  APPEARING ON BEHALF OF THE DEFENDANT:
11     Ms. Kristi A. Dowdy
12     Law Offices of Kristi A. Dowdy
13     300 North Richard Arrington, Suite 200
14     Birmingham, Alabama  35203
15
16  ALSO PRESENT:  Trenton McCluskey
17
18
19
20
21
22
23
```

5

1       I, Scott Wilmeth, CCR, RPR, State of
2 Alabama at Large, acting as commissioner, certify
3 that on this date, in accordance with the Federal
4 Rules of Civil Procedure and the foregoing
5 stipulations of counsel, there came before me at
6 2001 2nd Avenue, Birmingham, Alabama, on May 11,
7 2011, GEORGE CHAPMAN, JR., witness in the above
8 cause for oral examination, whereupon the
9 following proceedings were had:
10
11       GEORGE CHAPMAN, JR.,
12 having been first duly sworn, was examined and
13 testified as follows:
14       THE COURT REPORTER: Usual
15 stipulations?
16       MS. DOWDY: That's fine with me.
17       MR. SAXON: Yeah.
18
19 EXAMINATION BY MS. DOWDY:
20    Q.    Will you state your full name for
21 the record, please, sir?
22    A.    George Roscoe Chapman, Jr.
23    Q.    Mr. Chapman, I introduced myself to

6

1 you earlier. I'm Kristi Dowdy. I represent
2 the defendants in this lawsuit that you've
3 filed against them.
4    A.    Okay.
5    Q.    Have you ever given a deposition
6 before?
7    A.    No, ma'am, I haven't.
8    Q.    Okay. I'm just going to ask you a
9 series of questions and I just need you to
10 answer them out loud, if you can. If I ask you
11 a question that doesn't make sense or that you
12 don't understand, if you will please tell me,
13 I'll try to repeat it. I promise you will not
14 hurt my feelings.
15    A.    Okay.
16    Q.    Now, if you want to stop, take a
17 break, just let me know, okay?
18    A.    Okay.
19    Q.    Where are you currently living, Mr.
20 Chapman?
21    A.    I live in Jasper.
22    Q.    What's your address?
23    A.

7

1 Alabama.
2    Q.    How long have you lived at that
3 address?
4    A.    All my life.
5    Q.    Who lives there with you at that
6 address?
7    A.    My mom, my dad and my brother.
8    Q.    Is this your mom and dad's house?
9    A.    Yes.
10    Q.    What are their names?
11    A.    I'm a junior, so my father's name is
12 George, Sr. and my mom's name is Lois and my
13 brother's name is Cedric.
14    Q.    How old are you, Mr. Chapman?
15    A.    I'm 37 years old.
16    Q.    What's your date of birth?
17    A.
18    Q.    Do you have an Alabama driver's
19 license?
20    A.    Yes, ma'am, I do.
21    Q.    Do you know your number?
22    A.
23    Q.    What was the last grade you finished

8

1 in school, Mr. Chapman?
2    A.    High school, 12th grade.
3    Q.    Did you complete the 12th grade?
4    A.    Yes, ma'am, I did.
5    Q.    Where did you go to high school?
6    A.    Walker High.
7    Q.    What year did you finish?
8    A.    1994.
9    Q.    The Alabama driver's license you
10 gave me the number awhile ago, has that ever
11 been revoked?
12    A.    No, ma'am.
13    Q.    Do you have any restrictions on your
14 driver's license?
15    A.    No, ma'am.
16    Q.    After you got out of high school,
17 did you go to work?
18    A.    Yes, ma'am, I did.
19    Q.    Do you have any other education
20 beyond high school?
21    A.    No, ma'am.
22    Q.    Any vocational training?
23    A.    No, ma'am.

9

1   Q.   Where did you start work after you
2 got out of high school?
3   A.   I went to work with my father and
4 them. They had a logging company.
5   Q.   What logging company was that?
6   A.   Chapman Brothers Logging.
7   Q.   Chapman Brothers Logging?
8   A.   Yes.
9   Q.   Where is that located?
10   A.   Here in Jasper.
11   Q.   How long did you work for your dad?
12   A.   Really, up until I started working
13 here.
14   Q.   Which would have been what year?
15   A.   I started here March 31st, 2006.
16   Q.   So from 1994 to March of 2006,
17 Chapman Brothers Logging company was the only
18 place you worked?
19   A.   Well, I also worked at Marshall
20 Durbin for awhile, brief period of time.
21   Q.   Where is Marshall Durbin located?
22   A.   It's three months. It's like
23 leaving the post office here, cross these

10

1 tracks and just keep straight over this bridge
2 here and --
3   Q.   Is it still Walker County?
4   A.   Yes, ma'am.
5   Q.   That's a chicken plant; right?
6   A.   Right.
7   Q.   What did you do for Marshall Durbin?
8   A.   I worked in the cooler, shipping and
9 receiving.
10   Q.   You said you worked for them about
11 three months?
12   A.   Yeah, about three to six months, I'd
13 say.
14   Q.   Do you remember what year that would
15 have been?
16   A.   Not exactly. Maybe '98, '99,
17 something like that.
18   Q.   Is there any particular reason you
19 didn't work for them any longer than that?
20   A.   Not really. It's just that they
21 didn't pay a whole lot.
22   Q.   Did you quit that job or were you
23 terminated?

11

1   A.   I really don't remember, it's been
2 so long ago.
3   Q.   Have you worked anywhere else, up
4 until the time you went to work for the jail,
5 other than for your dad and for Marshall
6 Durbin?
7   A.   No.
8   Q.   Okay. Are you currently employed?
9   A.   Yes, I am.
10   Q.   Where are you employed?
11   A.   U.S. Security & Associates.
12   Q.   How long have you worked there?
13   A.   It'll be a year next month.
14   Q.   So June of 2010?
15   A.   Right.
16   Q.   What do you do for them?
17   A.   I'm a security guard.
18   Q.   Do you work in any particular place?
19   A.   Yes, wherever they put me.
20   Q.   Okay. So it's U.S. Security &
21 Associates?
22   A.   Uh-huh.
23   Q.   Where are they located?

12

1   A.   Birmingham, but they have a home
2 office in Atlanta, Georgia. Well, actually,
3 Roswell, Georgia.
4   Q.   So do they just place you in
5 different locations, Mr. Chapman? How does
6 that work?
7   A.   Just wherever the guards are needed.
8 They contract guards out all over.
9   Q.   Are you assigned to a particular
10 place for a specific period of time or --
11   A.   Well, right now I'm working at Jim
12 Walters, at a strip pit.
13   Q.   Do you work 40 hours a week?
14   A.   Not right now, I don't. Currently,
15 my hours is just being cut back to 36 hours,
16 because they're doing some changing around
17 right now, so they're not going to be able to
18 give everybody 40 hours.
19   Q.   Up until your time just got cut,
20 were you working 40 hours a week?
21   A.   Yes, I was.
22   Q.   What are you making with -- as a
23 security guard?

13

1   A.   8.60 an hour.

2   Q.   Has your pay changed in the last

3   year?

4   A.   No.

5   Q.   Do you get any benefits?

6   A.   I have no medical insurance. I've

7   got dental insurance and eye insurance.

8   Q.   They provide you with dental and

9   eye, but no medical?

10  A.   Well, I signed up for it on-line and

11  they said I didn't, so I don't know. It was

12  some kind of discrepancy with it. I don't

13  really like doing things on the computer. I'd

14  rather, you know, fill it out hands-on, pen and

15  paper, you know.

16  Q.   I'm of that generation too.

17  A.   Yeah.

18  Q.   Have you worked anywhere -- since

19  leaving the Walker County Sheriff's Department,

20  have you worked anywhere else other than as a

21  security guard?

22  A.   No, ma'am.

23  Q.   With a security company?

14

1   A.   No, ma'am.

2   Q.   Did you apply for work anywhere

3   else?

4   A.   Yes, I applied for several positions

5   around here.

6   Q.   Where all did you apply?

7   A.   Jasper Lumber, Marshall Durbin

8   again.

9   Q.   Anywhere else that you can recall?

10  A.   That's about it, I guess. Well, no,

11  Taco Bell, I forgot.

12  Q.   Now, you left here in November of

13  2008; is that right?

14  A.   Yes, ma'am.

15  Q.   So you did not work from November of

16  2008 up until June of 2010?

17  A.   Right.

18  Q.   All right. Anywhere else that you

19  can recall that you applied for work during

20  that period of time?

21  A.   The current job that I've got now.

22  Q.   And those are the only four places?

23  A.   As far as I can remember.

15

1   Q.   Okay. Did you ever try to go to

2   work through like a temporary employment

3   service?

4   A.   No.

5   Q.   Did you work for your dad during

6   that period of time?

7   A.   No, At that time, they had all the

8   help they needed.

9   Q.   Your dad still owns the logging

10  company?

11  A.   Yes.

12  Q.   Does your brother Cedric work for

13  him?

14  A.   No.

15  Q.   Where does he work?

16  A.   He doesn't. He's disabled.

17  Q.   Is your mom employed?

18  A.   No.

19  Q.   Who does your dad own the logging

20  company with?

21  A.   His two brothers.

22  Q.   Hence the name Chapman Brothers,

23  huh?

16

1   A.   Yeah.

2   Q.   Who are his brothers?

3   A.   Larry and Willie.

4   Q.   Is that located here in Walker

5   County, Mr. Chapman?

6   A.   Yes, ma'am.

7   Q.   How long have they had that

8   business?

9   A.   Oh, some odd 50 years, I'd say, or

10  more. Before I was born.

11  Q.   Okay. You started to work for the

12  sheriff's department in March of 2006?

13  A.   March 31st, 2006.

14  Q.   And what were you hired to do?

15  A.   I was a jailer.

16  Q.   And were you hired part-time or

17  full-time?

18  A.   Part-time.

19  Q.   How did you find out that there was

20  a job opening?

21  A.   I had been trying to get on down

22  here for awhile; newspaper.

23  Q.   So you saw an ad in the paper?

17

1    A.    Yes, ma'am.
2    Q.    Do you remember what paper it was?
3    A.    Daily Mountain Eagle.
4    Q.    Okay.  As a part-time employee, what
5    were your hours?
6    A.    I believe it was work four days and
7    off three days, so it was, I think, 32 hours
8    every two weeks, something like that, if I'm
9    not mistaken.
10    Q.    Do you remember when you were hired,
11    what your rate of pay was?
12    A.    9.85.
13    Q.    How did you apply for the job with
14    the sheriff's department?
15    A.    What do you mean?
16    Q.    Where did you go to apply for the
17    job?
18    A.    Oh, at the Civil Service Board.
19    Q.    And then who hired you?
20    A.    Well, I guess that would be the
21    sheriff.  I mean --
22    Q.    Okay.  Did you interview with the
23    sheriff or did you interview with somebody?

18

1    A.    No, I interviewed with Mr.
2    McCluskey.
3    Q.    Okay.  And then you were hired?
4    A.    Yeah, then I was hired.
5    Q.    How did you find out that they were
6    going to hire you to come to work?
7    A.    Well, I got a phone call.
8    Q.    Do you remember who called you?
9    A.    Mr. McCluskey.
10    Q.    All right.  And you started working
11    part-time as a jailer?
12    A.    Yes, ma'am.
13    Q.    And did your job change at any point
14    in time while you were here?
15    A.    No.
16    Q.    You were always a jailer?
17    A.    Right.
18    Q.    Okay.  And who -- when you first
19    started, who was your supervisor?
20    A.    Randy Brown, Lieutenant Randy Brown.
21    Q.    And what shift were you assigned to
22    when you --
23    A.    Third shift.

19

1    Q.    And that's --
2    A.    11:00 to 7:00.
3    Q.    Who else worked on that shift with
4    you?
5    A.    You mean in the supervisor's role?
6    Q.    Well, the other jailers?
7    A.    Charles Hannah, Sharon Craven, Cindy
8    Bond, Chris Kendrick, and Chris Kendrick was a
9    sergeant, Frank McGhetti (phonetic spelling),
10    Sergeant Frank McGhetti.
11    Q.    How long did you continue to work
12    third shift?
13    A.    Probably at least the main two years
14    that I was here, until recently, until they
15    moved me to second shift.
16    Q.    Okay.  Do you remember --
17    A.    I was full-time, though, when I
18    moved to second shift at that time.
19    Q.    Okay.  While you were part-time, you
20    worked third shift?
21    A.    Yes, ma'am.
22    Q.    Which is 11:00 to 7:00?
23    A.    Yes, ma'am.

20

1    Q.    The last time you worked third
2    shift, was your supervisor still Lieutenant
3    Brown?
4    A.    No, ma'am.
5    Q.    Who was it?
6    A.    Well, we had an acting lieutenant.
7    He hadn't really got the lieutenant position
8    yet, Tommy Miller.
9    Q.    When did you become a full-time
10    employee?
11    A.    It was around September 27th, I
12    believe, somewhere around in there, the end of
13    September of 2008.
14    Q.    How did you find out that there was
15    a full-time position open?
16    A.    Well, I had taken the jailer's test
17    again and I passed it, and so they go by your
18    score and everything, and then you're put on
19    the eligible register list and then they pull
20    names off that.
21    Q.    When a job position becomes
22    available?
23    A.    Yes, when a full-time position

21

1  becomes available.
2     Q.    When a full-time position becomes
3  available?
4     A.    Yes, ma'am.
5     Q.    So you were next in line for that, I
6  guess, position?
7     A.    I assume I was.
8     Q.    Okay. And when you went to
9  full-time, did your pay change?
10    A.    Yes, ma'am.
11    Q.    What were you making?
12    A.    Well, last thing when I worked here
13 and I was full-time, I was making 12.60 an
14 hour. Mr. McCluskey was the one that informed
15 me that I would be going full-time.
16    Q.    Did you have other benefits?
17    A.    Well, I had just got medical
18 insurance and all that good stuff and, you
19 know, dental. And I don't know if they offered
20 eye insurance in that health insurance package
21 or not. They may have. I don't quite remember
22 that. But it was a good medical package.
23    Q.    And you were not -- as a part-time

22

1  employee, you did not have those benefits
2  available?
3     A.    Oh, no, no, not at all.
4     Q.    Okay. What time did second shift
5  work?
6     A.    That would be 3:00 in the afternoon
7  till 11:00 at night.
8     Q.    And when you were moved to second
9  shift, who was your supervisor?
10    A.    That would be sergeant Rachel Harper
11 and Lieutenant James Woodley, which Lieutenant
12 Woodley is retired now.
13    Q.    Who else worked second shift with
14 you?
15    A.    Tifney Clifton, Ms. Killingsworth,
16 Mr. Hannah, I believe he was moved to that
17 shift with me at that time too, Ms. Craven
18 again.
19    Q.    Anybody else that you can recall?
20    A.    Yes, Ms. Monica Day. I'm trying to
21 think. Oh, Nick Harbison, I think. I think
22 that's his last name, Harbison. Maybe Harbin,
23 Nick Harbin, I'm sorry. It's Harbin, not

23

1  Harbison.
2     Q.    Anybody else that you can think of?
3     A.    Ms. Mary Phillips.
4     Q.    When you were hired to work as a
5  part-time jailer, did you attend any type of
6  training classes or go to school?
7     A.    Oh, yes.
8     Q.    Which classes did you go to?
9     A.    I had to do a taser class, a pepper
10 spray class, a baton class, I mean, just
11 whatever they told us we had to do, you know.
12 One other name that I omitted on there.
13    Q.    Who is that?
14    A.    Albert Steadman also worked with me
15 on second shift.
16    Q.    Did you go to the jail management
17 course?
18    A.    Yes, ma'am, I did.
19    Q.    When did you go to that?
20    A.    That was before I started here. We
21 went out to Bevill State for about two weeks.
22 We were paid for it, 40 hours a week, you know,
23 and did two weeks of training out there.

24

1     Q.    And you took that class before you
2  ever started as a jailer part-time here?
3     A.    Yes, ma'am, and that was taught by
4  the Bureau of Prisons, the DOC, Lieutenant
5  Steele and Sergeant Chester.
6     Q.    And then after you started, you
7  would regularly have different classes that you
8  would have to attend?
9     A.    Just taser classes and stuff like
10 that and, you know, to recertify yourself, you
11 know. I think we did that once a year. If you
12 didn't go through the training, you wasn't
13 allowed to carry a taser.
14    Q.    Right. Did y'all keep a taser on
15 you while you worked in the jail?
16    A.    I didn't, not particularly. I mean,
17 you know, I probably could have, but --
18    Q.    Was there a policy in place as to
19 whether you could keep a taser gun with you
20 while you were working as a jailer?
21    A.    Well, we could, I guess. I mean, we
22 only had two, but I guess we could.
23    Q.    What other weapons would you keep

25

1  with you while you were working as a jailer?
2      A.    Just my stick and my pepper spray.
3      Q.    Okay. When you refer to your stick,
4  is that a baton?
5      A.    Yeah, ASP baton, A-S-P baton. It's
6  a little folding baton, you know, like to whip
7  it out, you have to beat it on the ground, the
8  concrete to make it go back in.
9      Q.    I didn't ask you this earlier, Mr.
10  Chapman. I assume that since you're living at
11  home, you're not married?
12      A.    No, ma'am.
13      Q.    Have you ever been married?
14      A.    No, ma'am.
15      Q.    Have you ever lived anywhere other
16  than at home with your parents?
17      A.    No, ma'am.
18      Q.    Smart boy. When you took your
19  management jail class work, did they train you
20  in use of force?
21      A.    Well, they showed us some things, I
22  mean, you know, like how to hit with it and
23  stuff like that, I mean --

26

1      Q.    How to hit with what?
2      A.    With the baton.
3      Q.    Did they train you in any type of
4  force continuum?
5      A.    Kind of describe to me what you mean
6  by that.
7      Q.    Okay. Were you taught when it was
8  appropriate to use certain types of force?
9      A.    I would say if I was in a situation
10  where the inmate, you know, had me cornered or
11  whatever or to subdue the inmate, to get him
12  off of me, I mean, or whatever.
13      Q.    Were you taught that there were
14  steps you were supposed to follow to protect
15  yourself and the inmate?
16      A.    Well, I mean, if the inmate's
17  aggressively fighting me, I'm trying to protect
18  myself, you know, pretty much, I mean --
19      Q.    When you were taught your pepper
20  spray class, did they tell you when it was
21  appropriate to use pepper spray?
22      A.    Only for use of force, I mean, you
23  know, like if someone was, you know, being

27

1  aggressive with you in a manner of coming at
2  you or something or whatever. I guess you
3  would say pretty much if they're trying to do
4  bodily harm to you, the inmate, on both
5  occasions, baton or pepper spray.
6      Q.    What about the taser? When would
7  you use it?
8      A.    Same thing. I wouldn't just go
9  around beating nobody with a baton or just
10  shooting somebody with a taser or just spraying
11  somebody for no reason. I mean, you know, that
12  would be ridiculous.
13      Q.    Which were you supposed to use
14  first?
15      A.    I would use the pepper spray first,
16  myself, because that would be the less most
17  lethal, I mean, I guess you'd say, try to get
18  them in the eyes and then, you know, if they
19  can't see you, maybe subdue them and put the
20  cuffs on them or whatever.
21      Q.    Now, when you became a full-time
22  employee, was it your understanding that you
23  would be on probation for a certain period of

28

1  time?
2      A.    Yes, according to the letter I
3  received.
4           (Whereupon, Defendant's Exhibit
5           Number 1 was marked for
6           identification.)
7      Q.    (By Ms. Dowdy) Let me show you
8  what's going to be marked as Defendant's
9  Exhibit Number 1. Can you tell me what that
10  is, please, sir?
11      A.    Yeah, I got a letter like that.
12      Q.    Is that a letter you got, Mr.
13  Chapman, or that letter is addressed to you
14  from the Civil Service Board, advising you that
15  you were a probationary employee for a period
16  of six months?
17      A.    According to the paper, that's what
18  it says.
19      Q.    Okay. So in September of 2008, did
20  you understand you were a probationary
21  employee?
22      A.    Yes, but I was also a probationary
23  employee when I was part-time too.

29

1    Q.    Okay. Before you became a full-time
2  employee, had you had any incidents with any
3  inmates?
4    A.    When you say incidents, what kind of
5  incidents do you mean?
6    Q.    Had you had any verbal, I guess, for
7  lack of better words, altercations with an
8  inmate?
9    A.    I'm going to put it to you like
10  this: I would say yes and sometimes no. I
11  mean, it depended on what kind of inmate you're
12  dealing with.
13    Q.    Had you ever had an inmate accuse
14  you of doing anything wrong?
15    A.    Yeah, I have.
16    Q.    What were you accused of?
17    A.    It was some investigation one time
18  where they had this particular inmate, he
19  said -- I think it was something that he's --
20  what would you call it? I guess gay, bisexual,
21  whatever, and he made some comment about I
22  groped him or something.
23    Q.    Do you remember when this was, Mr.

30

1  Chapman?
2    A.    Not exactly, I don't. I mean, it's
3  been so long ago.
4    Q.    Do you remember the name of the
5  inmate?
6    A.    Not the particular inmate, but I do
7  remember his cellmate's name.
8    Q.    Who was that?
9    A.    His cellmate was George Bryant, but
10  I forget his name, the other guy.
11    Q.    And an investigation was done?
12    A.    Yes.
13    Q.    Do you recall being cleared in that
14  investigation?
15    A.    Right, I was cleared.
16    Q.    Any other times that you can recall,
17  while you were part-time, where an inmate may
18  have accused you of doing something wrong?
19    A.    Well, I had a particular incident
20  where an inmate tried to spit on me and kick me
21  in the chest as I entered his cell with another
22  officer and -- but in that instance, the inmate
23  was being aggressive with me and, you know,

31

1  physically trying to come at me, you know, so I
2  just struck him with my baton.
3    Q.    Do you remember the name of the
4  inmate?
5    A.    Daniel Ryan, I believe, Daniel Bryan
6  or something like that.
7    Q.    Did anything happen as a result of
8  that incident with the inmate?
9    A.    What do you mean? Like an
10  investigation or something?
11    Q.    Uh-huh.
12    A.    I believe there was an investigation
13  done.
14    Q.    Who was the other officer you were
15  with when this happened?
16    A.    Nick Harbin.
17    Q.    And did Mr. Harbin use any type of
18  force on the inmate?
19    A.    Not that I recall, except for just
20  helping me subdue him, you know.
21    Q.    Did the inmate have to have any type
22  of medical treatment?
23    A.    He may have, he may have, a few

32

1  stitches, I mean, or something; not nothing
2  that I would say that was drastically,
3  seriously life threatening or nothing like
4  that.
5    Q.    Was any type of investigation done?
6    A.    Yes, ma'am.
7    Q.    Do you recall what investigator
8  would have done that?
9    A.    I don't know the investigator's
10  name, not at that particular incident, I
11  didn't.
12    Q.    Do you recall what the result of the
13  investigation was?
14    A.    I was cleared.
15    Q.    And to the best of your
16  recollection, you struck this inmate with your
17  baton?
18    A.    Yes.
19    Q.    Where would you have hit the inmate?
20    A.    The head, right across the forehead.
21    Q.    Where are you trained to strike an
22  inmate with a baton?
23    A.    Well, we're trained to aim for the

33

1   knees and upper area (indicating), you know,
2   like knees, shoulders and upper mass.
3       Q.    So somewhere between their shoulders
4   and their knees?
5       A.    Yeah, like, you know, bone points,
6   like, you know.
7       Q.    Like what? When you say, "you
8   know," you've got to help me.
9       A.    Like your knees, you know, and upper
10  areas, your bone points, like your joints or
11  whatever, you know. I would think if you'd hit
12  a person in their knees, you know, that they
13  would pretty much fall, I mean, you know.
14      Q.    Okay. I know that you're telling me
15  that's what you think, but when you take your
16  baton class and you're trained to use the
17  baton; correct?
18      A.    Right.
19      Q.    Okay. Where are you taught to
20  strike an individual?
21      A.    That's what I just said.
22      Q.    Okay.
23      A.    I mean, upper torso and knee area

34

1   (indicating).
2       TRENTON McCLUSKEY: Do you need some
3   water?
4       THE WITNESS: Thank you.
5       MS. DOWDY: Let's take a break real
6   quick.
7       (Whereupon, a recess was taken.)
8       Q.    (By Ms. Dowdy) Okay. Mr. Chapman,
9   you told me about the incident with this one
10  inmate, Daniel Bryan. Do you recall there ever
11  being any other incidents before you became
12  a --
13      A.    That was Daniel Ryan.
14      Q.    Daniel Ryan?
15      A.    Yes, ma'am.
16      Q.    Okay. Any other incidents that you
17  can recall with inmates?
18      A.    Yes, I had an incident with a
19  Tovarius Hinkle. He was an African-American
20  inmate, became very disruptive one night as I
21  was performing count. We have to do count.
22  When we come in the jail, we have to get a head
23  count. And he was disrupting head count and he

35

1   just did not want to go to bed and settle down
2   at all or nothing, and so during my count, I
3   ended up encountering him and having to pepper
4   spray him and take him to the M-dorm.
5       Q.    Any other incidents that you can
6   recall?
7       A.    Let's see.
8       MR. SAXON: This is all before he
9   became full-time?
10      MS. DOWDY: Before he became
11  full-time.
12      A.    Not that I can remember, I mean, not
13  that, you know --
14      Q.    (By Ms. Dowdy) Nothing that stands
15  out in your mind?
16      A.    Yeah, that encouraged an
17  investigation or anything like that.
18      Q.    Was there an investigation after
19  this incident with Mr. Hinkle?
20      A.    No, no, Mr. McCluskey, I called him
21  that particular night and he told me Mr. Hinkle
22  has been a problem ever since he's been in
23  Walker County Jail and just do my job and

36

1   handle it and everything will be fine.
2       I also informed Mr. McCluskey that
3   one of my co-workers told me, "Well, you really
4   can't, you know, do your job and tell these
5   guys, you know, how to act and discipline them
6   or not, you know, discipline them, you know,
7   for, you know, not following the rules and
8   stuff."
9       And I was like, "I don't understand
10  that." I mean, they've got an inmate handbook,
11  you know.
12      Q.    Who was the co-employee that told
13  you that?
14      A.    I'd rather not say his name. I
15  don't want to --
16      Q.    But you've got to tell me.
17      A.    Shannon Phillips.
18      Q.    Do you know if Mr. Phillips is still
19  employed here?
20      A.    I believe he is.
21      Q.    Do you recall any other inmates,
22  before you became full-time, where you would
23  have used your pepper spray or the baton?

