# Exhibit "B"

# Deposition of Sheriff John Mark Tirey

Page 1

1 IN THE UNITED STATES DISTRICT COURT
2 FOR THE NORTHERN DISTRICT OF ALABAMA
3 NORTHEASTERN DIVISION
4
5 CIVIL ACTION NO.: 6:09-CV-1748-SLB
6
7 GEORGE R. CHAPMAN, JR.,
8     Plaintiff,
9 vs.
10 WALKER COUNTY, ALABAMA, et al.,
11     Defendants.
12
13     DEPOSITION TESTIMONY OF
14       JOHN MARK TIREY
15
16
17 May 17, 2011
18 10:05 a.m.
19
20 COURT REPORTER:
21 MELANIE L. PETIX, CCR
22
23

Page 2

1     S T I P U L A T I O N S
2     It is stipulated and agreed
3 by and between the parties through their
4 respective counsel that the deposition
5 of JOHN MARK TIREY, may be taken before
6 Melanie L. Petix, Certified Shorthand
7 Reporter and Notary Public for the State
8 of Alabama at Large, at the Walker
9 County Jail, 2001 2nd Avenue, Jasper,
10 Alabama 35501 on May 17, 2011,
11 commencing at approximately 10:05 a.m.
12     It is further stipulated and
13 agreed that the signature to and the
14 reading of the deposition by the witness
15 is waived, the deposition to have the
16 same force and effect as if full
17 compliance had been had with all laws
18 and rules of court relating to the
19 taking of depositions.
20     It is further stipulated and
21 agreed that it shall not be necessary
22 for any objections to be made by counsel
23 to any questions, except as to form or

Page 3

1 leading questions and that counsel for
2 the parties may make objections and
3 assign grounds at the time of trial or
4 at the time said deposition is offered
5 in evidence, or prior thereto.
6     In accordance with the Federal
7 Rules of Civil Procedure of the United
8 States District Court, I, Melanie L.
9 Petix, Certified Shorthand Reporter and
10 Notary Public, am hereby delivering to
11 John D. Saxon, Esq. the original
12 transcript of the oral testimony taken
13 on May 17, 2011.
14
15
16
17
18
19
20
21
22
23

Page 4

1     A P P E A R A N C E S
2
3
4 FOR THE PLAINTIFF:
5     JOHN D. SAXON, Esq.
6     2119 Third Avenue North
7     Birmingham, Alabama 35203
8
9
10 FOR THE DEFENDANTS:
11     KRISTI A. DOWDY, Esq.
12     KRISTI A. DOWDY, P.C.
13     300 N. Richard Arrington, Jr. Blvd.
14     Suite 200
15     Birmingham, Alabama 35203
16
17
18 ALSO PRESENT:
19     TRENT McCLUSKY
20
21
22
23

1 (Pages 1 to 4)

Page 5

```
 1                 I N D E X
 2
 3    EXAMINATION BY:            PAGE
 4    MR. SAXON              7
 5    MS. DOWDY             62
 6
 7    FURTHER EXAMINATION BY:
 8    MR. SAXON             76
 9                  82
10    MS. DOWDY            80
11
12             E X H I B I T S
13
14
15         (There were no exhibits
16         marked for identification.)
17
18             --oOo--
19
20
21
22
23
```

Page 6

```
 1         I, Melanie L. Petix, Certified
 2    Shorthand Reporter and Notary Public for
 3    the State of Alabama at Large, acting as
 4    Commissioner, certify that on this date,
 5    pursuant to the Federal Rules of Civil
 6    Procedure of the United States District
 7    Court, and the foregoing stipulation of
 8    counsel, there came before me at the
 9    Walker County Jail, 2001 2nd Avenue,
10    Jasper, Alabama 35501, commencing at
11    approximately 10:05 a.m. on May 17,
12    2011, JOHN MARK TIREY, witness in the
13    above cause, for oral examination,
14    whereupon, the following proceedings
15    were had:
16
17         JOHN MARK TIREY,
18    being duly sworn, was examined and
19    testified as follows:
20
21         COURT REPORTER: Usual
22    stipulations?
23         MS. DOWDY: Please.
```

Page 7

```
 1    EXAMINATION BY MR. SAXON:
 2         Q.  State your name for the record,
 3    please, sir.
 4         A.  John Mark Tirey, T-I-R-E-Y.
 5         Q.  Sheriff, my name is John Saxon.
 6    As you know, I represent Mr. Chapman in
 7    the lawsuit that has you here today.
 8    I'm going to be asking you some
 9    questions.  If at any time I ask you a
10    question that you don't understand, if
11    you would, just stop me and get me to
12    reword or rephrase it, I will be glad to
13    do that.  Can we agree on that?
14         A.  Yes, sir.
15         Q.  Likewise, if you don't do that,
16    I will assume you understood my
17    question.  Is that fair enough?
18         A.  Yes, sir.
19         Q.  Are you suffering from any
20    illness or taking any medication that
21    would in any way impair your ability to
22    think, speak, or remember clearly?
23         A.  No, sir.
```

Page 8

```
 1         Q.  What is your date of birth?
 2         A.
 3         Q.  And your place of birth?
 4         A.  Jasper, Alabama.
 5         Q.  Where did you grow up?
 6         A.  Carbon Hill, Alabama.
 7         Q.  What is your educational
 8    background?
 9         A.  Just shy of a four-year degree
10    in criminal justice.  Four -- real
11    close.  I just never did finish it up.
12         Q.  Where was that?
13         A.  UAB and Jeff State, Walker
14    College.
15         Q.  I was at Jeff State yesterday
16    in an arbitration with Dr. Merritt.
17            By whom are you presently
18    employed?
19         A.  I am the elected sheriff of
20    Walker County, Alabama, I guess employed
21    by the people.
22         Q.  What are your duties, your
23    duties as sheriff?
```

Page 9

1    A.  Manage the entire operational
2 part of the sheriff's office, which
3 includes many divisions:  The jail,
4 investigations, patrol, elections.  I
5 mean, it's quite a lot.
6    Q.  And in terms of the jail, does
7 Mr. McClusky report to you?
8    A.  Yes, sir, he does.
9    Q.  And how long have you been
10 sheriff?  Since '95?
11    A.  Yes, sir.
12    Q.  I have some questions I ask
13 everybody, Sheriff, so bear with me.
14      Have you ever been arrested?
15    A.  No, sir.
16    Q.  Not yet, at least?
17    A.  That's correct.
18    Q.  Have you ever declared
19 bankruptcy?
20    A.  No, sir.
21    Q.  Have you ever been terminated
22 from a job?
23    A.  No, sir.

Page 10

1    Q.  Have you ever served in the
2 military?
3    A.  No, sir.
4    Q.  What is your marital status?
5    A.  Married.
6    Q.  What is your wife's name?
7    A.  Lora, L-O-R-A, Tirey.
8    Q.  How long have y'all been
9 married?
10    A.  June the 19th will be three
11 years.
12    Q.  And is that your one and only
13 marriage?
14    A.  No, sir.  It's my second.
15    Q.  Who was your first?
16    A.  Tonja. T-O-N-J-A.  She has
17 since remarried.  Do you want her new
18 name?
19    Q.  Yeah.  What's her new name?
20    A.  Strickland.
21    Q.  How long were y'all married?
22    A.  Twenty-six years.
23    Q.  Were y'all divorced in Walker

Page 11

1 County?
2    A.  No, sir.  I think the judge
3 that signed it was Fayette County.  I
4 think I'm telling you right.  That's
5 been about five years.  But I'm almost
6 certain of that.
7    Q.  Were you living in Fayette
8 County at the time?
9    A.  No, sir.
10    Q.  Was she living in Fayette
11 County?
12    A.  No, sir.
13    Q.  What, if anything, did you do
14 to prepare for this deposition?
15    A.  I reviewed the files that were
16 presented to me at the end of the
17 investigation.  I reviewed the documents
18 early this morning.
19    Q.  Okay.  Would that be as it
20 relates to the Decatur incident or
21 terminating George Chapman?  I think I
22 know what you are talking about, but I
23 need you to be a little more specific.

Page 12

1    A.  The entire situation.  I
2 reviewed where I actually -- well, let
3 me say it this way:  I reviewed the
4 statements, the investigative file that
5 was presented to me, and then I actually
6 reviewed a letter where I actually
7 terminated Mr. Chapman.
8    Q.  When you say investigative
9 file, you mean of the Joseph Decatur
10 incident?
11    A.  Yes, sir.  I'm sorry.  Yes,
12 sir.
13    Q.  And the statements that were
14 taken regarding the Decatur incident?
15    A.  I reviewed the written ones,
16 yes, sir.
17    Q.  Have you ever been deposed
18 before?
19    A.  Yes, sir.
20    Q.  Have you ever been deposed in
21 an employment discrimination case
22 against the county and/or you personally
23 involving race discrimination?

Page 13

1    A.  No, sir.
2    Q.  Have you given a deposition in
3  any other employment cases?
4    A.  Not that I recall.
5    Q.  Why was George Chapman
6  terminated?
7    A.  I guess the correct way to
8  start out the thing:  After reviewing
9  this, I felt like he violated several
10  policies that are in place here at the
11  sheriff's office, that are put in place
12  to protect him, our employees and
13  inmates, and I felt very strongly that
14  he violated those after considering the
15  entire investigation and reviewing all
16  that.
17    Q.  All right.  What policies did
18  he violate?
19    A.  First, it's our policy here in
20  the M-Dorm for two correctional officers
21  to be there when a door is opened, a
22  cell door.  That was the first policy
23  violation.

Page 14

1      I guess the second violation of
2  our policy, after the inmate was subdued
3  and not combative, he struck the inmate
4  several times, as I recall, probably, I
5  think, four after he was on the ground.
6  That is certainly in violation of our
7  use of force policy here at the jail.
8    Q.  Any other policies he violated?
9    A.  Not that I recall at this
10  instant, no, sir.
11    Q.  Does Walker County Sheriff's
12  Department or jail have a progressive
13  discipline policy?
14    A.  No, sir, I would not say that's
15  a correct statement.
16    Q.  Let's talk about the two
17  policies you say Mr. Chapman violated.
18  The M-Dorm, for the record, what is the
19  M-Dorm?
20    A.  That's our maximum security,
21  our segregation unit for folks who are
22  either such a security risk or have
23  acted up or out into the jail and caused

Page 15

1  problems in the regular jail areas, they
2  are brought to that area and housed.
3    Q.  And the policy that two
4  officers be present when the cell door
5  is opened, where are these officers
6  supposed to be?
7    A.  (No response.)
8    Q.  The officer, him or herself,
9  cannot open the cell doors, so you have
10  always got somebody in the control room.
11  You are not talking about that one,
12  right?
13    A.  No, sir.
14    Q.  In the unit itself, where are
15  the two officers supposed to be?  Do
16  they both have to be standing there at
17  the door or can --
18    A.  Yes, sir.
19    Q.  And in your experience, has
20  there ever been any other instance at
21  the jail where a correction officer
22  opened or had opened a cell door in
23  M-Dorm and was the only officer standing

Page 16

1  there?
2    A.  Yes, sir.
3    Q.  All right.  When would that
4  happen?
5    A.  I have no doubt that that has
6  happened.  I can't give you an exact
7  date.  It could be for an extreme
8  emergency situation, maybe an inmate
9  down, what the officer at the door
10  deemed unconscious or some emergency
11  situation.
12    Q.  So there are exceptions to that
13  rule?
14    A.  Yes, sir.
15    Q.  Do you know any -- can you name
16  any officer in particular who has
17  participated in one of those exceptions
18  where one officer was standing at the
19  cell door when it was opened in M-Dorm
20  by him or herself?
21    A.  No, sir.  None just from
22  memory, no, sir.
23    Q.  But you know it has happened?

Page 17

1    A. I feel very strongly that it
2  has, yes, sir.
3    Q. And I understand you have been
4  here, been sheriff about 16 years, and a
5  lot of things happen and you don't
6  necessarily walk around making notes
7  every day because you might give a
8  deposition some years later.
9    But you say: I feel strongly
10  that it has. Can you not recall any
11  specific instance that allows you to say
12  that?
13    A. I don't remember any particular
14  -- I mean, I'm certain that there have
15  been times when someone was sick,
16  unconscious or something that's not by
17  any stretch normal, that someone would
18  have breached that door with one person.
19  I mean, I don't recall that we have ever
20  had any person in that area of the jail
21  that have hanged themselves. Certainly,
22  that happens in jails, but I don't think
23  it did in there. But certainly that

Page 18

1  would be a situation. If one of them
2  passed by there and observed somebody
3  hanging, they would have certainly
4  breached that door, I guess as an
5  example. But I feel certain that that
6  has -- I couldn't by no stretch of the
7  imagination tell you that has never
8  happened.
9    Q. If, as you think, it has
10  happened, was the sole officer standing
11  at the door, who breached the door in
12  violation of policy, was that officer
13  terminated?
14    A. No, sir, not that I am aware
15  of.
16    Q. The second policy that you say
17  Officer Chapman violated was that after
18  the inmate was subdued and not
19  combative, he struck the inmate several
20  times while on the ground. I want to
21  walk you through that statement. All
22  right.
23    The inmate we are talking about

Page 19

1  is Joseph Decatur, correct?
2    A. Yes, sir.
3    Q. You say after the inmate was
4  subdued. Now, how was the inmate
5  subdued?
6    A. From every account that I read
7  and considered before his termination,
8  he was on the ground, he had been
9  Tasered. It's my understanding from all
10  the reports, the two probes were still
11  in the inmate, still attached to the
12  Taser, which allows the ability to begin
13  a second cycle of the Taser. And at
14  some point while he was on the ground,
15  from reading the reports, Mr. Chapman
16  struck him with a baton while he was on
17  the ground.
18    Q. And you say Decatur, after
19  being subdued, was not combative; is
20  that correct?
21    A. Yes, sir. That's my
22  understanding from reading those, yes,
23  sir.

Page 20

1    Q. Now, are you aware that some of
2  the reports, the statements of the
3  eyewitnesses conflict on some of these
4  points you have made?
5    A. I know of one that sticks out
6  that may not dovetail with the rest.
7  But I thought it unique that there were
8  so many, even including inmates, which
9  is not always the same as the officers,
10  but in this case, I think they were
11  pretty well, with the exception of one
12  that I recall.
13    Q. What is the one you know of
14  which sticks out?
15    A. I think Clifton.
16    Q. All right. And you think
17  that's the only one that is in any way
18  at odds with the others?
19    A. That's the only one I recall,
20  yes, sir.
21    Q. In what way was Officer
22  Clifton's statement at odds with the
23  others?