37

1    A.   Not that I can remember.

2    Q.   Okay.

3    A.   Not that I can recollect.

4    Q.   Did you ever have an occasion to use

5 your taser?

6    A.   No, I don't remember tasering an

7 inmate.

8    Q.   So the whole time you were here,

9 even as a full-time employee, you never had to

10 use your taser?

11    A.   No. It wasn't my taser either,

12 though.

13    Q.   Okay. You never used a taser that

14 belonged to --

15    A.   We only had two, I mean, you know,

16 in the whole jail, but I -- I just didn't like

17 carrying that thing, because I'd be worried

18 about, well, now, if I get in a scuffle with

19 them, if they get it off me, you know, that

20 ain't good either. So, I mean, you know -- I

21 never shot anyone with it, but I -- I take that

22 back. I dry stunned a guy with it one day, an

23 inmate.

38

1    Q.   When was that?

2    A.   Dry stun is like a -- just like put

3 it up, you know, just give them a little jolt

4 (indicating). I just remembered that.

5    Q.   Do you remember what inmate that

6 would have been?

7    A.   Yeah, Christopher Parham.

8    Q.   What was his last name?

9    A.   Christopher Parham. He's

10 African-American also.

11    Q.   Do you remember when this would have

12 been?

13    A.   I'm thinking. I believe I was

14 full-time when this happened, though, I think.

15    Q.   What had happened to cause you to

16 dry stun Mr. Parham?

17    A.   Well, Mr. Parham became very

18 disruptive and causing problems in a dorm that

19 he was in and he was told to lock down and go

20 to his cell. He cursed me over the intercom

21 and told me he wasn't going to do it.

22        And I said, "Well, yeah, you are

23 going to do it. It's time to lock down." And

39

1 so Mr. Parham decided he wasn't going to do it,

2 so I told him, I said, "Well, okay, you're not

3 going to talk to me like that in front of these

4 guys and not tell me you're not going to do it.

5 I'll be in there." I grew up with Mr. Parham.

6 I know him and --

7    Q.   So when you went into the cell area

8 where he was, did you ask him to go back into

9 his cell?

10    A.   I had already told him to go back in

11 his cell. He refused. So I told him, "Well,

12 pack your stuff. You're going to go to

13 M-dorm."

14    Q.   Did you transfer him to M-dorm?

15    A.   Yes, I did. That's when he was dry

16 stunned, on the way up the hall.

17    Q.   On the way up the hall?

18    A.   Yes.

19    Q.   What had -- did something else occur

20 on the way down the hall?

21    A.   I said up the hall.

22    Q.   On the way up the hall, did

23 something else occur to cause you to dry taser

40

1 him?

2    A.   He was just being loud and

3 disruptive and not wanting to do what me and

4 the other officer told him to do.

5    Q.   Who was the other officer with you

6 that night?

7    A.   Charles Hannah.

8    Q.   What is M-dorm?

9    A.   It's maximum security. It's where

10 the murderers and all the bad, bad people are

11 housed.

12    Q.   Is the M-dorm used for any other

13 reason other than maximum security?

14    A.   That's it, as far as I know.

15    Q.   Is it more of a segregation type

16 area?

17    A.   It's an area where the inmates are

18 locked down 23 hours a day.

19    Q.   If an inmate gets out of line or is

20 causing a problem, can you put them in M-dorm?

21    A.   Yes.

22    Q.   Even if they're not normally a

23 maximum security type inmate?

41

1   A.   Yeah, if they're destroying county
2  property, I mean, you know --
3   Q.   So can an inmate be placed in the
4  M-dorm for segregation purposes?
5   A.   I would say for disciplinary
6  reasons. That would be my reason for putting
7  an inmate in there, or if he needs to be
8  protected from a dorm that he's in, you've
9  got -- say you've got 15 guys in there and he's
10  number 16 and all 15 of them want to jump on
11  him and beat the crap out of him, I would get
12  him out of there and put him somewhere safe.
13   Q.   He doesn't need to be in general
14  population at that point?
15   A.   Right, right.
16   Q.   How many people are housed in a cell
17  in M-dorm?
18   A.   I think they have 23 dorms in there,
19  cells in there, 23, 24, something like that.
20  It's been awhile since I've been in there.
21   Q.   Do they put more than one inmate in
22  a cell?
23   A.   Sometimes. It generally houses two

42

1  at a time.
2   Q.   That was my question. After you
3  became a full-time employee in September of
4  2008, did you have any incidents with any
5  inmates?
6   A.   Can you repeat that again?
7   Q.   After you became full-time in
8  September of 2008, did you have any type of
9  incidents with inmates that you can recall
10  where an inmate would have made a complaint
11  against you?
12   A.   Yes, I did.
13   Q.   When was that?
14   A.   On November 2nd, a fight ensued.
15   Q.   Okay. Was this the fight with Mr.
16  Parrish?
17   A.   Yes.
18   Q.   All right. But I'm talking about
19  before that time, though.
20   A.   Oh, no.
21   Q.   Between September and November, did
22  you have any type of incidents with any --
23   A.   No, no, not that I can recall.

43

1   Q.   Okay. Did you ever have an incident
2  with an inmate who escaped?
3   A.   Oh, yeah, yeah, yeah, yeah. I'm
4  sorry, I forgot about that, yeah.
5   Q.   Who was that inmate?
6   A.   Roy Dale Madison.
7   Q.   Madison?
8   A.   Yeah, Roy Dale Madison.
9   Q.   What happened that day?
10   A.   He was over there at work release
11  and I was told to go pick him up that day, but
12  I had just come to the shift that particular
13  day. That was my first day on second shift, if
14  I'm not mistaken. And Ms. Harper had me up in
15  booking, trying to brief me on some things and
16  telling me she needed to get some paperwork
17  done and needed me to sign some things and
18  stuff, and talk to me about, I guess, how they
19  do things on second shift or whatever and sign
20  some insurance papers and get my off days and
21  stuff straightened out and everything.
22      So at that time, I was kind of busy
23  and she was too, because she was, you know,

44

1  with me at that time, trying to, you know, go
2  over all this stuff with me. And the phone
3  rings. And we have a pod rover in the M-dorm.
4  If I'm not mistaken, I think I was M-dorm rover
5  that day. And I don't know where the pod rover
6  was at, you know, but I was asked to go get the
7  inmate. But at that time, I mean, my mind was
8  focused on trying to do these paperwork that
9  she wanted me to, you know, do, and these
10  papers she wanted me to sign.
11      So I left the jail here and went
12  over there, you know, just going to go pick him
13  up. You know, he had never gave me no
14  problems. I mean, I knew Roy Dale. But this
15  particular day, I didn't have any cuffs. I
16  forgot my cuffs, you know. So when I got over
17  there to get him, I brought him out and he was
18  calm and everything. And when I opened the van
19  door, wanting him to get in, he took off on me
20  and he ran from me.
21      So I had never had anything like
22  that to happen to me, so I immediately called
23  back to the jail and I asked to speak to Mr.

45

1　Williams, because he's like the senior officer
2　on our shift. He, you know, had worked here a
3　long time.
4　　　　So I asked him, I said, "Well, Mr.
5　Williams, what do I need to do?"
6　　　　He said, "Well, Trent's over in his
7　office. Call Mr. McCluskey." So he said,
8　"When you get back to the jail, just go over
9　and tell him what happened and, you know,
10　everything and explain everything to him."
11　　　　So I did, and Mr. McCluskey told me,
12　"Oh, buddy, it's okay. Don't worry about it.
13　Stuff like that happens. It happens to the
14　best of us."
15　　　　And I was told to write a report on
16　it and I didn't think nothing would come much
17　of it. That was it.
18　Q.　Was Mr. Madison eventually captured?
19　A.　Yes, ma'am.
20　Q.　Who picked him up?
21　A.　A county deputy. I think it was Mr.
22　Knight, Deputy Knight.
23　Q.　Okay. Had you ever gone to work

46

1　release to pick up an inmate before?
2　A.　I can't say that I had. I believe
3　this was my first time, like I said, because I
4　had just come to this particular shift. And
5　this shift here, second shift is a lot
6　different than third shift. It's like third
7　shift is a little more, I guess you would say
8　laid back and a little more quieter, because
9　they're asleep at night most of the time, you
10　know, and --
11　Q.　Had you ever transported an inmate?
12　A.　Yeah, I've went on a transport with
13　another officer, yes, I have.
14　Q.　Had you ever transported an inmate
15　for medical care while you were working for
16　third shift?
17　A.　Yes, I've taken inmates to the
18　hospital out here.
19　Q.　What is the policy or is there a
20　policy in place regarding transporting inmates?
21　A.　Well, they're supposed to be cuffed,
22　I mean, you know.
23　Q.　Okay. Is it the policy that anytime

47

1　an inmate is transported from one place to
2　another, that they are in cuffs?
3　A.　Right.
4　Q.　And you did not cuff Mr. Madison
5　that day; correct?
6　A.　I forgot my cuffs, as I said, you
7　know, with no one reminding me from booking
8　either, you know, at that time. I'm trying to
9　be totally honest with you here as I possibly
10　can, you know.
11　Q.　Well, Mr. Chapman, did you violate
12　County policy or the policy of the Walker
13　County Jail when you failed to cuff Mr. Madison
14　to transport him?
15　　　　MR. SAXON: Object to the form, to
16　the extent it assumes facts not in evidence and
17　calls for a legal conclusion. You can answer.
18　　　　THE WITNESS: Do you want me to
19　answer?
20　　　　MR. SAXON: Yeah.
21　A.　As I said, I forgot my cuffs, so, I
22　mean, I assume that that was against policy.
23　Q.　(By Ms. Dowdy) Okay. Was it your

48

1　understanding, the day you went to pick him up
2　from work release, that there was a policy in
3　place that inmates had to be handcuffed when
4　they were being transported?
5　A.　Yes.
6　Q.　Okay.
7　A.　But let me say this, ma'am. Like I
8　said, you know, things was kind of hectic at
9　that time. There was a lot going on and things
10　was like (indicating), you know, like that, and
11　I'm trying to do more than one thing at one
12　time, and you know how when you're doing more
13　than one thing. Sometimes you may forget
14　something. So I'm a human, you know, so honest
15　mistake on my part, though. But as I said, Mr.
16　Madison had never given me a day's trouble, you
17　know.
18　Q.　When you started work for the
19　sheriff's department, were you given a jail
20　policy and procedure manual?
21　A.　No, I wasn't given one. I asked for
22　one. I inquired about one.
23　Q.　Okay.

49

1     A.     And then my lieutenant told me where
2 they were at and he said, "Well, you can find
3 them over in the hallway, in a box.  Just go
4 over and get you one," so that's what I did.
5     Q.     Were y'all told to become familiar
6 with the policies and procedures?
7     A.     He told me that I should read over
8 it.
9     Q.     And did you do that?
10    A.     Yes, I did.
11    Q.     Did you have any other -- well, let
12 me ask you this, Mr. Chapman:  When you became
13 a full-time employee, full-time jailer, did you
14 ever have an inmate accuse you of excessive
15 force?
16    A.     No, not -- no one besides Decatur.
17    Q.     So during the whole time you had
18 been here, been employed here, even as a
19 part-time jailer, did you ever have an inmate
20 accuse you of excessive force?
21    A.     Not that I know of.  No one said
22 nothing to me if I did.
23    Q.     Were you ever made aware of an

50

1 investigation of an incident that had occurred
2 at the hospital where an inmate or actually a
3 hospital employee said that --
4     A.     Oh, yeah.  That didn't happen.
5     Q.     Well, let me ask you this:  Were you
6 ever made aware of that incident, of that
7 allegation?
8     A.     No, I wasn't made aware of it.  I
9 heard about it through another co-worker that
10 perhaps upon me taking -- well, going to the
11 hospital with said inmate, I think his name
12 was -- I forget his name.  The older gentleman.
13 I think his name was George, first name --
14 George Foust.  That's his name, yeah, yeah.  A
15 co-worker of mine asked me did I know anything
16 about some rude treatment, I guess, that he
17 received or anything.
18        And I said, "No.  What are you
19 talking about?"
20        And he told me, he said, "Well,
21 someone said, you know, that such and such
22 happened."
23        And I said, "No, I don't know -- you

51

1 know, I don't know what you're talking about."
2        I know I went out there one day to
3 sit with a guy.  I had been sitting with him
4 like three days straight.  About the fourth day
5 I was sent out to there to sit with the guy, I
6 was told by another officer, Mr. DeVito, that
7 Mr. McCluskey said to come back to the jail.  I
8 asked Mr. DeVito why and he said he didn't
9 know.  He said Mr. McCluskey said come back to
10 the jail.
11        So I said, "Okay, fine, back to the
12 jail."
13        Now, upon me sitting with him one
14 day, he -- inmates tend to get a little -- I
15 guess you would say when they get away from the
16 jail, they tend to get a little arrogant and
17 everything and think that they can do what they
18 want to do, because -- they just think they
19 can, you know.
20        So I believe the t.v. was on in the
21 room where I was sitting and watching him, and
22 the other officer had left and I was relieving
23 the other officer.  So I changed the t.v. and

52

1 he got upset because I changed the t.v. and
2 went to cussing and going on.
3        And I told him, I said, "Well, now,
4 you're not even really supposed to be watching
5 the t.v."  I said, you don't have t.v. there at
6 the jail, and according to Sheriff Tirey, you
7 won't have it, so I don't have to let you watch
8 it."  I said, "I can just turn it off."  I
9 said, "Because the t.v. is here for my
10 enjoyment anyway, not yours."  And that was
11 what I stated to the inmate and that was it.  I
12 mean, but I wasn't ugly with him or anything.
13    Q.     Never touched him?
14    A.     No, no.
15    Q.     Any of the staff at the hospital say
16 anything to you about it?
17    A.     No, no one said nothing to me about
18 anything.  That's why I said it never happened.
19 I don't know what you're talking about.
20    Q.     Other than Mr., is it Decatur?
21    A.     Yeah.
22    Q.     Or is his last name Parrish?
23    A.     Joseph Decatur Parrish or something

**53**

1  like that.
2       TRENTON McCLUSKEY: It's Decatur.
3    Q.  (By Ms. Dowdy) Decatur. Is that
4  the only inmate that you are aware of that ever
5  accused you of excessive force, to your
6  knowledge?
7    A.  Yeah, to my knowledge.
8    Q.  Okay. You said the incident with
9  Mr. Decatur happened on November the 2nd of
10  2008?
11   A.  Yes, ma'am.
12   Q.  Tell me what happened on that day.
13   A.  That particular day, a fight ensued
14  between said inmate Decatur and myself. He was
15  ranting and raving about wanting to go back to
16  B-dorm, B-dorm or -- no, he was in C-dorm. My
17  mistake. He was in C-dorm and he was wanting
18  to go back to C-dorm.
19   Q.  Where was he on November the 2nd of
20  2008?
21   A.  Oh, he was in M-dorm this particular
22  day. But what I'm trying to tell you, he was
23  placed in M-dorm by me and another officer,

**54**

1  because the few days prior to that, he was
2  having trouble with other inmates down on the
3  pod. They were calling him baby raper. Mr.
4  Decatur is a second offender, and so other
5  inmates took exception to that and was calling
6  him names and everything. And he tore the top
7  off the dayroom table and slung it and busted
8  glass, shattered it on both sides of the
9  dayroom.
10       So the officer in the cubical,
11  control room told me and the other officer,
12  "Hey, y'all get down here. This guy's tearing
13  the jail up. He needs to be gotten out of
14  here."
15       So we went down to find out what was
16  going on and he was pitching a fit and
17  everything.
18       And he was like, "Well, they're
19  calling me baby raper and this and that."
20       And we were like, "Well, hey, dude,
21  you're in jail, I mean, you know. But we can
22  take you out of here and we're going to have to
23  take you out of here, because you're not able

**55**

1  to get along with the rest of these people in
2  here." So we took him to M-dorm.
3    Q.  So he was moved from C-dorm to
4  M-dorm?
5    A.  Right. And usually sex offenders
6  are housed in X-dorm, which is upstairs, but I
7  believe there was something about a hole being
8  in a wall or something. Mr. McCluskey can tell
9  you more about that, so --
10   Q.  But y'all moved Mr. Decatur to
11  M-dorm?
12   A.  Yes, for his own protection, mind
13  you.
14   Q.  Right. And do you remember what
15  time period this was or how close to it was
16  before November the 2nd?
17   A.  It was a few days before, probably
18  about the end of October, I would say.
19   Q.  And on --
20   A.  Because I came back to work, I
21  think, that Sunday. I'm thinking this happened
22  on a Sunday, November the 2nd, 2008, when the
23  fight ensued, him against me.

**56**

1    Q.  Okay. And so he is in M-dorm?
2    A.  Right.
3    Q.  And then it's my understanding they
4  are locked down 23 hours a day?
5    A.  Yeah.
6    Q.  Is that what you testified to
7  earlier?
8    A.  That's what I said, yes, ma'am.
9    Q.  All right. So what were you doing
10  in M-dorm?
11   A.  Well, I was feeding in there. I was
12  feeding inmates. I had just got through
13  feeding them and put up the trays and
14  everything, closed up the bean holes. And
15  prior to that, before feeding him, I have to
16  pass out store forms, because they get store.
17  And so Mr. Decatur asked me for a commissary
18  list. That is a list of items that's all on
19  store, you know, like what you get, like Lays
20  Potato Chips, Snickers candy bars, you know,
21  Kool-Aid packs, stuff like that, commissary
22  items.
23   Q.  How would you give them their forms?

57

1    A.    Well, usually, sometimes you might
2  be able to slide them up under the door, if
3  they don't have nothing under the door blocking
4  the crack from you shooting it under there to
5  them, you know. But this particular time --
6  sometimes they keep towels up under the door or
7  whatever, I guess, to keep the air out of the
8  cell or whatever. I don't know. I don't know
9  their reason for doing it. But he asked for
10  the store form. I didn't think nothing of it,
11  I mean, the commissary list, so I call for the
12  door, to hand it to him, going to give it to
13  him. He comes out on me, plain and simple.
14          (Whereupon, Defendant's Exhibit
15          Number 2 was marked for
16          identification.)
17    Q.    (By Ms. Dowdy) Let me show you what
18  I'm going to mark as Defendant's Exhibit 2. Do
19  you recognize this, Mr. Chapman?
20    A.    Oh, yeah, I recognize that.
21    Q.    Okay. What is that?
22    A.    "There should be two officers
23  present at all times when opening cell doors in

58

1  M-dorm, no exception." We all know that, you
2  know. But if I'm in M-dorm, I can't open the
3  door and I'm not in the control room, so that's
4  impossible. I can't be in two places at one
5  time, see.
6    Q.    Who called for the door to be opened
7  that day?
8    A.    I called for the door to be opened,
9  but I'm telling you I can't open and push the
10  button and literally open the door and be in
11  there with him too. That's just not possible.
12    Q.    Do you remember who was in the
13  control room that day, November 2nd?
14    A.    Yes, I do.
15    Q.    Who was that?
16    A.    Jerry Williams.
17    Q.    Okay. So what happened after the
18  door was opened?
19    A.    He came out on me and a fight
20  ensued.
21    Q.    Okay. Can you tell me what
22  happened?
23    A.    Yeah, I'm getting pummelled, hit all

59

1  upside the head, shirt pulled off over my head.
2  I couldn't see him. He was punching me all in
3  the head and face and everything, and I'm just
4  trying to keep my hands up, to keep him off me
5  at that point in time.
6          And he was on me, so I got to my
7  spray and I sprayed him, and that seemed to
8  have no effect on him. He just kept coming.
9  And so at that time, I finally was able to kind
10  of get my balance and kind of get him pushed
11  off me. By then, he had ripped my shirt off
12  and I had no shirt on. And when the other
13  employees, my co-workers came in there, I'm in
14  there in my underwear, because my pants had
15  slipped down to my ankles by then, you know,
16  so --
17    Q.    Had you called for help?
18    A.    No, I couldn't call for help. I
19  lost my radio in the process of this scuffle.
20  Mr. Williams saw what was happening and he
21  hollered for help. He called a code red.
22    Q.    And what's a code red, Mr. Chapman?
23    A.    That means all officers need to get

60

1  to the immediate scene as quick as possible,
2  inmate fighting a guard.
3    Q.    So what other co-workers came in the
4  M-dorm?
5    A.    You had Ms. Clifton, you've got Ms.
6  Killingsworth, you've got Ms. Phillips, you've
7  got Ms. Harper.
8    Q.    What happened when your co-workers
9  got in there?
10    A.    Well, when they got in there, he was
11  tased. When he was tased by Ms. Clifton, he
12  fell like, you know, in a butt position, kind
13  of sitting in front of the cell door, but he's
14  still aggressive. He's still trying to get up
15  and come at me, and I don't know if he's going
16  to come at them or not. So by that time, I
17  retrieved my baton off the floor, struck Mr.
18  Decatur across the knees, here (indicating),
19  center mass, and the last place I struck him
20  was across the forehead.
21    Q.    How many times did you hit Mr.
22  Decatur?
23    A.    Maybe three, four, maybe. I'm not

61

1   sure. I really don't recall. But I know he
2   would not quit. He would not stop fighting
3   until he got that last lick across the head.
4   When he saw that he was bleeding, he said, "I
5   quit. I give up." That was his words.
6       My -- this is my scenario of the
7   whole thing. I'm trying to protect myself and
8   preserve human life, as well as these four
9   females I'm in there with. I'm worried about
10  their safety, just as well as mine. Mr.
11  Decatur's a sex offender. Hey, I don't know
12  what he would have did if he could have got
13  loose and got one of them and dragged them in
14  the cell, so I'm looking out for their best
15  interest too. Somebody had to gain control of
16  the situation. Mr. Decatur was not cuffed. He
17  was not subdued in any way. He was still
18  aggressive and trying to fight. That was the
19  only reason he was struck with that baton like
20  that.
21      Q.   He had already been tased at the
22  time you hit him?
23      A.   He had already been tased, but he

62

1   was still trying to get up and fight.
2       Q.   Were you aware that he was still
3   connected to the taser wires at the time you
4   struck him?
5       A.   Well, yeah, he was, but the taser
6   misfired when she first fired it.
7       Q.   Okay. He had actually been tased,
8   though, at the time you struck him?
9       A.   He was tased, ma'am. That's what
10  I'm telling you.
11      Q.   Okay.
12      A.   But, you know, the taser works like
13  this. If you don't get the probes all the way
14  deep into the skin, they might not hook up and
15  connect too good. Maybe she didn't hit him
16  directly and maybe they didn't go all the way
17  into him. Maybe only one of them went into
18  him. That's what I'm telling you. So he was
19  still being aggressive and trying to get up and
20  come at me and them too.
21      And prior to all this happening, the
22  one male officer that could have been here to
23  help me, she sends this officer, Nick Harbin,

63

1   to fill up a van with gas. I think those are
2   poor judgment calls on her part.
3       Q.   Who are you talking about?
4       A.   Ms. Harper. Now, you've got four
5   females there, including yourself, and one of
6   y'all can't go put gas in a county van and you
7   send my only help away from the jail and leave
8   me hanging out to dry like that. And that was
9   the only other male officer here, because Mr.
10  Williams is confined to the control room,
11  because he cannot take a blow to his neck,
12  because it would kill him. He's an older
13  gentleman and he ain't supposed to be scuffling
14  and fighting. He apologized to me that day.
15  He told me he was so sorry. He said he wished
16  he could have helped me. That was his words to
17  me, Mr. Williams.
18      Q.   Would this have happened if you had
19  had two officers when the M-dorm cell was
20  opened?
21      MR. SAXON:  Object to the form, to
22  the extent it calls for speculation. You can
23  answer.

64

1       A.   I don't know. I asked Ms. Harper to
2   come in there before this occurred. She told
3   me over the radio if it wasn't urgent, she
4   wasn't coming.
5       Q.   You asked her to come into where --
6       A.   Prior, into M-dorm where this took
7   place, before this happened. And she told me
8   if it was not urgent, she was not coming. I
9   had asked her to come in there and speak to two
10  more inmates that was upstairs, because they
11  were having problems. One of them was gay and
12  the other guy is heterosexual. One was white
13  and one's black. Well, the gay guy was black.
14  The white guy, he's heterosexual. He didn't
15  want the gay guy in the cell with him.
16      He told me, "Hey, man, if you don't
17  get him out of here, there's going to be a
18  problem. Me and him ain't going to be able to
19  stay in here together."
20      So I told him, I said, "Well, okay,
21  I can't move you on my own, unless I call her
22  and ask her if it's all right to move you."
23      We got a memo from moving people

**65**

1  from cell to cell and from dorm to dorm, doing
2  stuff like that without going through the
3  proper channels. We're not to allow inmates to
4  go to another dorm, from A to B, to cut another
5  inmate's hair or stuff like that. We're not
6  allowed to just move them from cell to cell
7  just because they want to, can't do it.
8      Q.    All right.
9      A.    So I had to have her to tell me that
10 I could do it and that it was okay, but she
11 never bothered to come in there, and that was
12 just a few minutes before this fight ensued
13 with Decatur. Had she been there, I don't know
14 what -- I mean, you know, had she been there,
15 hey, this might not have happened. I don't
16 know. I can't say.
17     Q.    The two inmates that you're talking
18 about that you -- that were upstairs -- Mr.
19 Decatur was not upstairs, was he?
20     A.    No, Mr. Decatur was downstairs.
21     Q.    Downstairs. And it was not these
22 two inmates that you had the fight with. It
23 was Mr. Decatur; correct?

**66**

1      A.    Right, right.
2      Q.    Okay. Was there anybody else being
3  housed in the cell with Mr. Decatur?
4      A.    Yes, there was.
5      Q.    Who was the other inmate?
6      A.    He was a Bureau of Prisons inmate.
7  His name was -- oh, what is that guy's name? I
8  don't know his name now. He was a black guy,
9  light skinned fellow, tall, kind of slim. I
10 forget his name, though, but I wrote his name
11 down. He never came out of the cell at all,
12 though, because he knows that they're not
13 supposed to leave the cell. All inmates know
14 that they're not supposed to leave the housing
15 area unless instructed by staff.
16     Q.    After this incident, did you have to
17 have any type of medical treatment?
18     A.    I didn't receive any medical
19 treatment. I wasn't offered any medical
20 treatment.
21     Q.    Did you need any medical treatment?
22     A.    I don't know.
23     Q.    Did Mr. Decatur have to have medical

**67**

1  treatment?