Page 21

1    A.  From my memory of re-reviewing
2  that this morning, I think she may have
3  indicated that he was wiggling or
4  moving.
5    Q.  What all did you review and
6  what all input did you have in making
7  the decision to terminate George
8  Chapman?  And I guess I should ask you
9  first, was that your decision?
10   A.  Ultimately, yes, sir.  Totally,
11  I am the only one that can make that
12  decision here.
13   Q.  Okay.
14   A.  I mean, do you want me to -- I
15  don't guess I understand what you are
16  asking exactly, sir.
17   Q.  Okay.  I want to know
18  everything that went into your process
19  of making that decision, meaning, I got
20  a report, I had a lot of statements, I
21  read them.  That was it.  Or I also
22  talked to some people, I talked to and
23  then name them, whoever that would be.

Page 22

1  I interviewed people myself.  I prayed
2  to the Good Lord about it.  Just tell me
3  whatever you did to make your decision
4  to terminate Officer Chapman.
5    A.  Yes, sir.  As I recall, I think
6  after this incident, and I directed an
7  investigation, my jail administrator,
8  and I can't tell you when, within a day
9  or two, I think, and I don't recall
10  whether he verbally told me or put it in
11  writing, I have not seen that document
12  this morning in my review and it may
13  very well be there.  I can't recall.
14      But Mr. McClusky, Trent
15  McClusky, jail administrator, told me he
16  felt like this was a pretty serious
17  incident and his recommendation is that
18  I look towards -- you know, that he
19  didn't think it was going to work out or
20  termination may be what he recommended.
21  Something very close to that.
22      As I recall, I had gotten
23  Sergeant Darrell Mote to actually do the

Page 23

1  investigation or another investigation.
2  I won't say another.  But to follow it
3  up more in-depth to make sure that we
4  had everything we could possibly gather.
5      And I recall speaking with
6  Sergeant Harper at some point in time.
7  And here again, I can't tell you whether
8  hers was in writing at that time or if
9  she just verbally said, look, boss, I
10  think he may have went outside the
11  policy.
12      My position on both those, and
13  I respect them, but certainly I think I
14  indicated, well, look, I'm having
15  Sergeant Darrell Mote relook at all
16  this, do more in-depth, you know,
17  checking on this and I'm waiting on his
18  investigation.
19      At some point in time, Sergeant
20  Darrell Mote, been with me about 15
21  years, quite thorough in his work, came
22  and presented me with a file which
23  included some of the things I had

Page 24

1  already seen.  He did some formal
2  statements that, I think, are on CD, and
3  he and I discussed it.  And after which
4  there -- within a few days, I made the
5  decision that I felt like this was
6  severe enough, the incident, this
7  incident to terminate George,
8  Mr. Chapman.
9    Q.  And that was the recommendation
10  that Mr. McClusky had given you, that
11  Chapman be terminated?
12   A.  As I recall, yes, sir.
13   Q.  And for the record, what is
14  Mr. McClusky's race?
15   A.  White male.  White.
16   Q.  And Sergeant Mote's race?
17   A.  White.
18   Q.  Sergeant Harper's race?
19   A.  White female.
20   Q.  For the record, what is your
21  race?
22   A.  I'm white.
23   Q.  Did Sergeant Mote actually do a

Page 25

1   report himself, a written summary of
2   what he had found and concluded? Or did
3   he just give y'all the statements that
4   he collected up?
5      A.  I have not found that report.
6   I thought he did.  I have asked him if
7   he did, he does not recall from memory.
8   And I asked him to look, but I don't
9   think he has found it.  But I thought he
10  did, but I could be mistaken.
11     Q.  And I say that, Sheriff,
12  because I don't think I have seen a
13  report as such.  And I'm not suggesting
14  one exists.  I'm just inquiring.
15     A.  I understand.  But on the cuff,
16  I would probably say I thought he did,
17  but I have not found it.  And it's
18  possible he did not.  So I can't say
19  with any certainty that there is or
20  there isn't.  I have not found it.
21     Q.  Now, that gets us to something
22  else that either can't be found or
23  didn't exist.  Y'all have video cameras

Page 26

1   in the M-Dorm, TV cameras,
2   closed-circuit cameras?
3      A.  Yes, sir.
4      Q.  What kind are they?  What would
5   you call them?
6      A.  Closed-circuit cameras, I
7   suppose.
8      Q.  And y'all had them at the time
9   of the Decatur incident?
10     A.  Yes, sir.
11     Q.  And did they run continuously,
12  24 hours a day?
13     A.  The system does, yes, sir.
14     Q.  And should there be a video,
15  whether it's on tape, CD, whatever, of
16  that incident that exists at present?
17     A.  Well, there could be.  There
18  could be one, but there may not be one,
19  to answer your question.
20     Q.  Okay.  That gives me a world of
21  possibilities.  So why might there be
22  one and why might there not be one?
23     A.  The system that was put in this

Page 27

1   jail when we moved here in 1998 used the
2   technology that was available.  It was a
3   VHS, the big tape like everybody's VCR.
4   That system does not simultaneously
5   record every camera in this jail at once
6   and store that data.  You have to select
7   which one you want, to make sure and
8   record. It's not automatic.  That was
9   the technology.
10     So it's possible that if
11  somebody punched the button in the
12  control unit and it recorded it, it
13  would be there.  If they did not, it was
14  not captured.  And to further answer
15  your question, that entire system went
16  down last year, I suppose, on a
17  lightning strike and we put in a whole
18  new system that is now on CD, to answer
19  your question.
20     Q.  Okay.  Have you, yourself,
21  either made investigation or directed
22  anyone under you, be that Mr. McClusky
23  or anybody else, to go look for whatever

Page 28

1   might exist: Tape, CD and the like --
2   well, I guess a tape of the George
3   Chapman/Joseph Decatur incident?
4      MS. DOWDY:  They have done so
5   at my request, John.  I mean, I don't
6   even know that the sheriff and I have
7   discussed that.  But they have done it
8   at my request.
9      Q.  What did you find, Sheriff?
10     A.  I don't have a tape.  I don't
11  know of one existing.
12     Q.  And do you know why that is?
13  And from what you have already told me,
14  there would be several possibilities.
15  One is nobody directed the VCR, if that
16  was the technology, to actually record
17  what the cameras might have been seeing
18  in that part of the M-Dorm where Chapman
19  and Decatur were; that's one
20  possibility.  Another is it recorded
21  every second of it, but somehow was lost
22  or not retained when y'all changed over,
23  or it got destroyed by lightning or

Page 29

1  someone put it in their pickup truck and
2  took it off and put it in the bottom of
3  Smith Lake. So there are a lot of
4  possibilities.
5        Do you know why y'all don't
6  have one?
7        A.  No, sir.  I can't answer that.
8  I don't know.  I feel very strongly we
9  looked for one.
10       Q.  And you're satisfied it can't
11 be found?
12       A.  Yes, sir.
13       Q.  Are there standing instructions
14 for the officer in the control room,
15 that when there is an altercation, a
16 fight, something that rises to a certain
17 level involving inmates with each other
18 or inmates with guards, that they are to
19 focus the cameras and hit the button and
20 start taping?
21       A.  Well, I'm certain that's the
22 way that's supposed to be done.
23       Q.  And who was in the control

Page 30

1  room? Officer Williams?
2        A.  Should have been Jerry
3  Williams.
4        Q.  Do you know if he followed
5  those instructions?
6        A.  I do not.
7        Q.  Does someone literally hit a
8  button and is there a control lever
9  that's switched or a button that's
10 pressed that starts taping?
11       A.  If my memory serves me correct,
12 the system that we used at that time
13 had -- you could look at four views on
14 one fairly large screen. They had four
15 camera views. You had to physically
16 select which camera -- and I'm not
17 certain of this, but I think you had to
18 physically decide which one you wanted
19 to watch, make it full screen, and punch
20 something over here to make it record.
21       Q.  We know from Officer Williams'
22 statement that he observed some things.
23 So he had to -- it was either one of the

Page 31

1  four screens in the larger screen or he
2  popped on it and it blew it up larger,
3  right? Would you agree with that?
4  Because he writes about things he saw
5  happen.
6        A.  Well, he could physically see
7  part of it through the glass, too. So I
8  can't answer whether he saw it on camera
9  or through the glass. I don't know,
10 sir.
11       Q.  Mr. Decatur, is he physically a
12 big fellow?
13       A.  I would consider him large. I
14 mean, he's not a giant but, my opinion,
15 large.
16       Q.  How would you define large?
17       A.  Well, I would consider myself
18 probably extra large, so he's smaller
19 than I am.  That's what I base that on.
20       Q.  Have you ever hit an inmate on
21 the head with a baton?
22       A.  An inmate?
23       Q.  Yes, sir.

Page 32

1        A.  No, sir, not that I recall.
2        Q.  Have you ever hit a suspect or
3  a detainee or arrestee on the head with
4  a baton?
5        A.  Not on the top of the head, as
6  I recall.
7        Q.  Where on the head would you
8  might have hit somebody?
9        A.  I think I may have tried to go
10 on a shoulder and got a guy kind of on
11 the side of the neck. But that's not
12 the head.  But that's as close, I think,
13 as I might have gotten.
14       Q.  Was it possible that George
15 Chapman may have been trying to hit
16 Mr. Decatur on the shoulder and Decatur
17 moved and got hit on the neck -- on the
18 head?
19       A.  It's possible.
20       Q.  Did you ever talk to George
21 about this incident? Did you ask him
22 what his version of events was?
23       A.  Yes, sir, we had a conversation

Page 33

1  about it.
2      Q.  What did he tell you?
3      A.  Well, I think his version is
4  that the guy was hollering, saying
5  something.  And he called and asked for
6  the door to be popped, and when he did,
7  the guy just came out on him.  He says
8  the guy was, you know, still trying to
9  attack him when he struck him with he
10  stick, if I remember correctly what he
11  told me.  And I remember asking him,
12  well, you know, if the guy is down on
13  the ground, I mean, how is he trying to
14  hurt you?  He said, well, he was trying
15  to get up and come after me.
16      Q.  And George's version is borne
17  out by more than one of the statements,
18  isn't it?
19          MS. DOWDY: Object to the form.
20      A.  I don't understand.  Are you
21  saying there is another statement
22  that --
23      Q.  There are statements from a

Page 34

1  number of people: Inmates and
2  correction officers?
3      A.  Correct.
4      Q.  I'm asking, are you aware --
5  because we will talk about them in a
6  little bit.  Are you aware that more
7  than one statement bears out Officer's
8  Chapman's version?
9      A.  The Clifton statement is the
10  only one that I -- that comes to memory.
11      Q.  Did you ever tell George
12  Chapman that you had hit an inmate or a
13  detainee on the head with a baton?
14      A.  No, sir.
15      Q.  Didn't say, oh, that's not a
16  big deal, I have done that?
17      A.  No, sir.
18      Q.  The jail's baton policy permits
19  hitting on the head as a last resort,
20  doesn't it?
21      A.  It's considered basically
22  deadly force.
23      Q.  But it's permitted under

Page 35

1  certain circumstances, right?
2      A.  Yes, sir.
3      Q.  You said that after the inmate
4  was subdued, he still had the two probes
5  in him from the Taser.  How do you know
6  that?
7      A.  From the statements that I
8  reviewed and some reference to it and, I
9  think, the nurse took them out of him.
10      Q.  Which nurse was that?
11  Ms. Gould?
12      A.  Yes, sir.
13      Q.  There are a lot of things, I
14  guess, that go on in jails that are
15  pretty standard.  You mentioned
16  hangings, and that's certainly something
17  I assume y'all don't encourage, but it
18  happens, right?
19      A.  Yes, sir.
20          MS. DOWDY: I object to using
21  the words standard and hanging in the
22  same sentence.
23      Q.  And I guess, from time to time,

Page 36

1  inmates get into fights with each other.
2  That happens, right?
3      A.  Yes, sir.
4      Q.  And, from time to time, inmates
5  and correction officers, guards,
6  whatever you want to call them, have
7  altercations, right?
8      A.  Yes, sir.
9      Q.  Was George Chapman the only
10  correction officer that has ever gotten
11  into an altercation, some kind of a
12  fight with an inmate?
13      A.  No, sir, I wouldn't think so.
14      Q.  Can you think of other
15  instances in which officers have gotten
16  into fights with inmates?
17      A.  Well, I can't give you a
18  specific incident, but I certainly know
19  it goes on.
20      Q.  And you don't terminate every
21  correction officer that gets in a fight
22  with an inmate, do you?
23      A.  No, sir.

Page 37

1     Q. Sergeant Harper was a
2 correction officer, initially; is that
3 right?
4     A. Yes, sir.
5     Q. She was a jailer?
6     A. Yes, sir.
7     Q. And did she get promoted to
8 sergeant?
9     A. Yes, sir.
10     Q. And who promoted her?
11     A. Ultimately, I did.
12     Q. Do you know what period of time
13 she was a jailer or a correction officer
14 before she got promoted to sergeant?
15     A. No, sir, not from memory, I do
16 not.
17     Q. It was pretty quick, wasn't it?
18     MS. DOWDY: He just testified
19 he didn't remember when it was.
20     A. I don't recall. I mean, I
21 don't know.
22     Q. Do you know a woman by the name
23 of Paula Richardson?

Page 38

1     A. No, sir.
2     Q. Do you know anything about an
3 incident involving Paula Richardson that
4 Mr. Chapman complained to Mr. McClusky
5 about?
6     A. I'm not sure of the name.
7 Without some more information, I'm not
8 sure who you are talking about.
9     Q. How would you describe your
10 arrangement with your food service here
11 at the jail? Y'all serve the inmates
12 three meals a day, correct?
13     A. Yes, sir.
14     Q. Y'all have somebody that y'all
15 use to prepare those meals and serve
16 them?
17     A. Yes, sir. The county
18 commission contracts with a food service
19 management company. They handle the
20 entire kitchen. I don't have anything
21 whatsoever to basically do with the
22 kitchen.
23     Q. What is that company?