2      A.    Yes, he did.
3      Q.    Do you know what kind of medical
4  treatment he had?
5      A.    A few stitches across the head, I
6  believe. They were not concerned if I needed
7  medical treatment. I was not asked if I was
8  okay. I was not asked did I need to go to the
9  hospital and at that time, I did not know that
10 I could leave the jail, take it upon myself to
11 just go get checked out.
12         But when I got home that next
13 night -- I mean that night, when I got off of
14 work, I noticed the next morning when I woke
15 up, I'm all red up here (indicating), I've got
16 scratches on me and everything.
17         I didn't have no shirt on and my mom
18 saw me and she said, "What happened to you?"
19         And I told her, "Well, I was in a
20 fight."
21         And I was sore all over, felt like
22 somebody had taken a hammer or something and
23 hit me in all my joints or something. Well,

**68**

1  I'm sore because I'm wrestling, tussling with
2  him during the fight.
3         Mr. Williams told me, he said, "Man,
4  I don't know how you did it, how you got that
5  guy back over to that cell." Because we fought
6  all the way from the cell over to the dayroom
7  table, to the middle of like the dayroom and
8  M-dorm. He said, "I don't know how you got him
9  back over there."
10         I said, "Well, I don't know how I
11 got him back over there either. I couldn't
12 even see him. I had my shirt over my head.
13 I'm just trying to keep him off me, trying to
14 push him off (indicating)."
15     Q.    Do you know whether an investigation
16 was done about this incident?
17     A.    Yeah, the same day it happened.
18     Q.    Do you know what investigator was
19 called to do the --
20     A.    Darrell Mote. I know that inmate's
21 name, Ronald Grant.
22     Q.    Ronald Grant?
23     A.    Yes. That's the inmate that was in

**69**

1  the cell with Mr. Decatur.

2    Q.  Do you know if he saw any of the

3  incident between the two of you occur?

4    A.  He saw the whole thing. All the

5  other inmates did too. They encouraged him to

6  kick my ass. That's what they told him, "Kick

7  his ass, get him, fat B, fat bastard, get him."

8  That's what all the other inmates in M-dorm

9  encouraging Mr. Decatur to get me, urging him

10  on.

11    Q.  So Mr. Mote did an investigation?

12    A.  Yes, he did.

13    Q.  And were you subsequently

14  terminated?

15    A.  November the 7th. I believe that's

16  on a Friday, if I'm not mistaken. This

17  happened on a Sunday. I come to work that

18  Friday, Mr. McCluskey hands me a piece of paper

19  and says, "You can go, bud. This is what we've

20  got."

21     I said, "Well, I guess you need your

22  radio." I sat it on his desk and I left. Ms.

23  Kelly Godfrey was in his office with him.

**70**

1    Q.  Who was?

2    A.  Ms. Kelly Godfrey.

3    Q.  What was your understanding of why

4  you were being terminated?

5    A.  Whatever the paper said. All I

6  know, I was being terminated for misconduct or

7  something, excessive force or something, using

8  the baton or something.

9     (Whereupon, Defendant's Exhibit

10     Number 3 was marked for

11     identification.)

12    Q.  (By Ms. Dowdy) Let me show you what

13  I've marked as Defendant's Exhibit 3. Is this

14  a copy of the letter you received terminating

15  you from employment with the Walker County

16  Sheriff's Department?

17    A.  Yeah, this looks like the one I got.

18    Q.  Okay. What was your understanding

19  of why you were being terminated?

20    A.  I didn't understand why I was being

21  terminated, to be quite frank with you.

22    Q.  Did you have a conversation with Mr.

23  McCluskey that day that you were terminated?

**71**

1    A.  No, except for him giving me the

2  paper and telling me that, "This is what we've

3  got," and that I could talk to the sheriff if I

4  wanted to about it.

5     And I said, "Well, where is he at,

6  Mr. McCluskey?"

7     He said, "Well, I don't know. You

8  know how he is. You may see him today, you may

9  see him tomorrow, you may not see him for a

10  week or so."

11     I said, "Well, okay." He said, "But

12  if you want to talk to him, you're welcome to

13  come talk to him." I said, "Well, all right.

14  Thank you," laid the radio down and I left.

15    Q.  Did you ever have a conversation

16  with Sheriff Tirey about the reason you were

17  terminated?

18    A.  Finally.

19    Q.  And when was that?

20    A.  March of 2009.

21    Q.  Where were you when you talked to

22  Sheriff Tirey?

23    A.  Upstairs in his office.

**72**

1    Q.  And what did he tell you?

2    A.  Well, when I talked to him, pretty

3  much, he told me that their insurance paid Mr.

4  Decatur $10,000.00 and he didn't agree with it,

5  he said, but they did, and Mr. Decatur got out

6  of jail. And Mr. Tirey pretty much told me, he

7  said, "Well, if I was you, I'd sue."

8    Q.  Did he tell you why?

9    A.  I guess because I had been

10  wrongfully fired, ma'am. I don't -- I mean,

11  you know, I can't put words in the man's mouth.

12  I'm just telling you what he told me.

13    Q.  Okay. Did you ask him what you

14  needed to sue for?

15    A.  For wrongful termination. That

16  would be my reason for suing.

17    Q.  Okay. Why do you think you were

18  terminated, Mr. Chapman?

19    A.  I don't know. This paper really

20  doesn't describe much, you know. It says

21  something about a probationary period. I don't

22  see anything the here about -- nothing about me

23  using excessive force with a baton or nothing.

73

1  I don't know. I ain't got a clue.
2      Q.   You don't have any explanation as to
3  why you were fired?
4      A.   No, because all I was doing was
5  defending myself and my co-workers. Pretty
6  much to state the most obvious, as I see it, I
7  mean, I'm in there were four women. I mean,
8  come on, this guy, he's still aggressive,
9  trying to fight. I mean, somebody's got to get
10  control of the situation.
11      Q.   Do you think you were terminated
12  because of the use of excessive force?
13      A.   I don't -- I really don't know,
14  ma'am. I mean, I don't know. I mean, you'd
15  have to ask them what was their reason for
16  terminating me. I don't know.
17      Q.   Do you think it was because of your
18  race?
19      A.   That could play a part.
20      Q.   Okay. How?
21      A.   Well, to be quite honest with you,
22  Sheriff Tirey also told me this: He said,
23  "I've hit inmates in the head with my baton."

74

1           And I'm thinking to myself, "Well,
2  now, he's hit inmates in the head with his
3  baton and I've done hit an inmate in the head
4  with my baton, but I'm fired."
5      Q.   Who made the decision to terminate
6  you?
7      A.   Mr. Tirey signed the paper, but he
8  also told me that Mr. McCluskey told him, "Mr.
9  Chapman needs to go. He's going to be a
10  problem." That was his words to me.
11      Q.   But do you know who made the
12  ultimate decision to fire you?
13      A.   I guess Mr. Tirey. He signed the
14  paper.
15      Q.   And --
16      A.   But he told me he was only going on
17  the word of his jail administrator. That was
18  his comment to me.
19      Q.   So what facts do you have that would
20  support any allegation that Mr. -- or that
21  Sheriff Tirey fired you because of your race?
22      A.   I just gave you an example, ma'am, I
23  mean, and I've talked to other officers. My

75

1  lieutenant, Randy Brown, he also told me the
2  same thing out of his mouth. He said, "Oh,
3  they fired you for that?" He said, "I've hit
4  people in the head with my baton and they
5  didn't fire me." That was his words to me.
6      Q.   Okay. What is Randy Brown's race?
7      A.   He's white.
8      Q.   Did he tell you about any of the
9  facts surrounding that incident?
10      A.   No, he didn't go into detail. He
11  just told me, he said, "Oh, you ain't done
12  nothing bad." He said, "I've done that. They
13  fired you for that?" I said, "Yeah, I'm
14  fired."
15      Q.   Do you know whether, when Mr. Brown
16  had used his baton on an inmate, it was after
17  that inmate had already been tased?
18      A.   I don't know. He did not go into
19  detail with me about it. I just bumped into
20  him somewhere one day and he was asking me
21  about the jail and am I still working here,
22  and I told him, "No."
23           He said, "Why not?" I said I had

76

1  been fired. He said, "What did you get fired
2  for?" And then I told him and he said, "Oh,
3  I've done that." He said, "They didn't fire
4  me." That was his words.
5      Q.   Any other officers that you're aware
6  of that used their baton on an inmate and were
7  not terminated?
8      A.   Yes, so I was told by other
9  co-workers.
10      Q.   Okay. Who else --
11      A.   Which he is terminated now, but he
12  was given like three chances before he was
13  terminated. His name was Sam Sherrer. He was
14  sent to anger management, he was suspended, and
15  the last time he was fired. And they said he
16  literally sat on top of an inmate and took his
17  baton and beat the inmate in the head
18  repeatedly. I did nothing of the sort.
19      Q.   That's what you were told; correct?
20      A.   That's what I was told by co-workers
21  of mine.
22      Q.   Did you witness that?
23      A.   No, ma'am, I didn't.

77

1    Q.    What is Mr. Sherrer's race?
2    A.    White.
3    Q.    Was Mr. Sherrer an employee here
4  when you were here?
5    A.    No, ma'am.
6    Q.    Have you ever had --
7    A.    But the people that told me that
8  were employed here when I was here. I'm trying
9  to be as honest with you as I possibly can. I
10  have no reason to lie.
11    Q.    Any other officers that you're aware
12  of that had any physical altercations with
13  inmates that were still employed?
14    A.    Say that again.
15    Q.    Any other officers that you're aware
16  of that had a physical altercation with an
17  inmate that did not lose their job?
18    A.    While I was employed?
19    Q.    No, that you're aware of.
20    A.    Other than the three I named?
21    Q.    Randy Brown, Sam Sherrer?
22    A.    And Sheriff Tirey. I told you --
23    Q.    Sheriff Tirey is an elected

78

1  official. I'm talking about employees.
2    A.    Well, no, not that I know of.
3    Q.    Before this incident with inmate
4  Decatur, you had used your baton on another
5  inmate; correct?
6    A.    Right, the one I told you about,
7  Daniel Ryan, the one who kicked me in the chest
8  and tried to spit in my face.
9    Q.    All right. And you were not
10  terminated for that incident; correct?
11    A.    No. What I'm trying to get my point
12  across to you is, ma'am, I didn't do anything
13  malicious to Mr. Decatur. It wasn't a Rodney
14  King beating or nothing like that. I struck
15  him one time in the forehead and that was it.
16  I didn't repeatedly beat him or nothing, and
17  the baton was not used as a weapon against my
18  co-workers or nothing.
19    Q.    Maybe I misunderstood. I thought
20  you told me you struck him three to four times.
21  Did you --
22    A.    I didn't tell I hit him in the head.
23  I told you I hit him in the kneecaps, once

79

1  across center mass here (indicating), and then
2  the last lick was across the forehead.
3    Q.    I mean three to four times in
4  general. One time he was struck in the head;
5  correct?
6    A.    One time.
7    Q.    Okay. And the other times were to
8  other parts of his body?
9    A.    Chest area, maybe shoulders area and
10  legs.
11    Q.    But a total of three to four times?
12    A.    Yeah, I would say, I guess, three to
13  four times. I really don't remember per se how
14  many times, but I couldn't tell you how many
15  times he cold fist punched me in the head,
16  because I couldn't see him.
17    Q.    And I don't imagine you were
18  probably counting either, were you?
19    A.    No.
20    Q.    Mr. Chapman, you have sued Sheriff
21  Tirey and Mr. McCluskey and actually Walker
22  County for race discrimination. Tell me every
23  fact you have to support your allegation that

80

1  you were terminated because of your race.
2    A.    I would say so. I mean, a
3  lieutenant, former lieutenant told me he wasn't
4  terminated for doing the same thing, I mean,
5  you know.
6    Q.    And that was Randy Brown?
7    A.    Randy Brown. And then I was told of
8  the other incident, Mr. Sherrer, and he was
9  given a chance to go to anger management. He
10  was suspended. And I got none of those
11  opportunities. That's what I'm trying to tell
12  you. If I'm such a bad officer or whatever --
13  I didn't want to sue these people. Let me make
14  that very clear up front. I also told Mr.
15  Saxon that. I tried to talk to them and make
16  all amends I could with them. I went and
17  talked to Bruce Hamrick, went and talked to
18  Senator Charles Bishop, went and talked to Mr.
19  Tirey finally, when I could finally catch up
20  with him. I went and talked to Andrew Archie,
21  the head of the --
22    Q.    Hold on. Let's go back. Who did
23  you talk to? You talked to Sheriff Tirey. I

81

1  know we talked about that. Who else did you
2  talk to?
3      A.    I talked to Senator Charles Bishop
4  too about this incident.
5      Q.    What did you talk to Mr. Bishop
6  about?
7      A.    I just explained to him what
8  happened and everything.
9      Q.    What did he tell you to do?
10     A.    He basically asked me did I plan on
11 living around here and did I plan on having any
12 children around here and I told him, "Well, I
13 don't know, maybe."
14     Q.    And why did you tell him you thought
15 you were terminated?
16     A.    I told him I thought I was
17 wrongfully terminated.
18     Q.    But did you tell him why you thought
19 that way?
20     A.    I just explained to him what
21 happened, exactly what happened, the incident
22 and everything.
23         And he -- when I told him that, he

82

1  said to me, "Well, seems like something ain't
2  quite right."
3      Q.    Did you tell him you thought you had
4  been terminated because of your race?
5      A.    I guess you could say that.
6      Q.    No, did you tell him that?
7      A.    I said I guess you could say that.
8      Q.    Okay. You're telling me you guess I
9  could say that. I don't want to say that. Did
10 you tell him that or not, yes or no?
11     A.    I explained to him exactly what
12 happened, just like I explained it to you, and
13 I showed him the reports and stuff, and he told
14 me something wasn't quite right about this
15 situation.
16     Q.    Okay. Let me ask you again, Mr.
17 Chapman. Did you tell Senator Bishop that you
18 thought you had been terminated because of your
19 race?
20     A.    I guess, yeah, yeah, you could say
21 that, yeah. I'd say yes to that.
22     Q.    Okay. Who else did you talk to?
23     A.    Okay. Senator Bishop, Sheriff

83

1  Tirey, Andrew Archie.
2      Q.    Who is Andrew Archie?
3      A.    He's the president of the Civil
4  Service Board. Bruce Hamrick, the man that
5  signs our checks.
6      Q.    When you talked to Mr. Archie, where
7  were you?
8      A.    Well, I was over at the monument
9  place, over there at the Gates Monuments.
10     Q.    What did you tell Mr. Archie?
11     A.    I just told him what happened,
12 exactly what happened, like I'm telling you,
13 and he pretty much just listened and, you know,
14 nodded and asked me, "What are you saying? You
15 want to file a grievance? What are you saying?
16 You want to file a grievance?" But according
17 to their handbook, Civil Service Board
18 handbook, I didn't have a right to file a
19 grievance because I'm, quote, "on a six month
20 probationary period."
21     Q.    Did you tell him you thought you had
22 been terminated because of your race?
23     A.    I told him I thought I had been

84

1  wrongfully terminated.
2      Q.    Did you tell him on what grounds?
3      A.    I explained to him what happened and
4  everything, so I guess you could say yeah, I
5  did.
6      Q.    Who was the other person you talked
7  to? Bruce?
8      A.    Bruce Hemrick.
9      Q.    And he is a commissioner?
10     A.    He's the head of the County
11 Commission over there, signs our paychecks.
12 Well, he used to sign mine. He don't sign
13 mine.
14     Q.    What did you tell Bruce?
15     A.    I explained the situation to him and
16 told him about the fight and everything with
17 the inmate, and he told me he'd try to talk to
18 Sheriff Tirey about it and see if he could help
19 me get my job back. Never heard a thing from
20 him since the day I talked to him.
21         Every day I called up here to speak
22 to Mr. Tirey, he was either busy or this or
23 that. Mr. Tirey also told me that the best he

85

1  could do for me was to give me my job back
2  part-time. I told him no, I didn't want that.
3  I wanted what I had when I left here, because I
4  felt I was wronged. I never should have been
5  fired anyway.
6         He said, "Well, I can't do that."
7    Q.   Did he ever offer you a full-time
8  position?
9    A.   No.
10   Q.   Did he ever offer you a part-time
11 position?
12   A.   He said the best he could do, he
13 might could get me my job back part-time. But
14 every time I called him, he told me, he said,
15 "Well, keep in touch with me. Keep checking
16 back." Every time I called him, I never could
17 get ahold of him or nothing, or he was so busy,
18 so I never got my job back.
19   Q.   Did you tell Commissioner Hemrick
20 that you thought you had been terminated
21 because of your race?
22   A.   I told him I thought I had been
23 wrongfully terminated.

86

1    Q.   Do you think you were terminated
2  because you used excessive force?
3    A.   I did not use excessive force. I
4  have a right to defend myself, ma'am.
5    Q.   Do you think you were terminated,
6  though, because somebody else viewed you as
7  having used excessive force?
8    A.   I don't know. I can't speak for
9  somebody else. You know what? I'm going to
10 say this: Mr. McCluskey never talked to me
11 about this incident at all, not from the day it
12 happened or nothing. And he set up there in
13 the investigator's room upstairs with the
14 investigator that particular day, sitting right
15 there beside him, across from him on the other
16 side of the table. I took my report up there.
17       I said, "Is there anything else?"
18       He said, "No, that's all, bud."
19       Well, I was told by Sheriff Tirey my
20 co-workers sold me out. Well, now, you tell
21 me, what's more important to them, their jobs,
22 having a family and having money in their
23 pockets every week or trying to help me? What

87

1  I'm trying to say is I don't see how I could
2  get a fair investigation from the get-go, not
3  with Mr. McCluskey sitting there.
4    Q.   Why do you say that? Do you think
5  Mr. McCluskey had something against you?
6    A.   A little incident occurred before
7  all this conveniently happened anyway between
8  me and Mr. McCluskey.
9    Q.   Okay. What happened?
10   A.   We had a phone conversation.
11   Q.   Okay. When was that?
12   A.   Around the end of October. It was
13 about a female kitchen worker.
14   Q.   Who was that?
15   A.   My ex-girlfriend, to be exact. Her
16 name's Paula Richardson.
17   Q.   Paula Richardson?
18   A.   Yes. She worked in the kitchen with
19 Ms. Ruby McCollum. She calls me from the
20 kitchen that particular day and tells me she's
21 had a bad day.
22       I'm like, "Well, what's wrong?"
23       So she tells me that Mr. McCluskey

88

1  has sent Ms. Becky Kimbrell and Ms. Laura Tirey
2  into the kitchen and been pulling out white
3  female inmates and trying to get them to say
4  that she's mistreating them differently,
5  opposed to the way she treats the one black
6  lady that's in the kitchen working, the female
7  inmate.
8        So I called Mr. McCluskey and I
9  asked him, I said, "Do you know anything about
10 this?"
11       He said, "No, what are you talking
12 about?"
13       I said, "Well, let me tell you about
14 it."
15       So when I begin to tell him about it
16 and everything, his reply to me was, "Are you
17 her boss? Are you her union president? Well,
18 you don't need to worry about what's going on
19 in the kitchen," and he hung up the phone on
20 me. And he also asked me was I her lawyer. I
21 replied no.
22   Q.   Okay. This was a conversation you
23 had on the phone with Mr. McCluskey?

89

1    A.    Yes. This happened first, before
2  the fight with Mr. Decatur. How conveniently
3  the fight with Mr. Decatur happens after this
4  phone conversation, just a few days later.
5    Q.    What did Ms. Richardson tell you was
6  going on in the kitchen?
7    A.    She said that the female officers
8  were coming in there all day long, off and on,
9  getting the kitchen workers out, trying to
10  question them and get them to say that she was
11  treating the white female inmates differently
12  than she did the one black female inmate.
13    Q.    Do you know who Ms. Richardson
14  worked for? Did she work for the sheriff?
15    A.    She works for ABL; she did.
16    Q.    What is that?
17    A.    That's a food service which in turn
18  worked -- that the county employs.
19    Q.    Did she tell you that Mr. McCluskey
20  had done anything to her?
21    A.    She told me, by no uncertain terms,
22  that the kitchen workers had been questioned
23  all day, off and on, by two female officers.

90

1    Q.    By Officers Kimbrell and Tirey?
2    A.    Right. And when I asked him about
3  it, he said he knew nothing about it. But when
4  I said, "Well, let me tell you about it," he
5  became upset, seemed like, a little aggressive.
6  And that's when he tells me all this other
7  stuff and then he hangs up the phone on me.
8        Then how conveniently, just a few
9  days later, November the 2nd, this fight
10  happens with me and the inmate. Follow the
11  pieces here? It's like I'm being set up.
12    Q.    Do you think somebody got Mr.
13  Decatur to get in a fight with you?
14    A.    Yeah.
15    Q.    Who do you think did that?
16    A.    I don't know.
17    Q.    Okay. Well, do you have any
18  evidence that somebody got Mr. Decatur to come
19  out of his cell and have a fight with you?
20    A.    You're going to -- I know you've got
21  the reports like I do. You're going to read
22  the reports. I mean, you know, I don't know.
23    Q.    What facts do you have to support

91

1  this allegation that you're making that they
2  set you up?
3    A.    Well, what I'm saying is, ma'am, I
4  didn't start having problems. Mr. McCluskey
5  was all right with me until I disagreed with
6  him about something. I was his buddy up until
7  then. He always told me anytime I had a
8  problem in the jail or if I saw some changes
9  that needed to be made in the jail that would
10  benefit the jail, speak up, let him know, he'd
11  help me with anything. He said, "Buddy,
12  whatever you need." He said, "If you've got a
13  problem or something, you want somebody to talk
14  to about it, you can talk to me."
15    Q.    And this phone conversation that you
16  had with Mr. McCluskey would have happened
17  when?
18    A.    Around the end of October. This
19  fight occurred on November 2nd.
20    Q.    The end of October being after
21  the -- what day?
22    A.    Around, I'd say the last week of
23  October.

92

1    Q.    Okay. So after the 20th?
2    A.    Yeah, I would say so.
3    Q.    At the time this phone conversation
4  happened, had you already had the incident with
5  the inmate where he escaped?
6    A.    Oh, yeah, that had already happened.
7    Q.    And had that alleged incident over
8  at the hospital already happened?
9    A.    That never happened.
10    Q.    Okay.
11    A.    I just told you that awhile ago. I
12  don't even know what --
13    Q.    And I said alleged incident.
14    A.    Yeah.
15    Q.    Do you know whether that had already
16  taken place?
17    A.    I don't even know nothing about
18  that.
19    Q.    Okay.
20    A.    I told you what I said, you know.
21  That was it.
22    Q.    Has anybody told you that you were
23  set up?

93

1    A.    I'm going to put it like this: I
2  feel that I was wronged.
3    Q.    Okay. I understand that you feel
4  that way, but I'm trying to find out if there's
5  anything that you -- any evidence you have that
6  would support your feeling that you were
7  wronged?
8    A.    Yeah, the fight. How conveniently
9  for it to happen after I had this phone
10  conversation with him. That's what I'm saying.
11    Q.    Did you ever talk to Mr. Decatur
12  after the fight y'all had?
13    A.    No, and he tried to sue me. Well,
14  he did sue me.
15    Q.    He sued you or he filed a claim?
16    A.    Well, the claim, suit, lawsuit,
17  whatever it was. He (indicating) brought the
18  papers to the house, Mr. McCluskey. Not to
19  mention I'm sick behind all this, after losing
20  my job and everything, on high blood pressure
21  medication and all types of medication. I've
22  got sleep apnea and just a whole lot of
23  sickness after all this, and I've got the

94

1  medical records to prove it.
2    Q.    Ms. Richardson was an employee of
3  ABL at the time you had this conversation with
4  Mr. McCluskey?
5    A.    Yes, yes.
6    Q.    And did you tell Mr. McCluskey that
7  you thought Ms. Richardson was being
8  discriminated against in some way?
9    A.    I didn't get the opportunity to tell
10  Mr. McCluskey nothing else. I asked him did he
11  know about the incident. When I went into
12  details to tell him about the incident and
13  everything, that's when he told me pretty much
14  it was none of my business, mind my own
15  business and asked me was I her lawyer, was I
16  her boss, was I her union president. And I
17  replied no to all of that and he hung up the
18  phone.
19    Q.    How long would you say you were on
20  the phone with Mr. McCluskey that day?
21    A.    What, maybe five, ten minutes,
22  maybe.
23    Q.    And during that time, you would have

95

1  been talking to him about the fact that these
2  white female officers were questioning inmates
3  about their treatment from Ms. Richardson?
4    A.    Correct.
5    Q.    Okay. Was it your understanding
6  that Ms. Richardson had been accused of
7  discriminating against some of the inmates
8  based on their race?
9    A.    That's what it sounded like. I
10  mean, and I was going to let him know that she
11  wouldn't do nothing like that, you know, and I
12  know this because I've been with her for 14
13  years.
14    Q.    Are you still dating her?
15    A.    No, not now.
16    Q.    But Ms. Richardson was not
17  complaining to you, let me make sure I
18  understand, that she was being discriminated
19  against; correct?
20    A.    She was telling me about she was
21  having a bad day, she was having problems that
22  day. That's what she was doing.
23    Q.    Okay. Did she tell you she felt

96

1  like she was being investigated for
2  discrimination?
3    A.    I didn't say that, ma'am. I told
4  you she called me on the phone and said she was
5  having a bad day and she started telling me
6  what happened. Because I said, "Well, what's
7  wrong?" because she was upset, and then that's
8  when she told me all about this, the inmates,
9  her story.
10    Q.    I'm just trying to make sure I
11  understand. She told you there were two white
12  officers who were questioning the inmates that
13  worked in the kitchen, trying to determine
14  whether or not she was mistreating them based
15  on their race?
16    A.    Right, prior (sic) to the way she
17  was treating the one black female that was in
18  there.
19    Q.    Did she tell you at the time that
20  she felt like anybody at the sheriff's
21  department was mistreating her based on her
22  race?
23    A.    All I can tell you is what I told

97

1  you she told me. That's all I know.
2      Q.    Okay. And that's all she told you?
3      A.    Yeah. Now, you can draw your own
4  conclusions or whatever. I don't know.
5      Q.    I'm not trying to draw any
6  conclusions. I'm just --
7      A.    I just know what she told me.
8      Q.    And I'm not trying to argue. I'm
9  just trying to make sure I understand what she
10  reported to you. Did she report to you that
11  anybody at the sheriff's department was
12  mistreating her?
13      A.    I -- like I said, I can only tell
14  you what she told me, and I told you what she
15  told me.