Page 39

1     A. ABL Management.
2     Q. Are you aware of an incident in
3 which an allegation was made to George
4 Chapman that Ms. Richardson, who is
5 African-American, was accused of
6 giving -- showing favoritism toward
7 African-American inmates, and some white
8 workers, co-workers of hers at ABL were
9 being questioned about that and
10 Mr. Chapman then talked to Mr. McClusky
11 about it? Does that ring a bell?
12     A. I don't have any -- I mean, I
13 don't remember. If he mentioned
14 anything to me, I can tell you
15 unequivocally, my position, they are not
16 my employees. I can't fire them, I
17 don't hire them. I don't have anything
18 to do with them. If anything makes it
19 to me that's of any consequence, I call
20 their direct manager and say, hey, you
21 better come check on this. That's my
22 position. I don't know anything about
23 an investigation or anything, really.

Page 40

1     Q. Well, I understand your
2 testimony that you can't hire them or
3 you can't fire them. But you have to
4 make a determination that they have a
5 security clearance to come on the
6 premises, right?
7     A. Yes, sir.
8     Q. Have you ever determined that
9 there were any employees of ABL, for
10 whatever reason, you did not want on the
11 premises?
12     A. I recall maybe one.
13     Q. Who was that?
14     A. I can't tell you a name. I
15 don't recall a name.
16     Q. Was it a male or female?
17     A. I don't recall that, either. I
18 can't answer that. I don't know.
19     Q. What was it this ABL employee
20 had done that caused you to conclude
21 y'all didn't want them on the premises,
22 done or not done?
23     A. In my best judgment, that's

Page 41

1  been some time back, I recall somebody
2  that they were trying to possibly hire
3  for the kitchen. We did a background
4  check and I think maybe they had some
5  criminal stuff and I think I called them
6  and said, look, these type folks, I
7  can't have them down here with these
8  other folks that are locked up, to the
9  understanding they did not hire them.
10  And that's basically -- that's from
11  memory and it's foggy on that issue.
12     Q. Do y'all do criminal background
13  checks on all people that ABL are
14  seeking to hire?
15     MS. DOWDY: To work here or
16  work anywhere?
17     MR. SAXON: To work here.
18     A. I know we did. I'm under the
19  assumption we do. I can't say that. I
20  don't deal with that kitchen very much,
21  in all honesty.
22     Q. Do you remember an officer by
23  the name of Sam Sherer?

Page 42

1     A. Yes, sir.
2     Q. Did he ever use excessive force
3  on an inmate?
4     A. Yes, sir.
5     Q. More than once?
6     A. I don't recall if it was more
7  than once, but I know he did one time.
8     Q. Who did you deal with at ABL
9  when you told them your background check
10  of somebody they were thinking of hiring
11  didn't reveal what you would have liked
12  it to reveal?
13     A. That's been some time back.
14  It's not a recent thing that I'm -- it
15  would have either been a district
16  manager, which they are not there --
17  John Appleton is the CEO of ABL. Roshan
18  or Roshon Cody, I think, is the district
19  manager now. He at one time was the
20  on-site guy here. But this hasn't been
21  anything recent. I honestly can't tell
22  you who I probably called, but it could
23  have been -- they are headquartered in

Page 43

1  Baton Rouge, I understand, where I could
2  have called them.
3     Q. You called somebody in
4  headquarters and said we don't want this
5  person?
6     A. I think, yes, sir, my best
7  judgment.
8     Q. When an officer uses a Taser,
9  do they have to do some kind of report
10  after the fact?
11     A. Yes, sir.
12     Q. And do they indicate or give
13  some description of the subject's action
14  after the Taser was deployed?
15     A. Yes, sir.
16     Q. Do you remember seeing in
17  Officer Clifton's Taser report where she
18  answered the question this way: Brief
19  description of subject's actions after
20  Taser was deployed, and she wrote inmate
21  was on the floor, trying to get up and
22  still going to fight. Did you see that?
23     A. I'm sure I did, if it was in a

Page 44

1  report, yes, sir.
2     Q. Officer Clifton did not,
3  however, administer a second charge from
4  the Taser, did she?
5     A. That's my understanding, she
6  did not.
7     Q. Now, if the probes were still
8  in, as you say, and the inmate was
9  trying to get up and still going to
10  fight, should she have administered a
11  second hit from the Taser?
12     A. Well, that would be, I think,
13  acceptable and correct.
14     Q. Did you talk to Officer Clifton
15  about her Taser report?
16     A. Not that I recall. I could
17  have. I'm not sure.
18     Q. Now, trying to get up and still
19  going to fight is different from just
20  laying on the ground, right?
21     A. Yes, sir.
22     Q. Did you actually read Officer
23  Clifton's statement that she wrote out,

Page 45

```
 1    not the Taser report, but just the
 2    incident report?
 3        A.  Yes, sir.
 4        Q.  Okay.  Were you aware that
 5    Officer Clifton gave a verbal command to
 6    Decatur to stop fighting and he ignored
 7    that and continued to fight?
 8        A.  If it was in her statement,
 9    I've certainly read it, yes, sir.
10        Q.  Okay.  Well, she said:  Saw CO
11    Chapman and IM Joseph Decatur fighting.
12    CO Clifton gave a verbal command to IM
13    Decatur to stop, IM Decatur still fought
14    with CO Chapman.  And then she deployed
15    the Taser because he hadn't heeded the
16    verbal command.  Did you ask her about
17    that statement?
18        A.  I can't recall.
19        Q.  Now, she says after she
20    deployed the Taser, Decatur fell to the
21    floor and then she says IM Decatur
22    started to stand up.  CO Clifton gave
23    the verbal command to IM Decatur to stay
```

Page 46

```
 1    on the floor.  IM Decatur still tried to
 2    stand up.
 3            So she has given a second
 4    command.  The first one was stop
 5    fighting; he ignored that; and now she
 6    is giving him a verbal command to stay
 7    down and he has ignored that.  Did you
 8    see that in her report?
 9        A.  Yes, sir, I did.
10        Q.  Now, if an officer has given
11    two commands to an inmate that have been
12    ignored, in between the two commands has
13    Tasered him, has not chosen to Taser him
14    a second time, but told him to stay down
15    and he didn't and he's trying to get up,
16    why wouldn't that justify, under the
17    circumstances, Officer Chapman using a
18    baton on him?
19        A.  If the guy was on his feet, I
20    suppose in our force continuum, that
21    falls in there, the use of a baton if
22    the guy is threatening you.
23        Q.  Finally, Clifton says she has
```

Page 47

```
 1    given him a command to stay on the
 2    floor, Decatur still tried to stand up.
 3    She says Chapman then tried to restrain
 4    Inmate Decatur from getting up and
 5    advancing toward all officers.
 6            Were you aware that, in
 7    Clifton's judgment, Chapman was
 8    protecting the other officers from
 9    Mr. Decatur?
10        A.  I read that in her statement,
11    yes, sir.
12        MR. SAXON:  Off the record.
13
14        (Discussion off the record.)
15
16        Q.  (BY MR. SAXON:)  Sheriff, in
17    Officer Williams' report, he writes that
18    Inmate Decatur was striking CO Chapman,
19    Inmate Decatur had CO Chapman bent over
20    and was hitting him and pulling his
21    shirt up over his head.
22            Do you remember reading that
23    description in Williams' report?
```

Page 48

```
 1        A.  Yes, sir, I do.
 2        Q.  Now, George Chapman is not a
 3    tiny, little fellow, is he?
 4        A.  No, sir.
 5        Q.  Would you call him large or
 6    extra large?
 7        A.  Falls under extra large.
 8        Q.  So if Mr. Decatur has got him
 9    bent over and hitting him and pulling
10    his shirt over his head, Decatur was --
11        MS. DOWDY:  Winning.  I'm
12    sorry.
13        Q.  -- winning, wasn't he, or being
14    aggressive?
15        A.  Yes, sir.
16        Q.  Who is Mary Phillips?
17    Correction officer?
18        A.  Yes, sir.
19        Q.  Now, Officer Phillips has a
20    report in which she says Chapman was
21    hitting Inmate Decatur with his baton.
22    CO Tiffany Clifton arrived just ahead of
23    CO Phillips, and just as CO Phillips was
```

Page 49

1  approaching the fight, CO Clifton
2  deployed the Taser at Inmate Decatur.
3  Upon deployment, Inmate Decatur
4  immediately dropped to the floor and
5  started to holler, I quit. CO Chapman
6  left Inmate Decatur's side and went over
7  to the table in M-Dorm and put his shirt
8  on and so forth.
9          Did you ask Officer Phillips
10 why she has a version different from
11 other people? She has a version that
12 the hitting of the baton was going on
13 during the fight and before the
14 Tasering. Did you notice that when you
15 read her statement?
16     A.  I recall from reviewing them
17 this morning, there is some discrepancy.
18     Q.  And then she has, after the
19 Tasering, that there was no more contact
20 by Chapman, that Chapman did not use the
21 baton after he was Tasered, dropping to
22 the floor and hollering, I quit. Did
23 you see that?

Page 50

1      A.  Yes, sir.
2      Q.  Did you ask her about that?
3      A.  No, sir, I did not. Or I don't
4  recall asking her.
5      Q.  Well, if you terminated George
6  Chapman, as you told me you did, for
7  hitting an inmate after he was Tasered,
8  on the ground, and you've got an officer
9  who says that's not how it happened,
10 what weight did you give to all these?
11 Did you decide who you believed and
12 didn't believe when you read these
13 statements?
14     A.  Well, I can't say that I -- I
15 read the entire -- everything that was
16 provided to me, I took the time out and
17 reviewed it and looked at it and read
18 them. And just the whole total
19 circumstance of the thing, I made a
20 decision that he went outside the policy
21 on the striking of the inmate after he
22 was down and no threat.
23     Q.  But that's not what the officer

Page 51

1  standing there who has just Tasered him
2  says. Clifton says, I gave him a
3  command, he didn't stop fighting, I
4  Tasered him, he starts to get up; I said
5  stay down, he didn't stay down, he's
6  coming up fighting. That's the officer
7  who Tasered him, who clearly was there
8  on top of things.
9          Why wouldn't you give -- when
10 you got that statement and you've got
11 Phillips having no beating with the
12 baton after the Tasering, why doesn't
13 George Chapman get the benefit of the
14 doubt?
15     A.  Well, I can't say that he
16 didn't get the benefit of the doubt. My
17 question throughout this somewhat, too,
18 is if, in fact, Clifton says he's trying
19 to get back up, simple thing to have
20 done is pull the trigger again. That
21 could have been avoided, but she --
22     Q.  But that was Clifton's mistake?
23     A.  That's correct.

Page 52

1      Q.  You fired George Chapman
2  because Clifton didn't Taser him a
3  second time?
4      A.  No, sir, I did not.
5      Q.  Who is Correction Officer
6  Killingsworth?
7      A.  She was an employee here at the
8  jail, correctional officer.
9      Q.  In her report, she says Officer
10 Clifton Tasered Inmate Decatur and
11 Decatur slumped to the floor. And then
12 she says Chapman began to hit Inmate
13 Decatur. Inmate Decatur's arms and
14 hands were up, still attempting to
15 fight. So she says Decatur was not just
16 laying on the ground non-combative, as
17 you put it earlier.
18         Did you ask her -- I assume you
19 read Killingsworth's report?
20     A.  Yes, sir.
21     Q.  That's another one of these
22 where he is still fighting back, right?
23     A.  Well, not necessarily. I mean,

13 (Pages 49 to 52)

Page 53

1   I have to review each and every one of
2   them.
3       Q.  Who is Ronald Grant?
4       A.  Who?
5       Q.  Ronald Grant.
6       A.  I don't know, unless he's an
7   inmate.
8       Q.  Did y'all take some statements
9   from some inmates?
10      A.  Yes, sir.
11      Q.  Did you read those statements,
12  too, as a part of this report?
13      A.  I did, the ones that were in
14  the file, yes, sir.
15      Q.  Did you read that Ronald Grant
16  says Inmate Decatur told Correctional
17  Officer Chapman, quote, to open this
18  mother fucking door and I will kick your
19  mother fucking ass, unquote?  Did you
20  see that?
21      A.  I read that, yes, sir.
22      Q.  Decatur wasn't in a nice mood
23  that night, was he, I reckon?

Page 54

1       A.  It doesn't sound like it.
2       Q.  Is James Lawson another one of
3   your inmates?
4       A.  Possibly, yes, sir.  He's not
5   an employee.
6       Q.  If someone lists their address
7   as M-007, is that M-Dorm?
8       A.  Yes, sir.
9       Q.  And Ronald Grant was M-006.  Is
10  that a cell in M-Dorm?
11      A.  Yes, sir.
12      Q.  And then Mr. Lawson was --
13  M-007 is his cell.  Mr. Lawson says that
14  he heard Decatur call Chapman a fat
15  bastard.  Do you remember reading that
16  in the statements?
17      A.  Yes, sir, I do.
18      Q.  Now, Mr. Lawson says Inmate
19  Decatur came out of the cell and hit
20  Correction Officer Chapman in the
21  stomach, and Decatur was pushing
22  correction officer backwards and
23  correction officer's pants fell down.

Page 55

1   Inmate Decatur had Correctional Officer
2   Chapman against the wall and began
3   hitting him in the head.  Correction
4   Officer Chapman takes nightstick out and
5   swings at Inmate Decatur.
6           So, according to Mr. Lawson,
7   did you read in here in his statement
8   where it was self-defense and Chapman
9   pulled his baton out after Decatur was
10  hitting him in the head?  Did you read
11  that part of it?
12      A.  I read that statement, yes,
13  sir.
14      Q.  That's not exactly the version
15  that Sergeant Harper tells, is it?
16      A.  No, sir.
17      Q.  If an inmate who has already
18  called an officer a fat bastard and told
19  him he was going to kick his mother
20  fucking ass starts hitting him in the
21  head, would that justify a correction
22  officer from defending himself with his
23  baton?

Page 56

1       A.  That would not prevent him
2   from -- no, sir.
3       Q.  It would be okay for the
4   officer to defend himself with his
5   baton?
6       A.  Yes, sir.
7       Q.  You have an inmate by the name
8   of Steven Garner or did you have who was
9   in cell 16 of M-Dorm?
10      A.  He's been in jail here.
11      Q.  Did you read in Mr. Garner's
12  statement that Decatur and Chapman were
13  fighting in front of the phones, Chapman
14  pushed inmate off of him and hit him in
15  his shoulder with his stick; at this
16  time, Sergeant Harper came in, and then
17  says Chapman was Tasered?  Did you read
18  that statement?
19      A.  Yes, sir.
20      Q.  Mr. Garner says Chapman hit him
21  in the shoulder with his baton, right?
22      A.  That's what he states, yes,
23  sir.