16      Q.    Okay. And you've told me everything
17  that she told you?
18      A.    Right.
19      MS. DOWDY: Okay. Can we take a
20  break real quick?
21      (Whereupon, a recess was taken.)
22      Q.    (By Ms. Dowdy) Mr. Chapman, who
23  trained you on use of a baton?

98

1      A.    I believe it was Sergeant Chris
2  Penley.
3      Q.    Were you taught when it was
4  appropriate to strike somebody in the head with
5  a baton?
6      A.    I guess that would be like if
7  drastic measures or something like -- you know,
8  like I said, this was a fight. I mean, you
9  know, I don't -- I really -- you would have to
10  be there. I mean, of course, if somebody's
11  attacking you, you're going to do what you can
12  to defend yourself, you know.
13      Q.    Okay. Is it considered deadly force
14  to strike somebody in the head with a baton?
15      A.    I don't know. It may be something
16  in the SOP book about that. I don't know. I'm
17  not quite sure.
18      Q.    In your training, though, that you
19  have received, did they teach you that if you
20  hit somebody in the head, that that could be
21  considered deadly force?
22      A.    Well, they really didn't talk much
23  about that, you know, at the class. I mean,

99

1  you know, it was they showed us the areas to --
2  you know, that we should try to focus on,
3  pretty much, I mean, you know. Apparently it's
4  frowned upon. I meant to say he was my
5  sergeant too, Chris Penley was, when I was on
6  third shift. I forgot about him.
7      Q.    Well, what would be the difference
8  between deadly force, in your opinion, and
9  nondeadly force?
10      MR. SAXON: Object to the form, to
11  the extent it calls for a legal conclusion.
12  You can answer.
13      A.    I guess I would say deadly force
14  would be if the -- my life is threatened, I
15  guess, you know. They didn't see the whole
16  fight. Nobody really saw the whole fight but
17  me. I'm in there by myself. They only saw
18  what ensued towards the end of the fight. Mr.
19  Williams could see from a certain distance what
20  he saw, but hey, this guy, by no means was he
21  being nice to me, you know, at all. This was a
22  fight, I mean literally a fight.
23      I just want to say I loved my job.

100

1  This was the best job I had had in my whole
2  life. I liked it. I would have loved to have
3  been still working here, but hey, stuff
4  happens.
5      Q.    (By Ms. Dowdy) After you use pepper
6  spray in the jail as a jailer, do y'all have to
7  file an incident report saying that y'all had
8  used --
9      A.    Yeah, we used it.
10      Q.    And would you also have to file an
11  incident report after each time you used a
12  baton?
13      A.    Well, we wrote reports -- I wrote a
14  report on what happened that particular day.
15  Everybody did, I mean, you know, that was
16  involved.
17      Q.    What about the previous incident
18  where you had used your baton on an inmate?
19  Was there a report written on that?
20      A.    I believe there was.
21      Q.    And would there have been an report
22  after you dry tased that one inmate?
23      A.    I probably wrote a report. I think

101

1 I did.

2      Q.    And would that have been the policy

3 at the Walker County Sheriff's Department, to

4 write a report following any type of incident

5 like that with an inmate?

6      A.    Yes, any type of incident, we're

7 supposed to document it.

8      MS. DOWDY: I think that's all the

9 questions I've got right now, Mr. Chapman.

10 Thank you.

11      A.    Thank you.

12

13 EXAMINATION BY MR. SAXON:

14      Q.    George, I've got a few follow-up

15 questions. You were asked by Ms. Dowdy the

16 race of some individuals. I don't know that we

17 got for the record what Sheriff Tirey's race

18 is. What is his race?

19      A.    He's a white man.

20      Q.    Now, you mentioned going to see

21 Senator Charles Bishop and you were asked if

22 you told him you thought you were terminated

23 because of your race, and basically you said

102

1 yes, but not in so many words. Was that before

2 or after he pulled a gun on you?

3      MS. DOWDY: I missed that. Senator

4 Bishop pulled a gun on him?

5      MR. SAXON: Well, you didn't ask him

6 and he didn't --

7      MS. DOWDY: Well, I was going to say

8 I had not heard that.

9      Q.    (By Mr. Saxon) Did Senator Bishop

10 pull a gun on you?

11      A.    Yes, he did.

12      Q.    Okay. A shotgun?

13      A.    Yes, a shotgun or some kind of

14 hunting rifle. That's what happened. My dad

15 took me to see Senator Bishop, because he

16 thought that he could help me, because he had

17 known him for such a long time and they've done

18 work for him and stuff and everything.

19      So upon me telling him about this

20 incident and everything, he's showing my dad

21 his hunting rifle and waving it around the room

22 (indicating). So I leaned back in the chair,

23 you know, and he was like, "Oh, I ain't going

103

1 to shoot you, son. Don't worry, it ain't

2 loaded."

3      So then he went on to ask me did I

4 plan on having kids and living here in Walker

5 County, you know, and I said, "Well, I don't

6 know. I guess, maybe, you know."

7      And then he pretty much told me,

8 "Well, Walker County's got a lot of hang-ups.

9 They're still behind in a lot of times, you

10 know." He said, "We've got a black president

11 now, but that really don't mean much around

12 Walker County."

13      Q.    The incident involving Paula

14 Richardson that you called Mr. McCluskey about,

15 did you conclude that Ms. Richardson thought

16 she was in some way being singled out or

17 discriminated against, based on what she was

18 telling you about?

19      MS. DOWDY: Object to form.

20      Q.    (By Mr. Saxon) You can answer.

21      A.    The way she described things to me,

22 it made me think that she was being mistreated

23 and that she was being unequally treated and

104

1 she was being discriminated against, just by

2 what she was telling me.

3      Q.    Based on her race being black?

4      A.    Right.

5      Q.    And supposedly favorable treatment

6 of the black inmate?

7      A.    Right.

8      Q.    And the fact that the white inmates

9 were being questioned?

10      A.    Right, right.

11      Q.    Okay. And did you convey that to

12 Mr. McCluskey?

13      A.    I didn't get the chance to convey

14 much of nothing to Mr. McCluskey, because I

15 told him, "Well, let me tell you about it."

16 When I told him about it -- first he lied to

17 me. He told me he knew nothing about it. Then

18 I said, "Well, let me tell you about it."

19      And when I started to tell him about

20 it, that's when he replied to me, "Are you her

21 boss? Are you her lawyer? Are you her union

22 president? You don't kneed to worry about

23 what's going on in the kitchen. Mind your own

105

1  business."
2      Q.    How do you know he lied to you?
3      A.    Because when I first asked him about
4  it, he said he knew nothing about it. But then
5  when I started telling him about it, he does a
6  whole 180, like he's upset now. So, I mean,
7  his actions, that's what led me to believe that
8  he was lying to me, his actions, the way he
9  answered me in such a short turn and, you know,
10  kind of wanted to rush me off the phone.
11      Q.    And then just within a week or two
12  of talking to Mr. McCluskey about Paula
13  Richardson and this possible discrimination in
14  the kitchen, Mr. McCluskey recommended your
15  termination?
16      A.    Yes, after the fight with Mr.
17  Decatur.
18      Q.    In baton class, were you taught that
19  it's okay to defend yourself and other
20  officers?
21      A.    Yeah, preserve human life.
22      Q.    Have you been taught in other
23  classes, since being a jailer for Walker

106

1  County, that it's okay to defend yourself and
2  other officers?
3      A.    Well, I would think that if they
4  gave me the tools to use, why punish me for
5  using them? That doesn't make sense.
6      Q.    Is that what you were doing when you
7  struck Mr. Decatur? You were defending
8  yourself and the four --
9      A.    I was defending myself and the
10  female officers. I was in there with four
11  women. I was the only male in there.
12      Q.    And you said he was a sex offender.
13  What was the nature of his offense, if you
14  know?
15      A.    I was told he raped a little 15 year
16  old girl that come over to spend the night with
17  his daughter. I don't know much about the man
18  other than that.
19      Q.    Have you ever seen any documents or
20  paperwork that indicated he was in for rape?
21      A.    No, I can't say that I have, not me
22  personally. I was also told by other
23  co-workers that Mr. McCluskey made sort of a

107

1  deal with Mr. Decatur that, "Well, if you don't
2  sue us, I'll get you out of jail. We'll see
3  about getting you out of here." And they ended
4  up -- insurance ended up paying him $10,000.00.
5      Now, Mr. Tirey admitted to that,
6  that they paid him $10,000.00. He said he
7  didn't agree with it, but he admitted to it
8  that they did, you know. And I forget the name
9  of the insurance company, Meadow something, it
10  was some lady. I saw the paperwork or
11  something.
12      Q.    Meadowbrook?
13      A.    That's it, yeah.
14      Q.    Okay.
15      A.    And I was told Mr. McCluskey helped
16  set Mr. Decatur up with a trailer somewhere,
17  out in Sipsey or somewhere; I don't know.
18      Q.    And gave him a get out of jail free
19  card?
20      A.    Yeah.
21      Q.    Did you ever see the taser report
22  that Tiffany Clifton did about Mr. Decatur?
23      A.    Yeah, I saw -- I read her report and

108

1  then I looked at the sheet that she had
2  attached to it, the little black area on it.
3      Q.    And that taser report indicates that
4  he was in for rape second; right?
5          MS. DOWDY: Object to form.
6      A.    Okay. That's it.
7      Q.    (By Mr. Saxon) Is that what it
8  says?
9      A.    Yeah, let's see. "Inmate was on
10  floor trying to get up --"
11      Q.    I'm just asking you if -- it says,
12  "Rape second," right there, doesn't it?
13      A.    Oh, yeah, it says, "Rape second."
14      Q.    Let me ask you a follow-up question
15  or two about Roy Dale Marsh.
16      A.    Roy Dale Madison.
17      Q.    I mean Madison. When you went to
18  pick him up, he was on work release?
19      A.    Yes.
20      Q.    All right. Was he in cuffs or leg
21  irons at the time?
22      A.    He wasn't in anything.
23      Q.    Okay. So if you had had your cuffs

109

1  on you, that doesn't necessarily mean you could
2  have kept him from running away, does it?
3      A.   No, not really.
4      Q.   I mean, if somebody runs away, they
5  can run away before you get them on there;
6  right?
7      A.   Yeah. I mean, I could have cuffed
8  him, you know, but who's to say he still
9  wouldn't have ran? He didn't have leg irons
10 on, so --
11     Q.   All right. If you would, take a
12 look at Defendant's Exhibit Number 2. Do you
13 have that in front of you?
14     A.   Right.
15     Q.   All right. Now, am I correct,
16 George, that the policy of the jail is that
17 whenever you're going to open a cell door that
18 has an inmate in it, there's supposed to be two
19 officers there at all times? Is that the
20 policy?
21     A.   Yes, in this particular area, yes.
22     Q.   Okay. And you knew that was the
23 policy, didn't you?

110

1      A.   Yes, I knew that.
2      Q.   Okay. And everybody knows that's
3  the policy here, don't they?
4      A.   Yes, sir.
5      Q.   But nobody follows it, do they?
6          MS. DOWDY: Object to form.
7      A.   No.
8      Q.   (By Mr. Saxon) Okay. Now, how many
9  of you were there working in that -- and was
10 this in M-dorm?
11     A.   M-dorm.
12     Q.   All right. In M-dorm that night,
13 the night of the incident with Mr. Decatur, how
14 many officers were there total working in
15 M-dorm?
16     A.   One (indicating).
17     Q.   Okay. And that was you?
18     A.   Me.
19     Q.   All right. Now, Mr. Williams, you
20 mentioned. Where was he?
21     A.   In the control room, central control
22 right here (indicating).
23     Q.   All right. Now, can you take and

111

1  put a key in that cell door and open it?
2      A.   Yeah, I can, but I didn't have a
3  key. They were in the control room.
4      Q.   Okay. So somebody has to be in the
5  control room to get the door open?
6      A.   Right.
7      Q.   Okay. So it would have been
8  physically impossible to open the door to get
9  him out or to go in to do anything with the
10 door open --
11     A.   Sure.
12     Q.   -- and have two officers present,
13 when you only had two on duty and one of them's
14 in the control room; right?
15         MS. DOWDY: Object to form.
16     A.   I had a pod rover. I was the dorm
17 rover and had a pod rover. I don't -- she sent
18 the pod rover off to fill the van with gas.
19 But I was the only male officer left here
20 besides Mr. Williams, and Mr. Williams was in
21 the control room, so it was me in there by
22 myself.
23         But what I'm saying, I could not

112

1  open the door, push the button and open the
2  door if I'm in there with Decatur. It's just
3  impossible. I just can't be in two places at
4  one time. That's what I was trying to say
5  awhile ago.
6      Q.   (By Mr. Saxon) Okay. And you had
7  asked Sergeant Harper to come with you over
8  there?
9      A.   Yes, I had asked her prior, to come
10 in there prior to this happened, just a few
11 minutes before this happened, maybe five
12 minutes at the most, maybe, to come talk to
13 these other two inmates that was having
14 problems, because they weren't getting along,
15 George Bryant and some white inmate. I forget
16 his name.
17     Q.   And she refused?
18     A.   And she told me if it wasn't urgent,
19 she wasn't coming. So I didn't feel the need
20 to keep bothering her, because she acted like I
21 was bothering her by asking her to come talk to
22 these two inmates, you know. And we did not
23 have any computers up and running that day

113

1  either, so we could not book anyone in, because
2  the computers were shut down. The Blood Hound
3  was off. It had been off since, I think, like
4  Friday, so it was off Friday, Saturday and
5  Sunday.
6      Q.   And in this case, the Blood Hound is
7  not a dog?
8      A.   No.
9      Q.   What's the Blood Hound?
10     A.   That's the computers that we use in
11 the jail, the computer program we use with all
12 the inmates' names listed and the offenses and
13 stuff on it and all that, and it didn't come
14 back up until after this incident happened, the
15 fight with me and Decatur.
16         MR. SAXON: I think that's all I've
17 got.
18     A.   But she was so busy, though, that
19 she couldn't help me.
20         MR. SAXON: That's all I've got.
21 Ms. Dowdy may have some follow-up questions.
22
23 RE-EXAMINATION BY MS. DOWDY:

114

1      Q.   You only need two employees, two
2  jailers in that M-dorm if you're going to open
3  a door; correct?
4      A.   Right.
5      Q.   But there are a lot of times you go
6  in there and there's just one employee; right?
7      A.   Yeah.
8      Q.   You can go in there and feed them,
9  there can be just one jailer and that's
10 perfectly fine; right?
11     A.   Yeah.
12     Q.   The policy is there'll be two of you
13 if the door is opened; right?
14     A.   When you've got bean holes, if
15 you've got the keys, you can open the bean hole
16 and stick the tray in there. But at this
17 particular time, as I told you earlier, I had
18 already fed the inmates, passed out store
19 forms. After he ate and I had gotten all the
20 trays up and I went and put the keys up, when I
21 come back in there to sign my logs -- I have to
22 sign my logs every 30 minutes. I'm supposed
23 to. We're all required to, by their rules and

115

1  federal law and all that.
2          He asked me when I come back in
3  there on signing my logs, he said, "I need a
4  commissary list. Will you get me one?"
5          I said, "Sure." So it just so
6  happened I had already passed store forms out
7  there. I had some in my back pocket. So I
8  reached to get it for him and I called for the
9  door -- I'm just going to hand him the store
10 form just like this (indicating), "Here you
11 go," and boom, he comes out on me.
12     Q.   Did you try to slide it up under the
13 door first?
14     A.   I couldn't. He keeps a towel up
15 under the door. And they've been told not to
16 do stuff like this.
17     Q.   Could you ask him to remove the
18 towel so you could slide it up under the door?
19     A.   I've asked inmates to do a lot of
20 things, ma'am.
21     Q.   Well, you wouldn't have to give him
22 the commissary list if he wouldn't do as you
23 asked him to do, did you?

116

1      A.   Well, I guess I might didn't have
2  to, but, I mean, you know --
3      Q.   And you made the decision to call
4  for the door to be opened, even though there
5  was just one officer present; correct?
6      A.   Yes.
7      Q.   Okay. Is it standard for you to go
8  and feed M-dorm without another officer?
9      A.   Oh, yeah, we can feed. One officer
10 can feed M-dorm.
11     Q.   So the fact that the other officer
12 was gone to get gas in the van was not
13 affecting your ability to feed these inmates;
14 correct?
15     A.   No.
16     Q.   And the fact that you did not have
17 anybody with you was not --
18     A.   But he helped me feed before. After
19 feeding, that's when all this transpired.
20 That's what I'm telling you. That's when the
21 fight transpired.
22     Q.   Okay. You made the decision,
23 though, Mr. Chapman, to have the door opened so

117

1   that you could hand him this list; right?
2      A.    Yes, I called for the door.  Yes, I
3   did.
4      Q.    All right.  And that list was not
5   anything that this inmate had to have; correct?
6      A.    Well, he -- yeah, he had to know
7   what to fill out on the store form.
8      Q.    Okay.  But he didn't have to have it
9   at the moment; right?  He could have waited
10   until the officer got back from getting gas and
11   y'all could have gone there together and handed
12   it to him if you felt like you needed to hand
13   it to him; correct?
14      A.    I didn't feel threatened by him,
15   though, ma'am.  Is that what you're trying to
16   say?
17      Q.    I'm not trying to say anything.  I'm
18   just asking you, you could have waited until
19   this other male officer got back if you thought
20   that was warranted; correct?
21      A.    Well, ask me that again, because I
22   don't know what you're trying to ask me,
23   because see, I'm sitting here and my mind is

118

1   racing and I'm --
2      Q.    Could you have waited until the
3   other male officer got back from getting gas in
4   the van to have the door at M-block opened to
5   hand Mr. Decatur his commissary list?
6      A.    Yeah, I guess I could have.  I guess
7   I could have waited on Ms. Harper to come in
8   there too, when I asked her to, but she didn't
9   come, I mean, so --
10      Q.    When you called Ms. Harper, you
11   asked her to come and see about transferring
12   those two inmates upstairs; correct?
13      A.    Right, about splitting them up, and
14   she didn't come.
15      Q.    Did you ever call another officer
16   and tell them you were about to open an M-door
17   cell and you needed another officer present?
18      A.    It was heard all over the radio.  I
19   used my radio and I said, "M-6."
20      Q.    Okay.
21      A.    Everybody heard it.  We've all got
22   radios.
23      Q.    Okay.  Does that let everybody know

119

1   that you're standing there alone, about to open
2   that cell?
3      A.    I'm the only one in there.  I'm the
4   only one on the post for M-dorm.  We fill out
5   post orders every time we come in to work.
6   Everybody's got a position they work.  Now,
7   she's the supervisor.  She should know where
8   everybody's at.  We're her people.  You see
9   what I'm saying?
10      Q.    So anytime you heard --
11      A.    She made out the post orders.
12      Q.    Anytime you heard an M-door was
13   about to be opened, you knew whether or not
14   there was another officer -- were there two
15   officers present?
16      A.    Say that again.
17      Q.    Okay.  While you were working here,
18   either as a part-time or full-time, and you
19   heard on the radio that somebody was about to
20   open a door in the M-block, you knew how many
21   officers were standing there?
22      A.    A lot of times we do that.  I
23   mean --

120

1      Q.    You're not answering --
2      A.    There would be two people present.
3   That's what I'm telling you.
4      Q.    But you're telling me that these
5   other officers should have known that you were
6   by yourself?  When you were working and you
7   heard on the radio that M-block, a door was
8   about to be opened, you were also aware whether
9   there was one or two inmates -- I mean two
10   officers standing there; correct?
11      A.    I was the only officer assigned to
12   this area.
13      Q.    All right.  But when you were not
14   working in M-block and somebody else was
15   supposed to be posted in there, if you hear on
16   the radio that a door is about to be opened in
17   that block, how are you supposed to know how
18   many officers are standing there?
19      A.    I don't, not really, I mean, you
20   know.
21      Q.    Okay.
22      A.    What are you getting at?  I don't
23   understand.

121

1    Q.    I'm just asking the question.

2    A.    I mean, I can't walk around through

3 the whole jail and have somebody with me at all

4 times to hold my hand. I've got a job to do.

5 I mean, you know, I'm not afraid of these

6 inmates, you know, afraid to be around them. I

7 treat them just like human beings every day,

8 you know.

9    Q.    You told me earlier that the most

10 violent inmates were usually housed in M-dorm;

11 is that correct?

12    A.    Right, right, right.

13    Q.    Do you think that might be the

14 reason that this Defendant's Exhibit 2 is

15 posted outside?

16    A.    Yeah, that's posted outside of

17 M-dorm. Everybody sees this every day.

18    Q.    Do you think that's the reason for

19 the policy, is because these are the most

20 violent inmates?

21    A.    Yeah, yeah, I mean, I would say

22 that.

23    Q.    When did you become aware of the

122

1 charges that were against Decatur?

2    A.    What charges?

3    Q.    That he had been charged with second

4 degree rape or a crime of a sexual nature?

5    A.    I was told that by a co-worker. I

6 mean, you know, I don't --

7    Q.    When were you told?

8    A.    I don't know. I mean, within the

9 period of time of me working there.

10    Q.    Before or after the incident, the

11 fight you had with him?

12    A.    Oh, I knew that before the fight, I

13 mean that he was a sex offender, because see,

14 the sex offenders are classified in X-dorm.

15 They're kept in a certain place. See, we've

16 got certain parts of the jail where we house

17 different inmates.

18    Q.    Right.

19    A.    That's what I'm saying. Like your

20 T-dorm, that's your workers that go out and

21 work with the districts and stuff, like

22 District 1, District 3, District 4. Then

23 you've got your MP-dorm here (indicating),

123

1 that's your trustees. That's the guys like we

2 get to take around with us to feed or clean up

3 the jail or whatever, you know, take out

4 garbage, stuff like that. What I'm saying is

5 it's not uncommon for officers to be by himself

6 or by herself with inmates in this facility.

7 That's not uncommon.

8        I mean, that happens in prisons. I

9 mean, you may have one officer trying to watch

10 50 inmates. That's not uncommon. I mean, so,

11 I mean, you've got to do your job. You can't

12 be -- you know, I can't, you know, pick up the

13 radio every time I've got to go somewhere and

14 say, "Well, hey, I need you to come over here

15 with me. I need you to come over here with me.

16 I need you to come over here with me." That

17 would kind of make me look like I might not

18 need to be working here, I'm kind of afraid or

19 scared or whatever.

20    Q.    But in M-dorm, how many times would

21 you go in there when you would be the only

22 officer with inmates?

23    A.    All day or all night long, because

124

1 I've got to sign those logs every 30 minutes.

2    Q.    So you would go in the M-dorm by

3 yourself?

4    A.    Yes.

5    Q.    And be the only officer in there

6 with inmates who were --

7    A.    I would go upstairs, downstairs --

8    Q.    And were all the inmates out or

9 would they be in their cell?

10    A.    No, they're in their cell, though.

11    Q.    Right.

12    A.    But this is what I'm trying to say.

13 I've learned that if you treat a person like

14 you want to be treated, you know, treat these

15 inmates with some type of respect and dignity,

16 you know, and just be fair with them, most of

17 the time you won't have no problems. They

18 won't bother you. They're still human, just

19 like us.

20        I mean, they've done things wrong,

21 but it's not for me to judge them or say, you

22 know, "Hey, they are the scum of the earth or

23 whatever," because I'm not God, so I can't do

125

1 that. I mean, you know, all I can do is treat
2 them the best way I know how to treat them.
3 All I was trying to do was give Mr. Decatur a
4 commissary list. That's my honest intentions
5 and that's it.
6    Q.    Prior to --
7    A.    I did not know he was going to
8 attack me. I didn't feel threatened by him, so
9 that's why I asked for the door to be opened.
10    Q.    Prior to --
11    A.    Just like I didn't know Mr. Madison
12 was going to run from me. I didn't feel
13 threatened by him. Mr. Madison never gave me a
14 day's trouble the whole time he had been in
15 this jail.
16    Q.    Prior to November 2nd, 2008, had you
17 ever had any problems with inmate Decatur?
18    A.    No.
19    Q.    Never had any problems with him
20 calling you names?
21    A.    Oh, you get that. He may have
22 called me names or something, but, I mean, you
23 know, I don't --

126

1    Q.    What had inmate Decatur called you?
2    A.    I don't know. I used to get Fat
3 Albert a lot, by a lot of the inmates and
4 stuff, fat ass, you know, stuff like that.
5    Q.    Did inmate Decatur ever call you
6 that?
7    A.    I don't know. He may have called me
8 a nigger one time. I mean, I've gotten that
9 too, you know, from inmates, from white
10 inmates. But, I mean, you know, it's part of
11 the job. So what I'm saying, this is not the
12 nicest place to work, but I liked my job.
13    Q.    So when you took inmate Decatur to
14 the M-dorm, how many officers escorted him to
15 M-dorm?
16    A.    Me and Officer Charles Hannah.
17    Q.    Okay. And when you got in M-dorm
18 and opened the cell, were there two of you
19 there?
20    A.    Yeah, there was two of us there when
21 we placed him in there that particular day. I
22 think that was like on a Friday, maybe,
23 Thursday or Friday or something.

127

1        MS. DOWDY: I don't have anything
2 else. Thank you.
3        THE WITNESS: Pardon me?
4        MS. DOWDY: I don't have anything
5 else. Thank you.
6        THE WITNESS: Okay.
7
8 RE-EXAMINATION BY MR. SAXON:
9    Q.    George, is it your testimony that
10 there were oftentimes when you were in M-dorm
11 and you were the only officer in there?
12    A.    Yes, sir.
13    Q.    And based on conversations with your
14 fellow officers, did anybody ever indicate to
15 you that there were times when they were the
16 only officer in M-dorm?
17    A.    Sure. We do it all the time. We
18 have to sign those logs every 30 minutes. The
19 inmates are secluded in their cell. They
20 can't -- I mean, they can't hurt you unless
21 they get out, unless they come out from behind
22 the door, and that's a heavy door with a glass
23 on it, like a little cut out window like that

128

1 (indicating), but you can see in and they can
2 see you, you know.
3    Q.    Okay.
4    A.    And if you can't see in, we've got a
5 flashlight we're supposed to keep with us,
6 where we can shine in there, because sometimes
7 the inmates tears up the cell lights and the
8 cell might not have lights on it.