Page 57

```
 1      Q.  And that that was before the
 2   Tasering?
 3      A.  Correct.
 4      Q.  And Mr. Garner is a white
 5   inmate, correct?
 6      A.  Yes, sir.
 7      Q.  And Joseph Decatur is white,
 8   right?
 9      A.  Yes, sir.
10      Q.  Do y'all have inmates here
11   designated at the jail as trusties?
12      A.  Yes, sir, we do.
13      Q.  What does that mean?
14      A.  They help clean and do some
15   work around the jail inside.  Some are
16   allowed access to outside, trash
17   removal, cleaning in general.
18      Q.  Washing cars?
19      A.  Yes, sir.
20      Q.  And when they are outside
21   washing cars, are they in leg irons or
22   tethered on a chain around their neck or
23   what?
```

Page 58

```
 1      A.  No, sir.
 2      Q.  So they are kind of free to
 3   come and go --
 4      A.  Well, yes, sir.
 5      Q.  -- on the premises?
 6      A.  On the premises, supposed to
 7   be.
 8      Q.  And is there somebody who makes
 9   the decision what trusties can go out
10   and wash cars?
11      A.  Yes, sir.
12      Q.  Who does that?
13      A.  I think Trent probably has the
14   final approval.  Sometimes, if he has
15   any doubt or question, he will -- and
16   I'm speaking of Trent McClusky -- he
17   will ask me.  I think sergeants and
18   lieutenants in the jail make
19   recommendations to him, and it's kind of
20   a joint effort where he probably
21   approves the majority, and occasionally,
22   I will.
23      Q.  Y'all had a couple of
```

Page 59

```
 1   car-washing inmates who decided to take
 2   a vacation from the premises, didn't
 3   you?
 4      A.  I recall one.
 5      Q.  Who was that?
 6      A.  I can't say his name.  As I
 7   recall, he took one of the chairman of
 8   the county commission's car, but I can't
 9   recall his name.
10      Q.  And he took off and got stopped
11   by other law enforcement officers and
12   was invited to come back, right?
13      A.  Yes, sir.
14      Q.  You didn't terminate
15   Mr. McClusky for that, did you?
16      A.  No, sir.
17      Q.  Who got to explain to the
18   county commissioner where his car was?
19      A.  I did.
20      Q.  What did the chairman say?
21      A.  Not a lot, really.  He didn't
22   fuss.  He was getting the car cleaned
23   up; he was trading it in.
```

Page 60

```
 1      Q.  Did Mr. Decatur file some kind
 2   of legal action based on this incident?
 3      A.  Yes, sir.
 4      Q.  Was it a lawsuit?
 5      A.  Yes, sir.
 6      Q.  In state or federal court?
 7      A.  I think federal, but I can't be
 8   sure.
 9      Q.  Who represented Decatur in that
10   action?
11      A.  I do not know.
12      Q.  What was the outcome of that
13   lawsuit?
14      A.  It's my understanding that our
15   insurance provider and their attorneys
16   who represent us settled that case.
17      Q.  What did y'all pay him to go
18   away?
19      A.  I don't know.
20      Q.  $10,000 sound right?
21      A.  I don't have any idea.  They
22   don't normally cue me in on that.
23      Q.  What happened to Mr. Decatur in
```

Page 65

1      A.   He was sent to the courthouse
2   to pick one up from Court Referral,
3   which is an agency, not a part of us,
4   it's an extension of the court.  It was
5   a Madison boy is about all I can
6   remember.  And George was sent to pick
7   him up, and I don't think he carried any
8   handcuffs, shackles, anything, and the
9   guy just ran off.
10      Q.   Did you terminate Mr. Chapman
11   for that?
12      A.   No.
13      Q.   And a couple of days later in
14   October of 2008, did you get some kind
15   of report or were you told about a
16   report that had been made by somebody
17   over at the hospital regarding
18   Mr. Chapman?
19      A.   Yes.
20      Q.   Do you recall what that was
21   about?
22      A.   Just the gist of that.  He was
23   sent by us on duty to guard an inmate

Page 66

1   who was admitted to Walker Baptist
2   Medical Center.
3      Q.   Was that inmate Mr. Files?
4      A.   Yes.
5      Q.   Was Mr. Files an elderly
6   gentleman?
7      A.   Yes.  And in pretty poor
8   health.
9      Q.   Who made that report against
10   Mr. Chapman?
11      A.   I don't recall the exact name,
12   but it was a nurse who actually
13   contacted us about him slapping --
14   George Chapman slapping Mr. Files, the
15   inmate, while out at the hospital.
16      Q.   And the employees over at the
17   hospital, they are not part of your
18   staff, are they?
19      A.   No, they are not.  No, ma'am.
20      Q.   And was there an investigation
21   going on into that allegation of
22   excessive force over at the hospital?
23      A.   Well, yes, ma'am.

Page 67

1      Q.   And do you know whether that
2   investigation had been completed at the
3   time of the incident with Mr. Decatur on
4   November 2nd, 2008?
5      A.   No, ma'am, it was not.
6      Q.   And had you made the decision
7   or somebody made the decision that
8   Mr. Chapman could not go back out there
9   to the hospital until the investigation
10   was complete?
11      A.   Correct, I made that decision.
12      Q.   You fired Sam Sherer; is that
13   correct?
14      A.   As I recall, he could have
15   resigned prior to me firing him.  I
16   mean, that happens sometimes.  I can't
17   tell you from memory.  That was even
18   further back than this.
19      Q.   Would that have been in like
20   2003, Sheriff?
21      A.   Two or three, somewhere in
22   there, yes, ma'am.
23      Q.   And Mr. Sherer was a sergeant?

Page 68

1      A.   He was.
2      Q.   Is he a white male?
3      A.   He was.
4      Q.   And if he resigned, would it
5   have been because you had given him a
6   choice to resign or be fired?
7      A.   I can't tell you specifically.
8   Sometimes, once I serve notice to set up
9   a hearing or a notice of my intent to
10   start termination, I mean, if they come
11   in and quit, they do.  I can't stop
12   that.
13      Q.   Right.
14      A.   But I can't tell you whether he
15   did or he didn't, but I recall I was
16   headed down that road to terminate him.
17      Q.   You were asked earlier about
18   some of the inmates' statements and a
19   couple of the -- there were several
20   inmates who gave statements --
21      A.   Yes, ma'am.
22      Q.   -- following the incident with
23   Mr. Decatur; is that right?

Page 69

1    A.  Yes.

2    Q.  And were there also several

3  inmates who gave statements, that you've

4  reviewed, that said that Mr. Chapman

5  struck Inmate Decatur while he was still

6  down?

7    A.  Yes.

8    Q.  And those would have been

9  consistent with a couple of your other

10  officers, correct, Sheriff?

11    A.  Correct.

12    Q.  Did you review any statement,

13  that you can recall, from one of your

14  officers that indicated to you that

15  Mr. Decatur was back on his feet at the

16  time Chapman struck him?

17    A.  Did I review a statement?

18    Q.  That said he was back up on his

19  feet after he had been Tasered.

20    A.  I don't recall that exact term.

21  I think there was maybe one that said he

22  was trying to get on his feet. I don't

23  recall exactly without actually reading

Page 70

1  it.

2    Q.  Is there a difference to you

3  about being on your feet and trying to

4  get up?

5    A.  Yes.

6    Q.  Under your force continuum, in

7  order for you to hit an inmate, to use

8  your baton, should there be an immediate

9  threat that is capable of being carried

10  out?

11    A.  Sure. But it's an escalating

12  policy. To answer your question, from

13  my memory, it starts with officers'

14  presence, just being there, verbal

15  commands, from verbal commands of, you

16  know, stop or put it down or whatever,

17  then the next one, it's, I think, OC,

18  the gas and Taser are equals. And the

19  next one above that, if they are

20  ineffective or not working, you can go

21  on up some to the baton, and the baton

22  is designed to strike nonlethal areas:

23  The arms, leg, nonvital areas. And then

Page 71

1  after that, you move up to deadly force.

2  And the policy actually says, and we

3  teach that in any of our training, that

4  blows to the head can be lethal, they

5  can be deadly.

6    Q.  You testified earlier that

7  there may be occasions when an officer

8  could violate the policy against --

9  that's posted outside of M-Dorm if he is

10  alone and calls for a door to be opened;

11  is that right?

12    A.  (No response.)

13    Q.  For instance, if you have an

14  inmate that's in the M-Dorm, in a cell

15  in M-Dorm and he's on the ground, can

16  the officer then call for that door to

17  be opened even though he is by himself?

18    A.  I'm not sure. Are you asking

19  me does it happen or would I say it's

20  okay to violate --

21    Q.  That could happen, right?

22    A.  It can happen, yes.

23    Q.  And that would be okay to

Page 72

1  violate the policy if that were the

2  case, correct.

3    A.  It's one of those calls, I

4  mean --

5    Q.  You leave that up to your

6  officer --

7    A.  Certainly.

8    Q.  -- to make a judgment call?

9    A.  Correct.

10    Q.  And if some of these inmates

11  gave statements that said Mr. Decatur

12  was taunting Mr. Chapman and telling him

13  to open the door and fight him, that

14  would not be a valid reason for him to

15  violate that policy, wouldn't it?

16    A.  No. It would be all the more

17  reason to don't open it if somebody

18  tells you they are going to come out and

19  kick your butt.

20    Q.  Are you aware that Mr. Chapman

21  was one of the officers who escorted

22  Mr. Decatur to M-Dorm when he had to be

23  moved over there?

Page 73

1    A.  I understand that or did, yes,
2  ma'am.
3    Q.  Do you know why he had to be
4  moved?
5    A.  Mr. Decatur had acted up in one
6  of the dorms and actually, I think,
7  damaged some of the county's property.
8  I don't recall if it was a sprinkler
9  head exactly or had broken something.
10  And that's pretty well our standard
11  thing.  The internal sanctions is move
12  you to M-Dorm then for internal
13  sanctions for violation of institutional
14  rules.
15        But I understand Mr. Chapman
16  was fully aware of that when it happened
17  and was actually one of the escorting
18  officers who brought him up there and
19  locked him up in M-Dorm.
20    Q.  Is it part of your job here --
21  I mean, if you work in a jail, that an
22  inmate is going to say things to you
23  that are probably not appropriate?

Page 74

1    A.  Absolutely.
2    Q.  Are they going to curse you
3  regularly if you work in a jail?
4    A.  Frequently.
5    Q.  Is that any reason for you to
6  open a cell door to get an inmate out,
7  because they have cursed you?
8    A.  No.
9    Q.  If Mr. Chapman had followed the
10  policy and not opened the cell door in
11  M-Dorm, this whole episode could have
12  been avoided, could it not have?
13    A.  I would say so.
14    Q.  And would you have fired
15  Mr. Chapman if he had not used his
16  baton, Sheriff?
17    A.  I don't think I would have.  I
18  mean, he has violated the policy.  But,
19  you know, the incident of him being on
20  the ground, I mean, both those coupled
21  together, I mean, one compounded the
22  other one.  I mean, I have had officers
23  who have opened the door before in

Page 75

1  circumstances and I am sure I haven't
2  terminated them.  I can't say that I
3  would have terminated him just for
4  opening a door under some reasonable
5  circumstance.
6    Q.  Did you take into account that
7  there was already a pending
8  investigation against Mr. Chapman for
9  excessive force when you made the
10  decision to terminate him?
11    A.  Absolutely.
12    Q.  And did it play into or did it
13  factor at all into your decision to
14  terminate Mr. Chapman, in that the other
15  complaint of excessive force came from
16  an absolutely independent source?
17    A.  Certainly, it did.
18    Q.  Would you have terminated
19  Mr. Chapman if he had been of a
20  different race or nationality?
21    A.  It has nothing to do with it.
22  No.
23    Q.  Did his race kind of factor

Page 76

1  into this equation to make a decision to
2  terminate him at all?
3    A.  None.
4    Q.  And if we assume that
5  Mr. Chapman had had some conversation
6  with Mr. McClusky about Ms. Richardson
7  who worked for this other company down
8  here, the food service company, did that
9  play into your decision to terminate him
10  at all?
11    A.  I'm not even sure I knew
12  anything about it.  And no, it played no
13  part in his termination.
14        MS. DOWDY:  Okay.  That's all
15  the questions I've got.
16        MR. SAXON:  I have a few
17  follow-ups, Sheriff.
18        THE WITNESS:  Yes, sir.
19
20  FURTHER EXAMINATION BY MR. SAXON:
21    Q.  The incident involving
22  Mr. Files at Walker Baptist Medical
23  Center, was there a formal investigation

19  (Pages 73 to 76)

Page 77

1  of that matter?
2      A.  I don't know if we carried on
3  through with it after his termination.
4      Q.  And so if you didn't carry on
5  through with it, you wouldn't know what
6  the result of the investigation was,
7  would you?
8      A.  Not the final one, no, sir.
9      Q.  Do you recall what investigator
10 was looking at the Files/Walker Baptist
11 incident?
12     A.  I don't know independently if I
13 actually assigned an investigator or
14 Mr. McClusky and I talked and he was
15 trying to do some stuff to get to it.
16     Q.  Sitting here today, is it your
17 best recollection that after George
18 Chapman was terminated, y'all didn't
19 pursue the investigation anymore into
20 the Files matter?
21     A.  Correct.  That's my best
22 judgment, yes, sir.
23     Q.  And sitting here today and

Page 78

1  under oath, it's your best recollection
2  you don't know whether Sam Sherer
3  resigned or you terminated him, correct?
4      A.  Not without the file.  That's
5  been some time back.  I truthfully
6  can't.
7      Q.  So I'm correct in saying you
8  don't recall one way or the other
9  whether he resigned or was terminated;
10 is that correct?
11     A.  Correct.
12     Q.  The incident Ms. Dowdy asked
13 you about where Officer Chapman was to
14 go pick up an inmate and he forgot to
15 carry his cuffs and the inmate ran off,
16 the inmate didn't steal the chairman of
17 the county commission's car and take it
18 with him, did he?
19     A.  No, sir.
20     Q.  And you said you didn't
21 terminate George Chapman for that.
22 Y'all got the inmate back, y'all
23 apprehended him; is that correct?