9        MR. SAXON: That's all I've got.
10
11 RE-EXAMINATION BY MS. DOWDY:
12    Q.    Mr. Chapman, the policy is not that
13 you couldn't be in M-dorm without two officers
14 present, was it?
15    A.    No, ma'am, that's not the policy.
16    Q.    Okay. The policy is that when a
17 cell door within the M-dorm was opened, there
18 had to be two officers present; correct?
19    A.    Right, yes, ma'am.
20        MS. DOWDY: All right. Thank you.
21
22 RE-EXAMINATION BY MR. SAXON:
23    Q.    And to your knowledge -- and was the

129

1  night you opened the door by yourself with Mr.
2  Decatur in the cell, was that the only time
3  that's ever happened here, in M-dorm?
4      A.    That's the only time it's ever
5  happened to me where an incident occurred.
6      Q.    Had you opened a cell door in M-dorm
7  where you were the only officer in the dorm?
8      A.    Had I called for one before like I
9  did that night? Is that what you're asking?
10     Q.    Yeah.
11     A.    Sure. We do it all time, me, as
12  well as the other officers. That's what I'm
13  saying.
14     Q.    Would be in M-dorm and only one
15  officer present when the cell door was opened?
16     A.    Yeah.
17         MR. SAXON: Okay.
18
19  RE-EXAMINATION BY MS. DOWDY:
20     Q.    You had done that before?
21     A.    Yeah. Other officers have too.
22     Q.    Okay. So you had violated policy
23  before this happened?

130

1      A.    I mean, what I'm saying, this is not
2  nothing we really, I guess you would say,
3  quote, unquote -- when you've got something to
4  do, you've got something to do.
5      Q.    Okay. What other occasions did you
6  have to be in M-dorm and open a cell door while
7  you were the only officer present?
8      A.    Okay. Well, I'll give you an
9  example. We give showers in M-dorm. I used to
10  work at night. At nights, that's what we do.
11  We give showers and pass out store on third
12  shift. Be one officer upstairs and one officer
13  downstairs. Well, the officer downstairs will
14  call his door, the officer upstairs will call
15  his door.
16     Q.    There were two officers present in
17  M-dorm when one of the cell doors was opened?
18     A.    But not at the same cell, but it's
19  two officers in there, but one's upstairs and
20  one's downstairs. See, we're working here,
21  see. He's getting the guys on the top, they're
22  getting their shower, and I'm getting the guys
23  on the bottom.

131

1      Q.    Well, was there ever another
2  occasion when you were the only officer in
3  M-dorm, the whole entire dorm, and you opened a
4  cell door?
5      A.    Maybe. I don't remember.
6      Q.    Well, sitting here today, can you
7  remember there ever being another occasion
8  where that occurred?
9      A.    I really can't answer that.
10     Q.    Because you can't recall any other
11  times?
12     A.    No, not except the time I just told
13  you, like when we're giving showers and stuff
14  like that.
15     Q.    And again, there were two officers
16  in M-dorm when those doors were opened;
17  correct?
18     A.    That's correct, that's correct, the
19  one upstairs and the one downstairs.
20     Q.    That's not my question. There were
21  two officers in M-dorm; correct?
22     A.    Yeah, that's correct.
23     Q.    Okay. Do you know of any other

132

1  times when another officer would have been by
2  himself or herself and had called for a door,
3  cell door to be opened in M-block?
4      A.    Yeah, it happens all the time.
5  That's what I'm telling you.
6      Q.    Give me the names of those officers,
7  please.
8      A.    I can't just go give you names of
9  people.
10     Q.    If you know that it's happened, give
11  me their names.
12     A.    I'm telling you it happened, but --
13     Q.    I want to know each and every
14  officer's name that you're aware of that it has
15  happened to.
16     A.    I don't want to get nobody in
17  trouble, you know, by saying people's names and
18  stuff.
19     Q.    Mr. Chapman, you have testified that
20  other officers have done this and it is really
21  not a big deal, so give me the name of every
22  officer that you're aware of that has opened a
23  cell door in M-dorm when they were the only

133

1  officer in that dorm.
2     A.   I'm telling you it's not uncommon
3  for us to do it.
4     Q.   If it's not uncommon, that means
5  it's common; right?
6     A.   Right, that's what I'm saying.
7     Q.   All right.  If it's common, then
8  give me the names of every officer you're aware
9  of that has opened a cell door in M-block when
10  they're the only officer in that dorm.
11    A.   Well, it wouldn't really much
12  matter, I mean --
13    Q.   Mr. Chapman, that's for me to
14  decide, not you.  I want their names.
15    A.   They don't work here no more.
16    Q.   Do they have names?
17    A.   Yeah.
18    Q.   Okay.  Give me their names.
19    A.   My lieutenant, he might do it
20  sometimes, Randy Brown.
21    Q.   Did he or did he not do it?
22    A.   I said he might would do it
23  sometimes.

134

1     Q.   Okay.  He might would.  I want to
2  know the names of the people that you know did
3  it, because you said it was common, okay?  That
4  was your testimony, not mine.  If it's common,
5  that means you have knowledge that there are
6  other jailers who have done this, so give me
7  the names of the jailers that you're aware of
8  that have done this.
9     A.   I just gave you a name.
10    Q.   No, you told me Randy Brown might
11  have.  Did he or did he not?
12    A.   I know this has happened before.
13    Q.   Okay.  To who?
14    A.   I mean, to all of us.  I mean, we,
15  you know --
16    Q.   I need names of people that this has
17  happened to.
18    A.   What I'm saying, I know that we've
19  opened doors in there before and two officers
20  might not be present at all times, just may be
21  one officer in there.
22    Q.   Okay.  Tell me when that's happened
23  that you're aware of.

135

1     A.   Well, it happened to me.
2     Q.   On November 2nd, 2008 it happened to
3  you?
4     A.   Yeah.
5     Q.   Okay.
6     A.   And Mr. Williams opened the door.  I
7  called the door number and he opened it.
8     Q.   Okay.
9     A.   So, I mean, it's not uncommon I'm
10  saying.
11    Q.   We've established that.  That's a
12  one time incident.  Does a one time incident
13  make something common?
14    A.   Put it like this:  That may be the
15  only time where something drastic happened,
16  maybe, I don't know, I mean a fight ensued or
17  something, but --
18    Q.   Mr. Chapman, you testified earlier
19  that that's the only time you can recall it
20  happening to you, was when you --
21    A.   It had happened to me, yeah.
22    Q.   It's the only time you can tell me
23  that you were the only officer in M-dorm when a

136

1  cell door was opened; is that right?
2     A.   Yeah, it was something -- where
3  something went wrong or something happened,
4  that's what I'm saying.
5     Q.   No, no.  Can you tell me a time when
6  you were the only officer in M-dorm and called
7  for a cell door to be opened and nothing
8  happened?
9     A.   I don't recall.
10    Q.   Okay.  So you can't tell me any
11  names of anybody else that was working here
12  that would have gone in M-dorm and called for a
13  cell to be opened when they were the only
14  officer in that dorm?
15    A.   Well, see, I ain't been working here
16  in awhile, so I can only tell about my
17  situation, really, you know.
18    Q.   Okay.  So if you can only tell me
19  about your situation, you don't have any idea
20  whether it happened to any other officer or
21  not; correct?
22    A.   I'll put it like this:  I know it's
23  something we're not supposed to do, but

137

1  sometimes it happens, and that's all I'm going
2  to say on that.
3      Q.   Okay.  You know you're not supposed
4  to do it, and we know on November 2nd, 2008 you
5  did it; correct?
6      A.   Yeah, but I didn't open the door,
7  though.  I called for the door to be opened.
8      Q.   You called for the door to be
9  opened?
10     A.   Yeah.
11     Q.   Regardless of whether you opened it
12 or not, it happened?
13     A.   Right.
14     Q.   Okay.  That's the only time you can
15 recall that you were in that dorm and the only
16 officer present and called for a door to be
17 opened; correct?
18     A.   Yeah, that -- at that particular
19 time, that particular day, yeah.
20     Q.   Were there other dates you were in
21 M-dorm and called for a cell door to be opened
22 when you were the only officer present?
23     A.   I don't know.

138

1      Q.   Okay.  Sitting here today, can you
2  tell me of any other officer that did that?
3      A.   I don't know.
4      Q.   Okay.  You testified earlier that
5  this was a common practice.  What do you base
6  that on?
7      A.   I base it on I just know it's done
8  sometimes, I mean, you know.
9      Q.   Okay.  You know it was done
10 sometimes based on what?  You can't give me the
11 names of anybody it's happened to.  We know it
12 happened to you and it happened one time.  Now,
13 maybe you and I have a difference of opinion.
14 In your opinion, if something happens one time,
15 does that make it a common occurrence?
16     A.   No, it doesn't have to make it a
17 common occurrence.
18     Q.   Okay, all right.  So it would have
19 to happen more than one time for it to be
20 something that was common?
21     A.   Yeah, I guess it would.
22     Q.   Okay.  So tell me all the other
23 times this happened to make it, in your

139

1  opinion, a common occurrence.
2      A.   I don't know dates and all that.  I
3  can't --
4      Q.   I'm not asking for dates, Mr.
5  Chapman.  I'm asking for names.
6      A.   I can't remember all the names of
7  people that's done worked here.
8      Q.   You haven't given me one name of
9  anybody else this has ever happened to but you
10 on November 2nd, 2008.  And if this was a
11 common occurrence, it would seem to me that you
12 would know other people it had happened to.
13 Maybe I'm wrong.  But if it's common, tell me
14 the names of these other people that have done
15 this.
16     A.   I don't know.
17     Q.   Did you ever have a discussion with
18 anybody, any other officer about the fact that
19 this policy was routinely being violated?
20     A.   No.
21     Q.   Did you ever go to anybody that
22 worked at the sheriff's department and say,
23 "Hey, I know this is up here, but it's really a

140

1  joke, because we don't follow this policy"?
2      A.   No, because I'm not a rat or a
3  snitch.
4      Q.   Okay.  Are you aware of that policy
5  being violated, other than November 2nd, 2008?
6      A.   Maybe.
7      Q.   I'm glad to sit here and let you
8  have time to think about it, but if you are
9  aware of any other incident, other than
10 November the 2nd, 2008, when there was an
11 officer present in M-dorm alone and called for
12 a cell door to be opened, now is your chance to
13 tell me.
14     A.   I don't know.  I don't have any
15 comment on that question.
16     Q.   Are you telling me that you are not
17 aware of any other incident, of this ever
18 happening other than November 2nd, 2008?
19     A.   Yeah, that's what I'm saying.
20         MS. DOWDY:  Okay.  I don't have any
21 other questions.
22
23 RE-EXAMINATION BY MR. SAXON:

141

1     Q.    George, when you look at Defendant's
2   Exhibit 2, how do you interpret that? Is it
3   that there are to be two officers present at
4   the particular cell door that's being opened?
5     A.    That's the way I interpret it.
6     Q.    Okay. And you've already testified
7   that there have been times when you've been in
8   M-dorm and you've been on one floor the only
9   officer present at a cell door, and somebody
10  else was on another floor the only officer
11  present at a cell, and those cell doors were
12  opened; right?
13    A.    Right.
14    Q.    Okay. So you know it's happened on
15  times other than November 2nd and you had
16  already told her that; right?
17    A.    Right, right.
18    Q.    Okay. Do you think that in casual
19  conversation, is it your testimony that you, in
20  general, have heard people say they've done the
21  same thing; you don't remember who it was?
22    A.    I wouldn't say it's nothing we talk
23  about or brag about amongst ourselves or

142

1   nothing, but it's just maybe something that --
2   you know, when you're busy sometimes and you're
3   working, you don't -- you might not take the
4   time to, you know, go with someone or that
5   person may be busy and the other person may be
6   off doing their thing, you know, and sometimes
7   it may just may be busy and we're understaffed.
8   We don't have a whole lot of jailers in here no
9   way. I mean, sometimes we've worked -- I've
10  worked here with four or five people in one
11  night, so --
12    Q.    How many are you supposed to have?
13    A.    I believe it's supposed to be 15
14  officers to each shift, every time a shift
15  changes, if I'm not mistaken.
16    Q.    And you've been here when it's been
17  one-third of what it's supposed to have?
18    A.    Yes.
19    Q.    Okay. Anybody get terminated for
20  that?
21    A.    Not that I know of.
22          MR SAXON: Okay. That's all.
23    A.    I remember working one particular

143

1   night, just four people, myself and three more
2   people.
3     Q.    (By Mr. Saxon) For the whole jail?
4     A.    For the whole shift, that was it.
5   Mind you, two is locked up in the control room,
6   one in one control room, the other in the other
7   control room, so that means you've only got two
8   free people on the floor.
9     Q.    And how many dorms or pods?
10    A.    You've got A-dorm, you've got
11  B-dorm, you've got C-dorm, you've got D-dorm,
12  and then you've got H, you've got G and you've
13  got E and you've got F.
14    Q.    So you were here one night and you
15  had two guards for all those dorms, two
16  jailers?
17    A.    Yeah, and M-dorm. And then if
18  somebody got brought in, booking, you got to
19  cover booking too.
20    Q.    And if they were brought in, would
21  they ultimately be put in a cell?
22    A.    They would be put in holding in
23  booking until somebody could book them in.

144

1     Q.    And the cell door would have to be
2   open to put them in it?
3     A.    Yeah.
4          MR. SAXON: Okay.
5
6   RE-EXAMINATION BY MS. DOWDY:
7     Q.    Could you read Exhibit 2 for me,
8   please?
9     A.    "There are to be two officers
10  present at all times when opening cell doors in
11  M-dorm, no exceptions."
12    Q.    Okay. And if it was your
13  understanding that you had to be both present
14  at the door, then you're telling me, testifying
15  today that y'all regularly -- you regularly
16  violated this policy?
17    A.    What are you saying? I regularly
18  violated the policy?
19    Q.    Uh-huh, yes.
20    A.    No, I'm not telling you that.
21    Q.    Well, you testified, when your
22  attorney asked you about it, that you were
23  supposed to both be present at the same -- at

145

1 the door when the cell was opened?

2      A.    Yeah.

3      Q.    When that door was opened, your

4 understanding is you're supposed to both be

5 standing there?

6      A.    Right.

7      Q.    And sometimes you would be

8 downstairs and sometimes the other officer

9 would be upstairs?

10      A.    Yeah, that's not uncommon when we're

11 giving showers.

12      Q.    Then you were regularly violating

13 the policy as you understood it; correct?

14      A.    Well, I mean, I -- I guess. I don't

15 know how he really intended for it to -- how

16 Mr. McCluskey intended for it to, you know,

17 read. I mean, I'm reading that, but it

18 elaborates no further than this. You know what

19 I'm saying? Do you understand me?

20      Q.    You just testified that your

21 understanding was that you were both supposed

22 to be standing at the door. You also testified

23 earlier that sometimes you would be at one door

146

1 and another officer would be on another floor,

2 at a different door?

3      A.    Right, right, the one upstairs and

4 the one downstairs.

5      Q.    But if your understanding was that

6 you were both supposed to be standing at that

7 one door, then that was a violation of policy

8 when y'all were doing it that way, wasn't it?

9      A.    Well, I guess it was.

10      Q.    Okay.

11      A.    I mean, hey, we're trying to --

12 we're trying to get things done here. We ain't

13 got all day and all night. You know, we've got

14 stuff to do. He (indicating) knows that.

15 These inmates want their shower, they want

16 their breakfast, they want their lunch, they

17 want their dinner, they want, they want, they

18 want. They want cigarettes too, but I never

19 brought them any.

20      Q.    Sitting here today, Mr. Chapman, do

21 you have any idea why you were terminated?

22      A.    No.

23      MS. DOWDY: Okay. I have nothing

147

1 further.

2      A.    I really don't, because this paper

3 really don't tell -- go into detail in

4 explaining why, never makes any mention of a

5 baton or anything.

6

7 RE-EXAMINATION BY MR. SAXON:

8      Q.    Separate and apart, though, from

9 what's on Defendant's Exhibit 3 or what you

10 were told at the time you were terminated, is

11 it your testimony that you believe it had to do

12 with your race, being African-American, and the

13 fact that you had complained to Mr. McCluskey

14 about how Paula Richardson was being treated?

15      A.    Yes, sir.

16      Q.    Okay.

17      A.    Because before all this, Mr.

18 McCluskey was fine with me. He would see me

19 sometimes, "Doing a good job, buddy,"

20 (indicating).

21      Q.    You mean before the Paula Richardson

22 incident?

23      A.    Yeah, yeah, pat me on the back,

148

1 shake my hand, "You're doing a good job,

2 buddy." And after me and him even talked on

3 the telephone, he walked down the hall one day

4 and I was coming up the hall, and he shook my

5 hand and smiled at me and I thought everything

6 was all right. I didn't know nothing, you

7 know, was going to transpire or nothing. But

8 the next few days, bam, fight with an inmate.

9 I'm gone by Friday. The fight happened Sunday.

10 I'm fired Friday.

11      MR. SAXON: That's all I've got.

12

13 RE-EXAMINATION BY MS. DOWDY:

14      Q.    You don't think that the reason you

15 were fired is because you hit an inmate four

16 times with a baton after he was being tased and

17 was still hooked up to the probes?

18      A.    Where did you get that, that he was

19 still hooked up to the probes? I never seen

20 him still hooked up to the probes.

21      Q.    You did testify to that earlier, Mr.

22 Chapman, but I also have it from the records

23 and from Nurse Goldman's notes -- Nurse Gold's

149

1  notes.

2      A.    He was still trying to fight,

3  though. I also told you that too.

4      Q.    You don't think that had anything to

5  do with the fact -- do you think that had

6  something to do with the fact that you were

7  fired?

8      A.    I don't know. This paper doesn't

9  make no reference to a baton or anything. I

10  told you what I was told, what Mr. Tirey told

11  me. His complete words to me was, "I fired you

12  because Mr. McCluskey said you were going to be

13  a problem and that I needed to get rid of you."

14  So he said, "That's the jail administrator."

15  He told me he had to take the word of his jail

16  administrator, so bye-bye George.

17       MS. DOWDY: I don't have anything

18  else.

19       MR. SAXON: Okay. That's it.

20

21       FURTHER THE DEPONENT SAITH NOT

22

23

---

150

1        C E R T I F I C A T E

2

3  STATE OF ALABAMA

4  COUNTY OF JEFFERSON

5       I hereby certify that the above and

6  foregoing deposition was taken down by me in

7  stenotype, and the questions and answers

8  thereto were transcribed by means of

9  computer-aided transcription, and that the

10  foregoing represents a true and correct

11  transcript of the testimony given by said

12  witness upon said hearing.

13       I further certify that I am neither of

14  counsel, nor of kin to the parties in the action,

15  nor am I in anywise interested in the result of

16  said cause.