Page 79

1      A.  Yes, sir.
2      Q.  If you had terminated George
3  for that, you would probably have had to
4  terminate Trent for letting the car-wash
5  trusty drive off with the county
6  commission chairman's car, wouldn't you?
7          MS. DOWDY:  Object to the form.
8      A.  It was my decision on both of
9  them and I elected not to.
10     Q.  Okay.  You told Ms. Dowdy that
11 trying to get on your feet is not the
12 same as being on your feet.  But if an
13 inmate who has already been aggressive
14 and struck and beaten a correction
15 officer is trying to get on his feet, if
16 you don't take some step, he probably
17 will get on his feet, right?
18         MS. DOWDY:  Object to the form.
19     A.  Yes, sir.
20     Q.  Ms. Dowdy asked you some
21 questions about Ms. Richardson, the food
22 service employee, and you said that the
23 Richardson matter played no part in your

Page 80

1  termination of George Chapman, right?
2      A.  Correct.
3      Q.  Do you know for a fact whether
4  the Richardson matter played any role in
5  Mr. McClusky's recommendation to you
6  that George Chapman be terminated?
7      A.  I have no idea.
8      Q.  Okay.  Don't know one way or
9  the other?
10     A.  No, sir.
11     Q.  Okay.  But he made that
12 recommendation to you and you ratified
13 it?
14         MS. DOWDY:  Object to the form.
15     A.  He and several others, and then
16 independently, I decided.  Yes, sir.  To
17 answer your question, yes, sir.
18         MR. SAXON:  Okay.  That's all
19 I've got.
20
21 FURTHER EXAMINATION BY MS. DOWDY:
22     Q.  Sheriff, who makes the decision
23 to terminate employment of one of your

20  (Pages 77 to 80)

Page 81

1 officers?
2   A.   Rests solely with the sheriff.
3 Myself.
4   Q.   If you have some of your other
5 staff recommending that they
6 terminate -- recommending that you
7 terminate, does that mean that you are
8 going to terminate that employee?
9   A.   No, ma'am. I have elected not
10 to terminate some folks that
11 Mr. McClusky has recommended and other
12 folks, too, that I have not terminated.
13   Q.   If an inmate has been Tasered
14 and there are five officers present and
15 the inmate is on the ground but trying
16 to get up, does that warrant an officer
17 striking that inmate with a baton if he
18 is not on his feet?
19   A.   No.
20   Q.   Okay. And isn't that the case
21 that the majority of the witnesses to
22 this incident said had happened?
23   A.   That's correct.

Page 82

1   Q.   And the cell door that exists
2 between an inmate and an officer,
3 doesn't that act as a barrier to keep
4 those two people apart?
5   A.   Yes.
6   Q.   And if you open that door, the
7 barrier is removed, correct?
8   A.   Correct.
9   Q.   So Mr. Chapman removed the
10 barrier between he and Inmate Decatur
11 when he called for that cell door to be
12 opened, did he not?
13   A.   Correct.
14       MS. DOWDY: I don't have any
15 other questions.
16
17 FURTHER EXAMINATION BY MR. SAXON:
18   Q.   Can you name someone who Trent
19 McClusky recommended be terminated and
20 you didn't terminate them?
21   A.   I think Rhonda Whisenhunt, if
22 that's her name, I think he kind of --
23 that would be one.

Page 83

1   Q.   Rhonda what?
2   A.   Whisenhunt. I would have -- if
3 you give me a few minutes, I can name
4 you another one or two.
5   Q.   What was Rhonda Whisenhunt's
6 position?
7   A.   Correctional officer -- I mean,
8 jailer, I think. I'm not sure if she is
9 full time now or part time. But I think
10 at the time, she was part time.
11   Q.   And what had she done that, in
12 the judgment of Mr. McClusky, warranted
13 termination?
14   A.   This is from memory and it's
15 not -- I think she had screwed up a
16 bunch of stuff on booking in some folks
17 over there, and I think he was
18 frustrated to the point of -- he tried
19 to correct and have her trained on some
20 stuff about booking, if my memory is
21 correct. And he just told me, you know,
22 he thought that she wasn't going to work
23 out and he recommended termination. And

Page 84

1 I looked at the thing and I did not feel
2 that way, so I didn't terminate her.
3   Q.   When was this?
4   A.   Last two or three years, best
5 judgment.
6   Q.   And what is Ms. Whisenhunt's
7 race?
8   A.   She is white. I'm trying to
9 remember. Maybe one of our evening
10 shift supervisors, he came up and saw me
11 and recommended, and I elected not to do
12 any -- terminate him.
13   Q.   Do you have a name?
14   A.   Probably James Woodley.
15 Lieutenant James Woodley.
16   Q.   He was an evening shift
17 supervisor?
18   A.   He was an evening shift
19 lieutenant, yes, sir.
20   Q.   What had he done in
21 Mr. McClusky's estimation to warrant
22 termination?
23   A.   I think he was absent quite a

Page 85

1   bit from duty.  Well, I mean, not absent
2   from duty, but wasn't supervising his
3   personnel and some things along those
4   lines of being a good supervisor.  And
5   this is just bits and pieces from my
6   memory.  I can't a hundred percent tell
7   you.
8       Q.   How long ago was that?
9       A.   Three or four years.  He
10  finally retired on his own.
11      Q.   And what is Lieutenant
12  Woodley's race?
13      A.   He's white.
14          MR. SAXON:  That's all I've
15  got.
16          MS. DOWDY:  I don't have
17  anything else.
18
19      (Further Deponent Saith Not)
20
21      (Whereupon, deposition
22       concluded at 12:15 p.m.)
23

Page 86

1           CERTIFICATE
2   STATE OF ALABAMA)
3   JEFFERSON COUNTY)
4
5       I hereby certify that the above and
6   foregoing deposition was taken down by
7   me in stenotype, and the questions and
8   answers thereto were transcribed by
9   means of computer-aided transcription,
10  and that the foregoing represents a true
11  and correct transcript of the testimony
12  given by said witness upon said hearing.
13      I further certify that I am neither
14  of counsel, nor kin to the parties to
15  the action, nor am I in any way
16  interested in the result of said cause
17  named in said caption.
18
19      /s/Melanie L. Petix
20      MELANIE L. PETIX, CCR
21      License Number: ACCR-412
22      My Commission expires 9/13/12
23

**A**

ability 7:21
  19:12
abl 39:1,8 40:9
  40:19 41:13
  42:8,17
absent 84:23
  85:1
absolutely 74:1
  75:11,16
acceptable
  44:13
access 57:16
account 19:6
  75:6
accr412 86:21
accused 39:5
act 82:3
acted 14:23 73:5
acting 6:3
action 1:5 43:13
  60:2,10 86:15
actions 43:19
actual 62:14
address 54:6
administer 44:3
administered
  44:10
administrator
  22:7,15
admitted 66:1
advancing 47:5
africanameric...
  39:5,7
agency 65:3
aggressive 48:14
  79:13
ago 85:8
agree 7:13 31:3
agreed 2:2,13,21
ahead 48:22
al 1:10
alabama 1:2,10
  2:8,10 4:7,15
  6:3,10 8:4,6,20
  86:2

allegation 39:3
  66:21
allowed 57:16
allows 17:11
  19:12
altercation
  29:15 36:11
altercations
  36:7
answer 26:19
  27:14,18 29:7
  31:8 40:18
  70:12 80:17
answered 43:18
answers 86:8
anybody 27:23
  61:20
anymore 77:19
apart 82:4
appleton 42:17
apprehended
  78:23
approaching
  49:1
appropriate
  73:23
approval 58:14
approve 62:22
approves 58:21
approximately
  2:11 6:11
arbitration 8:16
area 15:2 17:20
areas 15:1 70:22
  70:23
arms 52:13
  70:23
arrangement
  38:10
arrested 9:14
arrestee 32:3
arrington 4:13
arrived 48:22
asked 25:6,8
  33:5 68:17
  78:12 79:20
asking 7:8 21:16

33:11 34:4
  50:4 71:18
ass 53:19 55:20
assign 3:3
assigned 77:13
assume 7:16
  35:17 52:18
  76:4
assumption
  41:19
attached 19:11
attack 33:9
attempting
  52:14
attorneys 60:15
automatic 27:8
available 27:2
avenue 2:9 4:6
  6:9
avoided 51:21
  74:12
aware 18:14
  20:1 34:4,6
  39:2 45:4 47:6
  72:20 73:16

**B**

b 5:12
back 41:1 42:13
  51:19 52:22
  59:12 67:8,18
  69:15,18 78:5
  78:22
background 8:8
  41:3,12 42:9
backwards
  54:22
bankruptcy
  9:19
baptist 66:1
  76:22 77:10
barrier 82:3,7
  82:10
base 31:19
based 60:2
basically 34:21
  38:21 41:10

bastard 54:15
  55:18
baton 19:16
  31:21 32:4
  34:13,18 43:1
  46:18,21 48:21
  49:12,21 51:12
  55:9,23 56:5
  56:21 61:9
  70:8,21,21
  74:16 81:17
bear 9:13
bears 34:7
beaten 79:14
beating 51:11
began 52:12
  55:2
believe 50:12
believed 50:11
bell 39:11
benefit 51:13,16
bent 47:19 48:9
best 40:23 43:6
  77:17,21 78:1
  84:4
better 39:21
big 27:3 31:12
  34:16
birmingham 4:7
  4:15
birth 8:1,3
bit 34:6 85:1
bits 85:5
blew 31:2
blows 71:4
blvd 4:13
bond 62:21
bonding 62:20
bonds 62:22
booking 83:16
  83:20
borne 33:16
boss 23:9
bottom 29:2
boy 65:5
breached 17:18
  18:4,11

brief 43:18
broken 73:9
brought 15:2
  73:18
bunch 83:16
butt 72:19
button 27:11
  29:19 30:8,9

**C**

c 4:1,12
call 26:5 36:6
  39:19 48:5
  54:14 71:16
  72:8
called 33:5 41:5
  42:22 43:2,3
  55:18 82:11
calls 71:10 72:3
camera 27:5
  30:15,16 31:8
cameras 25:23
  26:1,2,6 28:17
  29:19
cant 16:6 22:8
  22:13 23:7
  25:18,22 29:7
  29:10 31:8
  36:17 39:16
  40:2,3,14,18
  41:7,19 42:21
  45:18 50:14
  51:15 59:6,8
  60:7 61:18
  63:2 67:16
  68:7,11,14
  75:2 78:6 85:6
capable 70:9
caption 86:17
captured 27:14
car 59:8,18,22
  78:17 79:6
carbon 8:6
carried 65:7
  70:9 77:2
carry 77:4 78:15
cars 57:18,21

58:10 63:6
**carwash** 79:4
**carwashing** 59:1
**case** 12:21 20:10
  60:16 72:2
  81:20
**cases** 13:3
**cause** 6:13 86:16
**caused** 14:23
  40:20
**ccr** 1:21 86:20
**cd** 24:2 26:15
  27:18 28:1
**cell** 13:22 15:4,9
  15:22 16:19
  54:10,13,19
  56:9 71:14
  74:6,10 82:1
  82:11
**center** 66:2
  76:23
**ceo** 42:17
**certain** 11:6
  17:14 18:5
  29:16,21 30:17
  35:1
**certainly** 14:6
  17:21,23 18:3
  23:13 35:16
  36:18 45:9
  72:7 75:17
**certainty** 25:19
**certificate** 86:1
**certified** 2:6 3:9
  6:1
**certify** 6:4 86:5
  86:13
**chain** 57:22
**chairman** 59:7
  59:20 78:16
**chairmans** 79:6
**changed** 28:22
**chapman** 1:7
  7:6 11:21 12:7
  13:5 14:17
  18:17 19:15
  21:8 22:4 24:8

24:11 28:3,18
  32:15 34:12
  36:9 38:4 39:4
  39:10 45:11,14
  46:17 47:3,7
  47:18,19 48:2
  48:20 49:5,20
  49:20 50:6
  51:13 52:1,12
  53:17 54:14,20
  55:2,4,8 56:12
  56:13,17,20
  61:7 63:8
  64:10,17 65:10
  65:18 66:10,14
  67:8 69:4,16
  72:12,20 73:15
  74:9,15 75:8
  75:14,19 76:5
  77:18 78:13,21
  80:1,6 82:9
**chapmans** 34:8
**charge** 44:3
**check** 39:21
  41:4 42:9
**checking** 23:17
**checks** 41:13
**choice** 68:6
**chosen** 46:13
**circumstance**
  50:19 75:5
**circumstances**
  35:1 46:17
  75:1
**civil** 1:5 3:7 6:5
  63:22
**claim** 62:8,12
**clean** 57:14
**cleaned** 59:22
**cleaning** 57:17
**clearance** 40:5
**clearly** 7:22 51:7
**clifton** 20:15
  34:9 44:2,14
  45:5,12,22
  46:23 48:22
  49:1 51:2,18

52:2,10
**cliftons** 20:22
  43:17 44:23
  47:7 51:22
**close** 8:11 22:21
  32:12
**closedcircuit**
  26:2,6
**cody** 42:18
**collected** 25:4
**college** 8:14
**combative** 14:3
  18:19 19:19
**come** 33:15
  39:21 40:5
  58:3 59:12
**comes** 34:10
**coming** 51:6
**command** 45:5
  45:12,16,23
  46:4,6 47:1
  51:3
**commands**
  46:11,12 70:15
  70:15
**commencing**
  2:11 6:10
**commission**
  38:18 79:6
  86:22
**commissioner**
  6:4 59:18
**commissions**
  59:8 78:17
**company** 38:19
  38:23 76:7,8
**complained**
  38:4
**complaint** 75:15
**complete** 67:10
**completed** 67:2
**compliance** 2:17
**compounded**
  74:21
**computeraided**
  86:9

**conclude** 40:20
**concluded** 25:2
  85:22
**conflict** 20:3
**consequence**
  39:19
**consider** 31:13
  31:17
**considered** 19:7
  34:21
**considering**
  13:14
**consistent** 69:9
**contact** 49:19
**contacted** 66:13
**continued** 45:7
**continuously**
  26:11
**continuum**
  46:20 70:6
**contracts** 38:18
**control** 15:10
  27:12 29:14,23
  30:8 63:1
**conversation**
  32:23 76:5
**correct** 9:17
  13:7 14:15
  19:1,20 30:11
  34:3 38:12
  44:13 51:23
  57:3,5 67:11
  67:13 69:10,11
  72:2,9 77:21
  78:3,7,10,11
  78:23 80:2
  81:23 82:7,8
  82:13 83:19,21
  86:11
**correction** 15:21
  34:2 36:5,10
  36:21 37:2,13
  48:17 52:5
  54:20,22,23
  55:3,21 79:14
**correctional**
  13:20 52:8