17

18       /s/ Scott Wilmeth

19       _____

20       Scott Wilmeth, CCR, RPR

21       CCR #392, Expires 9/30/11

22       Commissioner for the

23       State of Alabama at Large

**A**

ability 116:13
ABL 89:15 94:3
able 12:17 54:23
  57:2 59:9 64:18
accuse 29:13 49:14
  49:20
accused 29:16
  30:18 53:5 95:6
act 36:5
acted 112:20
acting 5:2 20:6
action 1:5 150:14
actions 105:7,8
ad 16:23
address 6:22 7:3,6
addressed 28:13
administrator
  74:17 149:14,16
admitted 107:5,7
advising 28:14
afraid 121:5,6
  123:18
African-American
  34:19 38:10
  147:12
afternoon 22:6
aggressive 27:1
  30:23 60:14 61:18
  62:19 73:8 90:5
aggressively 26:17
ago 8:10 11:2 30:3
  92:11 112:5
agree 72:4 107:7
AGREED 1:14,21
  2:4
ahold 85:17
aim 32:23
ain't 37:20 63:13
  64:18 73:1 75:11
  82:1 102:23 103:1
  136:15 146:12
air 57:7
Alabama 1:1,7,18
  1:19 4:8,14 5:2,6
  7:1,18 8:9 150:3
  150:23
Albert 23:14 126:3
allegation 50:7
  74:20 79:23 91:1
alleged 92:7,13
allow 65:3
allowed 24:13 65:6
altercation 77:16
altercations 29:7
  77:12
amends 80:16

Andrew 80:20 83:1
  83:2
anger 76:14 80:9
ankles 59:15
answer 6:10 47:17
  47:19 63:23 99:12
  103:20 131:9
answered 105:9
answering 120:1
answers 150:7
anybody 22:19 23:2
  66:2 92:22 96:20
  97:11 116:17
  127:14 136:11
  138:11 139:9,18
  139:21 142:19
anytime 46:23 91:7
  119:10,12
anyway 52:10 85:5
  87:7
anywise 150:15
apart 147:8
apnea 93:22
apologized 63:14
Apparently 99:3
APPEARING 4:4
  4:10
applied 14:4,19
apply 14:2,6 17:13
  17:16
appropriate 26:8
  26:21 98:4
Archie 80:20 83:1,2
  83:6,10
area 33:1,23 39:7
  40:16,17 66:15
  79:9,9 108:2
  109:21 120:12
areas 33:10 99:1
argue 97:8
Arrington 4:13
arrogant 51:16
asked 44:6,23 45:4
  48:21 50:15 51:8
  56:17 57:9 64:1,5
  64:9 67:7,8 81:10
  83:14 88:9,20
  90:2 94:10,15
  101:15,21 105:3
  112:7,9 115:2,19
  115:23 118:8,11
  125:9 144:22
asking 75:20
  108:11 112:21
  117:18 121:1
  129:9 139:4,5
asleep 46:9
ASP 25:5

ass 69:6,7 126:4
assign 2:8
assigned 12:9 18:21
  120:11
Associates 11:11,21
assume 21:7 25:10
  47:22
assumes 47:16
ate 114:19
Atlanta 12:2
attached 108:2
attack 125:8
attacking 98:11
attend 23:5 24:8
attorney 144:22
available 20:22
  21:1,3 22:2
Avenue 1:19 4:7 5:6
aware 49:23 50:6,8
  53:4 62:2 76:5
  77:11,15,19 120:8
  121:23 132:14,22
  133:8 134:7,23
  140:4,9,17
awhile 8:10 9:20
  16:22 41:20 92:11
  112:5 136:16
A-dorm 143:10
A-S-P 25:5
a.m 1:20

**B**

B 3:15 65:4 69:7
baby 54:3,19
back 12:15 25:8
  37:22 39:8,10
  44:23 45:8 46:8
  51:7,9,11 53:15
  53:18 55:20 68:5
  68:9,11 80:22
  84:19 85:1,13,16
  85:18 102:22
  113:14 114:21
  115:2,7 117:10,19
  118:3 147:23
bad 40:10,10 75:12
  80:12 87:21 95:21
  96:5
balance 59:10
bam 148:8
bars 56:20
base 138:5,7
based 95:8 96:14,21
  103:17 104:3
  127:13 138:10
basically 81:10
  101:23
bastard 69:7

baton 23:10 25:4,5
  25:5,6 26:2 27:5,9
  31:2 32:17,22
  33:16,17 36:23
  60:17 61:19 70:8
  72:23 73:23 74:3
  74:4 75:4,16 76:6
  76:17 78:4,17
  97:23 98:5,14
  100:12,18 105:18
  147:5 148:16
  149:9
bean 56:14 114:14
  114:15
beat 25:7 41:11
  76:17 78:16
beating 27:9 78:14
Becky 88:1
bed 35:1
BEHALF 4:4,10
beings 121:7
believe 17:6 20:12
  22:16 31:5,12
  36:20 38:13 46:2
  51:20 55:7 67:6
  69:15 98:1 100:20
  105:7 142:13
  147:11
Bell 14:11
belonged 37:14
benefit 91:10
benefits 13:5 21:16
  22:1
best 32:15 45:14
  61:14 84:23 85:12
  100:1 125:2
better 29:7
Bevill 23:21
beyond 8:20
big 132:21
Birmingham 4:8,14
  5:6 12:1
birth 7:16
bisexual 29:20
Bishop 80:18 81:3,5
  82:17,23 101:21
  102:4,9,15
black 64:13,13 66:8
  88:5 89:12 96:17
  103:10 104:3,6
  108:2
bleeding 61:4
block 120:17
blocking 57:3
blood 93:20 113:2,6
  113:9
blow 63:11
Board 17:18 28:14

83:4,17
bodily 27:4
body 79:8
Bond 19:8
bone 33:5,10
book 98:16 113:1
  143:23
booking 43:15 47:7
  143:18,19,23
boom 115:11
born 16:10
boss 88:17 94:16
  104:21
bother 124:18
bothered 65:11
bothering 112:20
bottom 130:23
box 49:3
boy 25:18
brag 141:23
break 6:17 34:5
  97:20
breakfast 146:16
bridge 10:1
brief 9:20 43:15
brother 7:7 15:12
brothers 9:6,7,17
  15:21,22 16:2
brother's 7:13
brought 44:17
  93:17 143:18,20
  146:19
Brown 18:20,20
  20:3 75:1,15
  77:21 80:6,7
  133:20 134:10
Brown's 75:6
Bruce 80:17 83:4
  84:7,8,14
Bryan 31:5 34:10
Bryant 30:9 112:15
bud 69:19 86:18
buddy 45:12 91:6
  91:11 147:19
  148:2
bumped 75:19
Bureau 24:4 66:6
business 16:8 94:14
  94:15 105:1
busted 54:7
busy 43:22 84:22
  85:17 113:18
  142:2,5,7
butt 60:12
button 58:10 112:1
bye-bye 149:16
B-dorm 53:16,16

143:11

_____
**C**

**C** 150:1,1
**call** 18:7 29:20 45:7
  57:11 59:18 64:21
  116:3 118:15
  126:5 130:14,14
**called** 18:8 35:20
  44:22 58:6,8
  59:17,21 68:19
  84:21 85:14,16
  88:8 96:4 103:14
  115:8 117:2
  118:10 125:22
  126:1,7 129:8
  132:2 135:7 136:6
  136:12 137:7,8,16
  137:21 140:11
**calling** 54:3,5,19
  125:20
**calls** 47:17 63:2,22
  87:19 99:11
**calm** 44:18
**candy** 56:20
**captured** 45:18
**card** 107:19
**care** 46:15
**carry** 24:13
**carrying** 37:17
**case** 113:6
**casual** 141:18
**catch** 80:19
**cause** 5:8 38:15
  39:23 150:16
**causing** 38:18 40:20
**CCR** 1:17 4:1 5:1
  150:20,21
**Cedric** 7:13 15:12
**cell** 30:21 38:20
  39:7,9,11 41:16
  41:22 57:8,23
  60:13 61:14 63:19
  64:15 65:1,1,6,6
  66:3,11,13 68:5,6
  69:1 90:19 109:17
  111:1 118:17
  119:2 124:9,10
  126:18 127:19
  128:7,8,17 129:2
  129:6,15 130:6,17
  130:18 131:4
  132:3,23 133:9
  136:1,7,13 137:21
  140:12 141:4,9,11
  141:11 143:21
  144:1,10 145:1
**cellmate** 30:9

**cellmate's** 30:7
**cells** 41:19
**center** 60:19 79:1
**central** 110:21
**certain** 26:8 27:23
  99:19 122:15,16
**certify** 5:2 150:5,13
**chair** 102:22
**chance** 80:9 104:13
  140:12
**chances** 76:12
**change** 18:13 21:9
**changed** 13:2 51:23
  52:1
**changes** 91:8
  142:15
**changing** 12:16
**channels** 65:3
**Chapman** 1:3,11,16
  5:7,11,22,23 6:20
  7:14 8:1 9:6,7,17
  12:5 15:22 16:5
  25:10 28:13 30:1
  34:8 47:11 49:12
  57:19 59:22 72:18
  74:9 79:20 82:17
  97:22 101:9
  116:23 128:12
  132:19 133:13
  135:18 139:5
  146:20 148:22
**charged** 122:3
**charges** 122:1,2
**Charles** 19:7 40:7
  80:18 81:3 101:21
  126:16
**checked** 67:11
**checking** 85:15
**checks** 83:5
**chest** 30:21 78:7
  79:9
**Chester** 24:5
**chicken** 10:5
**children** 81:12
**Chips** 56:20
**Chris** 19:8,8 98:1
  99:5
**Christopher** 38:7,9
**cigarettes** 146:18
**Cindy** 19:7
**Civil** 1:5 5:4 17:18
  28:14 83:3,17
**claim** 93:15,16
**class** 23:9,10,10
  24:1 25:19 26:20
  33:16 98:23
  105:18
**classes** 23:6,8 24:7

24:9 105:23
**classified** 122:14
**clean** 123:2
**clear** 80:14
**cleared** 30:13,15
  32:14
**Clifton** 22:15 60:5
  60:11 107:22
**close** 55:15
**closed** 56:14
**clue** 73:1
**code** 59:21,22
**cold** 79:15
**come** 18:6 31:1
  34:22 43:12 45:16
  46:4 51:7,9 60:15
  60:16 62:20 64:2
  64:5,9 65:11
  69:17 71:13 73:8
  90:18 106:16
  112:7,9,12,21
  113:13 114:21
  115:2 118:7,9,11
  118:14 119:5
  123:14,15,16
  127:21
**comes** 57:13 115:11
**coming** 27:1 59:8
  64:4,8 89:8
  112:19 148:4
**commencing** 1:20
**comment** 29:21
  74:18 140:15
**commissary** 56:17
  56:21 57:11 115:4
  115:22 118:5
  125:4
**Commission** 84:11
**commissioner** 4:2
  5:2 84:9 85:19
  150:22
**common** 133:5,7
  134:3,4 135:13
  138:5,15,17,20
  139:1,11,13
**company** 9:4,5,17
  13:23 15:10,20
  107:9
**complained** 147:13
**complaining** 95:17
**complaint** 42:10
**complete** 8:3
  149:11
**compliance** 2:1
**computer** 13:13
  113:11
**computers** 112:23
  113:2,10

**computer-aided**
  150:9
**concerned** 67:6
**conclude** 103:15
**conclusion** 47:17
  99:11
**conclusions** 97:4,6
**concrete** 25:8
**confined** 63:10
**connect** 62:15
**connected** 62:3
**considered** 98:13
  98:21
**continue** 19:11
**continuum** 26:4
**contract** 12:8
**control** 54:11 58:3
  58:13 61:15 63:10
  73:10 110:21,21
  111:3,5,14,21
  143:5,6,7
**conveniently** 87:7
  89:2 90:8 93:8
**conversation** 70:22
  71:15 87:10 88:22
  89:4 91:15 92:3
  93:10 94:3 141:19
**conversations**
  127:13
**convey** 104:11,13
**cooler** 10:8
**copy** 70:14
**cornered** 26:10
**correct** 33:17 47:5
  65:23 76:19 78:5
  78:10 79:5 95:4
  95:19 109:15
  114:3 116:5,14
  117:5,13,20
  118:12 120:10
  121:11 128:18
  131:17,18,18,21
  131:22 136:21
  137:5,17 145:13
  150:10
**counsel** 1:16 2:6,7
  5:5 150:14
**count** 34:21,21,23
  34:23 35:2
**counting** 79:18
**county** 1:7 10:3
  13:19 16:5 35:23
  41:1 45:21 47:12
  47:13 63:6 70:15
  79:22 84:10 89:18
  101:3 103:5,12
  106:1 150:4
**County's** 103:8

**course** 23:17 98:10
**court** 1:1 2:2 5:14
**cover** 143:19
**co-employee** 36:12
**co-worker** 50:9,15
  122:5
**co-workers** 36:3
  59:13 60:3,8 73:5
  76:9,20 78:18
  86:20 106:23
**crack** 57:4
**crap** 41:11
**Craven** 19:7 22:17
**crime** 122:4
**cross** 9:23
**cubical** 54:10
**cuff** 47:4,13
**cuffed** 46:21 61:16
  109:7
**cuffs** 27:20 44:15
  44:16 47:2,6,21
  108:20,23
**current** 14:21
**currently** 6:19 11:8
  12:14
**cursed** 38:20
**cussing** 52:2
**cut** 12:15,19 65:4
  127:23
**C-dorm** 53:16,17
  53:18 55:3 143:11

_____
**D**

**D** 3:1 4:5,6
**dad** 7:7 9:11 11:5
  15:5,9,19 102:14
  102:20
**dad's** 7:8
**Daily** 17:3
**Dale** 43:6,8 44:14
  108:15,16
**Daniel** 31:5,5 34:10
  34:13,14 78:7
**Darrell** 68:20
**date** 5:3 7:16
**dates** 137:20 139:2
  139:4
**dating** 95:14
**daughter** 106:17
**day** 22:20 37:22
  40:18 43:9,11,13
  43:13 44:5,15
  47:5 48:1 51:2,4
  51:14 53:12,13,22
  56:4 58:7,13
  63:14 68:17 70:23
  75:20 84:20,21
  86:11,14 87:20,21

89:8,23 91:21
94:20 95:21,22
96:5 100:14
112:23 121:7,17
123:23 126:21
137:19 146:13
148:3
**dayroom** 54:7,9
68:6,7
**days** 17:6,7 43:20
51:4 54:1 55:17
89:4 90:9 148:8
**day's** 48:16 125:14
**deadly** 98:13,21
99:8,13
**deal** 107:1 132:21
**dealing** 29:12
**Decatur** 49:16
52:20,23 53:2,3,9
53:14 54:4 55:10
56:17 60:18,22
61:16 65:13,19,20
65:23 66:3,23
69:1,9 72:4,5 78:4
78:13 89:2,3
90:13,18 93:11
105:17 106:7
107:1,16,22
110:13 112:2
113:15 118:5
122:1 125:3,17
126:1,5,13 129:2
**Decatur's** 61:11
**decide** 133:14
**decided** 39:1
**decision** 74:5,12
116:3,22
**deep** 62:14
**defend** 86:4 98:12
105:19 106:1
**DEFENDANT** 4:10
**defendants** 1:9 6:2
**Defendant's** 3:16
28:4,8 57:14,18
70:9,13 109:12
121:14 141:1
147:9
**defending** 73:5
106:7,9
**degree** 122:4
**dental** 13:7,8 21:19
**department** 13:19
16:12 17:14 48:19
70:16 96:21 97:11
101:3 139:22
**depended** 29:11
**DEPONENT**
149:21

**deposition** 1:11,16
1:22,23 2:10 6:5
150:6
**depositions** 2:3
**deputy** 45:21,22
**describe** 26:5 72:20
**described** 103:21
**desk** 69:22
**destroying** 41:1
**detail** 75:10,19
147:3
**details** 94:12
**determine** 96:13
**DeVito** 51:6,8
**difference** 99:7
138:13
**different** 12:5 24:7
46:6 122:17 146:2
**differently** 88:4
89:11
**dignity** 124:15
**dinner** 146:17
**directly** 62:16
**disabled** 15:16
**disagreed** 91:5
**disciplinary** 41:5
**discipline** 36:5,6
**discrepancy** 13:12
**discriminated** 94:8
95:18 103:17
104:1
**discriminating** 95:7
**discrimination**
79:22 96:2 105:13
**discussion** 139:17
**disrupting** 34:23
**disruptive** 34:20
38:18 40:3
**distance** 99:19
**District** 1:1,1
122:22,22,22
**districts** 122:21
**DIVISION** 1:2
**DOC** 24:4
**document** 101:7
**documents** 106:19
**dog** 113:7
**doing** 12:16 13:13
29:14 30:18 48:12
56:9 57:9 65:1
73:4 80:4 95:22
106:6 142:6 146:8
147:19 148:1
**door** 44:19 57:2,3,6
57:12 58:3,6,8,10
58:18 60:13
109:17 111:1,5,8
111:10 112:1,2

114:3,13 115:9,13
115:15,18 116:4
116:23 117:2
118:4 119:20
120:7,16 125:9
127:22,22 128:17
129:1,6,15 130:6
130:14,15 131:4
132:2,3,23 133:9
135:6,7 136:1,7
137:6,7,8,16,21
140:12 141:4,9
144:1,14 145:1,3
145:22,23 146:2,7
**doors** 57:23 130:17
131:16 134:19
141:11 144:10
**dorm** 38:18 41:8
65:1,1,4 111:16
129:7 131:3 133:1
133:10 136:14
137:15
**dorms** 41:18 143:9
143:15
**Dowdy** 3:3,5,7,9,11
3:13 4:11,12 5:16
5:19 6:1 28:7
34:5,8 35:10,14
47:23 53:3 57:17
70:12 97:19,22
100:5 101:8,15
102:3,7 103:19
108:5 110:6
111:15 113:21,23
127:1,4 128:11,20
129:19 140:20
144:6 146:23
148:13 149:17
**downstairs** 65:20
65:21 124:7
130:13,13,20
131:19 145:8
146:4
**dragged** 61:13
**drastic** 98:7 135:15
**drastically** 32:2
**draw** 97:3,5
**driver's** 7:18 8:9,14
**dry** 37:22 38:2,16
39:15,23 63:8
100:22
**dude** 54:20
**duly** 5:12
**Durbin** 9:20,21
10:7 11:6 14:7
**duty** 111:13
**D-dorm** 143:11

|                 |
| --- |
| **E** |

**E** 3:1,15 143:13
150:1,1
**Eagle** 17:3
**earlier** 6:1 25:9
56:7 114:17 121:9
135:18 138:4
145:23 148:21
**earth** 124:22
**education** 8:19
**effect** 2:1 59:8
**either** 37:11,20
47:8 68:11 79:18
84:22 113:1
119:18
**elaborates** 145:18
**elected** 77:23
**eligible** 20:19
**employed** 11:8,10
15:17 36:19 49:18
77:8,13,18
**employee** 17:4
20:10 22:1 27:22
28:15,21,23 29:2
37:9 42:3 49:13
50:3 77:3 94:2
114:6
**employees** 59:13
78:1 114:1
**employment** 15:2
70:15
**employs** 89:18
**encountering** 35:3
**encouraged** 35:16
69:5
**encouraging** 69:9
**ended** 35:3 107:3,4
**enjoyment** 52:10
**ensued** 42:14 53:13
55:23 58:20 65:12
99:18 135:16
**entered** 30:21
**entire** 131:3
**Entity** 1:7
**escaped** 43:2 92:5
**escorted** 126:14
**established** 135:11
**eventually** 45:18
**everybody** 12:18
100:15 110:2
118:21,23 121:17
**everybody's** 119:6
119:8
**evidence** 2:10 47:16
90:18 93:5
**exact** 87:15
**exactly** 10:16 30:2

81:21 82:11 83:12
**examination** 3:2 5:8
5:19 101:13
**examined** 5:12
**example** 74:22
130:9
**exception** 54:5 58:1
**exceptions** 144:11
**excessive** 49:14,20
53:5 70:7 72:23
73:12 86:2,3,7
**Exhibit** 3:16 28:4,9
57:14,18 70:9,13
109:12 121:14
141:2 144:7 147:9
**Expires** 150:21
**explain** 45:10
**explained** 81:7,20
82:11,12 84:3,15
**explaining** 147:4
**explanation** 73:2
**extent** 47:16 63:22
99:11
**ex-girlfriend** 87:15
**eye** 13:7,9 21:20
**eyes** 27:18

|                 |
| --- |
| **F** |

**F** 143:1 150:1
**face** 59:3 78:8
**facility** 123:6
**fact** 79:23 95:1
104:8 116:11,16
139:18 147:13
149:5,6
**facts** 47:16 74:19
75:9 90:23
**failed** 47:13
**fair** 87:2 124:16
**fall** 33:13
**familiar** 49:5
**family** 86:22
**far** 14:23 40:14
**fat** 69:7,7 126:2,4
**father** 9:3
**father's** 7:11
**favorable** 104:5
**February** 7:17
**fed** 114:18
**federal** 5:3 115:1
**feed** 114:8 116:8,9
116:10,13,18
123:2
**feeding** 56:11,12,13
56:15 116:19
**feel** 93:2,3 112:19
117:14 125:8,12
**feeling** 93:6

feelings 6:14
fell 60:12
fellow 66:9 127:14
felt 67:21 85:4
  95:23 96:20
  117:12
female 87:13 88:3,6
  89:7,11,12,23
  95:2 96:17 106:10
females 61:9 63:5
fight 42:14,15
  53:13 55:23 58:19
  61:18 62:1 65:12
  65:22 67:20 68:2
  73:9 84:16 89:2,3
  90:9,13,19 91:19
  93:8,12 98:8
  99:16,16,18,22,22
  105:16 113:15
  116:21 122:11,12
  135:16 148:8,9
  149:2
fighting 26:17 60:2
  61:2 63:14
file 83:15,16,18
  100:7,10
filed 6:3 93:15
fill 13:14 63:1
  111:18 117:7
  119:4
finally 59:9 71:18
  80:19,19
find 16:19 18:5
  20:14 49:2 54:15
  93:4
fine 5:16 36:1 51:11
  114:10 147:18
finish 8:7
finished 7:23
fire 74:12 75:5 76:3
fired 62:6 72:10
  73:3 74:4,21 75:3
  75:13,14 76:1,1
  76:15 85:5 148:10
  148:15 149:7,11
first 5:12 18:18
  27:14,15 43:13
  46:3 50:13 62:6
  89:1 104:16 105:3
  115:13
fist 79:15
fit 54:16
five 94:21 112:11
  142:10
flashlight 128:5
floor 60:17 108:10
  141:8,10 143:8
  146:1

focus 99:2
focused 44:8
folding 25:6
follow 26:14 90:10
  140:1
following 5:9 36:7
  101:4
follows 5:13 110:5
follow-up 101:14
  108:14 113:21
food 89:17
force 2:1 25:20 26:4
  26:8,22 31:18
  49:15,20 53:5
  70:7 72:23 73:12
  86:2,3,7 98:13,21
  99:8,9,13
foregoing 5:4 150:6
  150:10
forehead 32:20
  60:20 78:15 79:2
forget 30:10 48:13
  50:12 66:10 107:8
  112:15
forgot 14:11 43:4
  44:16 47:6,21
  99:6
form 2:7 47:15
  57:10 63:21 99:10
  103:19 108:5
  110:6 111:15
  115:10 117:7
former 80:3
forms 56:16,23
  114:19 115:6
fought 68:5
four 14:22 17:6
  60:23 61:8 63:4
  73:7 78:20 79:3
  79:11,13 106:8,10
  142:10 143:1
  148:15
fourth 51:4
Foust 50:14
frank 19:9,10 70:21
free 107:18 143:8
Friday 69:16,18
  113:4,4 126:22,23
  148:9,10
front 39:3 60:13
  80:14 109:13
frowned 99:4
full 2:1 5:20
full-time 16:17
  19:17 20:9,15,23
  21:2,9,13,15
  27:21 29:1 35:9
  35:11 36:22 37:9

38:14 42:3,7
  49:13,13 85:7
  119:18
further 1:21 2:4
  145:18 147:1
  149:21 150:13
———————
**G**
G 143:12
gain 61:15
garbage 123:4
gas 63:1,6 111:18
  116:12 117:10
  118:3
Gates 83:9
gay 29:20 64:11,13
  64:15
general 41:13 79:4
  141:20
generally 41:23
generation 13:16
gentleman 50:12
  63:13
George 1:3,11,16
  5:7,11,22 7:12
  30:9 50:13,14
  101:14 109:16
  112:15 127:9
  141:1 149:16
Georgia 12:2,3
getting 58:23 89:9
  107:3 112:14
  117:10 118:3
  120:22 130:21,22
  130:22
get-go 87:2
girl 106:16
give 12:18 38:3
  56:23 57:12 61:5
  85:1 115:21 125:3
  130:8,9,11 132:6
  132:8,10,21 133:8
  133:18 134:6
  138:10
given 6:5 48:16,19
  48:21 76:12 80:9
  139:8 150:11
giving 71:1 131:13
  145:11
glad 140:7
glass 54:8 127:22
go 8:5,17 15:1
  17:16 20:17 23:6
  23:8,16,19 24:12
  25:8 27:8 35:1
  38:19 39:8,10,12
  43:11 44:1,6,12
  45:8 49:3 53:15

53:18 62:16 63:6
  65:4 67:8,11
  69:19 74:9 75:10
  75:18 80:9,22
  111:9 114:5,8
  115:11 116:7
  122:20 123:13,21
  124:2,7 132:8
  139:21 142:4
  147:3
God 124:23
Godfrey 69:23 70:2
going 6:8 12:17
  18:6 21:15 28:8
  29:9 38:21,23
  39:1,3,4,12 44:12
  48:9 50:10 52:2
  54:16,22 57:12,18
  60:15 64:17,18
  65:2 74:9,16 86:9
  88:18 89:6 90:20
  90:21 93:1 95:10
  98:11 101:20
  102:7,23 104:23
  109:17 114:2
  115:9 125:7,12
  137:1 148:7
  149:12
Goldman's 148:23
Gold's 148:23
good 21:18,22
  37:20 62:15
  147:19 148:1
gotten 54:13 114:19
  126:8
Governmental 1:7
grade 7:23 8:2,3
Grant 68:21,22
grew 39:5
grievance 83:15,16
  83:19
groped 29:22
ground 25:7
grounds 2:9 84:2
guard 11:17 12:23
  13:21 60:2
guards 12:7,8
  143:15
guess 14:10 17:20
  21:6 24:21,22
  27:2,17 29:6,20
  43:18 46:7 50:16
  51:15 57:7 69:21
  72:9 74:13 79:12
  82:5,7,8,20 84:4
  98:6 99:13,15
  103:6 116:1 118:6
  118:6 130:2

138:21 145:14
  146:9
gun 24:19 102:2,4
  102:10
guy 30:10 37:22
  51:3,5 64:12,13
  64:14,15 66:8
  68:5 73:8 99:20
  guys 36:5 39:4 41:9
  123:1 130:21,22
guy's 54:12 66:7
———————
**H**
H 3:15 143:12
hair 65:5
hall 39:16,17,20,21
  39:22 148:3,4
hallway 49:3
hammer 67:22
Hamrick 80:17
  83:4
hand 57:12 115:9
  117:1,12 118:5
  121:4 148:1,5
handbook 36:10
  83:17,18
handcuffed 48:3
handed 117:11
handle 36:1
hands 59:4 69:18
hands-on 13:14
hanging 63:8
hangs 90:7
hang-ups 103:8
Hannah 19:7 22:16
  40:7 126:16
happen 31:7 44:22
  50:4 93:9 138:19
happened 31:15
  38:14,15 43:9
  45:9 50:22 52:18
  53:9,12 55:21
  58:17,22 60:8
  63:18 64:7 65:15
  67:18 68:17 69:17
  81:8,21,21 82:12
  83:11,12 84:3
  86:12 87:7,9 89:1
  91:16 92:4,6,8,9
  96:6 100:14
  102:14 112:10,11
  113:14 115:6
  129:3,5,23 132:10
  132:12,15 134:12
  134:17,22 135:1,2
  135:15,21 136:3,8
  136:20 137:12
  138:11,12,12,23

139:9,12 141:14
148:9
**happening** 59:20
62:21 135:20
140:18
**happens** 45:13,13
89:3 90:10 100:4
123:8 132:4 137:1
138:14
**Harbin** 22:22,23,23
31:16,17 62:23
**Harbison** 22:21,22
23:1
**harm** 27:4
**Harper** 22:10 43:14
60:7 63:4 64:1
112:7 118:7,10
**head** 32:20 34:22
34:23 59:1,1,3
61:3 67:5 68:12
73:23 74:2,3 75:4
76:17 78:22 79:4
79:15 80:21 84:10
98:4,14,20
**health** 21:20
**hear** 120:15
**heard** 50:9 84:19
102:8 118:18,21
119:10,12,19
120:7 141:20
**hearing** 150:12
**heavy** 127:22
**hectic** 48:8
**help** 15:8 33:8
59:17,18,21 62:23
63:7 84:18 86:23
91:11 102:16
113:19
**helped** 63:16
107:15 116:18