53:16 55:1
  83:7
**corrections** 61:8
**correctly** 33:10
**couldnt** 18:6
**counsel** 2:4,22
  3:1 6:8 86:14
**county** 1:10 2:9
  6:9 8:20 11:1,3
  11:8,11 12:22
  14:11 38:17
  59:8,18 78:17
  79:5 86:3
**countys** 73:7
**couple** 58:23
  65:13 68:19
  69:9
**coupled** 74:20
**court** 1:1,20
  2:18 3:8 6:7,21
  60:6 65:2,4
**courthouse** 65:1
**coworkers** 39:8
**criminal** 8:10
  41:5,12
**cue** 60:22
**cuff** 25:15
**cuffs** 78:15
**curse** 74:2
**cursed** 74:7
**cycle** 19:13

**D**
**d** 3:11 4:5 5:1
**damaged** 73:7
**darrell** 22:23
  23:15,20
**data** 27:6
**date** 6:4 8:1 16:7
  64:23
**day** 17:7 22:8
  26:12 38:12
**days** 24:4 64:6
  65:13
**deadly** 34:22
  71:1,5
**deal** 34:16 41:20

42:8
**decatur** 11:20
  12:9,14 19:1
  19:18 26:9
  28:3,19 31:11
  32:16,16 45:6
  45:11,13,13,20
  45:21,23 46:1
  47:2,4,9,18,19
  48:8,10,21
  49:2,3 52:10
  52:11,13,15
  53:16,22 54:14
  54:19,21 55:1
  55:5,9 56:12
  57:7 60:1,9,23
  62:7 67:3
  68:23 69:5,15
  72:11,22 73:5
  82:10
**decaturs** 49:6
  52:13
**decide** 30:18
  50:11 63:3
**decided** 59:1
  80:16
**decision** 21:7,9
  21:12,19 22:3
  24:5 50:20
  58:9 67:6,7,11
  75:10,13 76:1
  76:9 79:8
  80:22
**declared** 9:18
**deemed** 16:10
**defend** 56:4
**defendants** 1:11
  4:10
**defending** 55:22
**define** 31:16
**degree** 8:9
**delivering** 3:10
**department**
  14:12
**deployed** 43:14
  43:20 45:14,20
  49:2

**deployment**
  49:3
**deponent** 85:19
**deposed** 12:17
  12:20
**deposition** 1:13
  2:4,14,15 3:4
  11:14 13:2
  17:8 85:21
  86:6
**depositions** 2:19
**describe** 38:9
**description**
  43:13,19 47:23
**designated**
  57:11
**designed** 70:22
**destroyed** 28:23
**detainee** 32:3
  34:13
**determination**
  40:4
**determined** 40:8
**didnt** 22:19
  25:23 34:15
  37:19 40:21
  42:11 46:15
  50:12 51:3,5
  51:16 52:2
  59:2,14,21
  68:15 77:4,18
  78:16,20 82:20
  84:2
**difference** 70:2
**different** 44:19
  49:10 75:20
**direct** 39:20
**directed** 22:6
  27:21 28:15
**discipline** 14:13
**discrepancy**
  49:17
**discrimination**
  12:21,23
**discussed** 24:3
  28:7
**discussion** 47:14

**district** 1:1,2 3:8
  6:6 42:15,18
**division** 1:3
**divisions** 9:3
**divorced** 10:23
**document** 22:11
**documents**
  11:17
**doesnt** 34:20
  51:12 54:1
  82:3
**dont** 7:10,15
  17:5,13,19,22
  21:15 22:9
  25:8,12 28:5
  28:10,10 29:5
  29:8 31:9
  33:20 35:17
  36:20 37:20,21
  38:20 39:12,13
  39:17,17,22
  40:15,17,18
  41:20 42:6
  43:4 50:3 53:6
  60:19,21,22
  61:5 62:9 65:7
  66:11 69:20,22
  72:17 73:8
  74:17 77:2,12
  78:2,8 79:16
  80:8 82:14
  85:16
**door** 13:21,22
  15:4,17,22
  16:9,19 17:18
  18:4,11,11
  33:6 53:18
  71:10,16 72:13
  74:6,10,23
  75:4 82:1,6,11
**doors** 15:9
**dorms** 73:6
**doubt** 16:5
  51:14,16 58:15
**dovetail** 20:6
**dowdy** 4:11,12
  5:5,10 6:23

28:4 33:19
  35:20 37:18
  41:15 48:11
  61:23 62:2,3,5
  76:14 78:12
  79:7,10,18,20
  80:14,21 82:14
  85:16
**dr** 8:16
**drive** 79:5
**dropped** 49:4
**dropping** 49:21
**duly** 6:18
**duties** 8:22,23
**duty** 65:23 85:1
  85:2

**E**
**e** 4:1,1 5:1,12
**earlier** 52:17
  62:18 68:17
  71:6
**early** 11:18 63:3
**educational** 8:7
**effect** 2:16
**effort** 58:20
**either** 14:22
  25:22 27:21
  30:23 40:17
  42:15
**elderly** 66:5
**elected** 8:19
  79:9 81:9
  84:11
**elections** 9:4
**eligible** 62:21
**emergency** 16:8
  16:10
**employed** 8:18
  8:20
**employee** 40:19
  52:7 54:5 63:8
  63:23 64:15
  79:22 81:8
**employees** 13:12
  39:16 40:9
  66:16

**employment**
  12:21 13:3
  80:23
**encourage** 35:17
**enforcement**
  59:11
**entire** 9:1 12:1
  13:15 27:15
  38:20 50:15
**episode** 74:11
**equals** 70:18
**equation** 76:1
**escalating** 70:11
**escaped** 64:17
**escorted** 72:21
**escorting** 73:17
**esq** 3:11 4:5,11
**estimation**
  84:21
**et** 1:10
**evening** 84:9,16
  84:18
**events** 32:22
**everybody** 9:13
**everybodys** 27:3
**evidence** 3:5
**exact** 16:6 66:11
  69:20
**exactly** 21:16
  55:14 69:23
  73:9
**examination** 5:3
  5:7 6:13 7:1
  62:5 76:20
  80:21 82:17
**examined** 6:18
**example** 18:5
**exception** 20:11
**exceptions**
  16:12,17
**excessive** 42:2
  66:22 75:9,15
**excuse** 61:13
**exhibits** 5:15
**exist** 25:23 28:1
**existing** 28:11
**exists** 25:14

26:16 82:1
**experience**
15:19
**expires** 86:22
**explain** 59:17
**extension** 65:4
**extra** 31:18 48:6
48:7
**extreme** 16:7
**eyewitnesses**
20:3

**F**
**fact** 43:10 51:18
80:3
**factor** 75:13,23
**fair** 7:17
**fairly** 30:14
**falls** 46:21 48:7
**far** 62:22
**fat** 54:14 55:18
**favoritism** 39:6
**fayette** 11:3,7,10
**federal** 3:6 6:5
60:6,7
**feel** 17:1,9 18:5
29:8 84:1
**feet** 46:19 69:15
69:19,22 70:3
79:11,12,15,17
81:18
**fell** 45:20 54:23
**fellow** 31:12
48:3
**felt** 13:9,13
22:16 24:5
**female** 24:19
40:16
**fight** 29:16
36:12,21 43:22
44:10,19 45:7
49:1,13 52:15
72:13
**fighting** 45:6,11
46:5 51:3,6
52:22 56:13
**fights** 36:1,16

**file** 12:4,9 23:22
53:14 60:1
78:4
**filed** 62:7,8,12
62:14
**files** 11:15 66:3
66:5,14 76:22
77:10,20
**final** 58:14 77:8
**finally** 46:23
85:10
**find** 28:9
**finish** 8:11
**fire** 39:16 40:3
**fired** 52:1 67:12
68:6 74:14
**firing** 67:15
**first** 10:15 13:19
13:22 21:9
46:4
**five** 11:5 81:14
**floor** 43:21
45:21 46:1
47:2 49:4,22
52:11
**focus** 29:19
**foggy** 41:11
**folks** 14:21 41:6
41:8 81:10,12
83:16
**follow** 23:2
**followed** 30:4
74:9
**following** 6:14
68:22
**follows** 6:19
**followups** 76:17
**food** 38:10,18
76:8 79:21
**force** 2:16 14:7
34:22 42:2
46:20 66:22
70:6 71:1 75:9
75:15
**foregoing** 6:7
86:6,10
**forgot** 78:14

**form** 2:23 33:19
79:7,18 80:14
**formal** 24:1
76:23
**forth** 49:8
**fought** 45:13
**found** 25:2,5,9
25:17,20,22
29:11
**four** 8:10 14:5
30:13,14 31:1
85:9
**fouryear** 8:9
**free** 58:2
**frequently** 74:4
**front** 56:13
**frustrated** 83:18
**fucking** 53:18
53:19 55:20
**full** 2:16 30:19
63:15,23 83:9
**fulltime** 63:20
64:15
**fully** 73:16
**further** 2:12,20
5:7 27:14
67:18 76:20
80:21 82:17
85:19 86:13
**fuss** 59:22

**G**
**garner** 56:8,20
57:4
**garners** 56:11
**gas** 70:18
**gather** 23:4
**general** 57:17
**gentleman** 66:6
**george** 1:7 11:21
13:5 21:7 24:7
28:2 32:14,20
34:11 36:9
39:3 48:2 50:5
51:13 52:1
61:7 65:6
66:14 77:17

78:21 79:2
80:1,6
**georges** 33:16
**getting** 47:4
59:22
**giant** 31:14
**gist** 65:22
**give** 16:6 17:7
25:3 36:17
43:12 50:10
51:9 83:3
**given** 13:2 24:10
46:3,10 47:1
68:5 86:12
**gives** 26:20
**giving** 39:6 46:6
**glad** 7:12
**glass** 31:7,9
**go** 27:23 32:9
35:14 58:3,9
60:17 63:2
67:8 70:20
78:14
**goes** 36:19
**going** 7:8 22:19
43:22 44:9,19
49:12 55:19
66:21 72:18
73:22 74:2
81:8 83:22
**good** 22:2 85:4
**gotten** 22:22
32:13 36:10,15
**gould** 35:11
**grant** 53:3,5,15
54:9
**ground** 14:5
18:20 19:8,14
19:17 33:13
44:20 50:8
52:16 71:15
74:20 81:15
**grounds** 3:3
**grow** 8:5
**guard** 65:23
**guards** 29:18
36:5

**guess** 8:20 13:7
14:1 18:4 21:8
21:15 28:2
35:14,23
**guy** 32:10 33:4,7
33:8,12 42:20
46:19,22 65:9

**H**
**h** 5:12
**hadnt** 45:15
**handcuffs** 65:8
**handle** 38:19
**hands** 52:14
**hanged** 17:21
**hanging** 18:3
35:21
**hangings** 35:16
**happen** 16:4
17:5 31:5
71:19,21,22
**happened** 16:6
16:23 18:8,10
50:9 60:23
62:10 64:23
73:16 81:22
**happens** 17:22
35:18 36:2
67:16
**harper** 23:6
37:1 55:15
56:16
**harpers** 24:18
**hasnt** 42:20
**havent** 75:1
**head** 31:21 32:3
32:5,7,12,18
34:13,19 47:21
48:10 55:3,10
55:21 71:4
73:9
**headed** 68:16
**headquartered**
42:23
**headquarters**
43:4
**health** 66:8

| | | | | |
|---|---|---|---|---|
| heard 54:14 | im 7:8 11:4,5 | 63:10 | 73:12 | jefferson 86:3 |
| hearing 68:9 | 12:11 17:14 | inmate 14:2,3 | interviewed | jerry 30:2 |
| 86:12 | 23:14,17 24:22 | 16:8 18:18,19 | 22:1 | job 9:22 73:20 |
| heeded 45:15 | 25:13,14 29:21 | 18:23 19:3,4 | investigation | john 1:14 2:5 |
| help 57:14 | 30:16 34:4 | 19:11 31:20,22 | 11:17 13:15 | 3:11 4:5 6:12 |
| hes 31:14,18 | 38:6,7 41:18 | 34:12 35:3 | 22:7 23:1,1,18 | 6:17 7:4,5 28:5 |
| 46:15 51:5,18 | 42:14 43:23 | 36:12,22 42:3 | 27:21 39:23 | 42:17 |
| 53:6 54:4 | 44:17 45:11,12 | 43:20 44:8 | 66:20 67:2,9 | joint 58:20 |
| 56:10 71:15 | 45:13,21,23 | 46:11 47:4,18 | 75:8 76:23 | joseph 12:9 19:1 |
| 85:13 | 46:1 48:11 | 47:19 48:21 | 77:6,19 | 28:3 45:11 |
| hey 39:20 | 58:16 61:5 | 49:2,3,6 50:7 | investigations | 57:7 |
| hill 8:6 | 63:12 71:18 | 50:21 52:10,12 | 9:4 | jr 1:7 4:13 |
| hire 39:17 40:2 | 76:11 78:7 | 52:13 53:7,16 | investigative | judge 11:2 |
| 41:2,9,14 | 83:8 84:8 | 54:18 55:1,5 | 12:4,8 | judgment 40:23 |
| hired 63:8,10,15 | imagination | 55:17 56:7,14 | investigator | 43:7 47:7 72:8 |
| 63:23 64:14 | 18:7 | 57:5 61:9,14 | 77:9,13 | 77:22 83:12 |
| hiring 42:10 | immediate 70:8 | 62:17 64:17 | invited 59:12 | 84:5 |
| hit 29:19 30:7 | immediately | 65:23 66:3,15 | involving 12:23 | june 10:10 |
| 31:20 32:2,8 | 49:4 | 69:5 70:7 | 29:17 38:3 | justice 8:10 |
| 32:15,17 34:12 | impair 7:21 | 71:14 73:22 | 76:21 | justify 46:16 |
| 44:11 52:12 | incident 11:20 | 74:6 78:14,15 | irons 57:21 | 55:21 |
| 54:19 56:14,20 | 12:10,14 22:6 | 78:16,22 79:13 | isnt 25:20 33:18 | |
| 70:7 | 22:17 24:6,7 | 81:13,15,17 | 81:20 | **K** |
| hitting 34:19 | 26:9,16 28:3 | 82:2,10 | issue 41:11 | keep 82:3 |
| 47:20 48:9,21 | 32:21 36:18 | inmates 13:13 | ive 45:9 61:22 | kick 53:18 55:19 |
| 49:12 50:7 | 38:3 39:2 45:2 | 20:8 29:17,18 | 76:15 80:19 | 72:19 |
| 55:3,10,20 | 60:2 64:16 | 34:1 36:1,4,16 | 85:14 | killingsworth |
| holler 49:5 | 67:3 68:22 | 38:11 39:7 | | 52:6 |
| hollering 33:4 | 74:19 76:21 | 53:9 54:3 | **J** | killingsworths |
| 49:22 | 77:11 78:12 | 57:10 59:1 | jail 2:9 6:9 9:3,6 | 52:19 |
| honestly 42:21 | 81:22 | 62:23 68:18,20 | 14:7,12,23 | kin 86:14 |
| honesty 41:21 | included 23:23 | 69:3 72:10 | 15:1,21 17:20 | kind 26:4 32:10 |
| hospital 65:17 | includes 9:3 | input 21:6 | 22:7,15 27:1,5 | 36:11 43:9 |
| 66:15,17,22 | including 20:8 | inquiring 25:14 | 38:11 52:8 | 58:2,19 60:1 |
| 67:9 | independent | inside 57:15 | 56:10 57:11,15 | 65:14 75:23 |
| hours 26:12 | 75:16 | instance 15:20 | 58:18 61:3 | 82:22 |
| housed 15:2 | independently | 17:11 71:13 | 62:18 73:21 | kitchen 38:20,22 |
| hundred 85:6 | 61:19 63:9,18 | instances 36:15 | 74:3 | 41:3,20 |
| hurt 33:14 | 77:12 80:16 | instant 14:10 | jailer 37:5,13 | knew 76:11 |
| | indepth 23:3,16 | institutional | 63:11 83:8 | know 7:6 11:22 |
| **I** | indicate 43:12 | 73:13 | jails 17:22 34:18 | 16:15,23 20:5 |
| idea 60:21 80:7 | indicated 21:3 | instructions | 35:14 | 20:13 21:17 |
| identification | 23:14 69:14 | 29:13 30:5 | james 54:2 | 22:18 23:16 |
| 5:16 | ineffective 70:20 | insurance 60:15 | 84:14,15 | 28:6,11,12 |
| ignored 45:6 | information | intent 68:9 | jasper 2:9 6:10 | 29:5,8 30:4,21 |
| 46:5,7,12 | 38:7 | interested 86:16 | 8:4 | 31:9 33:8,12 |
| illness 7:20 | initially 37:2 | internal 73:11 | jeff 8:13,15 | 35:5 36:18 |