**helping** 31:20
**Hemrick** 84:8 85:19
**heterosexual** 64:12
64:14
**hey** 54:12,20 61:11
64:16 65:15 99:20
100:3 123:14
124:22 139:23
146:11
**high** 8:2,5,6,16,20
9:2 93:20
**Hinkle** 34:19 35:19
35:21
**hire** 18:6
**hired** 16:14,16
17:10,19 18:3,4
23:4
**hit** 25:22 26:1 32:19

33:11 58:23 60:21
61:22 62:15 67:23
73:23 74:2,3 75:3
78:22,23 98:20
148:15
**hold** 80:22 121:4
**holding** 143:22
**hole** 55:7 114:15
**holes** 56:14 114:14
**hollered** 59:21
**home** 12:1 25:11,16
67:12
**honest** 47:9 48:14
73:21 77:9 125:4
**hook** 62:14
**hooked** 148:17,19
148:20
**hospital** 46:18 50:2
50:3,11 52:15
67:9 92:8
**Hound** 113:2,6,9
**hour** 13:1 21:14
**hours** 12:13,15,15
12:18,20 17:5,7
23:22 40:18 56:4
**house** 7:8 93:18
122:16
**housed** 40:11 41:16
55:6 66:3 121:10
**houses** 41:23
**housing** 66:14
**huh** 15:23
**human** 48:14 61:8
105:21 121:7
124:18
**hung** 88:19 94:17
**hunting** 102:14,21
**hurt** 6:14 127:20

---
**I**

**idea** 136:19 146:21
**identification** 28:6
57:16 70:11
**imagine** 79:17
**immediate** 60:1
**immediately** 44:22
**important** 86:21
**impossible** 58:4
111:8 112:3
**incident** 30:19 31:8
32:10 34:9,18
35:19 43:1 50:1,6
53:8 66:16 68:16
69:3 75:9 78:3,10
80:8 81:4,21
86:11 87:6 92:4,7
92:13 94:11,12
100:7,11,17 101:4

101:6 102:20
103:13 110:13
113:14 122:10
129:5 135:12,12
140:9,17 147:22
**incidents** 29:2,4,5
34:11,16 35:5
42:4,9,22
**including** 63:5
**indicate** 127:14
**indicated** 106:20
**indicates** 108:3
**indicating** 33:1
34:1 38:4 48:10
60:18 67:15 68:14
79:1 93:17 102:22
110:16,22 115:10
122:23 128:1
146:14 147:20
**individual** 33:20
**individuals** 1:8
101:16
**informed** 21:14
36:2
**inmate** 26:10,11,15
27:4 29:8,11,13
29:18 30:5,6,17
30:20,22 31:4,8
31:18,21 32:16,19
32:22 34:10,20
36:10 37:7,23
38:5 40:19,23
41:3,7,21 42:10
43:2,5 44:7 46:1
46:11,14 47:1
49:14,19 50:2,11
52:11 53:4,14
60:2 66:5,6 68:23
74:3 75:16,17
76:6,16,17 77:17
78:3,5 84:17 88:7
89:12 90:10 92:5
100:18,22 101:5
104:6 108:9
109:18 112:15
117:5 125:17
126:1,5,13 148:8
148:15
**inmates** 29:3 34:17
36:21 40:17 42:5
42:9 46:17,20
48:3 51:14 54:2,5
56:12 64:10 65:3
65:17,22 66:13
69:5,8 73:23 74:2
77:13 88:3 89:11
95:2,7 96:8,12
104:8 112:13,22

113:12 114:18
115:19 116:13
118:12 120:9
121:6,10,20
122:17 123:6,10
123:22 124:6,8,15
126:3,9,10 127:19
128:7 146:15
**inmate's** 26:16 65:5
68:20
**inquired** 48:22
**instance** 30:22
**instructed** 66:15
**insurance** 13:6,7,7
21:18,20,20 43:20
72:3 107:4,9
**intended** 145:15,16
**intentions** 125:4
**intercom** 38:20
**interest** 61:15
**interested** 150:15
**interpret** 141:2,5
**interview** 17:22,23
**interviewed** 18:1
**introduced** 5:23
**investigated** 96:1
**investigation** 29:17
30:11,14 31:10,12
32:5,13 35:17,18
50:1 68:15 69:11
87:2
**investigator** 32:7
68:18 86:14
**investigator's** 32:9
86:13
**involved** 100:16
**involving** 103:13
**irons** 108:21 109:9
**items** 56:18,22
**It'll** 11:13

---
**J**

**jail** 11:4 23:16
24:15 25:19 34:22
35:23 37:16 44:11
44:23 45:8 47:13
48:19 51:7,10,12
51:16 52:6 54:13
54:21 63:7 67:10
72:6 74:17 75:21
91:8,9,10 100:6
107:2,18 109:16
113:11 121:3
122:16 123:3
125:15 143:3
149:14,15
**jailer** 16:15 18:11
18:16 23:5 24:2

24:20 25:1 49:13
49:19 100:6
105:23 114:9
**jailers** 19:6 114:2
134:6,7 142:8
143:16
**jailer's** 20:16
**James** 22:11
**Jasper** 1:2,19 6:21
6:23 9:10 14:7
**JEFFERSON**
150:4
**Jerry** 58:16
**Jim** 12:11
**job** 10:22 14:21
16:20 17:13,17
18:13 20:21 35:23
36:4 77:17 84:19
85:1,13,18 93:20
99:23 100:1 121:4
123:11 126:11,12
147:19 148:1
**jobs** 86:21
**John** 1:8 4:5,6
**joints** 33:10 67:23
**joke** 140:1
**jolt** 38:3
**Joseph** 52:23
**Jr** 1:3,11,17 5:7,11
5:22
**judge** 124:21
**judgment** 63:2
**jump** 41:10
**June** 11:14 14:16
**junior** 7:11

---
**K**

**keep** 10:1 24:14,19
24:23 57:6,7 59:4
59:4 68:13 85:15
85:15 112:20
128:5
**keeps** 115:14
**Kelly** 69:23 70:2
**Kendrick** 19:8,8
**kept** 59:8 109:2
122:15
**key** 111:1,3
**keys** 114:15,20
**kick** 30:20 69:6,6
**kicked** 78:7
**kids** 103:4
**kill** 63:12
**Killingsworth**
22:15 60:6
**Kimbrell** 88:1 90:1
**kin** 150:10
**kind** 13:12 26:5

29:4,11 43:22
48:8 59:9,10
60:12 66:9 67:3
102:13 105:10
123:17,18
**King** 78:14
**kitchen** 87:13,18,20
88:2,6,19 89:6,9
89:22 96:13
104:23 105:14
**knee** 33:23
**kneecaps** 78:23
**kneed** 104:22
**knees** 33:1,2,4,9,12
60:18
**knew** 44:14 90:3
104:17 105:4
109:22 110:1
119:13,20 122:12
**Knight** 45:22,22
**know** 6:17 7:21
13:11,14,15 21:19
21:19 23:11,22
24:10,11,17 25:6
25:22 26:10,18,23
26:23 27:11,18
30:23 31:1,20
32:9 33:1,5,6,8,9
33:11,12,13,14
35:13 36:4,5,6,6,7
36:11,18 37:15,19
37:20 38:3 39:6
40:14 41:2 43:23
44:1,5,6,9,12,13
44:16 45:2,9
46:10,22 47:7,8
47:10 48:8,10,12
48:14,17 49:21
50:15,21,23 51:1
51:1,2,9,19 52:19
54:21 56:19,20
57:5,8,8 58:1,2
59:15 60:12,15
61:1,11 62:12
64:1 65:13,14,16
66:8,13,22 67:3,9
68:4,8,10,15,18
68:20 69:2 70:6
71:7,8 72:11,19
72:20 73:1,13,14
73:16 74:11 75:15
75:18 78:2 80:5
81:1,13 83:13
86:8,9 88:9 89:13
90:16,20,22,22
91:10 92:12,15,17
92:20 94:11 95:10
95:11,12 97:1,4,7

98:7,9,12,15,16
98:23 99:1,2,3,15
99:21 100:15
101:16 102:23
103:5,6,6,10
105:2,9 106:14,17
107:8,17 109:8
112:22 116:2
117:6,22 118:23
119:7 120:17,20
121:5,6,8 122:6,8
123:3,12,12
124:14,16,22
125:1,2,7,11,23
126:2,4,7,9,10
128:2 131:23
132:10,13,17
134:2,2,12,15,18
135:16 136:17,22
137:3,4,23 138:3
138:7,8,9,11
139:2,12,16,23
140:14 141:14
142:2,4,6,21
145:15,16,18
146:13 148:6,7
149:8
**knowledge** 53:6,7
128:23 134:5
**known** 102:17
120:5
**knows** 66:12 110:2
146:14
**Kool-Aid** 56:21
**Kristi** 4:11,12 6:1

_____

**L**

**lack** 29:7
**lady** 88:6 107:10
**laid** 46:8 71:14
**Large** 1:18 5:2
150:23
**Larry** 16:3
**Laura** 88:1
**law** 4:12 115:1
**laws** 2:2
**lawsuit** 6:2 93:16
**lawyer** 88:20 94:15
104:21
**Lays** 56:19
**leading** 2:7
**leaned** 102:22
**learned** 124:13
**leave** 63:7 66:13,14
67:10
**leaving** 9:23 13:19
**led** 105:7
**left** 14:12 44:11

51:22 69:22 71:14
85:3 111:19
**leg** 108:20 109:9
**legal** 47:17 99:11
**legs** 79:10
**lethal** 27:17
**letter** 3:17,19 28:2
28:11,12,13 70:14
**let's** 34:5 35:7
80:22 108:9
**license** 7:19 8:9,14
**lick** 61:3 79:2
**lie** 77:10
**lied** 104:16 105:2
**lieutenant** 18:20
20:2,6,7 22:11,11
24:4 49:1 75:1
80:3,3 133:19
**life** 7:4 32:3 61:8
99:14 100:2
105:21
**light** 66:9
**lights** 128:7,8
**liked** 100:2 126:12
**line** 21:5 40:19
**list** 20:19 56:18,18
57:11 115:4,22
117:1,4 118:5
125:4
**listed** 113:12
**listened** 83:13
**literally** 58:10
76:16 99:22
**little** 25:6 38:3 46:7
46:8 51:14,16
87:6 90:5 106:15
108:2 127:23
**live** 6:21
**lived** 7:2 25:15
**lives** 7:5
**living** 6:19 25:10
81:11 103:4
**loaded** 103:2
**located** 9:9,21
11:23 16:4
**locations** 12:5
**lock** 38:19,23
**locked** 40:18 56:4
143:5
**logging** 9:4,5,6,7,17
15:9,19
**logs** 114:21,22
115:3 124:1
127:18
**Lois** 7:12
**long** 7:2 9:11 11:2
11:12 16:7 19:11
30:3 45:3 89:8

94:19 102:17
123:23
**longer** 10:19
**look** 109:12 123:17
141:1
**looked** 108:1
**looking** 61:14
**looks** 70:17
**loose** 61:13
**lose** 77:17
**losing** 93:19
**lost** 59:19
**lot** 10:21 46:5 48:9
93:22 103:8,9
114:5 115:19
119:22 126:3,3
142:8
**loud** 6:10 40:2
**loved** 99:23 100:2
**Lumber** 14:7
**lunch** 146:16
**lying** 105:8

_____

**M**

**Madison** 43:6,7,8
45:18 47:4,13
48:16 108:16,17
125:11,13
**main** 19:13
**making** 12:22 21:11
21:13 91:1
**male** 62:22 63:9
106:11 111:19
117:19 118:3
**malicious** 78:13
**man** 64:16 68:3
83:4 101:19
106:17
**management** 23:16
25:19 76:14 80:9
**manner** 27:1
**manual** 48:20
**man's** 72:11
**March** 9:15,16
16:12,13 71:20
**mark** 1:8 57:18
**marked** 3:16 28:5,8
57:15 70:10,13
**married** 25:11,13
**Marsh** 108:15
**Marshall** 9:19,21
10:7 11:15 14:7
**Mary** 23:3
**mass** 33:2 60:19
79:1
**matter** 133:12
**maximum** 40:9,13
40:23

**ma'am** 6:7 7:20 8:4
8:12,15,18,21,23
10:4 13:22 14:1
14:14 16:6 17:1
18:12 19:21,23
20:4 21:4,10
23:18 24:3 25:12
25:14,17 32:6
34:15 45:19 48:7
53:11 56:8 62:9
72:10 73:14 74:22
76:23 77:5 78:12
86:4 91:3 96:3
115:20 117:15
128:15,19
**McCLUSKEY** 1:8
4:16 18:2,9 21:14
34:2 35:20 36:2
45:7,11 51:7,9
53:2 55:8 69:18
70:23 71:6 74:8
79:21 86:10 87:3
87:5,8,23 88:8,23
89:19 91:4,16
93:18 94:4,6,10
94:20 103:14
104:12,14 105:12
105:14 106:23
107:15 145:16
147:13,18 149:12
**McCollum** 87:19
**McGhetti** 19:9,10
**Meadow** 107:9
**Meadowbrook**
107:12
**mean** 17:15,21 19:5
23:10 24:16,21
25:22,23 26:5,12
26:16,18,22 27:11
27:17 29:5,11
30:2 31:9 32:1
33:13,23 35:12
36:10 37:15,20
41:2 44:7,14
46:22 47:22 52:12
54:21 57:11 65:14
67:13 72:10 73:7
73:7,9,14,14
74:23 79:3 80:2,4
90:22 95:10 98:8
98:10,23 99:3,22
100:15 103:11
105:6 108:17
109:1,4,7 116:2
118:9 119:23
120:9,19 121:2,5
121:21 122:6,8,13
123:8,9,10,11

124:20 125:1,22
126:8,10 127:20
130:1 133:12
134:14,14 135:9
135:16 138:8
142:9 145:14,17
146:11 147:21
**means** 59:23 99:20
133:4 134:5 143:7
150:8
**meant** 99:4
**measures** 98:7
**medical** 13:6,9
21:17,22 31:22
46:15 66:17,18,19
66:21,23 67:3,7
94:1
**medication** 93:21
93:21
**memo** 3:18 64:23
**mention** 93:19
147:4
**mentioned** 101:20
110:20
**middle** 68:7
**Miller** 20:8
**mind** 35:15 44:7
55:12 94:14
104:23 117:23
143:5
**mine** 50:15 61:10
76:21 84:12,13
134:4
**minutes** 65:12
94:21 112:11,12
114:22 124:1
127:18
**misconduct** 70:6
**misfired** 62:6
**missed** 102:3
**mistake** 48:15
53:17
**mistaken** 17:9
43:14 44:4 69:16
142:15
**mistreated** 103:22
**mistreating** 88:4
96:14,21 97:12
**misunderstood**
78:19
**mom** 7:7,8 15:17
67:17
**moment** 117:9
**mom's** 7:12
**money** 86:22
**Monica** 22:20
**month** 11:13 83:19
**months** 9:22 10:11

10:12 28:16
**monument** 83:8
**Monuments** 83:9
**morning** 67:14
Mote 68:20 69:11
**Mountain** 17:3
**mouth** 72:11 75:2
**move** 64:21,22 65:6
**moved** 19:15,18
22:8,16 55:3,10
**moving** 64:23
**MP-dorm** 122:23
**murderers** 40:10
**M-block** 118:4
119:20 120:7,14
132:3 133:9
**M-door** 118:16
119:12
**M-dorm** 35:4 39:13
39:14 40:8,12,20
41:4,17 44:3,4
53:21,23 55:2,4
55:11 56:1,10
58:1,2 60:4 63:19
64:6 68:8 69:8
110:10,11,12,15
114:2 116:8,10
119:4 121:10,17
123:20 124:2
126:14,15,17
127:10,16 128:13
128:17 129:3,6,14
130:6,9,17 131:3
131:16,21 132:23
135:23 136:6,12
137:21 140:11
141:8 143:17
144:11
**M-6** 118:19

_____

**N**

**N** 3:1
**name** 5:20 7:11,12
7:13 15:22 22:22
23:12 30:4,7,10
31:3 32:10 36:14
38:8 50:11,12,13
50:13,14 52:22
66:7,7,8,10,10
68:21 76:13 107:8
112:16 132:14,21
134:9 139:8
**named** 77:20
**names** 7:10 20:20
54:6 113:12
125:20,22 132:6,8
132:11,17 133:8
133:14,16,18

134:2,7,16 136:11
138:11 139:5,6,14
**name's** 87:16
**nature** 106:13
122:4
**necessarily** 109:1
**necessary** 2:5
**neck** 63:11
**need** 6:9 34:2 41:13
45:5 59:23 66:21
67:8 69:21 88:18
91:12 112:19
114:1 115:3
123:14,15,16,18
134:16
**needed** 12:7 15:8
43:16,17 67:6
72:14 91:9 117:12
118:17 149:13
**needs** 41:7 54:13
74:9
**neither** 150:13
**never** 37:9,13,21
44:13,21 48:16
52:13,18 65:11
66:11 84:19 85:4
85:16,18 86:10
92:9 125:13,19
146:18 147:4
148:19
**newspaper** 16:22
**nice** 99:21
**nicest** 126:12
**Nick** 22:21,23 31:16
62:23
**nigger** 126:8
**night** 22:7 34:20
35:21 40:6 46:9
67:13,13 106:16
110:12,13 123:23
129:1,9 130:10
142:11 143:1,14
146:13
**nights** 130:10
**nodded** 83:14
**nondeadly** 99:9
**normally** 40:22
**North** 4:7,13
**NORTHERN** 1:1
**notes** 148:23 149:1
**noticed** 67:14
**November** 14:12,15
42:14,21 53:9,19
55:16,22 58:13
69:15 90:9 91:19
125:16 135:2
137:4 139:10
140:5,10,18

141:15
**number** 7:21 8:10
28:5,9 41:10
57:15 70:10
109:12 135:7
**Nurse** 148:23,23

_____

**O**

**Object** 47:15 63:21
99:10 103:19
108:5 110:6
111:15
**objections** 2:5,8
**obvious** 73:6
**occasion** 37:4 131:2
131:7
**occasions** 27:5
130:5
**occur** 39:19,23 69:3
**occurred** 50:1 64:2
87:6 91:19 129:5
131:8
**occurrence** 138:15
138:17 139:1,11
**October** 55:18
87:12 91:18,20,23
**odd** 16:9
**offender** 54:4 61:11
106:12 122:13
**offenders** 55:5
122:14
**offense** 106:13
**offenses** 113:12
**offer** 85:7,10
**offered** 2:10 21:19
66:19
**office** 9:23 12:2
45:7 69:23 71:23
**officer** 30:22 31:14
40:4,5 45:1 46:13
51:6,22,23 53:23
54:10,11 62:22,23
63:9 80:12 111:19
116:5,8,9,11
117:10,19 118:3
118:15,17 119:14
120:11 123:9,22
124:5 126:16
127:11,16 129:7
129:15 130:7,12
130:12,13,14
131:2 132:1,22
133:1,8,10 134:21
135:23 136:6,14
136:20 137:16,22
138:2 139:18
140:11 141:9,10
145:8 146:1

**officers** 57:22 59:23
63:19 74:23 76:5
77:11,15 89:7,23
90:1 95:2 96:12
105:20 106:2,10
109:19 110:14
111:12 119:15,21
120:5,10,18 123:5
126:14 127:14
128:13,18 129:12
129:21 130:16,19
131:15,21 132:6
132:20 134:19
141:3 142:14
144:9
**officer's** 132:14
**Offices** 4:12
**official** 78:1
**oftentimes** 127:10
**oh** 16:9 17:18 22:3
22:21 23:7 42:20
43:3 45:12 50:4
53:21 57:20 66:7
75:2,11 76:2 92:6
102:23 108:13
116:9 122:12
125:21
**okay** 6:4,8,15,17,18
11:8,20 15:1
16:11 17:4,22
18:3,18 19:16,19
21:8 22:4 25:3
26:7 28:19 29:1
33:14,19,22 34:8
34:16 37:2,13
39:2 42:15 43:1
45:12,23 46:23
47:23 48:6,23
51:11 53:8 56:1
57:21 58:17,21
62:7,11 64:20
65:10 66:2 67:8
70:18 71:11 72:13
72:17 73:20 75:6
76:10 79:7 82:8
82:16,22,23 87:9
87:11 88:22 90:17
92:1,10,19 93:3
95:5,23 97:2,16
97:19 98:13
102:12 104:11
105:19 106:1
107:14 108:6,23
109:22 110:2,8,17
111:4,7 112:6
116:7,22 117:8
118:20,23 119:17
120:21 126:17

127:6 128:3,16
129:17,22 130:5,8
131:23 133:18
134:1,3,13,22
135:5,8 136:10,18
137:3,14 138:1,4
138:9,18,22 140:4
140:20 141:6,14
141:18 142:19,22
144:4,12 146:10
146:23 147:16
149:19
old 7:14,15 106:16
older 50:12 63:12
omitted 23:12
once 24:11 78:23
one's 64:13 130:19
130:20
one-third 142:17
on-line 13:10
open 20:15 58:2,9
58:10 109:17
111:1,5,8,10
112:1,1 114:2,15
118:16 119:1,20
130:6 137:6 144:2
opened 44:18 58:6
58:8,18 63:20
114:13 116:4,23
118:4 119:13
120:8,16 125:9
126:18 128:17
129:1,6,15 130:17
131:3,16 132:3,22
133:9 134:19
135:6,7 136:1,7
136:13 137:7,9,11
137:17,21 140:12
141:4,12 145:1,3
opening 16:20
57:23 144:10
opinion 99:8 138:13
138:14 139:1
opportunities 80:11
opportunity 94:9
opposed 88:5
oral 5:8
orders 119:5,11
outside 121:15,16
owns 15:9

_____

P
pack 39:12
package 21:20,22
packs 56:21
PAGE 3:2
paid 23:22 72:3
107:6

pants 59:14
paper 13:15 16:23
17:2 28:17 69:18
70:5 71:2 72:19
74:7,14 147:2
149:8
papers 43:20 44:10
93:18
paperwork 43:16
44:8 106:20
107:10
Pardon 127:3
parents 25:16
Parham 38:7,9,16
38:17 39:1,5
Parrish 42:16 52:22
52:23
part 48:15 63:2
73:19 126:10
particular 10:18
11:18 12:9 29:18
30:6,19 32:10
35:21 43:12 44:15
46:4 53:13,21
57:5 86:14 87:20
100:14 109:21
114:17 126:21
137:18,19 141:4
142:23
particularly 24:16
parties 1:15 2:8
150:14
parts 79:8 122:16
part-time 16:16,18
17:4 18:11 19:19
21:23 23:5 24:2
28:23 30:17 49:19
85:2,10,13 119:18
pass 56:16 130:11
passed 20:17
114:18 115:6
pat 147:23
Paula 87:16,17
103:13 105:12
147:14,21
pay 10:21 13:2
17:11 21:9
paychecks 84:11
paying 107:4
pen 13:14
Penley 98:2 99:5
people 40:10 41:16
55:1 64:23 75:4
77:7 80:13 119:8
120:2 132:9 134:2
134:16 139:7,12
139:14 141:20
142:10 143:1,2,8

people's 132:17
pepper 23:9 25:2
26:19,21 27:5,15
35:3 36:23 100:5
perfectly 114:10
performing 34:21
period 9:20 12:10
14:20 15:6 27:23
28:15 55:15 72:21
83:20 122:9
person 33:12 84:6
124:13 142:5,5
personally 106:22
Phillips 23:3 36:17
36:18 60:6
phone 18:7 44:2
87:10 88:19,23
89:4 90:7 91:15
92:3 93:9 94:18
94:20 96:4 105:10
phonetic 19:9
physical 77:12,16
physically 31:1
111:8
pick 43:11 44:12
46:1 48:1 108:18
123:12
picked 45:20
piece 69:18
pieces 90:11
pit 12:12
pitching 54:16
place 9:18 11:18
12:4,10 24:18
46:20 47:1 48:3
60:19 64:7 83:9
92:16 122:15
126:12
placed 41:3 53:23
126:21
places 14:22 58:4
112:3
plain 57:13
Plaintiff 1:4 4:4
plan 81:10,11 103:4
plant 10:5
play 73:19
please 5:21 6:12
28:10 132:7 144:8
pocket 115:7
pockets 86:23
pod 44:3,5 54:3
111:16,17,18
pods 143:9
point 18:13 41:14
59:5 78:11
points 33:5,10
policies 49:6

policy 24:18 46:19
46:20,23 47:12,12
47:22 48:2,20
101:2 109:16,20
109:23 110:3
114:12 121:19
128:12,15,16
129:22 139:19
140:1,4 144:16,18
145:13 146:7
poor 63:2
population 41:14
position 20:7,15,21
20:23 21:2,6
60:12 85:8,11
119:6
positions 14:4
possible 58:11 60:1
105:13
possibly 47:9 77:9
post 9:23 119:4,5
119:11
posted 120:15
121:15,16
Potato 56:20
practice 138:5
present 4:16 57:23
111:12 116:5
118:17 119:15
120:2 128:14,18
129:15 130:7,16
134:20 137:16,22
140:11 141:3,9,11
144:10,13,23
preserve 61:8
105:21
president 83:3
88:17 94:16
103:10 104:22
pressure 93:20
pretty 26:18 27:3
33:13 72:2,6 73:5
83:13 94:13 99:3
103:7
previous 100:17
prior 2:10 54:1
56:15 62:21 64:6
96:16 112:9,10
125:6,10,16
prisons 24:4 66:6
123:8
probably 19:13
24:17 55:17 79:18
100:23
probation 27:23
probationary 28:15
28:20,22 72:21
83:20

probes 62:13
148:17,19,20
problem 35:22
40:20 64:18 74:10
91:8,13 149:13
problems 38:18
44:14 64:11 91:4
95:21 112:14
124:17 125:17,19
procedure 5:4
48:20
procedures 49:6
proceedings 5:9
process 59:19
program 113:11
promise 6:13
proper 65:3
property 41:2
protect 26:14,17
61:7
protected 41:8
protection 55:12
prove 94:1
provide 13:8
pull 20:19 102:10
pulled 59:1 102:2,4
pulling 88:2
pummelled 58:23
punched 79:15
punching 59:2
punish 106:4
purposes 41:4
push 58:9 68:14
112:1
pushed 59:10
put 11:19 20:18
27:19 29:9 38:2
40:20 41:12,21
56:13 63:6 72:11
93:1 111:1 114:20
135:14 136:22
143:21,22 144:2
putting 41:6
P.C 4:6

_____

Q
question 6:11 42:2
89:10 108:14
121:1 131:20
140:15
questioned 89:22
104:9
questioning 95:2
96:12
questions 2:6,7 6:9
101:9,15 113:21
140:21 150:7
quick 34:6 60:1

97:20
quieter 46:8
quit 10:22 61:2,5
quite 21:21 70:21
73:21 82:2,14
98:17
quote 83:19 130:3

**R**

R 1:3 150:1
race 73:18 74:21
75:6 77:1 79:22
80:1 82:4,19
83:22 85:21 95:8
96:15,22 101:16
101:17,18,23
104:3 147:12
Rachel 22:10
racing 118:1
radio 59:19 64:3
69:22 71:14
118:18,19 119:19
120:7,16 123:13
radios 118:22
ran 44:20 109:9
Randy 18:20,20
75:1,6 77:21 80:6
80:7 133:20
134:10
ranting 53:15
rape 106:20 108:4
108:12,13 122:4
raped 106:15
raper 54:3,19
rat 140:2
rate 17:11
raving 53:15
reached 115:8
read 49:7 90:21
107:23 144:7
145:17
reading 1:22
145:17
real 34:5 97:20
really 9:12 10:20
11:1 13:13 20:7
36:3 52:4 61:1
72:19 73:13 79:13
98:9,22 99:16
103:11 109:3
120:19 130:2
131:9 132:20
133:11 136:17
139:23 145:15
147:2,3
reason 10:18 27:11
40:13 41:6 57:9
61:19 71:16 72:16

73:15 77:10
121:14,18 148:14
reasons 41:6
recall 14:9,19 22:19
30:13,16 31:19
32:7,12 34:10,17
35:6 36:21 42:9
42:23 61:1 131:10
135:19 136:9
137:15
receive 66:18
received 28:3 50:17
70:14 98:19
receiving 10:9
recertify 24:10
recess 34:7 97:21
recognize 57:19,20
recollect 37:3
recollection 32:16
recommended
105:14
record 5:21 101:17
records 94:1 148:22
red 59:21,22 67:15
refer 25:3
reference 149:9
refused 39:11
112:17
regarding 46:20
Regardless 137:11
register 20:19
regularly 24:7
144:15,15,17
145:12
relating 2:3
release 43:10 46:1
48:2 108:18
relieving 51:22
remember 10:14
11:1 14:23 17:2
17:10 18:8 19:16
21:21 29:23 30:4
30:7 31:3 35:12
37:1,6 38:5,11
55:14 58:12 79:13
131:5,7 139:6
141:21 142:23
remembered 38:4
reminding 47:7
remove 115:17
repeat 6:13 42:6
repeatedly 76:18
78:16
replied 88:21 94:17
104:20
reply 88:16
report 45:15 86:16
97:10 100:7,11,14

100:19,21,23
101:4 107:21,23
108:3
reported 97:10
**REPORTER** 5:14
reports 82:13 90:21
90:22 100:13
represent 6:1
represents 150:10
required 114:23
respect 124:15
respective 1:15
rest 55:1
restrictions 8:13
result 31:7 32:12
150:15
retired 22:12
retrieved 60:17
revoked 8:11
**RE-EXAMINAT...**
113:23 127:8
128:11,22 129:19
140:23 144:6
147:7 148:13
Richard 4:13