37:12,21,22
38:2 39:22
40:18 41:18
42:7 53:6
60:11,19 61:4
62:6,9,21 67:1
70:16 73:3
74:19 77:2,5
77:12 78:2
80:3,8 83:21
kristi 4:11,12

**L**

l 1:21 2:1,6 3:8
6:1 86:19,20
lake 29:3
large 2:8 6:3
30:14 31:13,15
31:16,18 48:5
48:6,7
larger 31:1,2
law 59:11
laws 2:17
lawson 54:2,12
54:13,18 55:6
lawsuit 7:7 60:4
60:13 62:7,15
laying 44:20
52:16
leading 3:1
leave 72:5
left 49:6 61:3
leg 57:21 70:23
legal 60:2
lengthy 63:19
lethal 71:4
letter 12:6
letting 79:4
level 29:17
lever 30:8
license 86:21
lieutenant 84:15
84:19 85:11
lieutenants
58:18
lightning 27:17
28:23

liked 42:11
likewise 7:15
lines 85:4
lists 54:6
literally 30:7
little 11:23 34:6
48:3
living 11:7,10
locked 41:8
73:19
long 9:9 10:8,21
85:8
look 22:18 23:9
23:14 25:8
27:23 30:13
41:6
looked 29:9
50:17 84:1
looking 77:10
lora 10:7,7
lord 22:2
lost 28:21
lot 9:5 17:5
21:20 29:3
35:13 59:21

**M**

m 1:18 2:11 6:11
85:22
m006 54:9
m007 54:7,13
maam 63:4,12
64:2,13,19,22
66:19,23 67:5
67:22 68:21
73:2 81:9
madison 65:5
majority 58:21
81:21
making 17:6
21:6,19
male 24:15
40:16 68:2
manage 9:1
management
38:19 39:1
manager 39:20

42:16,19
marital 10:4
mark 1:14 2:5
6:12,17 7:4
marked 5:16
marriage 10:13
married 10:5,9
10:21
mary 48:16
matter 77:1,20
79:23 80:4
maximum 14:20
mcclusky 4:19
9:7 22:14,15
24:10 27:22
38:4 39:10
58:16 59:15
76:6 77:14
81:11 82:19
83:12
mccluskys 24:14
80:5 84:21
mdorm 13:20
14:18,19 15:23
16:19 26:1
28:18 49:7
54:7,10 56:9
71:9,14,15
72:22 73:12,19
74:11
meals 38:12,15
mean 9:5 12:9
17:14,19 21:14
28:5 31:14
33:13 37:20
39:12 52:23
57:13 62:20
67:16 68:10
72:4 73:21
74:18,20,21,22
81:7 83:7 85:1
meaning 21:19
means 86:9
medical 66:2
76:22
medication 7:20
melanie 1:21 2:6

3:8 6:1 86:19
86:20
memory 16:22
21:1 25:7
30:11 34:10
37:15 41:11
61:12,16 67:17
70:13 83:14,20
85:6
mentioned
35:15 39:13
merritt 8:16
military 10:2
minutes 83:3
mistake 51:22
mistaken 25:10
months 64:5,7
mood 53:22
morning 11:18
21:2 22:12
49:17
mote 22:23
23:15,20 24:23
motes 24:16
mother 53:18,19
55:19
move 71:1 73:11
moved 27:1
32:17 72:23
73:4
moving 21:4

**N**

n 2:1 4:1,13 5:1
name 7:2,5 10:6
10:18,19 16:15
21:23 37:22
38:6 40:14,15
41:23 56:7
59:6,9 66:11
82:18,22 83:3
84:13
named 86:17
nationality
75:20
nature 62:23
necessarily 17:6

52:23
necessary 2:21
neck 32:11,17
57:22
need 11:23
neither 86:13
never 8:11 18:7
62:14
new 10:17,19
27:18
nice 53:22
night 53:23
nightstick 55:4
noncombative
52:16
nonlethal 70:22
nonvital 70:23
normal 17:17
normally 60:22
north 4:6
northeastern
1:3
northern 1:2
notary 2:7 3:10
6:2
notes 17:6
notice 49:14
68:8,9
november 67:4
number 34:1
86:21
nurse 35:9,10
66:12

**O**

o 2:1
oath 78:1
object 33:19
35:20 79:7,18
80:14
objections 2:22
3:2
observed 18:2
30:22
oc 70:17
occasionally
58:21

occasions 71:7
october 64:16
  65:14
odds 20:18,22
offered 3:4
office 9:2 13:11
officer 15:8,21
  15:23 16:9,16
  16:18 18:10,12
  18:17 20:21
  22:4 29:14
  30:1,21 36:10
  36:21 37:2,13
  41:22 43:8,17
  44:2,14,22
  45:5 46:10,17
  47:17 48:17,19
  49:9 50:8,23
  51:6 52:5,8,9
  53:17 54:20,22
  55:1,4,18,22
  56:4 61:8 71:7
  71:16 72:6
  78:13 79:15
  81:16 82:2
  83:7
officers 13:20
  15:4,5,15 20:9
  34:2,7 36:5,15
  47:5,8 54:23
  59:11 69:10,14
  70:13 72:21
  73:18 74:22
  81:1,14
oh 34:15
okay 11:19
  21:13,17 26:20
  27:20 45:4,10
  56:3 71:20,23
  76:14 79:10
  80:8,11,18
  81:20
once 27:5 42:5,7
  68:8
ones 12:15 53:13
onsite 42:20
ooo 5:18

open 15:9 53:17
  72:13,17 74:6
  82:6
opened 13:21
  15:5,22,22
  16:19 71:10,17
  74:10,23 82:12
opening 63:21
  75:4
operational 9:1
opinion 31:14
oral 3:12 6:13
order 70:7
original 3:11
outcome 60:12
outside 23:10
  50:20 57:16,20
  71:9

          P
p 2:1 4:1,1,12
  85:22
page 5:3
pants 54:23
part 9:2 28:18
  31:7 53:12
  55:11 63:20
  65:3 66:17
  73:20 76:13
  79:23 83:9,10
participated
  16:17
particular 16:16
  17:13
particularly
  61:20
parties 2:3 3:2
  86:14
parttime 63:11
passed 18:2
patrol 9:4
paula 37:23 38:3
pay 60:17
pending 75:7
people 8:21
  21:22 22:1
  34:1 41:13

49:11 82:4
percent 85:6
period 37:12
  63:20 64:1,4,8
  64:12
permits 34:18
permitted 34:23
person 17:18,20
  43:5 62:21
personally
  12:22
personnel 85:3
petix 1:21 2:6
  3:9 6:1 86:19
  86:20
phillips 48:16,19
  48:23,23 49:9
  51:11
phones 56:13
physically 30:15
  30:18 31:6,11
pick 64:18 65:2
  65:6 78:14
pickup 29:1
pieces 85:5
place 8:3 13:10
  13:11
plaintiff 1:8 4:4
play 75:12 76:9
played 76:12
  79:23 80:4
please 6:23 7:3
point 19:14 23:6
  23:19 63:15
  83:18
points 20:4
policies 13:10,17
  14:8,17
policy 13:19,22
  14:2,7,13 15:3
  18:12,16 23:11
  34:18 50:20
  70:12 71:2,8
  72:1,15 74:10
  74:18
poor 66:7
popped 31:2

33:6
position 23:12
  39:15,22 83:6
possibilities
  26:21 28:14
  29:4
possibility 28:20
possible 25:18
  27:10 32:14,19
  62:16
possibly 23:4
  41:2 54:4
  62:13
posted 71:9
prayed 22:1
premises 40:6
  40:11,21 58:5
  58:6 59:2
prepare 11:14
  38:15
presence 70:14
present 4:18
  15:4 26:16
  81:14
presented 11:16
  12:5 23:22
presently 8:17
pressed 30:10
pretty 20:11
  22:16 35:15
  37:17 63:19
  66:7 73:10
prevent 56:1
prior 3:5 67:15
probably 14:4
  25:16 31:18
  42:22 58:13,20
  73:23 79:3,16
  84:14
probationary
  64:1,3,8,12
probes 19:10
  35:4 44:7
problems 15:1
procedure 3:7
  6:6
proceedings

6:14
process 21:18
progressive
  14:12
promoted 37:7
  37:10,14
property 73:7
protect 13:12
protecting 47:8
provided 50:16
provider 60:15
public 2:7 3:10
  6:2
pull 51:20
pulled 55:9
pulling 47:20
  48:9
punch 30:19
punched 27:11
pursuant 6:5
pursue 77:19
pushed 56:14
pushing 54:21
put 13:11 22:10
  26:23 27:17
  29:1,2 49:7
  52:17 70:16

          Q
question 7:10,17
  26:19 27:15,19
  43:18 51:17
  58:15 62:2
  70:12 80:17
questioned 39:9
questions 2:23
  3:1 7:9 9:12
  76:15 79:21
  82:15 86:7
quick 37:17
quit 49:5,22
  68:11
quite 9:5 23:21
  84:23
quote 53:17

          R

r 1:7 4:1
race 12:23 24:14
  24:16,18,21
  75:20,23 84:7
  85:12
ran 65:9 78:15
ratified 80:12
read 19:6 21:21
  44:22 45:9
  47:10 49:15
  50:12,15,17
  52:19 53:11,15
  53:21 55:7,10
  55:12 56:11,17
reading 2:14
  19:15,22 47:22
  54:15 69:23
real 8:10
really 39:23
  59:21 62:9
reason 40:10
  72:14,17 74:5
reasonable 75:4
recall 13:4 14:4
  14:9 17:10,19
  20:12,19 22:5
  22:9,13,22
  23:5 24:12
  25:7 32:1,6
  37:20 40:12,15
  40:17 41:1
  42:6 44:16
  45:18 49:16
  50:4 59:4,7,9
  61:5 63:14
  64:10,20 65:20
  66:11 67:14
  68:15 69:13,20
  69:23 73:8
  77:9 78:8
reckon 53:23
recollection
  61:19 77:17
  78:1
recommendat...
  22:17 24:9
  80:5,12

recommendat...
  58:19
recommended
  22:20 81:11
  82:19 83:23
  84:11
recommending
  81:5,6
record 7:2 14:18
  24:13,20 27:5
  27:8 28:16
  30:20 47:12,14
recorded 27:12
  28:20
reference 35:8
referral 65:2
regarding 12:14
  65:17
regular 15:1
regularly 74:3
relates 11:20
relating 2:18
release 64:18
relook 23:15
remarried 10:17
remember 7:22
  17:13 33:10,11
  37:19 39:13
  41:22 43:16
  47:22 54:15
  63:7,17 65:6
  84:9
removal 57:17
removed 82:7,9
repeatedly
  61:15
rephrase 7:12
report 9:7 21:20
  25:1,5,13 43:9
  43:17 44:1,15
  45:1,2 46:8
  47:17,23 48:20
  52:9,19 53:12
  65:15,16 66:9
reporter 1:20
  2:7 3:9 6:2,21
reports 19:10,15

20:2
represent 7:6
  60:16
represented
  60:9
represents
  86:10
request 28:5,8
rereviewing
  21:1
residents 61:2
resign 68:6
resigned 67:15
  68:4 78:3,9
resort 34:19
respect 23:13
respective 2:4
response 15:7
  71:12
rest 20:6
restrain 47:3
rests 81:2
result 77:6
  86:16
retained 28:22
retired 85:10
reveal 42:11,12
review 21:5
  22:12 53:1
  69:12,17
reviewed 11:15
  11:17 12:2,3,6
  12:15 35:8
  50:17 69:4
reviewing 13:8
  13:15 49:16
reword 7:12
rhonda 82:21
  83:1,5
richard 4:13
richardson
  37:23 38:3
  39:4 76:6
  79:21,23 80:4
right 11:4 13:17
  15:12 16:3
  18:22 20:16