Richardson 87:16
87:17 89:5,13
94:2,7 95:3,6,16
103:14,15 105:13
147:14,21
rid 149:13
ridiculous 27:12
rifle 102:14,21
right 10:5,6 11:15
12:11,14,17 14:13
14:17,18 18:10,17
24:14 30:15 32:20
33:18 41:15,15
42:18 47:3 55:5
55:14 56:2,9
64:22 65:8 66:1,1
71:13 78:6,9 82:2
82:14 83:18 86:4
86:14 90:2 91:5
96:16 97:18 101:9
104:4,7,10,10
108:4,12,20 109:6
109:11,14,15
110:12,19,22,23
111:6,14 114:4,6
114:10,13 117:1,4
117:9 118:13
120:13 121:12,12
121:12 122:18
124:11 128:19,20
133:5,6,7 136:1
137:13 138:18
141:12,13,16,17

141:17 145:6
146:3,3 148:6
rings 44:3
ripped 59:11
Rodney 78:13
role 19:5
Ronald 68:21,22
room 51:21 54:11
58:3,13 63:10
86:13 102:21
110:21 111:3,5,14
111:21 143:5,6,7
Roscoe 5:22
Roswell 12:3
routinely 139:19
rover 44:3,4,5
111:16,17,17,18
Roy 43:6,8 44:14
108:15,16
RPR 1:18 4:1 5:1
150:20
Ruby 87:19
rude 50:16
rules 2:2 5:4 36:7
114:23
run 109:5 125:12
running 109:2
112:23
runs 109:4
rush 105:10
Ryan 31:5 34:13,14
78:7

**S**

s 3:15 150:18
safe 41:12
safety 61:10
**SAITH** 149:21
Sam 76:13 77:21
sat 69:22 76:16
Saturday 113:4
saw 16:23 59:20
61:4 67:18 69:2,4
91:8 99:16,17,20
107:10,23
Saxon 3:4,6,8,10,12
4:5,6 5:17 35:8
47:15,20 63:21
80:15 99:10
101:13 102:5,9
103:20 108:7
110:8 112:6
113:16,20 127:8
128:9,22 129:17
140:23 142:22
143:3 144:4 147:7
148:11 149:19
saying 83:14,15

91:3 93:10 100:7
111:23 119:9
122:19 123:4
126:11 129:13
130:1 132:17
133:6 134:18
135:10 136:4
140:19 144:17
145:19
says 28:18 69:19
72:20 108:8,11,13
scared 123:19
scenario 61:6
scene 60:1
school 8:1,2,5,16,20
9:2 23:6
score 20:18
Scott 1:17 4:1 5:1
150:18,20
scratches 67:16
scuffle 37:18 59:19
scuffling 63:13
scum 124:22
se 79:13
secluded 127:19
second 19:15,18
22:4,8,13 23:15
43:13,19 46:5
54:4 108:4,12,13
122:3
security 11:11,17
11:20 12:23 13:21
13:23 40:9,13,23
see 27:19 35:7 58:5
59:2 68:12 71:8,9
71:9 72:22 73:6
79:16 84:18 87:1
99:15,19 101:20
102:15 107:2,21
108:9 117:23
118:11 119:8
122:13,15 128:1,2
128:4 130:20,21
136:15 147:18
seen 106:19 148:19
sees 121:17
segregation 40:15
41:4
Senator 80:18 81:3
82:17,23 101:21
102:3,9,15
send 63:7
sends 62:23
senior 45:1
sense 6:11 106:5
sent 51:5 76:14
88:1 111:17
Separate 147:8

160

**September** 20:11
20:13 28:19 42:3
42:8,21
**sergeant** 19:9,10
22:10 24:5 98:1
99:5 112:7
**series** 6:9
**seriously** 32:3
**service** 15:3 17:18
28:14 83:4,17
89:17
**set** 86:12 90:11 91:2
92:23 107:16
**settle** 35:1
**sex** 55:5 61:11
106:12 122:13,14
**sexual** 122:4
**shake** 148:1
**Shannon** 36:17
**Sharon** 19:7
**shattered** 54:8
**sheet** 108:1
**sheriff** 1:7 17:21,23
52:6 71:3,16,22
73:22 74:21 77:22
77:23 79:20 80:23
82:23 84:18 86:19
89:14 101:17
**sheriff's** 13:19
16:12 17:14 48:19
70:16 96:20 97:11
101:3 139:22
**Sherrer** 76:13 77:3
77:21 80:8
**Sherrer's** 77:1
**shift** 18:21,23 19:3
19:12,15,18,20
20:2 22:4,9,13,17
23:15 43:12,13,19
45:2 46:4,5,5,6,7
46:16 99:6 130:12
142:14,14 143:4
**shine** 128:6
**shipping** 10:8
**shirt** 59:1,11,12
67:17 68:12
**shook** 148:4
**shoot** 103:1
**shooting** 27:10 57:4
**short** 105:9
**shot** 37:21
**shotgun** 102:12,13
**shoulders** 33:2,3
79:9
**show** 28:7 57:17
70:12
**showed** 25:21 82:13
99:1

**shower** 130:22
146:15
**showers** 130:9,11
131:13 145:11
**showing** 102:20
**shut** 113:2
**sic** 96:16
**sick** 93:19
**sickness** 93:23
**side** 86:16
**sides** 54:8
**sign** 43:17,19 44:10
84:12,12 114:21
114:22 124:1
127:18
**signature** 1:22
**signed** 13:10 74:7
74:13
**signing** 115:3
**signs** 83:5 84:11
**simple** 57:13
**singled** 103:16
**Sipsey** 107:17
**sir** 5:21 28:10 110:4
112:12 147:15
**sit** 51:3,5 140:7
**sitting** 51:3,13,21
60:13 86:14 87:3
117:23 131:6
138:1 146:20
**situation** 26:9 61:16
73:10 82:15 84:15
136:17,19
**six** 10:12 28:16
83:19
**skin** 62:14
**skinned** 66:9
**sleep** 93:22
**slide** 57:2 115:12,18
**slim** 66:9
**slipped** 59:15
**slung** 54:7
**Smart** 25:18
**smiled** 148:5
**Snickers** 56:20
**snitch** 140:3
**sold** 86:20
**somebody** 17:23
27:10,11 61:15
67:22 86:6,9
90:12,18 91:13
98:4,14,20 109:4
111:4 119:19
120:14 121:3
141:9 143:18,23
**somebody's** 73:9
98:10
**son** 103:1

**SOP** 98:16
**sore** 67:21 68:1
**sorry** 22:23 43:4
63:15
**sort** 76:18 106:23
**sounded** 95:9
**speak** 44:23 64:9
84:21 86:8 91:10
**specific** 12:10
**speculation** 63:22
**spelling** 19:9
**spend** 106:16
**spit** 30:20 78:8
**splitting** 118:13
**spray** 23:10 25:2
26:20,21 27:5,15
35:4 36:23 59:7
100:6
**sprayed** 59:7
**spraying** 27:10
**Sr** 7:12
**staff** 52:15 66:15
**standard** 116:7
**standing** 119:1,21
120:10,18 145:5
145:22 146:6
**stands** 35:14
**start** 9:1 91:4
**started** 9:12,15
16:11 18:10,19
23:20 24:2,6
48:18 96:5 104:19
105:5
**state** 1:18 5:1,20
23:21 73:6 150:3
150:23
**stated** 52:11
**STATES** 1:1
**stay** 64:19
**Steadman** 23:14
**Steele** 24:5
**stenotype** 150:7
**steps** 26:14
**stick** 25:2,3 114:16
**STIPULATED**
1:14,21 2:4
**stipulations** 1:13
5:5,15
**stitches** 32:1 67:5
**stop** 6:16 61:2
**store** 56:16,16,19
57:10 114:18
115:6,9 117:7
130:11
**story** 96:9
**straight** 10:1 51:4
**straightened** 43:21
**Street** 6:23

**strike** 32:21 33:20
98:4,14
**strip** 12:12
**struck** 31:2 32:16
60:17,19 61:19
62:4,8 78:14,20
79:4 106:7
**stuff** 21:18 24:9
25:23 36:8 39:12
43:18,21 44:2
45:13 56:21 65:2
65:5 82:13 90:7
100:3 102:18
113:13 115:16
122:21 123:4
126:4,4 131:13
132:18 146:14
**stun** 38:2,16
**stunned** 37:22
39:16
**subdue** 26:11 27:19
31:20
**subdued** 61:17
**subsequently** 69:13
**sue** 72:7,14 80:13
93:13,14 107:2
**sued** 79:20 93:15
**suing** 72:16
**suit** 93:16
**Suite** 4:13
**Sunday** 55:21,22
69:17 113:5 148:9
**supervisor** 18:19
20:2 22:9 119:7
**supervisor's** 19:5
**support** 74:20
79:23 90:23 93:6
**supposed** 26:14
27:13 46:21 52:4
63:13 66:13,14
101:7 109:18
114:22 120:15,17
128:5 136:23
137:3 142:12,13
142:17 144:23
145:4,21 146:6
**supposedly** 104:5
**sure** 61:1 95:17
96:10 97:9 98:17
111:11 115:5
127:17 129:11
**surrounding** 75:9
**suspended** 76:14
80:10
**sworn** 5:12

_____ **T** _____

**T** 3:15 150:1,1

**table** 54:7 68:7
86:16
**Taco** 14:11
**take** 6:16 33:15
34:5 35:4 37:21
54:22,23 63:11
67:10 97:19
109:11 110:23
123:2,3 142:3
149:15
**taken** 1:17 20:16
34:7 46:17 67:22
92:16 97:21 150:6
**talk** 39:3 43:18 71:3
71:12,13 80:15,23
81:2,5 82:22
84:17 91:13,14
93:11 98:22
112:12,21 141:22
**talked** 71:21 72:2
74:23 80:17,17,18
80:20,23 81:1,3
83:6 84:6,20
86:10 148:2
**talking** 42:18 50:19
51:1 52:19 63:3
65:17 78:1 88:11
95:1 105:12
**tall** 66:9
**tased** 60:11,11
61:21,23 62:7,9
75:17 100:22
148:16
**taser** 23:9 24:9,13
24:14,19 27:6,10
37:5,10,11,13
39:23 62:3,5,12
107:21 108:3
**tasering** 37:6
**taught** 24:3 26:7,13
26:19 33:19 98:3
105:18,22
**teach** 98:19
**tearing** 54:12
**tears** 128:7
**telephone** 148:3
**tell** 6:12 26:20 28:9
36:4,16 39:4 45:9
53:12,22 55:8
58:21 65:9 72:1,8
75:8 78:22 79:14
79:22 80:11 81:9
81:14,18 82:3,6
82:10,17 83:10,21
84:2,14 85:19
86:20 88:13,15
89:5,19 90:4 94:6
94:9,12 95:23

96:19,23 97:13
104:15,18,19
118:16 134:22
135:22 136:5,10
136:16,18 138:2
138:22 139:13
140:13 147:3
**telling** 33:14 43:16
58:9 62:10,18
71:2 72:12 82:8
83:12 95:20 96:5
102:19 103:18
104:2 105:5
116:20 120:3,4
132:5,12 133:2
140:16 144:14,20
**tells** 87:20,23 90:6
**temporary** 15:2
**ten** 94:21
**tend** 51:14,16
**terminate** 74:5
**terminated** 10:23
69:14 70:4,6,19
70:21,23 71:17
72:18 73:11 76:7
76:11,13 78:10
80:1,4 81:15,17
82:4,18 83:22
84:1 85:20,23
86:1,5 101:22
142:19 146:21
147:10
**terminating** 70:14
73:16
**termination** 72:15
105:15
**terms** 89:21
**test** 20:16
**testified** 5:13 56:6
132:19 135:18
138:4 141:6
144:21 145:20,22
**testify** 148:21
**testifying** 144:14
**testimony** 127:9
134:4 141:19
147:11 150:11
**Thank** 34:4 71:14
101:10,11 127:2,5
128:20
**them's** 111:13
**thereto** 2:11 150:8
**thing** 21:12 27:8
37:17 48:11,13
61:7 69:7 75:2
80:4 84:19 141:21
142:6
**things** 13:13 25:21

43:15,17,19 48:8
48:9 103:21
115:20 124:20
146:12
**think** 17:7 22:21,21
22:21 23:2 24:11
29:19 33:11,15
38:14 41:18 44:4
45:16,21 50:11,13
51:17,18 55:21
57:10 63:1 72:17
73:11,17 86:1,5
87:4 90:12,15
100:23 101:8
103:22 106:3
113:3,16 121:13
121:18 126:22
140:8 141:18
148:14 149:4,5
**thinking** 38:13
55:21 74:1
**third** 18:23 19:12
19:20 20:1 46:6,6
46:16 99:6 130:11
**thought** 78:19
81:14,16,18 82:3
82:18 83:21,23
85:20,22 94:7
101:22 102:16
103:15 117:19
148:5
**threatened** 99:14
117:14 125:8,13
**threatening** 32:3
**three** 9:22 10:11,12
17:7 51:4 60:23
76:12 77:20 78:20
79:3,11,12 143:1
**Thursday** 126:23
**Tiffany** 107:22
**Tifney** 22:15
**till** 22:7
**time** 2:9,9 9:20 11:4
12:10,19 14:20
15:6,7 18:14
19:18 20:1 22:4
22:17 28:1 29:17
37:8 38:23 42:1
42:19 43:22 44:1
44:7 45:3 46:3,9
47:8 48:9,12
49:17 55:15 57:5
58:5 59:5,9 60:16
61:22 62:3,8 67:9
76:15 78:15 79:4
79:6 85:14,16
92:3 94:3,23
96:19 100:11

102:17 108:21
112:4 114:17
119:5 122:9
123:13 124:17
125:14 126:8
127:17 129:2,4,11
131:12 132:4
135:12,12,15,19
135:22 136:5
137:14,19 138:12
138:14,19 140:8
142:4,14 147:10
**times** 30:16 57:23
60:21 78:20 79:3
79:7,11,13,14,15
103:9 109:19
114:5 119:22
121:4 123:20
127:15 131:11
132:1 134:20
138:23 141:7,15
144:10 148:16
**Tirey** 1:8 3:19 52:6
71:16,22 72:6
73:22 74:7,13,21
77:22,23 79:21
80:19,23 83:1
84:18,22,23 86:19
88:1 90:1 107:5
149:10
**Tirey's** 101:17
**today** 71:8 131:6
138:1 144:15
146:20
**told** 23:11 34:9
35:21 36:3,12
38:19,21 39:2,10
39:11 40:4 43:11
45:11,15 49:1,5,7
50:20 51:6 52:3
54:11 63:15 64:2
64:7,16,20 67:19
68:3 69:6 72:3,6
72:12 73:22 74:8
74:8,16 75:1,11
75:22 76:2,8,19
76:20 77:7,22
78:6,20,23 80:3,7
80:14 81:12,16,23
82:13 83:11,23
84:16,17,23 85:2
85:14,22 86:19
89:21 91:7 92:11
92:20,22 94:13
96:3,8,11,23 97:1
97:2,7,14,14,15
97:16,17 101:22
103:7 104:15,16

104:17 106:15,22
107:15 112:18
114:17 115:15
121:9 122:5,7
131:12 134:10
141:16 147:10
149:3,10,10,10,15
**Tommy** 20:8
**tomorrow** 71:9
**tools** 106:4
**top** 54:6 76:16
130:21
**tore** 54:6
**torso** 33:23
**total** 79:11 110:14
**totally** 47:9
**touch** 85:15
**touched** 52:13
**Tovarius** 34:19
**towel** 115:14,18
**towels** 57:6
**tracks** 10:1
**trailer** 107:16
**train** 25:19 26:3
**trained** 32:21,23
33:16 97:23
**training** 8:22 23:6
23:23 24:12 98:18
**transcribed** 150:8
**transcript** 150:11
**transcription** 150:9
**transfer** 39:14
**transferring** 118:11
**transpire** 148:7
**transpired** 116:19
116:21
**transport** 46:12
47:14
**transported** 46:11
46:14 47:1 48:4
**transporting** 46:20
**tray** 114:16
**trays** 56:13 114:20
**treat** 121:7 124:13
124:14 125:1,2
**treated** 103:23
124:14 147:14
**treating** 89:11
96:17
**treatment** 31:22
50:16 66:17,19,20
66:21 67:1,4,7
95:3 104:5
**treats** 88:5
**Trenton** 1:8 4:16
34:2 53:2
**Trent's** 45:6
**trial** 2:9

**tried** 30:20 78:8
80:15 93:13
**trouble** 48:16 54:2
125:14 132:17
**true** 150:10
**trustees** 123:1
**try** 6:13 15:1 27:17
84:17 99:2 115:12
**trying** 16:21 22:20
26:17 27:3 31:1
43:15 44:1,8 47:8
48:11 53:22 59:4
60:14 61:7,18
62:1,19 68:13,13
73:9 77:8 78:11
80:11 86:23 87:1
88:3 89:9 93:4
96:10,13 97:5,8,9
108:10 112:4
117:15,17,22
123:9 124:12
125:3 146:11,12
149:2
**Tucker** 3:17
**turn** 52:8 89:17
105:9
**tussling** 68:1
**two** 15:21 17:8
19:13 23:21,23
24:22 37:15 41:23
57:22 58:4 63:19
64:9 65:17,22
69:3 89:23 96:11
105:11 108:15
109:18 111:12,13
112:3,13,22 114:1
114:1,12 118:12
119:14 120:2,9,9
126:18,20 128:13
128:18 130:16,19
131:15,21 134:19
141:3 143:5,7,15
143:15 144:9
**type** 23:5 26:3
31:17,21 32:5
40:15,23 42:8,22
66:17 101:4,6
124:15
**types** 26:8 93:21
**T-dorm** 122:20
**t.v** 51:20,23 52:1,5
52:5,9

---

**U**

**ugly** 52:12
**Uh-huh** 11:22
31:11 144:19
**ultimate** 74:12

**ultimately** 143:21
**uncertain** 89:21
**uncommon** 123:5,7
  123:10 133:2,4
  135:9 145:10
**understaffed** 142:7
**understand** 6:12
  28:20 36:9 70:20
  93:3 95:18 96:11
  97:9 120:23
  145:19
**understanding**
  27:22 48:1 56:3
  70:3,18 95:5
  144:13 145:4,21
  146:5
**understood** 145:13
**underwear** 59:14
**unequally** 103:23
**union** 88:17 94:16
  104:21
**UNITED** 1:1
**unquote** 130:3
**upper** 33:1,2,9,23
**upset** 52:1 90:5
  96:7 105:6
**upside** 59:1
**upstairs** 55:6 64:10
  65:18,19 71:23
  86:13 118:12
  124:7 130:12,14
  130:19 131:19
  145:9 146:3
**urgent** 64:3,8
  112:18
**urging** 69:9
**use** 25:20 26:8,21
  26:22 27:7,13,15
  31:17 33:16 37:4
  37:10 73:12 86:3
  97:23 100:5 106:4
  113:10,11
**Usual** 5:14
**usually** 55:5 57:1
  121:10
**U.S** 11:11,20

---
**V**
---

**van** 44:18 63:1,6
  111:18 116:12
  118:4
**verbal** 29:6
**viewed** 86:6
**violate** 47:11
**violated** 129:22
  139:19 140:5
  144:16,18
**violating** 145:12

**violation** 146:7
**violent** 121:10,20
**vocational** 8:22
**VS** 1:5

---
**W**
---

**waited** 117:9,18
  118:2,7
**waived** 1:23
**walk** 121:2
**walked** 148:3
**Walker** 1:7 8:6 10:3
  13:19 16:4 35:23
  47:12 70:15 79:21
  101:3 103:4,8,12
  105:23
**wall** 55:8
**Walters** 12:12
**want** 6:16 35:1
  36:15 41:10 47:18
  51:18 64:15 65:7
  71:12 80:13 82:9
  83:15,16 85:2
  91:13 99:23
  124:14 132:13,16
  133:14 134:1
  146:15,15,16,17
  146:17,17,18,18
**wanted** 44:9,10
  71:4 85:3 105:10
**wanting** 40:3 44:19
  53:15,17
**warranted** 117:20
**wasn't** 24:12 37:11
  38:21 39:1 48:21
  50:8 52:12 64:3,4
  66:19 78:13 80:3
  82:14 108:22
  112:18,19 146:8
**watch** 52:7 123:9
**watching** 51:21
  52:4
**water** 34:3
**waving** 102:21
**way** 39:16,17,20,22
  61:17 62:13,16
  68:6 81:19 88:5
  93:4 94:8 96:16
  103:16,21 105:8
  125:2 141:5 142:9
  146:8
**weapon** 78:17
**weapons** 24:23
**week** 12:13,20
  23:22 71:10 86:23
  91:22 105:11
**weeks** 17:8 23:21
  23:23

**welcome** 71:12
**went** 9:3 11:4 21:8
  23:21 39:7 44:11
  46:12 48:1 51:2
  52:2 54:15 62:17
  80:16,17,18,20
  94:11 103:3
  108:17 114:20
  136:3
**weren't** 112:14
**West** 6:23
**We'll** 107:2
**we're** 32:23 54:22
  65:3,5 101:6
  114:23 119:8
  128:5 130:20
  131:13 136:23
  142:7 145:10
  146:11,12
**we've** 69:19 71:2
  103:10 118:21
  122:15 128:4
  134:18 135:11
  142:9 146:13
**whip** 25:6
**white** 64:12,14 75:7
  77:2 88:2 89:11
  95:2 96:11 101:19
  104:8 112:15
  126:9
**Williams** 45:1,5
  58:16 59:20 63:10
  63:17 68:3 99:19
  110:19 111:20,20
  135:6
**Willie** 16:3
**Wilmeth** 1:17 4:1
  5:1 150:18,20
**window** 127:23
**wires** 62:3
**wished** 63:15
**witness** 1:23 5:7
  34:4 47:18 76:22
  127:3,6 150:12
**woke** 67:14
**women** 73:7 106:11
**Woodley** 22:11,12
**word** 74:17 149:15
**words** 29:7 61:5
  63:16 72:11 74:10
  75:5 76:4 102:1
  149:11
**work** 8:17 9:1,3,11
  10:19 11:4,18
  12:6,13 14:2,15
  14:19 15:2,5,12
  15:15 16:11 17:6
  18:6 19:11 22:5

**23:4 25:19 43:10**
  45:23 48:2,18
  55:20 67:14 69:17
  89:14 102:18
  108:18 119:5,6
  122:21 126:12
  130:10 133:15
**worked** 9:18,19
  10:8,10 11:3,12
  13:18,20 19:3,20
  20:1 21:12 22:13
  23:14 24:15 45:2
  87:18 89:14,18
  96:13 139:7,22
  142:9,10
**worker** 87:13
**workers** 89:9,22
  122:20
**working** 9:12 12:11
  12:20 18:10 24:20
  25:1 46:15 75:21
  88:6 100:3 110:9
  110:14 119:17
  120:6,14 122:9
  123:18 130:20
  136:11,15 142:3
  142:23
**works** 62:12 89:15
  119:23 141:15
**worried** 37:17 61:9
**worry** 45:12 88:18
  103:1 104:22
**wouldn't** 27:8
  95:11 109:9
  115:21,22 133:11
  141:22
**wrestling** 68:1
**write** 45:15 101:4
**written** 100:19
**wrong** 29:14 30:18
  87:22 96:7 124:20
  136:3 139:13
**wronged** 85:4 93:2
  93:7
**wrongful** 72:15
**wrongfully** 72:10
  81:17 84:1 85:23
**wrote** 66:10 100:13
  100:13,23

---
**X**
---

**X** 3:1,15
**X-dorm** 55:6
  122:14

---
**Y**
---

**yeah** 5:17 10:12
  13:17 16:1 18:4
  25:5 28:11 29:15

**33:5 35:16 38:7**
  38:22 41:1 43:3,3
  43:3,3,4,8 46:12
  47:20 50:4,14,14
  52:21 53:7 56:5
  57:20 58:23 62:5
  68:17 70:17 75:13
  79:12 82:20,20,21
  84:4 90:14 92:2,6
  92:14 93:8 97:3
  100:9 105:21
  107:13,20,23
  108:9,13 109:7
  111:2 114:7,11
  116:9 117:6 118:6
  121:16,21,21
  126:20 129:10,16
  129:21 131:22
  132:4 133:17
  135:4,21 136:2
  137:6,10,18,19
  138:21 140:19
  143:17 144:3
  145:2,10 147:23
  147:23
**year** 8:7 9:14 10:14
  11:13 13:3 24:11
  106:15
**years** 7:15 16:9
  19:13 95:13
**y'all** 24:14 49:5
  54:12 55:10 63:6
  93:12 100:6,7
  117:11 144:15
  146:8

---
**$**
---

**$10,000.00** 72:4
  107:4,6

---
**#**
---

**#392** 150:21

---
**1**
---

**1** 3:17 28:5,9
  122:22
**101** 3:4
**11** 1:19 5:6
**11-7-08** 3:19
**11:00** 19:2,22 22:7
**113** 3:5
**12th** 8:2,3
**12.60** 21:13
**127** 3:6
**128** 3:7,8
**129** 3:9
**14** 95:12
**140** 3:10

**144** 3:11
**147** 3:12
**148** 3:13
**15** 41:9,10 106:15
  142:13
**16** 41:10
**180** 105:6
**1974** 7:17
**1994** 8:8 9:16

---
**2**

**2** 3:18 57:15,18
  109:12 121:14
  141:2 144:7
**2nd** 1:18 5:6 42:14
  53:9,19 55:16,22
  58:13 90:9 91:19
  125:16 135:2
  137:4 139:10
  140:5,10,18
  141:15
**20th** 92:1
**200** 4:13
**2001** 1:18 5:6
**2006** 9:15,16 16:12
  16:13
**2008** 14:13,16
  20:13 28:19 42:4
  42:8 53:10,20
  55:22 125:16
  135:2 137:4
  139:10 140:5,10
  140:18
**2009** 71:20
**2010** 11:14 14:16
**2011** 1:19 5:7
**2119** 4:7
**23** 40:18 41:18,19
  56:4
**24** 41:19
**27th** 20:11
**28** 3:17

---
**3**

**3** 3:19 70:10,13
  122:22 147:9
**3rd** 4:7
**3:00** 22:6
**30** 114:22 124:1
  127:18
**30th** 6:23
**300** 4:13
**31st** 9:15 16:13
**32** 17:7
**35203** 4:8,14
**36** 12:15
**37** 7:15

---
**4**

**4** 122:22
**40** 12:13,18,20
  23:22

---
**5**

**5** 3:3
**5th** 7:17
**50** 16:9 123:10
**505** 6:23
**57** 3:18
**5880563** 7:22

---
**6**

**6:09-cv-1748-SLB**
  1:5

---
**7**

**7th** 69:15
**7:00** 19:2,22
**70** 3:19

---
**8**

**8.60** 13:1

---
**9**

**9-25-08** 3:17
**9.85** 17:12
**9/30/11** 150:21
**9:58** 1:20
**98** 10:16
**99** 10:16

*Civil Service Board*
*of Walker County*

Post Office Box 493
Jasper, Alabama 35502-0493
Telephone: (205) 384-7248

September 25, 2008

Mr. George Chapman, Jr.
505 30ᵗʰ Street
Jasper, AL 35501

Dear Mr. Chapman:

New Employee

The employee that has vacated the position you now hold or will hold has a probationary period of six (6) months in his/her new position. If this employee doesn't succeed in the new position he/she can be rolled back.

In the event that this happens you may be terminated within your probationary period of six (6) months.

Reference: Walker County Civil Service Rule Book
Rule 4, Section 3, Number 6 & 7, Page 4

(Board has not approved your hiring; Board will meet again on October 20, 2008)

If you have any questions, please let us know.

Sincerely,

Sharon Tucker

Sharon Tucker
Walker County Civil Service Board
Andrew Archie, Chairman

AA/st



There are to be two officers present at all times when opening cell doors in m-dorm, no exceptions!

per 104


DEFENDANT'S EXHIBIT
Chapman



**Walker County**
*Office of Sheriff*
Telephone 205/302-6464

John Mark Tirey
Sheriff

2001 2nd Avenue
Jasper, AL 35501

November 7, 208

Mr. George Chapman
Walker County Jail
2001 Second Avenue
Jasper, Alabama 35501

Dear Mr. Chapman,

As you are aware you are a probationary employee. This probationary period extends for a period of six (6) months. It is with regret that I must inform you that your work performance is unsatisfactory at the Walker County Jail.

I must inform you that your position as a jailer at the Walker County Jail is hereby terminated effective Friday, November 7, 2008.

Sincerely,



John Mark Tirey,
Sheriff

cc:   Walker County Commission
      Civil Service Board of Walker County
      Jail Administrator Trent McCluskey

DEFENDANT'S EXHIBIT 3 Chapman

*"Serving the Citizens of Walker County"*