31:3 35:1,18
  36:2,7 37:3
  40:6 44:20
  52:22 56:21
  57:8 59:12
  60:20 68:13,23
  71:11,21 79:17
  80:1
ring 39:11
rises 29:16
risk 14:22
road 68:16
role 80:4
ronald 53:3,5,15
  54:9
room 15:10
  29:14 30:1
roshan 42:17
roshon 42:18
rouge 43:1
rule 16:13
rules 2:18 3:7
  6:5 73:14
run 26:11

S

s 2:1,1 4:1 5:12
  86:19
saith 85:19
sam 41:23 61:13
  67:12 78:2
sanctions 73:11
  73:13
satisfied 29:10
saw 31:4,8 45:10
  84:10
saxon 3:11 4:5
  5:4,8 7:1,5
  41:17 47:12,16
  61:21 62:1
  63:5 76:16,20
  80:18 82:17
  85:14
saying 33:4,21
  78:7
says 33:7 45:19
  45:21 46:23

47:3 48:20
  50:9 51:2,2,18
  52:9,12,15
  53:16 54:13,18
  56:17,20 71:2
screen 30:14,19
  31:1
screens 31:1
screwed 83:15
second 10:14
  14:1 18:16
  19:13 28:21
  44:3,11 46:3
  46:14 52:3
security 14:20
  14:22 40:5
see 31:6 43:22
  46:8 49:23
  53:20
seeing 28:17
  43:16
seeking 41:14
seen 22:11 24:1
  25:12
segregation
  14:21
select 27:6 30:16
selected 63:21
selfdefense 55:8
sent 61:3 65:1,6
  65:23
sentence 35:22
  61:2
sentenced 62:22
sergeant 22:23
  23:6,15,19
  24:16,18,23
  37:1,8,14
  55:15 56:16
  61:13 67:23
sergeants 58:17
serious 22:16
serve 38:11,15
  68:8
served 10:1
serves 30:11
service 38:10,18

63:22 76:8 79:22
set 68:8
settled 60:16
severe 24:6
shackles 65:8
sham 61:13
sherer 41:23
  61:13 67:12,23
  78:2
sheriff 7:5 8:19
  8:23 9:10,13
  17:4 25:11
  28:6,9 47:16
  61:21 62:6
  64:21 67:20
  69:10 74:16
  76:17 80:22
  81:2
sheriffs 9:2
  13:11 14:11
shift 84:10,16,18
shirt 47:21
  48:10 49:7
shorthand 2:6
  3:9 6:2
shoulder 32:10
  32:16 56:15,21
showing 39:6
shy 8:9
sick 17:15
side 32:11 49:6
signature 2:13
signed 11:3
simple 51:19
simultaneously
  27:4
sir 7:3,14,18,23
  9:8,11,15,20
  9:23 10:3,14
  11:2,9,12
  12:11,12,16,19
  13:1 14:10,14
  15:13,18 16:2
  16:14,21,22
  17:2 18:14
  19:2,21,23

20:20 21:10,16
  22:5 24:12
  26:3,10,13
  29:7,12 31:10
  31:23 32:1,23
  34:14,17 35:2
  35:12,19 36:3
  36:8,13,23
  37:4,6,9,15
  38:1,13,17
  40:7 42:1,4
  43:6,11,15
  44:1,21 45:3,9
  46:9 47:11
  48:1,4,15,18
  50:1,3 52:4,20
  53:10,14,21
  54:4,8,11,17
  55:13,16 56:2
  56:6,19,23
  57:6,9,12,19
  58:1,4,11
  59:13,16 60:3
  60:5 61:10
  63:12 76:18
  77:8,22 78:19
  79:1,19 80:10
  80:16,17 84:19
sitting 77:16,23
situation 12:1
  16:8,11 18:1
six 64:5,7
slapping 66:13
  66:14
slumped 52:11
smaller 31:18
smith 29:3
sole 18:10
solely 81:2
somebody 15:10
  18:2 27:11
  32:8 38:14
  41:1 42:10
  43:3 58:8
  65:16 67:7
  72:17
somewhat 51:17

sorry 12:11
  48:12 63:13
sound 54:1
  60:20
source 75:16
speak 7:22
speaking 23:5
  58:16
specific 11:23
  17:11 36:18
specifically 68:7
specifics 64:21
sprinkler 73:8
staff 66:18 81:5
stand 45:22 46:2
  47:2
standard 35:15
  35:21 73:10
standing 15:16
  15:23 16:18
  18:10 29:13
  51:1
start 13:8 29:20
  68:10
started 45:22
  49:5
starts 30:10 51:4
  55:20 70:13
state 2:7 6:3 7:2
  8:13,15 60:6
  86:2
statement 14:15
  18:21 20:22
  30:22 33:21
  34:7,9 44:23
  45:8,17 47:10
  49:15 51:10
  55:7,12 56:12
  56:18 69:12,17
statements 12:4
  12:13 20:2
  21:20 24:2
  25:3 33:17,23
  35:7 50:13
  53:8,11 54:16
  68:18,20 69:3
  72:11

states 1:1 3:8
  6:6 56:22
status 10:4
stay 45:23 46:6
  46:14 47:1
  51:5,5
steal 78:16
stenotype 86:7
step 79:16
steven 56:8
stick 33:10
  56:15 61:14
sticks 20:5,14
stipulated 2:2
  2:12,20
stipulation 6:7
stipulations
  6:22
stomach 54:21
stop 7:11 45:6
  45:13 46:4
  51:3 68:11
  70:16
stopped 59:10
store 27:6
stretch 17:17
  18:6
strickland 10:20
strike 27:17
  70:22
striking 47:18
  50:21 81:17
strongly 13:13
  17:1,9 29:8
struck 14:3
  18:19 19:16
  33:9 61:8,14
  69:5,16 79:14
stuff 41:5 77:15
  83:16,20
subdued 14:2
  18:18 19:4,5
  19:19 35:4
subjects 43:13
  43:19
suffering 7:19
suggesting

25:13
suite 4:14
summary 25:1
supervising 85:2
supervisor
  84:17 85:4
supervisors
  84:10
suppose 26:7
  27:16 46:20
supposed 15:6
  15:15 29:22
  58:6
sure 23:3 27:7
  38:6,8 43:23
  44:17 60:8
  61:5 70:11
  71:18 75:1
  76:11 83:8
suspect 32:2
swings 55:5
switched 30:9
sworn 6:18
system 26:13,23
  27:4,15,18
  30:12

**T**
t 2:1,1 5:12
table 49:7
take 53:8 59:1
  75:6 78:17
  79:16
taken 2:5 3:12
  12:14 86:6
takes 55:4
talk 14:16 32:20
  34:5 44:14
talked 21:22,22
  39:10 77:14
talking 11:22
  15:11 18:23
  38:8
tape 26:15 27:3
  28:1,2,10
taping 29:20
  30:10

taser 19:12,13
  35:5 43:8,14
  43:17,20 44:4
  44:11,15 45:1
  45:15,20 46:13
  49:2 52:2
  70:18
tasered 19:9
  46:13 49:21
  50:7 51:1,4,7
  52:10 56:17
  69:19 81:13
tasering 49:14
  49:19 51:12
  57:2
taunting 72:12
teach 71:3
technology 27:2
  27:9 28:16
tell 18:7 22:2,8
  23:7 33:2
  34:11 39:14
  40:14 42:21
  67:17 68:7,14
  85:6
telling 11:4
  72:12
tells 55:15 72:18
term 69:20
terminate 21:7
  22:4 24:7
  36:20 59:14
  65:10 68:16
  75:10,14 76:2
  76:9 78:21
  79:4 80:23
  81:6,7,8,10
  82:20 84:2,12
terminated 9:21
  12:7 13:6
  18:13 24:11
  50:5 61:15
  64:11 75:2,3
  75:18 77:18
  78:3,9 79:2
  80:6 81:12
  82:19

terminating
  11:21
termination
  19:7 22:20
  68:10 76:13
  77:3 80:1
  83:13,23 84:22
terms 9:6 61:1
testified 6:19
  37:18 71:6
testimony 1:13
  3:12 40:2
  86:11
tethered 57:22
thats 9:17 11:4
  14:14,20 17:16
  19:21 20:17,19
  28:19 29:21,22
  30:9,9 31:19
  32:11,12 34:15
  35:16 39:19,11
  40:23 41:10,10
  42:13 44:5
  50:9,23 51:6
  51:23 52:21
  55:14 56:22
  61:16,22 62:16
  71:9,14 73:10
  76:14 77:21
  78:4 80:18
  81:23 82:22
  85:14
thereto 3:5 86:8
thing 13:8 42:14
  50:19 51:19
  73:11 84:1
things 17:5
  23:23 30:22
  31:4 35:13
  51:8 62:23
  73:22 85:3
think 7:22 11:2
  11:4,21 14:5
  17:22 18:9
  20:10,15,16
  21:2 22:5,9,19
  23:10,13 24:2

25:9,12 30:17
  32:9,12 33:3
  35:9 36:13,14
  41:4,5 42:18
  43:6 44:12
  58:13,17 60:7
  61:12,18,21
  65:7 69:21
  70:17 73:6
  74:17 82:21,22
  83:8,9,15,17
  84:23
thinking 42:10
third 4:6
thorough 23:21
thought 20:7
  25:6,9,16
  83:22
threat 50:22
  70:9
threatening
  46:22
three 10:10
  38:12 67:21
  84:4 85:9
tiffany 48:22
time 3:3,4 7:9
  11:8 23:6,8,19
  26:8 30:12
  35:23,23 36:4
  36:4 37:12
  41:1 42:7,13
  42:19 46:14
  50:16 52:3
  56:16 63:15,19
  63:20 64:1
  67:3 69:16
  78:5 83:9,9,10
  83:10
times 14:4 17:15
  18:20
tiny 48:3
tirey 1:14 2:5
  6:12,17 7:4,4
  10:7
today 7:7 77:16
  77:23

told 22:10,15
  28:13 33:11
  42:9 46:14
  50:6 53:16
  55:18 65:15
  79:10 83:21
tonja 10:16,16
top 32:5 51:8
total 50:18
totally 21:10
trading 59:23
trained 83:19
training 71:3
transcribed
  86:8
transcript 3:12
  86:11
transcription
  86:9
trash 57:16
trent 4:19 22:14
  58:13,16 79:4
  82:18
trial 3:3
tried 32:9 46:1
  47:2,3 83:18
trigger 51:20
truck 29:1
true 86:10
trusties 57:11
  58:9
trusty 79:5
truthfully 78:5
trying 32:15
  33:8,13,14
  41:2 43:21
  44:9,18 46:15
  51:18 69:22
  70:3 77:15
  79:11,15 81:15
  84:8
tv 26:1
twentysix 10:22
two 13:20 14:16
  15:3,15 19:10
  22:9 35:4
  46:11,12 62:2

67:21 82:4
  83:4 84:4
type 41:6

U
u 2:1
uab 8:13
ultimately 21:10
  37:11
unconscious
  16:10 17:16
understand 7:10
  17:3 21:15
  25:15 33:20
  40:1 43:1 73:1
  73:15
understanding
  19:9,22 41:9
  44:5 60:14
understood 7:16
unequivocally
  39:15
unique 20:7
unit 14:21 15:14
  27:12
united 1:1 3:7
  6:6
unquote 53:19
use 14:7 38:15
  42:2 46:21
  49:20 70:7
uses 43:8
usual 6:21

V
vacation 59:2
valid 72:14
vcr 27:3 28:15
verbal 45:5,12
  45:16,23 46:6
  70:14,15
verbally 22:10
  23:9
version 32:22
  33:3,16 34:8
  49:10,11 55:14
vhs 27:3

video 25:23
26:14
views 30:13,15
violate 13:18
71:8,20 72:1
72:15
violated 13:9,14
14:8,17 18:17
74:18
violation 13:23
14:1,6 18:12
73:13
vs 1:9

**W**
waiting 23:17
waived 2:15
walk 17:6 18:21
walker 1:10 2:8
6:9 8:13,20
10:23 14:11
66:1 76:22
77:10
wall 55:2
want 10:17
18:20 21:14,17
27:7 36:6
40:10,21 43:4
wanted 30:18
wants 62:17,18
warrant 81:16
84:21
warranted
83:12
wash 58:10 63:6
washing 57:18
57:21
wasnt 37:17
48:13 53:22
83:22 85:2
watch 30:19
way 7:21 12:3
13:7 20:17,21
29:22 43:18
78:8 80:8 84:2
86:15
weight 50:10

went 21:18
23:10 27:15
49:6 50:20
whats 10:19
whatsoever
38:21
whisenhunt
82:21 83:2
whisenhunts
83:5 84:6
white 24:15,15
24:17,19,22
39:7 57:4,7
68:2 84:8
85:13
wifes 10:6
wiggling 21:3
williams 30:1,3
30:21 47:17,23
winning 48:11
48:13
witness 2:14
6:12 76:18
86:12
witnesses 81:21
woman 37:22
wont 23:2
woodley 84:14
84:15
woodleys 85:12
words 35:21
work 22:19
23:21 41:15,16
41:17 57:15
64:18 73:21
74:3 83:22
worked 63:18
76:7
workers 39:8
working 70:20
world 26:20
wouldnt 36:13
46:16 51:9
72:15 77:5
79:6
writes 31:4
47:17

writing 22:11
23:8
written 12:15
25:1
wrote 43:20
44:23

**X**
x 5:1,12

**Y**
yall 10:8,21,23
25:3,23 26:8
28:22 29:5
35:17 38:11,14
38:14 40:21
41:12 53:8
57:10 58:23
60:17 77:18
78:22,22
yeah 10:19
year 27:16
years 10:11,22
11:5 17:4,8
23:21 84:4
85:9
yesterday 8:15
youre 29:10
youve 50:8
51:10 69:3

**Z**
zero 63:1

**0**
000 60:20
05 1:18 2:11
6:11
09cv1748slb 1:5

**1**
10 1:18 2:11
6:11 8:2,2
60:20
12 85:22 86:22
13 86:22
15 23:20 85:22

16 17:4 56:9
17 1:17 2:10
3:13 6:11
1959 8:2
1998 27:1
19th 10:10

**2**
200 4:14
2001 2:9 6:9
2003 67:20
2008 64:16
65:14 67:4
2011 1:17 2:10
3:13 6:12
2119 4:6
24 26:12
2nd 2:9 6:9 67:4

**3**
300 4:13
35203 4:7,15
35501 2:10 6:10

**4**

**5**

**6**
6 1:5
62 5:5

**7**
7 5:4
76 5:8

**8**
80 5:10
82 5:9

**9**
9 86:22
90 64:6
95 9:10