# Exhibit "C"

# Deposition of Trenton McCluskey

1

1  IN THE UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF ALABAMA
2        JASPER DIVISION
3
   GEORGE R. CHAPMAN, JR.,
4      Plaintiff,
5  VS.        CIVIL ACTION
             NO. 6:09-cv-1748-SLB
6
   WALKER COUNTY, ALABAMA, a
7  Governmental Entity; and SHERIFF
   JOHN MARK TIREY and TRENTON
8  McCLUSKEY, Individuals,
       Defendants.
9
10     DEPOSITION OF TRENTON McCLUSKEY
11
12        STIPULATIONS
13     IT IS STIPULATED AND AGREED, by and
14  between the parties, through their respective
15  counsel, that the deposition of TRENTON
16  McCLUSKEY may be taken before Scott Wilmeth,
17  CCR, RPR, State of Alabama at Large, at 2001
18  2nd Avenue, Jasper, Alabama, on May 11, 2011,
19  commencing at 4:03 p.m.
20     IT IS FURTHER STIPULATED AND AGREED
21  that the reading and signature to the deposition
22  by the witness is waived, said deposition to have
23  the same force and effect as if full compliance

2

1  had been had with all laws and rules of court
2  relating to taking of depositions.
3     IT IS FURTHER STIPULATED AND AGREED
4  that it shall not be necessary for any objections
5  to be made by counsel as to any questions, except
6  as to form or leading questions, and that counsel
7  for the parties may make objections and assign
8  grounds at the time of the trial, or at the time
9  said deposition is offered in evidence, or prior
10  thereto.
11
12
13
14
15
16
17
18
19
20
21
22
23

3

1        I N D E X
2  EXAMINATION BY:          PAGE NO.
3  Mr. Saxon-------------------------------  5
4  Ms. Dowdy------------------------------- 105
5  Mr. Saxon------------------------------- 108
6
7        E X H I B I T S
8  PLAINTIFF'S EXHIBIT NO.          MARKED
9  1 - Batons Memo------------------------- 80
10  2 - 11-3-08 Letter from McCluskey------- 89
11
12  DEFENDANT'S EXHIBIT NO.          MARKED
13  1 - 2-21-01 Memo----------------------- 106
14
15
16
17
18
19
20
21
22
23

4

1  BEFORE: Scott Wilmeth, CCR, RPR
2      Commissioner
3
4  APPEARING ON BEHALF OF THE PLAINTIFF:
5    Mr. John D. Saxon
6    John D. Saxon, P.C.
7    2119 3rd Avenue North
8    Birmingham, Alabama 35203
9
10  APPEARING ON BEHALF OF THE DEFENDANT:
11    Ms. Kristi A. Dowdy
12    Law Offices of Kristi A. Dowdy
13    300 North Richard Arrington, Suite 200
14    Birmingham, Alabama 35203
15
16  ALSO PRESENT: George Chapman, Jr.
17
18
19
20
21
22
23

5

1　　　　I, Scott Wilmeth, CCR, RPR, State of
2　Alabama at Large, acting as commissioner, certify
3　that on this date, in accordance with the Federal
4　Rules of Civil Procedure and the foregoing
5　stipulations of counsel, there came before me at
6　2001 2nd Avenue, Birmingham, Alabama, on May 11,
7　2011, TRENTON McCLUSKEY, witness in the above
8　cause for oral examination, whereupon the
9　following proceedings were had:
10
11　　　　TRENTON McCLUSKEY,
12　having been first duly sworn, was examined and
13　testified as follows:
14　　　　THE COURT REPORTER:  Usual
15　stipulations?
16　　　　MR. SAXON:  Please.
17　　　　MS. DOWDY:  Yes.
18
19　EXAMINATION BY MR. SAXON:
20　　Q.　State your full name for the record,
21　please, sir.
22　　A.　Trenton Jerome McCluskey.
23　　Q.　Okay.  Mr. McCluskey, we met this

6

1　morning.  I'm John Saxon.  I represent George
2　Chapman.  During the course of the deposition,
3　I'm going to ask you some questions.  If at any
4　time I ask you a question you don't understand,
5　if you'd just stop me and get me to reword or
6　rephrase it and I'll do so.  Can we agree on
7　that?
8　　A.　Yes, sir.
9　　Q.　Likewise, if you don't do that, I'll
10　assume you've understood my question.  Is that
11　fair enough?
12　　A.　Yes, sir.
13　　Q.　Are you taking any medication or
14　suffering from any illness that would impair
15　your ability to think, hear, speak or remember
16　clearly today?
17　　A.　No, sir.
18　　Q.　Okay.  What is your date of birth?
19　　A.
20　　Q.　Your place of birth?
21　　A.　Jasper, Alabama.
22　　Q.　And where did you grow up?
23　　A.　Between Jasper and Oakman, here in

7

1　Walker County.
2　　Q.　What's your educational background?
3　　A.　I got a B.A. degree in Florence from
4　International Bible College.  I got an Juris
5　Doctorate from the Birmingham School of Law.  I
6　have several certificates of training, death
7　investigations and so forth.
8　　Q.　Okay.  And when did you graduate
9　from BSL?
10　　A.　2000.
11　　Q.　Are you admitted to any bar?
12　　A.　No, sir.
13　　Q.　Where did you graduate from high
14　school?
15　　A.　Walker.  1980.
16　　Q.　Is that the Vikings?
17　　A.　Yes, sir.  We agree on that, don't
18　we, George?
19　　　　GEORGE CHAPMAN:  Yeah.
20　　Q.　(By Mr. Saxon) By whom are you
21　presently employed?
22　　A.　Walker County Sheriff's Department.
23　　Q.　And what is your position?

8

1　　A.　Jail administrator.
2　　Q.　What are your duties?
3　　A.　Oversee jail operations.
4　　Q.　How long have you been in that job?
5　　A.　In this particular position, since
6　August the 10th of '95 -- wait a minute.  No,
7　sir, August the 10th of '99.
8　　Q.　And to whom do you report?
9　　A.　The sheriff and/or chief deputy.
10　　Q.　Who is the chief deputy at present?
11　　A.　The acting chief deputy is Jim or
12　James Painter, P-a-i-n-t-e-r.
13　　Q.　Have you ever been arrested?
14　　A.　No, sir.
15　　Q.　Have you ever declared bankruptcy?
16　　A.　No, sir.
17　　Q.　Have you ever been terminated from a
18　job?
19　　A.　No, sir.
20　　Q.　Have you ever resigned in order to
21　avoid termination?
22　　A.　No, sir.
23　　Q.　Have you ever served in the

9

1　military?
2　　A.　No, sir.
3　　Q.　What's your martial status?
4　　A.　Been divorced since 1991 -- '90.
5　　Q.　And was that your one and only
6　marriage?
7　　A.　Yes, sir.
8　　Q.　And who were you married to?
9　　A.　Gina Katherine McCluskey Shumate,
10　and her maiden name was Simmons, I'm sorry.
11　　Q.　She has remarried and her name is
12　now Shumate?
13　　A.　Yes, sir.
14　　Q.　Does she still live in Walker
15　County?
16　　A.　Yes, sir.
17　　Q.　Have you ever given a deposition
18　before?
19　　A.　Yes, sir.
20　　Q.　How many times?
21　　A.　I don't know, sir. I'd venture to
22　say five or six.
23　　Q.　Have any of them involved employment

10

1　cases arising out of the jail?
2　　A.　No, sir.
3　　Q.　What have they involved?
4　　A.　Situations such as jail hangings.
5　That's pretty much been the ones I've had to go
6　on.
7　　Q.　Y'all have had four or five
8　hangings?
9　　A.　Over the years, yes, sir.
10　　Q.　And were these actions brought by
11　the families of the inmate who hung him or
12　herself, who claim y'all should have prevented
13　it somehow?
14　　A.　Yes, sir.
15　　Q.　Okay. When was the most recent one
16　of those?
17　　A.　That we've had depositions on?
18　　Q.　Yes, sir.
19　　A.　It was about -- the depositions
20　were -- I can tell you the name. The inmate
21　was Jonathan Hagler. That was not a hanging,
22　but it was an in-custody death. And it was the
23　deposition that settled the case -- actually,

11

1　it settled by mediation. We didn't do a
2　deposition. And that was about October of '08,
3　I would guess, just before this incident.
4　　Q.　So you don't think you gave a
5　deposition in that case?
6　　A.　The best I remember, I did not.
7　　Q.　Who was the mediator? Do you
8　recall?
9　　A.　I do not. Daryl Masters represented
10　me and on the other side was Tommy Carmichael
11　and Charles Tatum.
12　　Q.　Did you review any documents in
13　preparation for your deposition?
14　　A.　Today's?
15　　Q.　Yes, sir.
16　　A.　We glanced at the initial report,
17　the letter that I sent to the sheriff.
18　　Q.　Initial report?
19　　A.　The letter that I sent, the letter
20　of recommendation. Nothing extensively; just a
21　brief glance at some documents.
22　　Q.　All right. Initial report by whom,
23　of what?

12

1　　A.　To the best of my memory, we looked
2　over my letter of recommendation that I sent to
3　the sheriff.
4　　Q.　Recommending George's termination?
5　　A.　Yes, sir.
6　　Q.　Okay.
7　　A.　And there were some other documents
8　there which I believe included the reports of
9　Rachel Harper, Mary Phillips, perhaps Ms.
10　Killingsworth, Cindy Killingsworth and maybe
11　Jerry Williams' report may have been there. I
12　didn't really read them, sir. I glanced them
13　over. I don't even recall if Darrell Mote's
14　report was in there or not.
15　　Q.　How long have you been with the
16　Walker County Jail?
17　　A.　Since March the 10th of 1995.
18　　Q.　What was your first position?
19　　A.　Jailer.
20　　Q.　Your next position?
21　　A.　Lieutenant.
22　　Q.　How long were you a jailer?
23　　A.　I was promoted in '97, I believe.

13

1    Q.    How long were you a lieutenant?
2    A.    Until August of '99.
3    Q.    At which point you became
4  administrator?
5    A.    Yes, sir.
6    Q.    Were you promoted from lieutenant to
7  administrator by the sheriff?
8    A.    Yes.
9    Q.    Who was the sheriff then?
10   A.    Same sheriff we have now, John Mark
11 Tirey.
12   Q.    All right.  And you made a
13 recommendation to the sheriff that George be
14 terminated?
15   A.    Yes, sir.
16   Q.    And why did you make that
17 recommendation?
18   A.    A culmination of several events.
19 One, there had been an incident where I was
20 contacted by Walker Baptist Medical Center.
21 And if my memory is correct, it was Ginger
22 Kilgore who was the nurse supervisor who
23 contacted me and indicated that George had used

14

1  excessive force on Mr. George Files, who was an
2  inmate with cardiac problems that was being
3  housed at Walker Baptist.  And again, from
4  memory, I believe Ralph Williams, Jr. was the
5  investigator on that particular incident.
6    Q.    And when did that supposedly happen,
7  what I will call the Files incident?
8    A.    I would strictly be guessing, sir.
9  It would be within three months or so of this
10 incident, I would say, relatively close.
11   Q.    Within three months of the Decatur
12 incident?
13   A.    Yes, sir, and that's definitely an
14 approximation.  I'm just not sure on the time
15 frames.
16   Q.    Was Dayron Bridges the investigator
17 on the Files incident?
18   A.    Could have been Dayron.  Could have
19 been Dayron, yes, sir.
20   Q.    And what did he conclude?
21   A.    I don't recall, remember the -- if
22 he gave me a letter of conclusion,
23 recommendation, so forth.  I believe that went

15

1  to the sheriff.  And the contact I had was from
2  the hospital and told them not to send that man
3  back out there.
4    Q.    So one of the bases for you
5  recommending George be terminated was the Files
6  incident, but you don't even know what the
7  investigator concluded?
8    A.    I do not know the conclusion, the
9  formal conclusion of the investigator's report.
10 I do not.  It would have gone to the sheriff,
11 along with my letter.  The sheriff would have
12 both pieces of information to make his decision
13 with.
14   Q.    All right.  Sitting here today,
15 what's your best judgment as to who was the
16 investigator on the Files incident?
17   A.    We've got three incidents that
18 occurred with George that I had to ask for an
19 investigator to take care of.  One involved
20 Dayron Bridges, and it may well have been the
21 Files incident.  I think you're right.  I think
22 it was Dayron.
23        There was another incident in which

16

1  George was cleared of allegations from some
2  inmates that I don't -- I don't even recall the
3  exact particulars on the allegations; something
4  to the effect he may have exposed himself to
5  them or groped them or something of that
6  nature.  And again, I step back, hand to the
7  investigator and leave it alone.  But they did
8  come to me and tell me that he was cleared of
9  that incident.
10   Q.    Okay.  So that one was not part of
11 the basis for your recommendation, was it?
12   A.    No, sir, other than the fact that I
13 would mention to the sheriff that, you know,
14 "We have tied up investigators with this
15 probationary employee on three occasions in his
16 short term of employment here."
17   Q.    Well, if some guys want to -- some
18 inmates want to fabricate something about
19 George, that's not his fault, is it?
20   A.    No, sir; no, sir.
21   Q.    And that's not the first time you've
22 heard of that happening, is it?
23   A.    No, sir.  And in that same letter, I

17

1 say he was cleared.

2 Q. But you indicate that it formed, in

3 some way, your basis of your recommending that

4 a probationary employee be terminated, because

5 it was tying up resources?

6 A. Yes, sir.

7 Q. Isn't that what you told the

8 sheriff?

9 A. That's information that goes to the

10 sheriff for him to make the final decision

11 with. We didn't sit and have a passionate,

12 "Persuade me to fire or keep," discussion. I

13 simply made a black and white report on paper

14 to the sheriff, or recommendation.

15 Q. Well, did you talk to him verbally

16 about whether George should be terminated?

17 A. I'm sure we had some kind of a

18 discussion about it, but it wasn't one that was

19 over a career that just really stands out and I

20 don't remember any major discussions about it.

21 Q. Was it in person or on the phone?

22 A. I don't remember, sir.

23 Q. Were you in his office or your

18

1 office?

2 A. I really don't remember. I could

3 tell you routinely, those type meetings are

4 handled in a sensitive manner and would be in

5 his office.

6 Q. Okay. Do you recall anything that

7 you and the sheriff discussed?

8 A. I don't even remember for certain

9 that there was such a meeting, but routinely,

10 there would be on something of that nature.

11 Q. In the time that you've been jail

12 administrator, how many times have inmates made

13 what were determined to be false allegations

14 against a correction officer that had to be

15 investigated and then were determined to be

16 without merit?

17 A. I don't recall of another incident.

18 Now, I can't tell you definitively there's not

19 been one, but just from my memory, where we

20 went to the point of calling in someone from

21 the outside -- yes, sir, I do. I recall of at

22 least one.

23 We had a juvenile who alleged that

19

1 he had been raped, and it was determined

2 through medical exams and so forth that he was

3 not raped, there was no evidence of it. And

4 there was an officer who was suspended and

5 investigated as a result of those allegations,

6 because of the classification of the juvenile.

7 The -- I don't recall who the investigator was

8 that took care of that situation.

9 Q. Who was the correction officer

10 falsely accused?

11 A. I don't know that he was falsely

12 accused of misclassifying the inmate, but --

13 Q. Well, who was accused of raping the

14 juvenile?

15 A. Lee Andrew Smith.

16 Q. And what was his position? Jailer?

17 A. No, sir, he was an inmate.

18 Q. I'm sorry, so an inmate was accused

19 of raping a juvenile?

20 A. Yes, sir, a juvenile inmate who was

21 being housed in an adult facility, who was

22 placed in the cell with this adult inmate

23 through the misclassification by a jailer.

20

1 Q. Okay.

2 A. That led to the suspension of the

3 jailer.

4 Q. All right. And who was the jailer?

5 A. I believe it was James Collins. And

6 I think he actually resigned as a result of

7 this investigation, if my memory is correct.

8 Q. All right. I appreciate that effort

9 to be responsive. That's not quite what I was

10 asking, because it sounds as if the allegations

11 against the jailer were actually valid, in that

12 he should not have put the juvenile in with the

13 adult; correct?

14 A. Yes, sir.

15 Q. Okay. I was asking had any other

16 correction officer been accused of something by

17 an inmate, which was then investigated and then

18 the allegations found not to have merit, as

19 with the investigation that you told me about

20 earlier involving Mr. Chapman?

21 A. And I'm sure that through the

22 numerous things that are looked into in the

23 daily operations of the county jail, there are

21

1  some. Just from the top of my head, no, sir, I
2  couldn't cite one for you. I know there are
3  times -- when extensive force is used, it's
4  routine that I'm going to ask somebody from the
5  outside to look into it, and hopefully our
6  person is justified. Now, some of those
7  situations, I'm just trying to recall, and just
8  immediately, I can't, I'm sorry.
9      Q.  All right. And what were the
10  other -- when I asked you why you recommended
11  George be terminated, you said there were
12  several events. One was the Files incident at
13  Walker Baptist. The second one was the groping
14  incident in which George was cleared. Any
15  others?
16      A.  Of course, this final incident with
17  Mr. Decatur.
18      Q.  All right. Well, let's talk about
19  that. What did you -- what was ultimately
20  concluded about the Decatur incident?
21      A.  And again, once the investigator,
22  Darrell Mote, had completed his investigation,
23  I'm sure at the time I got a copy of it, but I

22

1  read over it and then made my recommendations
2  based upon it.
3      Q.  All right. Well, what did Mr. Mote
4  conclude?
5      A.  I've not read it in recent days. I
6  did not review that.
7      Q.  So sitting here today, you don't
8  recall what he concluded?
9      A.  No, sir, I do not.
10      Q.  All right. Let me see if I
11  understand your testimony. You're telling me
12  that you made a recommendation to the sheriff
13  that George Chapman, correction officer, be
14  terminated based on three events: One of them,
15  the Walker Baptist Medical Center incident
16  involving George Files, you're not sure who
17  investigated it and you don't know the formal
18  conclusion of the investigative report; the
19  second one involving an allegation that George
20  groped an inmate, he was investigated and
21  actually cleared; and the third one, the
22  Decatur incident, you don't recall what Mote
23  concluded; is that correct?

23

1      A.  It's correct that today, 2011, I do
2  not recall the outcome of Darrell Mote's
3  investigation. It's also correct that a
4  supervising nurse from the hospital contacted
5  me and said they didn't want this man back out
6  there, and that led into an investigator
7  looking into that matter, who would have
8  reported their findings to the sheriff. And
9  it's also correct that I don't remember, with
10  the volume of investigations that we deal with
11  here, all the details.
12      Q.  Okay. Do you know Ginger Kilgore
13  personally?
14      A.  No, sir. I know who she is. I
15  mean, I don't --
16      Q.  Have you ever met her?
17      A.  Yes, sir, I met her that day.
18      Q.  What is her race?
19      A.  She's white.
20      Q.  Okay. George Files, do you know
21  the -- the inmate, do you know his race?
22      A.  He's white. He's dead now.
23      Q.  Darrell Mote, what is his race?

24

1      A.  He's white.
2      Q.  You were here during the deposition
3  of Ms. Harper; correct?
4      A.  Yes, sir.
5      Q.  Okay. I asked her some questions
6  about the jail that I want to ask you. And I
7  say that just because I may can kind of
8  shorthand them and move a little more quickly.
9  What would you say the jail population is right
10  now?
11      A.  Probably right at 200 today.
12      Q.  Okay. And what would it have been
13  about October or November of '08?
14      A.  About the same.
15      Q.  Okay.
16      A.  A little more or less, but --
17      Q.  And the number of corrections
18  officers, how many do you have at present?
19      A.  The entire jail?
20      Q.  Yes, sir.
21      A.  43 jail personnel.
22      Q.  All right. That's jail personnel?
23      A.  Yes, sir.

25

1    Q.    Are they all correction officers?
2    A.    Well, there are 43 classified as
3  jail staff. Among those, you have a couple
4  that come over and run this front desk, so 41.
5  But again, one of those can be pulled if
6  they're needed inside the jail when we close
7  this (indicating), so 43.
8    Q.    Okay. Corrections officers?
9    A.    Yes, sir.
10    Q.    Okay. And what would that number
11  have been in October or November of '08?
12    A.    43.
13    Q.    Okay. Is there some ratio of
14  correction officer to inmate that you try to
15  maintain?
16    A.    Yes, sir, we did a staffing analysis
17  with Dr. William Osterhoff and Mike Berg, Mike
18  Berg being from the National Institute of
19  corrections, Dr. William Osterhoff at AUM over
20  criminal justice, Auburn University Montgomery,
21  and he was also our federal court monitor
22  appointed by Judge Sharon Lovelace Blackburn as
23  we transitioned in this facility. We actually

26

1  surpass the ratio recommended. I don't recall
2  the exact numbers on that. Those figures were
3  reached back in -- prior to September of '98,
4  when we moved into this building.
5    Q.    All right. What's your ratio now?
6    A.    It would be the same.
7    Q.    All right. So whatever it is, it's
8  good, because you surpass the recommended
9  ratio, but you don't know what it is?
10    A.    That's correct.
11    Q.    Okay. Now, you mentioned Judge
12  Blackburn. Of course, she's our Chief Judge in
13  the Northern District. When was it that she
14  weighed in on something? Was there a lawsuit
15  about prison overcrowding or facility
16  overcrowding?
17    A.    Several aspects of the old facility
18  led to this facility being constructed as part
19  of consent decree, Randall v. Terrell -- Randy
20  Terrell v. Tommy Herring. It's a 1993 case,
21  and the consent decree created this building.
22    Q.    And Judge Blackburn's the judge that
23  had that case?

27

1    A.    That's correct.
2    Q.    And her consent decree affected that
3  ratio. And what else did it affect?
4    A.    It also affected the rank structure.
5  It affected the training, being the minimum
6  training standards, and also -- it was very
7  vague, in that it only recommended and
8  required, if I recall, the phrase was adequate
9  staffing. But it was reviewed by the National
10  Institute of Corrections, as well as with our
11  court monitor, and said we surpassed what would
12  be termed as adequate.
13    Q.    All right. What kind of training do
14  you provide for your corrections officers?
15    A.    They're each put through an 80 hour
16  jail management school. There are at least two
17  places in Alabama to get that, Northeast
18  Alabama Police Academy --
19    Q.    Okay. At Jax State?
20    A.    Yes, sir, and the State of Alabama
21  Department of Corrections. That's the minimum
22  standards training. They would each get that.
23  In addition, we send supervisors to some

28

1  supervision schools.
2    Q.    Is there any training provided on
3  tasers?
4    A.    Yes, sir. That's elective. You're
5  not required to qualify nor to carry a taser.
6    Q.    Where is that taught?
7    A.    Usually here.
8    Q.    In-house?
9    A.    Usually here, yes, sir.
10    Q.    And what do you teach officers about
11  tasers?
12    A.    I think Darrell Mote is the training
13  officer on the taser, if I'm not mistaken.
14  They have different ones. I think Darrell has
15  been assigned to the jail training.
16    Q.    And do you have --
17    A.    Baton training, we also have the ASP
18  baton training, and the entire jail staff just
19  went through that again. Even those who were
20  qualified, they were --
21    Q.    And is that in-house?
22    A.    It has been, but this time it was
23  conducted by Samford University, Mike Cole.

29

1    Q.    Mike Cole is at Samford?
2    A.    He's employed by Samford, but I'm
3  not -- let me pull some paperwork for you on
4  that, sir.  I just -- I know he's an employee
5  of Samford, but I'm not sure that he does this
6  training under the umbrella of Samford
7  University and I don't want to mislead you on
8  that.
9    Q.    What did he teach your correction
10 officers about the use of batons?
11   A.    Well, that's a pretty broad
12 statement or question.  The general force
13 continuum is we teach our officers the first
14 step is officer's presence.  The officer's on
15 the scene.  That commands a certain level of
16 respect.  The second step is loud verbal
17 commands.  Then the escalation of force begins.
18 Use the minimum force required to bring about
19 compliance with the orders, the reasonable
20 orders of the officer.
21       The use of the baton, the training
22 teaches some body jabs to create distance.  It
23 also teaches striking the extremities,

30

1  extremities being the arms and legs.  And then,
2  of course, the only time to strike the head is
3  if eminent deadly or serious bodily harm is
4  immediate by the perpetrator.
5    Q.    So the policies of the jail do
6  permit -- there are circumstances under which
7  an officer would be permitted to use the baton
8  to strike the head?
9    A.    Yes, sir, if deadly force is
10 justified, because that's what you're employing
11 when you strike the head.
12   Q.    So I take it from your testimony
13 that the officers are to use minimum force
14 allowed to bring about compliance.  But if a
15 loud verbal command wasn't bringing about
16 compliance, then you go to some form of
17 physical restraint?
18   A.    Depending on the situation, several
19 factors.  The officer's going to have to do
20 some rapid decision making on how they're going
21 to escalate the force.  Number one, the
22 officer's going to have to determine the level
23 of the threat being posed by this

31

1  noncompliance.  In that, as you escalate to a
2  physical confrontation, they're also going to
3  have to decide size of perpetrator, physical
4  ability versus that particular officer, and
5  then that they're going to -- before they
6  engage, they're rapidly making decisions as to
7  which weapon that they're qualified with that
8  they're going to employ.
9    Q.    Mr. Decatur was a pretty big guy,
10 wasn't he?
11   A.    He was a pretty good sized fellow,
12 yes.
13   Q.    Okay.  At any point in your review
14 of all of this, were you made aware that Mr.
15 Decatur had pulled George's shirt up over his
16 head, so that he couldn't see?
17   A.    I don't think that I have
18 personally, since calling for an investigator,
19 asked anything about the particulars of the
20 incident.  I've heard some people say, yeah, he
21 had George's shirt up, this, that and the
22 other.  I simply rely in good faith on the
23 investigator's report.

32

1    Q.    Well, did you read all of the
2  statements that were supplied by all of the
3  officers present on November 2nd, 2008, the
4  night of the incident?
5    A.    I know that I read at least the
6  supervisor's statement and probably the others
7  as well.
8    Q.    All right.  So you know for a fact
9  the only one you read was Sergeant Harper?
10   A.    No, sir, I didn't say I know for a
11 fact it was the only one.
12   Q.    All right.  Well, did you read
13 Sergeant Harper's?
14   A.    I know that I did read hers and the
15 others that were supplied to me and forwarded
16 them on to the investigator.
17   Q.    All right.  Well, tell me the other
18 ones that you read for certain, that you know
19 sitting here today under oath for this lawsuit
20 in federal court, tell me the ones you know for
21 a fact that you read at the time; not in
22 preparation for your deposition, but at the
23 time that you were deciding to recommend

33

1 George's termination.
2   A.   I couldn't definitively tell you
3 which ones I read, other than when I got the
4 supervisor's letter, I did put those together
5 and forwarded them upstairs to the
6 investigator.
7   Q.   So the only one you know for certain
8 that you read was Sergeant Harper's?
9   A.   Prior to the investigation being
10 complete. This is while it's still being
11 investigated.
12   Q.   Okay.
13   A.   I, in no way, want to complicate nor
14 interfere with that.
15   Q.   Okay. If in fact, as some have
16 suggested, Decatur pulled George's shirt up and
17 over his head, would you agree with me that
18 would obstruct an officer's ability to have a
19 field of vision and see what was going on,
20 which would affect how that officer reacted?
21   A.   If a man's -- I want to make sure I
22 understand you correct. If a man's shirt's
23 pulled up over his head so that he can't see,

34

1 is this going to change how he assesses and
2 responds to the situation?
3   Q.   Yes, sir.
4   A.   Yes, sir, obviously it is.
5   Q.   When you were a jailer, did you have
6 a baton?
7   A.   I don't think at the time when I was
8 working with the County, I did. When I worked
9 with the State, we carried a fiberglass baton.
10   Q.   Did you ever hit an inmate or
11 someone in custody with it?
12   A.   I'm trying to remember for certain.
13 I don't remember an incident where I actually
14 deployed the baton, but again, I don't want to
15 mislead. Yes, sir; yes, sir, I did.
16   Q.   Okay.
17   A.   September the 25th, 1993, Lorenzo
18 Stokes.
19   Q.   What was your job at the time?
20   A.   I was a corrections officer for the
21 State of Alabama Department of Corrections.
22   Q.   And what facility were you at?
23   A.   William E. Donaldson.

35

1   Q.   In west Jefferson County?
2   A.   Yes, sir, it's 100 Warrior Lane,
3 Bessemer, Alabama.
4   Q.   And Lorenzo Stokes was an inmate?
5   A.   Yes, sir.
6   Q.   And what had Mr. Stokes done, if
7 anything, to warrant you hitting him with a
8 baton?
9   A.   We were in special management unit
10 number two. Mr. Stokes was going to be given
11 the privilege of a shower. That day, I
12 exited -- the way that worked, you would escort
13 a prisoner, having them handcuffed, from their
14 cell, secure them in the shower. Then you exit
15 that cell block, go around the exercise yard,
16 go into SMU one, remove a prisoner there,
17 secure them in the shower. By the time you
18 make that process back, the person in SMU two
19 should be completed with their shower. So we
20 get to SMU two, and if my memory's correct,
21 cell 13, Mr. Lorenzo Stokes was seated on his
22 commode when the cell door rolled opened.
23          And I said, "Mr. Stokes, would you

36

1 like to take a shower?"
2          He said, "Yes, I would."
3          I said, "Okay. We'll return to
4 you."
5          The cell door closed. I went to the
6 next cell, which was inmate Ronnie Townsend. I
7 carried Mr. Townsend downstairs, having secured
8 his hands properly, carried him to the shower,
9 uncuffed him, went back to SMU one. I went
10 back, removed Mr. Townsend, carried him up to
11 his cell.
12          Lorenzo Stokes' cell door began to
13 roll open. The bean tray doors, where you
14 would secure the hands, were welded closed.
15 There had been prior problems with Mr. Stokes
16 that had gone unreported by that
17 administration. In fact, an Officer Price had
18 his back broken two weeks before by Mr. Stokes.
19 Mr. Stokes exited his cell with a bandana
20 around his face, carrying two half pint milk
21 cartons dripping with urine and feces. Mr.
22 Stokes was about six-foot-five or so and about
23 300 pounds, and he was belligerent, and he was

37

1  threatening the black male, Ronnie Townsend,
2  that I had just escorted back to his cell.
3      And I placed myself between those
4  two African-Americans and suffered severe
5  injuries for about 18 months, so this is the
6  only extension (indicating) I have now, from
7  that injury. I attempted to use my baton, yes,
8  sir.
9      Q.    And did you succeed? Did you hit
10  him with it?
11      A.    I don't know.
12      Q.    So he beat you?
13      A.    Threw me over the tier. I caught
14  the bottom rail of the tier with my right hand
15  and began to pull up and then I pulled the
16  baton back from the harness, threw it away from
17  my body, because it's 26 feet in the air there.
18  And he stomped my wrist, breaking it.
19      Q.    Why were you throwing away the
20  baton?
21      A.    Didn't want it to ram through my
22  body if I fell.
23      Q.    All right. Can you recall any other

38

1  instance where you've used your baton on an
2  inmate or someone in custody?
3      A.    I believe that's the only baton
4  incident in my career, to the best of my
5  knowledge. I don't recall -- I bought one for
6  this last class and gave it to a young man
7  here, who's working here, went through the
8  training with them.
9      Q.    Would it have been justified that
10  day for you to hit Lorenzo Stokes in the head
11  with it?
12      A.    At a point, it would have become
13  justified. I could not have started out by
14  striking him on the head.
15      Q.    I'm not sure if I understand that
16  answer. Is it that had things continued, there
17  might have come a point hypothetically where
18  you would use it or looking back on it, given
19  everything that actually did happen, you would
20  have been justified in hitting him on the head
21  at some point?
22      A.    Well, given -- at the point when Mr.
23  Stokes is threatening to take the life and

39

1  shows the physical ability to take the life of
2  Ronnie Townsend and he has shown he's got the
3  ability to get to him, at that point, yes, I
4  can defend Ronnie Townsend's life, when I
5  believe that eminent threat to his life or
6  serious bodily harm is there, yes, sir. At the
7  point when I get Townsend secured in that cell,
8  I can no longer just go kill Stokes.
9      Q.    But there was a point when you
10  perceived that Stokes was threatening another
11  inmate, that you could have hit him on the head
12  and it would have been okay, in your mind?
13      A.    When that threat was eminent, the
14  bodily harm was present, the ability for that
15  to be carried out, yes, sir, I can protect that
16  third party's life.
17      Q.    Have you ever heard Sheriff Tirey
18  say that he's hit inmates on the head with a
19  baton?
20      A.    No, sir, I've never heard him say
21  that.
22      Q.    Have you ever seen him do it?
23      A.    Not on the head, no, sir.

40

1      Q.    But you've seen him use a baton on
2  inmates?
3      A.    In a riot situation here in '99 or
4  2000, Sheriff Tirey had his baton with him
5  here. I didn't see him physically striking
6  people with it, but we were moving throughout
7  the facility, calming things down. As far as
8  witnessing him striking, no, sir, I did not,
9  but he did have the equipment with him. And
10  nobody was carried to the hospital. Nobody got
11  medical treatment that I'm aware of on that
12  occasion, but --
13      Q.    But from other circumstances, you
14  know that he used it on that occasion?
15      A.    No, sir, I know he had it with him
16  and we were meeting the force that came up that
17  day.
18      Q.    Did you watch the video of George
19  Chapman and Mr. Decatur on November 2nd, 2008?
20      A.    No, sir, I've not seen that.
21      Q.    Okay. Do you know where that video
22  is?
23      A.    No, sir, I do not. I would suggest

41

1    that if that video exists, it would be with the
2    investigator, Darrell Mote.
3        Q.   Is that something you could find out
4    and if it exists, give it to your lawyer and
5    let her produce it to us?
6        A.   Yes, sir; yes, sir.
7        Q.   What is the jail's policy about the
8    monitors and the cameras and what's recorded on
9    them?
10       A.   I don't recall the exact date that
11   we had some enhancement done.  We were on the
12   old VHS system up until a particular point and
13   then we were able to go to -- I don't know if
14   it's digital or disk or how it's done at this
15   point, but there was some changing done, and I
16   don't know if it was prior to this incident,
17   after it or even right around that time.  So
18   the jail's policy obviously would be that we're
19   going to preserve any evidence and make it
20   available to the courts, to the investigators
21   and so forth.
22       Q.   I assume there came a point when the
23   jail or the County got served with Mr.

42

1    Chapman's lawsuit and you became aware that he
2    had filed it?
3        A.   Yes, sir.
4        Q.   Okay.  Did you send out any
5    directive to anyone, telling them to find and
6    preserve the videotape from the night of
7    November 2nd, 2008?
8        A.   No, sir, by the time I was served,
9    that investigation was over.  Mr. Chapman was
10   gone.  Whoever had possession of that evidence,
11   and I'm just certain it's going to be
12   investigator Darrell Mote, still would have it.
13       Q.   Okay.  Well, did you send out any
14   directive that that be preserved or produced to
15   you through use of the litigation?
16       A.   No, sir, I have not received
17   anything telling me that -- to get in touch
18   with him on that.  I did receive a copy of
19   something from our lawyers saying about the
20   files and so forth.  And no, I didn't contact
21   Darrell.
22       Q.   Well, have you made a search for
23   that tape?

43

1        A.   No, sir, I have not.
2        Q.   What is the policy of the jail as to
3    how long tapes are kept, whether it's VHS or
4    some other medium?  I assume it's on -- is it
5    on disk now or DVD?
6        A.   That's something I don't know for
7    sure, sir, if it's strictly digitally kept and
8    then is transferred to disk.  I know Kelly
9    Godfrey handles those materials for me here in
10   the jail, as far as locating and finding and so
11   forth.  If there is something that has been
12   turned over to the investigator, that would
13   have been something that would have been gotten
14   to him, if it exists.  I'm not sure if it does.
15       Q.   All right.  What's the jail's policy
16   as to how long -- let me ask you -- let me
17   break it down two ways.  A general calm,
18   uneventful night or day, if there is such a
19   thing, where there are no altercations, fights
20   inmate to inmate, inmate to correction officer,
21   just kind of a routine, calm, peaceful day, do
22   y'all keep all that footage?
23       A.   That's the thing.  Now, this system,

44

1    it's there, under this system.  And I don't
2    know if this system was in place at the time of
3    this incident.
4        Q.   No.  But right today, how long would
5    you keep today's --
6        A.   That's what I'm saying, sir.
7        Q.   You don't know?
8        A.   From the date this system was put in
9    place, we've got everything from the date this
10   system came into existence, so I'm told.
11       Q.   Okay.
12       A.   Now, the old VHS that we were on
13   before this system, it was like 24 hours and
14   then it's recycled.  But an incident of this
15   degree, that tape should have been pulled if we
16   were on the VHS.
17       Q.   So the policy was that an incident
18   like the one we've talked about and we're going
19   to talk about some more with George and Mr.
20   Decatur, that tape would have been -- should
21   have been preserved?
22       A.   Yes, sir, if we were on the VHS
23   system, it should have been passed to the

45

1  investigator. If we were on the digital
2  system, it should still be available to us.
3      Q.   Why would you not have looked at it
4  when you're trying to decide on a
5  recommendation to the sheriff?
6      A.   At the point when an investigator
7  that's trained to investigate these incidents
8  has been handed the case, I'm out of it. I
9  give him -- my recommendation is based on the
10 incidents I have, and the sheriff's going to be
11 aware of that. He's going to be aware of my
12 limited knowledge into these incidents. He's
13 also going to have the information provided to
14 him by the investigator. He may have far more
15 and should have more information than what I'm
16 privy to. The investigator is not going to bog
17 down in coming and reporting to me and so
18 forth.
19     Q.   Well, you were here during Ms.
20 Harper's deposition, and I showed her some
21 exhibits. And you don't have to agree with me,
22 but I guess I'll ask if you would agree at
23 least that based on what was Plaintiff's

46

1  Exhibit Number 1, which was a report by her, a
2  report by Officer Williams and a report by
3  Officer Clifton, there are some differences
4  and/or discrepancies? Would you agree with
5  that?
6      A.   It seemed to be, in listening to
7  your discussions, yes, sir.
8      Q.   Okay. Sergeant Harper says, "I saw
9  Mr. Chapman, Officer Chapman get out his baton
10 and hit Decatur with it." There's no mention
11 of a baton and hitting in the other two,
12 Officer Williams or Officer Clifton. Sergeant
13 Harper says the probes from the taser were
14 still in Decatur; no mention of that in the
15 other two, Williams or Clifton. Officer Harper
16 says Decatur was no longer a threat after he
17 was tased, he was on the floor. The other two
18 reports, Williams and Clifton, suggest at least
19 some effort to get off the floor and to
20 continue to fight.
21         Now, if you had those kinds of
22 differences in front of you, why wouldn't you
23 say, "You know, I need to go look at that

47

1  dad-gum tape. Do we still have that thing?"
2      A.   There are other reports that are in
3  front of us as well, and those reports also
4  agree that the man was being hit while he was
5  down and not posing a threat.
6      Q.   But you've already told me that
7  you're not certain you looked at those reports.
8      A.   But you're asking me to be basing it
9  on those three alone, which is unfair when I've
10 got others.
11     Q.   Okay. In the training that jailers
12 receive, do you do any situational training
13 with exercises where they're asked to respond
14 to altercation with inmate situations?
15     A.   In each of the specialized
16 trainings, whether it's the OC spray, the baton
17 training, not so much with the taser, less so,
18 but with those two devices, there is at least
19 discussion and announcement of, "Suppose you're
20 here in this particular situation. How would
21 that change the setting?" So the training does
22 touch on some of the different scenarios.
23         There's been some discussion about

48

1  the OC spray earlier. The OC spray is
2  different from the other two weapons, in that
3  it also incapacitates the officer when it's
4  deployed upon the other person, so --
5      Q.   Well, it could, I mean, if it --
6      A.   It will. You're going to be
7  affected. I mean, you know, ask any of us that
8  have used it or been around when someone else
9  used it --
10     Q.   Meaning it gets in your eyes and --
11     A.   Yes, sir, it does.
12     Q.   When you were making your decision
13 to recommend George Chapman's termination, were
14 you aware that Joseph Decatur was a sex
15 offender?
16     A.   I'm sure that I was.
17     Q.   That he, among other offenses, was
18 in your facility for rape?
19     A.   I'm sure that I was, yes, sir.
20     Q.   If George was there with him and had
21 already -- I mean, unquestionably there was a
22 fight and Decatur was hitting an officer;
23 right? I mean, you would agree with that?

49

1   A.   That's been reported.
2   Q.   Okay. And four female officers show
3 up on the scene with a sex offender. Do you
4 think it would be fair for George to factor
5 that into the equation?
6   A.   I think whatever the scene is that
7 any officer's on, they have to deal with that
8 scene and their situation at that given time,
9 so yeah, George is going to factor that in.
10 But these other officers, the fact that they're
11 female doesn't eliminate the fact that they're
12 trained correctional officers there to respond
13 with weapons and to bring a situation under
14 control, and we've entrusted this jail to them.
15 If a situation was continuing to escalate, they
16 could have called for rove deputies or done
17 some other things to bring help in here.
18   Q.   So it would be totally irrelevant,
19 not a factor or not a fair consideration for
20 George to have in mind that, "Here's a guy
21 who's in for rape and we've got four female
22 officers and he could grab one of them and do
23 something or go into the cell with them and

50

1 close the door and --"
2   A.   No, sir, the pendulum wouldn't have
3 to swing that far. You can have the ability to
4 use discretion and understand who your support
5 group is. At the same time, that support group
6 reaches beyond this jail with the radios to
7 bring more manpower if needed, and Jerry
8 Williams sitting there, that called for these
9 female officers, had the same ability to pick
10 up and get rove deputies or whatever he needed
11 here.
12   Q.   With some admitted time delay;
13 right?
14   A.   Maybe, maybe not. There may have
15 been some upstairs. If that threat is that
16 strong and that eminent, that call should have
17 gone forward. We're not going to let our
18 female officers be raped and taken hostage, nor
19 are we going to require one of our jail staff
20 members to be sacrificed.
21   Q.   When does the jail investigate an
22 altercation with an inmate? What are the
23 criteria? What level does it have to rise to?

51

1   A.   Well, part of it is my discretion,
2 part of it. When it reaches my desk and
3 there's a recommendation for an investigation
4 by a supervisor or an employee, if there are
5 conflicting stories, if there is injury that
6 requires medical treatment, I'm going to ask
7 for an independent investigator to look at it.
8 And by independent, that's somebody outside the
9 jail setting.
10   Q.   Well, Mr. Mote is a deputy sheriff,
11 right, or a sheriff's investigator?
12   A.   Yes.
13   Q.   And you report to the sheriff?
14   A.   Yes, sir.
15   Q.   I mean, it's all family; right?
16    MS. DOWDY: Object to form.
17   Q.   (By Mr. Saxon) And literally in
18 this county, it is family. I mean, there are a
19 lot of relatives -- the sheriff's got relatives
20 working are here, doesn't he?
21   A.   His wife works here, yes, sir.
22   Q.   Okay. Anybody else?
23   A.   His ex-brother-in-law.

52

1   Q.   Ms. Harper have relatives working
2 here when she was here?
3   A.   I don't know.
4   Q.   Okay. When you say an independent
5 investigator, you just mean somebody not on the
6 jail staff?
7   A.   That's correct.
8   Q.   Okay. What does Mrs. Tirey do for
9 the department?
10   A.   She's a receptionist here at the
11 front.
12   Q.   Okay. And who does she report to?
13   A.   Carol Herron is the chief clerk over
14 there.
15   Q.   Okay. And who does Ms. Herron
16 report to?
17   A.   To me.
18   Q.   And you report to the sheriff?
19   A.   And the chief deputy.
20   Q.   Okay. When you sent your letter or
21 memo to the sheriff recommending George
22 Chapman's termination, did he respond in any
23 way in writing?

53

1     A.     I don't believe so.
2     Q.     Were you ever part of any discussion
3  with the sheriff at which anyone else was
4  present when y'all discussed whether George
5  should be terminated?
6     A.     I don't remember a particular
7  meeting, but on the other hand, in this type
8  setting, I could see where probably at some
9  point the investigator and the sheriff and
10 myself would sit down and probably did, and I
11 just don't recall it right now. And it may be
12 that the investigator met with the sheriff.
13    Q.     But you made your recommendation and
14 the sheriff ratified it and y'all terminated
15 George?
16    A.     Yes, sir.
17           MS. DOWDY: Wait a minute. I'm
18 going to object to the form. Y'all didn't
19 terminate him.
20    A.     The sheriff did. The sheriff's the
21 hiring and firing authority.
22    Q.     (By Mr. Saxon) How many direct
23 reports do you have?

54

1     A.     I don't understand the phrase direct
2  reports.
3     Q.     People who report directly to you,
4  as opposed to people down the chain who report
5  up and ultimately you're above them all, but --
6     A.     Right now, two lieutenants and one
7  sergeant and potentially -- I'm trying to think
8  of what slots are open so we get this
9  accurately. We have the two lieutenants, but
10 we have three lieutenant slots. One is vacant
11 right now. Because of the one vacant
12 lieutenant slot, there is a sergeant who
13 reports directly to me.
14    Q.     Okay. So normally, it would be
15 three lieutenants report directly to you.
16 Right now it's two, with one vacancy and a
17 sergeant is temporarily filling that in and
18 that makes them a direct report?
19    A.     That's correct.
20    Q.     Okay. Who are the two lieutenants?
21    A.     Richard Jesus and Tommy Miller.
22    Q.     And who's the sergeant?
23    A.     Charles Hannah. And on the

55

1  weekends -- just for clarification, sir, on the
2  weekends, when the lieutenants are off, those
3  sergeants can report directly to me also. That
4  would be three sergeants.
5     Q.     Okay. Did Charles Hannah replace
6  Sergeant Harper?
7     A.     I'm sure that's right.
8     Q.     Who promoted Sergeant Harper from
9  jailer? You?
10    A.     The sheriff.
11    Q.     The sheriff. Okay. Did you make
12 that recommendation?
13    A.     No, sir.
14    Q.     Tell me about the food service
15 operation here at the jail.
16    A.     ABL Food Service is a contracting
17 company out of Baton Rouge, Louisiana. They
18 provide three meals a day. The employees of
19 ABL work directly for ABL, not us.
20    Q.     So they bring food up from Baton
21 Rouge three times a day? Wouldn't it be cold
22 by the time it gets here?
23    A.     Well, that would be an unreasonable

56

1  thing to even --
2     Q.     So they have people here locally?
3     A.     Yes, sir, that work directly for the
4  company that's headquartered in Louisiana.
5     Q.     Well, do they make it in Baton
6  Rouge?
7     A.     They occupy our kitchen here on
8  site.
9     Q.     Okay. They work in your kitchen.
10 Is there a head ABL on-site person?
11    A.     There is a food service director,
12 yes, sir.
13    Q.     All right. Who is that?
14    A.     Presently, the lady's -- I know her
15 first name, but there's a lady named Carolyn
16 who's back there.
17    Q.     Okay. Who does Carolyn deal with on
18 behalf of the jail?
19    A.     Me.
20    Q.     Okay. And so you tell her what the
21 population is and therefore how many meals
22 she'll need to prepare?
23    A.     No, sir; no, sir.

57

1    Q.    Does she go count noses that --
2    A.    She gets her information from
3  booking.
4    Q.    Okay.
5    A.    There is a board which sustains the
6  jail population and how it changes there in
7  booking.
8    Q.    Okay.
9    A.    And her daily routine, as far as
10  interacting routinely, would be with booking.
11    Q.    Who does she deal with in booking?
12    A.    Whoever the booking officer is. It
13  could be any of our jail staff.
14    Q.    Okay. Who provides the ovens,
15  toasters, coffee pots, pots and pans,
16  silverware, all of that?
17    A.    They're part of the physical plant
18  here.
19    Q.    Okay. They belong to the jail?
20    A.    Yes, sir.
21    Q.    Who decides when the inmates will be
22  served these meals? Is that something you
23  decide?

58

1    A.    No, sir, that's a part of the
2  contract. Those times are pretty well set and
3  there's a little bit of leeway in there. And
4  if my memory serves me correctly, it's been a
5  long time since I've read that contract, it
6  says something to this effect: That there will
7  never be a gap of more than 12 or 13 hours
8  between meals. Other than that, it's pretty
9  loose.
10    Q.    Is that something that you decided,
11  to keep the inmates from getting too restless?
12    A.    Well, it's -- and nutritionists
13  helped to decide that as well.
14    Q.    And I take it that would be 12, 13
15  hours between the evening meal and the morning
16  meal?
17    A.    Yes, sir.
18    Q.    Okay. And do y'all have a nice, big
19  cafeteria where all the inmates go and eat?
20    A.    No, sir.
21    Q.    Okay. So y'all go collect it up
22  from these folks and take it to the inmates and
23  shove it through the bean holes?

59

1    A.    That's correct, they have rolling
2  food carts that are heated and they roll those
3  around.
4    Q.    And that's y'all's decision that
5  that's how they'll be served?
6    A.    Yes, sir.
7    Q.    I guess doing it that way cuts down
8  on the food fights?
9    A.    I hope.
10    Q.    And so has the jail retained a
11  nutritionist to help you work on the diet?
12    A.    The food service provider has
13  registered dieticians on hand.
14    Q.    And y'all work with them on what you
15  want in the menus?
16    A.    Yes, sir, they send menus that are
17  signed off on for approval, that have been
18  evaluated for caloric content and nutritional
19  value.
20    Q.    Do you sign off on the menus?
21    A.    Yes, sir. Really, any of our jail
22  staff can sign off on the menus. The only ones
23  that we receive to sign off on are like if it's

60

1  a holiday or if there's a change in something,
2  if they're eliminating something, if there's a
3  special diet, medically ordered diet, something
4  like that.
5    Q.    And y'all will tell them that for
6  some particular inmate, if they have dietary
7  needs based on their health?
8    A.    We try to get the doctor to
9  communicate directly with ABL. That way, the
10  communications are far more accurate.
11    Q.    And your jail employees, does this
12  food service operation feed any of them?
13    A.    Under Alabama law, one person on
14  each meal -- one employee will partake of each
15  meal, so they do. Sometimes one or two will,
16  but yeah.
17    Q.    Is there a place where the employees
18  go to --
19    A.    No, sir, they usually eat, if
20  they're eating that food, on their post.
21    Q.    Okay. But I mean pick up kind of a
22  carry-out?
23    A.    They deliver it to them. They're

61

1  good to bring it by to you.
2  Q. Okay. And so you -- do you get to
3  pick which of your three meals, if you wanted
4  to eat one, and you can just tell them, "I want
5  breakfast today," or, "I want dinner tomorrow"?
6  A. I've never done it, but I'm sure if
7  I were to go back there and say, "Hey, Miss
8  Carolyn, I'd like a meal," she would prepare
9  one and mark it as an employee meal.
10  Q. Okay. You don't do what they were
11  doing up in Decatur or wherever it was, with
12  the collecting the money and not spending much
13  of it on the meals? Do you know what I'm
14  talking about?
15  A. No, sir, I have no knowledge. Yes,
16  sir, I'm familiar with what you're talking
17  about.
18  Q. You are familiar and y'all don't do
19  that?
20  A. We don't do that, that's correct.
21  We're not even a party to the contract.
22  Q. Who is? The County, the sheriff's
23  department?

62

1  A. I'm sure it's the County Commission
2  that's contracted with ABL.
3  Q. All right. Well, let me ask you
4  about Ms. Richardson. Do you know her?
5  A. I know Miss Paula, yes.
6  Q. What was going on back in October of
7  2008, in terms of some kind of inquiry or
8  investigation or something about whether she
9  was playing favorites with inmates? Do you
10  know what I'm talking about?
11  A. I've heard the discussion about it.
12  I remember our interaction about it.
13  Q. And I'll ask you about that in a
14  minute.
15  A. Sure.
16  Q. But what was the underlying nature
17  of whatever inquiry was taking place?
18  A. I don't know the particulars of what
19  had gone on there. There's so many incidents
20  in a single day that I couldn't tell you what
21  had gone on then. The interaction, though,
22  with Miss Paula was always pleasant, was always
23  good, it was never a terrible thing, you know,

63

1  and still is. I still talk to Miss Paula
2  occasionally.
3  Q. But I'm not sure you answered my
4  question.
5  A. I'm not sure I'm capable of
6  answering your question. I did not -- to the
7  best of my memory, I've never initiated any
8  inquiry concerning her. If there were reports
9  from inmate workers of any such discriminatory
10  act, yeah, I would have looked into it. To
11  what extent, it just doesn't stick out as
12  something that was very major.
13  Did it happen? Maybe. I just don't
14  remember, sir. The fact that two females went
15  back there asking, yeah, that's Trent's style.
16  I personally wouldn't go back there asking all
17  the females what they thought and so forth. I
18  would have asked a couple of female officers to
19  look into it if I had received those
20  allegations.
21  Q. Sitting here today, do you remember
22  if you received any allegations?
23  A. I do not remember, sir. And I did

64

1  look through the ABL file today, and there are
2  no notes in there. There was nothing
3  noteworthy.
4  Q. Did you look through the ABL file
5  this morning or during lunch?
6  A. It was this morning.
7  Q. All right. You alluded to
8  conversation you and George Chapman had about
9  Paula Richardson and this alleged incident.
10  Tell me what you recall about the conversation
11  with George.
12  A. And my memory may be failing me. It
13  may have been on the phone, but I thought we
14  were in person. So if George says it was on
15  the phone, perhaps it was on the phone.
16  I do remember saying to George,
17  "What is your role in this matter? Are you
18  acting as her lawyer? Are you a union steward
19  or what is your capacity in this?"
20  And the facts are, I will not
21  discuss with a third party someone else's --
22  just like I wouldn't concerning George. Even
23  though Miss Paula's not my direct employee, if

65

1    there was a matter that we are discussing,
2    that's hers. That's her matter. That's not
3    for George or anybody else, no matter what
4    their relationship, unless she wants to give it
5    to him; and in that case, I'm okay with it.
6        Q.    What do you remember George saying
7    about whatever it is that took place?
8        A.    I don't remember. I remember that
9    he mentioned Miss Paula and that's pretty
10   much -- at that point, I remember thinking, you
11   know, "I can't get into this. Her relationship
12   with us, with a third party, I just can't do
13   it."
14       Q.    But other than mentioning Paula's
15   name, what do you recall him saying happened?
16       A.    I remember him saying something
17   about was I aware of the situation, what was
18   going on back there or making some type of
19   inquiry into what was going on back there. And
20   at that point, I wasn't going to discuss it
21   with him.
22       Q.    But what did he tell you was going
23   on back there?

66

1        A.    I don't recall, sir.
2        Q.    Well, did it involve -- do you
3    remember him saying it involved some suspicion
4    or allegation or question about whether Paula
5    Richardson was showing some kind of favoritism
6    for black inmates over white ones?
7        A.    I really didn't remember that at
8    all, until this morning when I heard it
9    mentioned. I couldn't tell you yes or no, that
10   that's what was said. My first instinct, when
11   I reflect from something from that kitchen, is
12   there's been an allegation of contraband being
13   brought. That's usually the big item back
14   there.
15       Q.    Contraband would be something like
16   potatoes, that violate the nutrition
17   requirements?
18       A.    Usually a cigarette, or we've even
19   had -- anything. Anything the other inmates
20   can't get. And I don't remember anything about
21   Miss Paula being looked at in a negative light
22   on any issue. I do remember talking with her.
23   And the best I remember, it was a preventive

67

1    thing, a caution thing, and I don't remember if
2    it was about some of them trying to get her to
3    bring something or if it was about some of them
4    claiming she was playing favorites or whatever
5    it might be. There's so many inmate games that
6    go on back there.
7        Q.    When do you remember talking to
8    Paula about this thing?
9        A.    Oh, I don't remember. It was prior
10   to George and my conversation, but not long; a
11   couple of days or so, I guess. I don't know
12   exactly.
13       Q.    And you said a preventive thing.
14   What do you mean by that?
15       A.    Well, you don't want to lose
16   somebody if the inmates are playing games
17   and -- we've had inmates to accuse contractual
18   employees of bringing things, that weren't
19   bringing things. We have had inmates do that,
20   in an effort to get them to bring things. And
21   we've had inmates to accuse people of playing
22   favorites, who weren't playing favorites. And
23   we've had some that were legitimate, that the

68

1    people were bringing things, so --
2        Q.    And on those occasion, if it was
3    legitimate that the cafeteria workers were
4    bringing contraband, so do you then say
5    something to ABL and they get rid of them?
6        A.    Well, we don't tell them to get rid
7    of them. It's their employee. We would simply
8    say they've lost their security clearance. But
9    again, we would first start with Miss
10   Carolyn -- well, at that time it would have
11   been Miss Ruby, and asked her how's the
12   performance and ask her if she's seen anything
13   and could she do anything to correct it, talk
14   to them, see what she could do.
15       Q.    With the loss of security clearance,
16   they cannot get access to the jail; right?
17       A.    That's correct, this facility.
18       Q.    Which, in effect, means they aren't
19   going to be working here anymore; right?
20       A.    At this facility, that's correct.
21   But there was -- that never happened with Miss
22   Paula.
23       Q.    But you do remember, a couple of

69

1  days before George talked to you about Paula
2  Richardson, having a conversation with her
3  about something along these lines?
4      A.    I remember two visits with Miss
5  Paula.  One, while she was an employee here,
6  putting it in that context and in that setting,
7  one, George, Miss Paula and I met at Captain
8  D's and visited, and I think that was maybe in
9  reference to Miss Paula wanting to work
10  directly for the County.  And then two, there
11  was some something that we interacted about
12  just before George and I talked on that
13  occasion.  I still don't remember the
14  conversation.  I remember the content.  That's
15  the weird thing.  I can remember the content,
16  responding to George and saying, "What is your
17  role in this?  Are you her union steward?  Are
18  you her lawyer?  What's your role?  I've got to
19  have some clarification here.  I've got to know
20  in what capacity we're talking."  So that's
21  pretty much the extent of my memory of it.
22      Q.    But he clearly was in some kind of
23  advocate role for her?

70

1      A.    Oh, yes, yes, intervening role of
2  some sort.
3      Q.    Since you have been the
4  administrator at the jail, have you had a
5  former correction officer named Sam Sherrer who
6  worked here?
7      A.    Yes, sir.
8      Q.    Did he ever use force on an inmate?
9      A.    Yes, sir.
10      Q.    On more than one occasion?
11      A.    Yes, sir.
12      Q.    What were the instances?
13      A.    From my memory, there were reports
14  to me of someone who was handcuffed in booking,
15  and this has been sometime back, that
16  reportedly Mr. Sherrer slapped that person.
17  There was a report of a person --
18      Q.    Did you say slapped them?
19      A.    Yes, sir.
20      Q.    And they were handcuffed?
21      A.    Yes, sir.  There was a report of Mr.
22  Sherrer slapping someone on the hallway and --
23      Q.    An inmate?

71

1      A.    Yes, sir.  And the -- Arthur Clark.
2  Mr. Sherrer reportedly used his baton on Arthur
3  Clark and that's when he was fired.
4      Q.    All right.  When he slapped an
5  inmate while cuffed, that would certainly be a
6  form of physical contact not warranted by the
7  circumstances; right?
8      A.    Yes, sir, I would say that's right.
9      Q.    Okay.  But he wasn't terminated for
10  that?
11      A.    I believe I recommended it.
12      Q.    But the sheriff didn't terminate
13  him?
14      A.    To the best of my knowledge, at that
15  point he did not.
16      Q.    Okay.
17      A.    I don't remember if he suspended him
18  or what action he took.
19      Q.    And then when Sam slapped an inmate
20  in the hallway, was that inmate in cuffs?
21      A.    I don't believe that one was in
22  cuffs.
23      Q.    Okay.  What did he slap that inmate

72

1  for?
2      A.    I don't remember, sir.  I just
3  remember there were like three things there.
4      Q.    And was he terminated for slapping
5  the inmate in the hallway?
6      A.    To the best of my memory, no, sir.
7      Q.    Okay.  And what was Sam Sherrer's
8  position?
9      A.    He was a jail sergeant.
10      Q.    When all three of these things took
11  place?
12      A.    I don't remember if he was when all
13  three of them took place or not, sir.
14      Q.    He was a jailer prior to being a
15  sergeant?
16      A.    Yes, sir.
17      Q.    What's Mr. Sherrer's race?
18      A.    He's white.
19      Q.    Is Ms. Clifton still employed by the
20  jail?
21      A.    No, sir.
22      Q.    What's she doing now?  Do you know?
23      A.    I do not, sir.

73

1  Q.  Did you make a deal with Mr. Decatur
2  that if he wouldn't sue you individually, you
3  would get him out of jail?
4  A.  No, sir.
5  Q.  Did he get out of jail after all
6  this happened with George?
7  A.  Yes, sir. I don't know exactly how
8  long after, but it wasn't immediately after, I
9  don't believe.
10  Q.  Did the County -- did he file a
11  lawsuit against the County or the sheriff's
12  department or somebody, in addition to or other
13  than Mr. Chapman?
14  A.  Yes, sir.
15  Q.  And was it settled? Was he paid
16  some money?
17  A.  Yes, sir.
18  Q.  What for?
19  A.  Meadowbrook paid him and I don't
20  know the exact --
21  MS. DOWDY: Do you know the terms of
22  the settlement? Were they confidential?
23  THE WITNESS: They are.

74

1  MS. DOWDY: Okay. Stop, then.
2  Q.  (By Mr. Saxon) Well, was he paid
3  with -- by a public entity? I mean, he sued
4  a --
5  MS. DOWDY: He didn't file a
6  lawsuit. There was a claim filed and
7  Meadowbrook -- and if it's a confidential
8  settlement, he's not going to discuss it.
9  MR. SAXON: The claim's against a
10  public entity, right, the jail, the county, the
11  sheriff?
12  MS. DOWDY: I don't know how the
13  claim was filed, but if that was a confidential
14  settlement, and I've not looked at it, he's not
15  going to discuss it.
16  MR. SAXON: Well, you can instruct
17  him not to answer, but --
18  MS. DOWDY: I instruct you not to
19  answer anything about a confidential
20  settlement, but I haven't looked at it.
21  MR. SAXON: When it's a matter of
22  public record or should be?
23  MS. DOWDY: Maybe. It depends on

75

1  how the money was paid, and I don't know that.
2  And unless he does, I don't want him to --
3  MR. SAXON: Well, no, it's public
4  business. It doesn't matter -- if an insurance
5  company paid it, it doesn't matter. It's
6  public business.
7  MS. DOWDY: I don't know what the
8  terms of the settlement were. I'm not going to
9  let him discuss it until I've read it. I
10  wasn't the lawyer involved in that.
11  MR. SAXON: Okay. Well, I'm just
12  trying to avoid us being back here.
13  MS. DOWDY: Well, I mean, surely you
14  can understand I can't let him testify to
15  something I've never seen. If it's a
16  confidential settlement, John, I don't know.
17  MR. SAXON: And I'm not trying to
18  play games with you, but --
19  MS. DOWDY: I know you're not, and I
20  understand where you're coming from. I just --
21  MR. SAXON: I go through this all
22  the time, when the other side says, "Well,
23  look, you know, we're settling -- the school

76

1  board's settling this, but it's got to be
2  confidential." And then in the next board
3  meeting, they approve it publicly and the
4  Talladega Daily Home runs it. I mean, it's a
5  game that everybody plays, but if it's a public
6  entity, it's public business.
7  MS. DOWDY: I'm not playing with
8  you. I'm just --
9  Q.  (By Mr. Saxon) Okay. Did y'all pay
10  him $10,000.00?
11  A.  I truly don't remember.
12  Q.  Okay. Now, go back to my earlier
13  question. Why did y'all settle with him? Did
14  you just compromise a disputed claim or did you
15  think he had been wronged somehow?
16  MS. DOWDY: If you remember. I
17  don't even know what part you played in it.
18  A.  We were in Huntsville. And I say
19  "we," Darrell and myself.
20  Q.  (By Mr. Saxon) Darrell Mote?
21  A.  Daryl Masters.
22  Q.  Okay.
23  A.  And --

77

1      MS. DOWDY: You don't need to
2  discuss anything you discussed with your
3  attorneys about that either.
4      A.    I just don't remember, sir. I mean,
5  I -- I know that as far as letting a sex
6  offender out of jail, I don't have the
7  authority to do that.
8      Q.    Well, is he one of your inmates
9  today?
10     A.    Yes, sir.
11     Q.    Okay. He's still in the jail?
12     A.    Yes, sir, he's here right now.
13     Q.    Okay. Mr. Decatur?
14     A.    The same man he had this conflict
15  with.
16     Q.    Okay.
17     A.    Now, for the record, I don't want to
18  be deceitful to anybody. He's been out and
19  he's back, so he wasn't out very long.
20     Q.    He liked that ABL food too much?
21     A.    I guess that's right, sir.
22     Q.    What did he do to get back?
23     A.    I don't know if it was a failure to

78

1  report or what it was.
2      Q.    Well, what did he do to get out?
3  Was his sentence up or was that part of the
4  settlement?
5      A.    On sex offenders at that time --
6      MS. DOWDY: Since when do they have
7  the ability to let somebody out of jail as part
8  of a settlement? I'm sorry.
9      MR. SAXON: I'm just asking
10  questions. We lawyers just ask questions.
11     A.    Sex offenders had to be cleared by
12  Jim Painter before they were released. Now
13  Dayron Bridges clears them.
14     Q.    (By Mr. Saxon) And who is that?
15     A.    He's an investigator. And Jim
16  Painter is the acting chief deputy. So that's
17  the extent of that. It's -- however he was
18  released.
19     Q.    Did you ever review Officer
20  Clifton's taser report about this incident?
21     A.    I couldn't definitively answer that,
22  sir. What papers I received, I attached them
23  together and sent them upstairs, since an

79

1  investigator was looking into it.
2      Q.    Do you know where Sam Sherrer is
3  these days? Is he working for Sumiton?
4      A.    That's my understanding, sir.
5      Q.    Okay. Now, when Sheriff Tirey sent
6  George Chapman a letter telling him he was
7  terminated, that was dated November 7, and I'm
8  assuming this is a typo, because it's the year
9  2008 -- I'm sorry, 208 and I assume that's
10  supposed to be 2008. It shows a copy going to
11  you. Did you see that letter?
12     A.    Yes, sir, I'm sure I did.
13     Q.    Okay. It says, "It is with regret
14  that I must inform you that your work
15  performance is unsatisfactory at the Walker
16  County Jail." What about his work performance
17  was unsatisfactory?
18     A.    Well, certainly the use of the baton
19  was a part of his work performance.
20     Q.    So that's what's being referred to
21  there?
22     A.    That would certainly be part of it.
23  Now, this is the sheriff's letter. He may have

80

1  some information from immediate supervisors
2  that I'm unaware of. I just -- I don't want to
3  mislead you in any way. I can't tell you the
4  sheriff's meaning there, but certainly at the
5  time he wrote this letter, he had all of our
6  reports, including that of the investigating
7  officer.
8      (Whereupon, Plaintiff's Exhibit
9      Number 1 was marked for
10     identification.)
11     Q.    (By Mr. Saxon) Let me show you what
12  I'm marking as Plaintiff's Exhibit 1 to your
13  deposition and give you a chance to look at
14  that.
15     A.    (Witness reviews document.)
16     Q.    Have you had a chance to look at
17  that, sir?
18     A.    Yes, sir.
19     Q.    Are you familiar with this policy on
20  the use of batons for Walker County?
21     A.    Yes, sir.
22     Q.    Okay. Is this the policy that
23  applies to the jail?

81

1    A.    Yes, sir.

2    Q.    And it applied in November of 2008?

3    A.    Yes, sir.

4    Q.    Okay.  Now, on the second page, in

5    terms of use of the baton, it says, "The baton

6    may be used by an officer to subdue a violently

7    resisting subject."  You don't take issue with

8    that?  You would agree with that, right, that

9    if the subject is violently resisting, you can

10   use the baton?

11   A.    Yes, sir, that's the policy.  It

12   plainly says so.

13   Q.    Okay.  And it can also be used in

14   self-defense, according to the policy; right?

15   A.    Yes, sir.

16   Q.    And then it could be used to defend

17   a third party, such as another officer;

18   correct?

19   A.    That's correct.

20   Q.    Okay.  Now, paragraph number one

21   under that says, "When striking with the baton,

22   officers should attempt to avoid striking the

23   following areas," and they mention the head.

82

1    Would you admit that it's certainly possible

2    that if an officer were going to strike someone

3    in a more permissible area, like the arm or

4    shoulder, that the subject could move and they

5    could actually hit them in the head?

6    A.    Sure.

7    Q.    Okay.  Now, paragraph two, this

8    would be Roman numeral III, number two,

9    "Deliberate strikes to these areas," that would

10   include the head, "should be limited to

11   situations in which the use of deadly force is

12   authorized or necessary."  So I take it that

13   there are times when the baton policy

14   recognizes a baton could be used in certain

15   circumstances to hit someone on the head?

16   A.    Yes, sir.

17   Q.    Did Sergeant Harper make a

18   recommendation to you that George Chapman be

19   terminated?

20   A.    I believe she did, sir.  I believe

21   that's when I forwarded her letter, along with

22   mine and any others that I had received

23   upstairs.

83

1    Q.    What was Sergeant Harper's basis for

2    thinking George should be terminated?

3    A.    Since I had received nothing from

4    the investigator and to my knowledge it was

5    still ongoing, I didn't delve into it.  I just

6    shipped it straight to the sheriff, let he and

7    the investigating officer look at all the

8    information.

9    Q.    Did you and Sergeant Harper discuss

10   George after the Decatur incident?

11   A.    No, sir; no, sir.

12   Q.    Did you talk to anybody after the

13   Decatur incident?

14   A.    Did I?

15   Q.    Yes, sir, about what happened,

16   George's role, et cetera?

17   A.    I'm trying to remember of any

18   particular thing.  Obviously we reported it to

19   the sheriff, the chief deputy, got an

20   investigator.  I'm sure I interacted, to some

21   degree, with that investigator.  And I'm sure

22   that I asked for reports to be generated by

23   everybody that was on shift.  And beyond that,

84

1    I don't remember any discussions about it.

2    Q.    Did you ever talk to George Chapman

3    about what happened that night?

4    A.    I don't believe I did.  Since an

5    investigator was going to interview him, I did

6    not.

7    Q.    Do you remember when a couple of

8    trustees escaped from the facility while

9    washing cars?

10   A.    Yes, sir.

11   Q.    Who were they?  Was one of them

12   named Sanford?

13   A.    Andy Sanford.

14   Q.    Andy Sanford?

15   A.    Yes, sir.

16   Q.    And he just needed a change of

17   scenery and walked off?

18   A.    Mr. Sanford was washing the chairman

19   of the County Commission's automobile and Mr.

20   Ham rick had left the keys in that car.

21   Q.    So he took it for a test-drive?

22   A.    He was gone for about six hours,

23   yes, sir.

85

1    Q.    Did he return it on his own or did
2  he just come back or did he --
3    A.    No, sir. It was towed from the
4  place it was stopped, yes, sir.
5    Q.    Okay. It was reported stolen and he
6  got stopped by some fellow officers somewhere
7  else?
8    A.    I believe that an off-duty Jefferson
9  County officer encountered the car around
10 Quinton and our guys were looking for it and we
11 got him over around Quinton, if I remember.
12   Q.    So what happened to Andy Sanford?
13   A.    He's in prison.
14   Q.    Not in this facility?
15   A.    No, he's in a State prison.
16   Q.    Y'all -- were charges pressed
17 against him for --
18   A.    I believe so, yes, sir.
19   Q.    Auto theft?
20   A.    I'm not sure of the specific
21 charges, but he did get more charges out of
22 that event.
23   Q.    Okay. And Justin Williamson, did he

86

1  do something similar?
2    A.    Yes, sir, Justin left from the car
3  wash area also.
4    Q.    In a vehicle?
5    A.    No, sir, he left -- I don't know. I
6  don't know his mode of leaving. Someone could
7  have picked him up or he could have left on
8  foot. I just don't know.
9    Q.    And was he ultimately caught?
10   A.    No, sir, he killed himself.
11   Q.    Okay. Committed suicide or had an
12 accident or what?
13   A.    Suicide in Florida.
14   Q.    Very shortly thereafter or some
15 later time?
16   A.    It was shortly. I can't put a time
17 frame on it, but under a week.
18   Q.    Okay. Did the two of them leave in
19 close proximity to each other or was there
20 some -- do you remember when the times were?
21 When did Sanford leave?
22   A.    I don't remember, sir.
23   Q.    How about Williamson?

87

1    A.    I just -- I don't remember.
2    Q.    But since you've been jail
3  administrator?
4    A.    Oh, yes, sir.
5    Q.    Now, was somebody -- was a
6  corrections officer out there --
7    A.    No, sir, we don't post somebody out
8  there.
9    Q.    Okay.
10   A.    And each of these people -- the
11 orders came from upstairs for Sanford to be
12 allowed to be an inmate worker.
13   Q.    Okay. And the order from upstairs
14 from whom?
15   A.    I believe -- let me think through
16 this. It was a request -- I'm sorry, it was a
17 request from an investigator that -- Dayron
18 Bridges, I believe. I'm pretty sure that's
19 right.
20   Q.    Bridges thought that Sanford was
21 trustworthy enough to let -- be out there
22 unattended, unsupervised and wash cars?
23   A.    Well, all of the car wash people are

88

1  unattended, so I guess to that extent, yes.
2    Q.    Okay. And after Sanford took off in
3  the commission chair's car, was Bridges
4  terminated for that poor judgment?
5    A.    No, no, he was not. And again, that
6  wouldn't have been a decision for him to make.
7  It was something that I made the decision on,
8  but based upon his recommendation.
9    Q.    All right. And on whose
10 recommendation did Justin Williamson get to go
11 wash cars unsupervised?
12   A.    I pulled Justin Williamson because
13 at the time, in running his local charges, they
14 were all pretty minor.
15   Q.    So you thought he would be a fair
16 risk to put out there, that he wasn't going to
17 run?
18   A.    Yes, sir; yes, sir.
19   Q.    Were you disciplined or terminated
20 in any way when Justin Williamson took off?
21   A.    I wasn't terminated, but we had a
22 meeting or two.
23   Q.    You and the mayor -- I mean you and

89

1   the sheriff?
2       A.    Yes, sir, the sheriff and
3   investigators. It was discussed.
4       Q.    Okay. For the record, what is
5   Dayron Bridges' race?
6       A.    He's white.
7       Q.    Do y'all still let people go
8   unattended wash cars?
9       A.    Yes, sir, the car wash is unattended
10  by officers.
11      Q.    Do they wash visiting lawyers' cars?
12      A.    No, sir.
13          MS. DOWDY: I wish.
14          (Whereupon, Plaintiff's Exhibit
15          Number 2 was marked for
16          identification.)
17      Q.    (By Mr. Saxon) Let me show you what
18  has been marked as Plaintiff's Exhibit Number 2
19  and give you a chance to look at that.
20      A.    (Witness reviews document.) Yes,
21  sir.
22      Q.    First of all, did you draft this
23  letter?

90

1       A.    Yes, sir.
2       Q.    And is this the letter in which you
3   made the recommendation to the sheriff that
4   George be terminated?
5       A.    I requested that the sheriff review
6   the incident involving George Chapman and that
7   my recommendation is dismissal, yes, sir.
8       Q.    And in that last paragraph, you talk
9   about a pattern of activities. Do you see that
10  in your last sentence?
11      A.    Yes, sir.
12      Q.    Are you talking about the pattern
13  evidenced by the three instances cited above?
14      A.    Yes, sir.
15      Q.    All right. But the first instance,
16  he was totally cleared; right?
17      A.    That's correct.
18      Q.    Okay. Well, something in which
19  somebody has no culpability whatsoever, they've
20  actually been investigated and cleared, that's
21  not part of a pattern that justifies their
22  termination, is it?
23      A.    I think it's something to be brought

91

1   to the attention of the hiring and firing
2   authority while this person's employment is
3   being reviewed and they're on a probationary
4   status, yes, sir.
5       Q.    But you've already told me that
6   inmates make wild, is my word, but wild
7   accusations?
8       A.    Yes.
9       Q.    They claim that somebody, some
10  cafeteria person did or didn't give them
11  contraband, they claim that an inmate groped
12  them or mistreated them. That happens all the
13  time, doesn't it?
14      A.    It happens frequently, yes, sir, and
15  it's investigated on a case-by-case basis.
16      Q.    And do you recommend the termination
17  of other corrections officers who are accused
18  of things and then exonerated, cleared?
19      A.    If they then have a pattern of other
20  things that come forth for which they're not
21  cleared.
22      Q.    Okay. But so the pattern doesn't
23  include the first one or it does include the

92

1   first one?
2       A.    For the hiring authority to look at
3   on a probationary employee, as the
4   administrator, I remind him of it. He puts
5   whatever weight into it that he so chooses.
6       Q.    And then the second incident, you
7   cite the October 9, 2008 incident, but you
8   don't make any mention there what Mr. Bridges'
9   conclusion was, do you?
10      A.    I don't know that I received it.
11      Q.    Okay. So in other words, you, at
12  the date -- at the point at which you wrote
13  this letter, you didn't know what Bridges'
14  conclusion was, did you?
15      A.    I know that a nurse called me out
16  there and said she didn't want this man back
17  out there. I know that I went to visit with
18  George Files in a follow-up and George Files
19  told me, "Trent, I'm going to do some time in
20  prison. My health isn't good. This happened.
21  That man hit me whenever I switched the channel
22  from BET to Animal Planet." He said, "Am I
23  going to pursue it? No." That's what George

93

1    Files said. That's what I know about that
2    situation. I didn't try to get him to pursue
3    it or anything else. I was through.
4        Q.    And you don't indicate what Darrell
5    Mote's investigation concluded, do you?
6        A.    That would have gone to the sheriff.
7        Q.    Okay.
8        A.    We report to the sheriff. He gets
9    all the pieces of the puzzle to make his
10   decision on.
11       Q.    All right. What was it that George
12   Chapman did wrong the night of the Joseph
13   Decatur incident?
14       A.    Based upon what I have seen,
15   striking the man in the top of the head, not
16   the forehead, as has been stated, in the top of
17   the head with a baton while he was seated was
18   wrong.
19       Q.    All right. Anything else?
20       A.    Out of that particular incident, I
21   don't know. I haven't -- again, once it was
22   given to the investigator, that report from the
23   investigator and his conclusions on it would

94

1    have gone to the sheriff. I simply brought to
2    the sheriff's attention these incidences that
3    have been brought to my desk. They were then
4    investigated by a person not employed by the
5    jail staff and those findings would have been
6    forwarded to their boss, the sheriff.
7        Q.    All right. You say that what George
8    did wrong on November 2, 2008 was striking Mr.
9    Decatur on the top of the head with a baton
10   while seated. What's your basis for concluding
11   that Joseph Decatur was seated when he was
12   struck?
13       A.    If you look at the height of these
14   two men, I don't see how this man could have
15   stood in front of him and struck him on the top
16   of the head.
17       Q.    I don't understand.
18       A.    His injury, sir, was up here
19   (indicating), not here.
20       Q.    Okay. And what would you say is the
21   height difference between George and Joseph
22   Decatur?
23       A.    They're pretty similar in height,

95

1    wouldn't you think? George may be a little
2    higher, taller.
3        Q.    So you can't just take a baton -- as
4    you come down like that (indicating), that's
5    where you'd hit anybody, wouldn't it? It would
6    almost always be on the top of the head?
7        A.    If that's the way he's going to
8    employ the baton, I'm still accurate in my
9    recommendation.
10       Q.    No, I'm just asking you --
11       A.    If he's going to put that kind of
12   effort into striking the top of an inmate's
13   head, he had to be trying to do it.
14       Q.    Well, that's a separate matter. I'm
15   asking you right now what George did wrong, and
16   you've told me one thing and that was striking
17   on top of the head with a baton while seated.
18   And I'm asking you the basis for your
19   conclusion that Decatur was seated when this
20   happened, and you said something about, I
21   guess, how tall George is.
22       A.    Yes, sir. No, I didn't say about
23   how tall George is. We're comparing the two

96

1    people. I think enough of George to hope the
2    man was seated. I hope he didn't put that kind
3    of effort into hitting that man on top of the
4    head.
5        Q.    So you -- what makes you conclude
6    that he came down, straight down like that, as
7    opposed to from the side?
8        A.    Because it's on the top of the head.
9        Q.    Well, the guy could go to duck. I
10   mean, he could go to hit his arm and --
11       MS. DOWDY: I'm going to object.
12   You're arguing with him. I mean, he's given
13   you his basis for his opinion. You're arguing
14   with him.
15       Q.    (By Mr. Saxon) Would you admit that
16   George could be swinging at his arm or shoulder
17   or chest, not the head, not the neck, the
18   throat, the things that are forbidden, and
19   Decatur could move and get hit on the top of
20   the head?
21       A.    Well, certainly we can speculate and
22   say, yeah, he could be in the process of
23   swinging and this man could duck, but there's

97

1  been no evidence brought in that says that.
2  Q.  I'm just saying what's the evidence
3  he was seated?
4  A.  I think we've got reports that he
5  was seated from Rachel Harper.
6  Q.  She says that he's lying on the
7  floor.
8  MS. DOWDY: I'm going to object.
9  That's not what she said. You go back and look
10  at her report.
11  MR. SAXON: Well, you can object,
12  but you can't coach your witness by telling him
13  what it says.
14  A.  I believe she says he was seated. I
15  believe one of the other testimonies was that
16  he was making effort to stand up while he was
17  seated.
18  Q.  (By Mr. Saxon) So you did think he
19  did -- you read the other reports?
20  A.  I think I've heard them today, sir.
21  MS. DOWDY: Can we take a break?
22  MR. SAXON: Sure.
23  (Whereupon, a recess was taken.)

98

1  Q.  (By Mr. Saxon) Going back to
2  Plaintiff's Exhibit Number 2 to your
3  deposition, you mentioned three investigations
4  in your letter to the sheriff, one done by
5  Investigator Ralph Williams. Did you ever see
6  a copy of that investigation?
7  A.  I don't believe so.
8  Q.  The second was by Investigator
9  Bridges. Did you ever see a copy of that
10  investigation?
11  A.  I don't believe so.
12  Q.  The third one was by --
13  A.  Hang on a minute, sir. Ralph did
14  provide me with a copy of his investigation.
15  Yes, sir, he did.
16  Q.  Okay. And Darrell Motes'
17  investigation of the Decatur incident, did you
18  ever see a copy of it?
19  A.  I don't remember seeing one of
20  those, sir. And I tried to call Darrell to
21  check on the video, but his radio's not on.
22  Q.  Okay. Let me ask you about staffing
23  in the jail. Sergeant Harper testified this

99

1  afternoon that there are about 13 or so
2  corrections officers would be on duty at any
3  one time, or at least kind of the optimal
4  number?
5  A.  That are assigned to a shift.
6  Q.  That are assigned to, I'm sorry, a
7  shift, and you have three shifts during the
8  day. What is the least number you're aware of
9  that have actually ever worked a shift?
10  A.  By policy, no less than five.
11  Q.  All right. And have you ever had a
12  day or a shift which, for whatever reason, you
13  had less than five?
14  A.  Not with my authorization nor my
15  knowledge of it while it was occurring, no,
16  sir.
17  Q.  Okay. Have you learned after the
18  fact a time or two that that happened?
19  A.  One time.
20  Q.  How many did you have?
21  A.  Four.
22  Q.  Okay. So when she testified to that
23  today, you would concur that that has happened

100

1  at least once?
2  MS. DOWDY: I'm going to object. I
3  don't think that was her testimony.
4  Q.  (By Mr. Saxon) All right. Well, so
5  you know of an incident in which as few as four
6  people have been present for a shift; correct?
7  A.  Yes, sir.
8  Q.  Okay. When was that?
9  A.  I don't remember the date, but Ron
10  Pearson was the sergeant on the shift. I
11  delegate scheduling. Scheduling is generally
12  done by the shift commander. Ordinarily, that
13  shift commander is a lieutenant. In cases
14  where we don't have a lieutenant, there will be
15  a sergeant. So there was one occasion when Ron
16  covered with four people, but he knows we don't
17  do that. He doesn't -- he's at the courthouse
18  now, but we discussed that.
19  Q.  Okay. Was he terminated for
20  violating policy on the minimum number of
21  people, of corrections officers on a shift?
22  A.  No, sir.
23  Q.  And who was that?

101

1   A.   Ron Pearson.

2   Q.   He was a sergeant here then?

3   A.   Yes, sir.

4   Q.   What is his race?

5   A.   He's white.

6   Q.   All right. Let me ask you about

7 M-dorm. Are there times when there would only

8 be one correction officer on the floor and one

9 in the control room in M-dorm? Has that ever

10 happened?

11   A.   There should never be just one

12 person opening doors in M-dorm. The -- and I

13 say never. That's a word you never say. The

14 person's always in the control room. That's

15 24/7, 365, there's always somebody in central

16 control. Likewise, there should always be

17 somebody in booking and in pod control. Those

18 three posts have to have somebody there. The

19 rovers should be able to pull together and back

20 each other up. The doors in M-dorm should not

21 be opened without two officers present,

22 particularly for routine operations like giving

23 someone a paper.

102

1   Q.   In your experience, since you've

2 been the jail administrator, does it ever

3 happen from time to time, for whatever reason?

4   A.   Well, it happened on this occasion.

5   Q.   Okay. Well, on the night when

6 Sergeant Pearson ran the operation with just

7 four people, if you had somebody in pod control

8 and somebody in the control room and somebody

9 in booking, that only left one rover to do

10 everything else; right?

11   A.   Right.

12   Q.   Okay. So if any cell had been

13 opened on that shift for any reason, it would

14 have been in violation of the policy; right?

15   A.   Unless there was no one housed in

16 booking and the booking officer accompanied

17 him.

18   Q.   Okay. Are you aware of any instance

19 of which you have knowledge, other than

20 November 2nd, 2008 involving Officer Chapman

21 and Mr. Decatur, in which an officer has opened

22 doors in M-dorm without some second officer

23 standing there?

103

1   A.   I wouldn't be aware of it, sir,

2 unless there is an incident that causes it to

3 be magnified. I'm aware of making a policy to

4 protect our officers, as well as to secure that

5 dorm.

6   Q.   All right. So this policy reflected

7 by Defendant's Exhibit Number 2 to Mr.

8 Chapman's deposition, that's a policy you made?

9   A.   Yes, sir, and it's endorsed by the

10 sheriff. Only the sheriff can make policy.

11   Q.   Okay. And the way you understood it

12 when you drafted that is that the two officers

13 are to be standing there together at the cell

14 door?

15   A.   In the dorm.

16   Q.   Sir?

17   A.   Within the dorm.

18   Q.   Okay.

19   A.   Within the dorm.

20   Q.   So one could be on one level and one

21 on another?

22   A.   Yes, sir. That gives them

23 sufficient time to respond, if need be. They,

104

1 however, cannot open two doors in that dorm and

2 comply with policy. There is another piece of

3 paper that's posted by this one that indicates

4 that this is a segregation unit and these

5 people are separated for security reasons, so

6 you can't -- there would be no reason to have

7 one up here opening doors and one down here

8 (indicating), exposing those people one to the

9 other within that unit.

10   Q.   When this facility was built as a

11 result of the consent order, has there been

12 continuous monitoring by the court of the jail

13 and the facilities and so forth since then, or

14 was there a point at which that was all closed?

15   A.   It was closed after a lengthy

16 monitoring and we had substantially fulfilled

17 the requirements of the decree.

18   Q.   When did the monitoring end?

19   A.   It's been about two or three, maybe

20 four years now. I'd have to look, sir. I'd

21 strictly be guessing.

22   Q.   After George Chapman talked to you

23 about Paula Richardson, was that toward the end

105

1   of October of 2008?
2       A.   I don't know, sir.
3       Q.   It was a week or two or so before
4   you recommended his termination; right?
5       A.   I guess, sir. I don't know.
6       Q.   What is Charles Hannah's race?
7       A.   He's white.
8       Q.   And Tommy Miller?
9       A.   He's white.
10      Q.   And Richard Jesus?
11      A.   D.J. is -- he's African-American,
12  but he also has some Latino influence.
13      Q.   Did I ask you -- did you tell me
14  Tifney Clifton's not with the jail anymore?
15      A.   No, sir, she resigned.
16      Q.   What's she doing?
17      A.   I don't know.
18          MR. SAXON: That's all I have, sir.
19  Your lawyer may have a question or two for you.
20
21  EXAMINATION BY MS. DOWDY:
22      Q.   You were asked earlier what Mr.
23  Chapman did wrong on November the 2nd, 2008.

106

1   If he opened the door in -- a cell door in
2   M-dorm and he was the only officer present, was
3   he in violation of the policy?
4       A.   Yes, he was.
5       Q.   And if Mr. Decatur was sitting in
6   the floor with a taser probe still in him at
7   the time Mr. Chapman struck him with a baton,
8   was he in violation of the force continuum
9   policy by using a baton at all?
10      A.   Yes.
11          (Whereupon, Defendant's Exhibit
12          Number 1 was marked for
13          identification.)
14      Q.   (By Ms. Dowdy) Okay. And let me
15  show you what 1 will mark as Defendant's
16  Exhibit 1 to your deposition. Is this the
17  other notice that was posted outside of M-dorm,
18  Mr. McCluskey?
19      A.   It is, and it's also been given with
20  the checks on occasion, as most of these memos
21  have.
22      Q.   And does that indicate that they are
23  violating jail policy if more than one jail

107

1   cell door is opened at a time?
2       A.   Yes.
3       Q.   Are these policies in place because
4   of -- in part, because of the fact that the
5   inmates housed in M-dorm are violent offenders?
6       A.   Thinking back on today, George
7   testified that when he brought Decatur up, it
8   was after he had ripped the tabletop off and
9   was breaking windows and so forth, and he takes
10  him to M-dorm because this is a more secure
11  dorm. That's exactly why we don't go in there
12  and loosely open doors with one person.
13      Q.   And prior to -- or after Mr. Chapman
14  had been hired on a full-time basis, was that
15  when the inmate escaped from work release?
16      A.   I'm not sure of the chronology on
17  that. I'm just not sure. I'm not sure if he
18  was full-time or part-time when that occurred.
19  I think it was shortly after he became
20  full-time, but to just sit here and tell you I
21  remember, I really don't.
22          MS. DOWDY: Okay. I don't have any
23  other questions.

108

1   RE-EXAMINATION BY MR. SAXON:
2       Q.   Under the court monitoring from the
3   consent decree, did Judge Blackburn appoint any
4   kind of special master?
5       A.   That was Dr. William Osterhoff that
6   I had mentioned to you earlier. He was the
7   court monitor. I can give you his phone
8   number, if you'd like.
9           MR. SAXON: I think that's all I've
10  got.
11
12          FURTHER THE DEPONENT SAITH NOT
13          (DEPOSITION CONCLUDED AT 6:25 P.M.)
14
15
16
17
18
19
20
21
22
23

109

```
 1              C E R T I F I C A T E
 2
 3    STATE OF ALABAMA
 4    COUNTY OF JEFFERSON
 5          I hereby certify that the above and
 6    foregoing deposition was taken down by me in
 7    stenotype, and the questions and answers
 8    thereto were transcribed by means of
 9    computer-aided  transcription, and that the
10    foregoing represents a true and correct
11    transcript of the testimony given by said
12    witness upon said hearing.
13          I further certify that I am neither of
14    counsel, nor of kin to the parties in the action,
15    nor am I in anywise interested in the result of
16    said cause.
17
18          /s/ Scott Wilmeth
19          _____
20          Scott Wilmeth, CCR, RPR
21          CCR #392, Expires 9/30/11
22          Commissioner for the
23          State of Alabama at Large
```

**A**

ability 6:15 31:4
33:18 39:1,3,14
50:3,9 78:7
ABL 55:16,19,19
56:10 60:9 62:2
64:1,4 68:5 77:20
able 41:13 101:19
Academy 27:18
access 68:16
accident 86:12
accompanied
102:16
accurate 60:10 95:8
accurately 54:9
accusations 91:7
accuse 67:17,21
accused 19:10,12
19:13,18 20:16
91:17
act 63:10
acting 5:2 8:11
64:18 78:16
action 1:5 71:18
109:14
actions 10:10
activities 90:9
addition 27:23
73:12
adequate 27:8,12
administration
36:17
administrator 8:1
13:4,7 18:12 70:4
87:3 92:4 102:2
admit 82:1 96:15
admitted 7:11
50:12
adult 19:21,22
20:13
advocate 69:23
affect 27:3 33:20
African-American
105:11
African-Americans
37:4
afternoon 99:1
agree 6:6 7:17
33:17 45:21,22
46:4 47:4 48:23
81:8
AGREED 1:13,20
2:3
air 37:17
Alabama 1:1,6,17
1:18 4:8,14 5:2,6
6:21 27:17,18,20

34:21 35:3 60:13
109:3,23
allegation 22:19
66:4,12
allegations 16:1,3
18:13 19:5 20:10
20:18 63:20,22
alleged 18:23 64:9
allowed 30:14
87:12
alluded 64:7
altercation 47:14
50:22
altercations 43:19
analysis 25:16
Andrew 19:15
Andy 84:13,14
85:12
and/or 8:9 46:4
Animal 92:22
announcement
47:19
answer 38:16 74:17
74:19 78:21
answered 63:3
answering 63:6
answers 109:7
anybody 51:22 65:3
77:18 83:12 95:5
anymore 68:19
105:14
anywise 109:15
APPEARING 4:4
4:10
applied 81:2
applies 80:23
appoint 108:3
appointed 25:22
appreciate 20:8
approval 59:17
approve 76:3
approximation
14:14
area 82:3 86:3
areas 81:23 82:9
arguing 96:12,13
arising 10:1
arm 82:3 96:10,16
arms 30:1
arrested 8:13
Arrington 4:13
Arthur 71:1,2
asked 21:10 24:5
31:19 47:13 63:18
68:11 83:22
105:22
asking 20:10,15
47:8 63:15,16

78:9 95:10,15,18
ASP 28:17
aspects 26:17
assesses 34:1
assign 2:7
assigned 28:15 99:5
99:6
assume 6:10 41:22
43:4 79:9
assuming 79:8
attached 78:22
attempt 81:22
attempted 37:7
attention 91:1 94:2
attorneys 77:3
Auburn 25:20
August 8:6,7 13:2
AUM 25:19
authority 53:21
77:7 91:2 92:2
authorization 99:14
authorized 82:12
Auto 85:19
automobile 84:19
available 41:20
45:2
Avenue 1:18 4:7 5:6
avoid 8:21 75:12
81:22
aware 31:14 40:11
42:1 45:11,11
48:14 65:17 99:8
102:18 103:1,3

**B**

B 3:7
back 15:3 16:6 23:5
26:3 35:18 36:9
36:10,18 37:2,16
38:18 56:16 61:7
62:6 63:15,16
65:18,19,23 66:13
67:6 70:15 75:12
76:12 77:19,22
85:2 92:16 97:9
98:1 101:19 107:6
background 7:2
bandana 36:19
bankruptcy 8:15
Baptist 13:20 14:3
21:13 22:15
bar 7:11
based 22:2,14 45:9
45:23 60:7 88:8
93:14
bases 15:4
basing 47:8
basis 16:11 17:3

83:1 91:15 94:10
95:18 96:13
107:14
baton 28:17,18
29:21 30:7 34:6,9
34:14 35:8 37:7
37:16,20 38:1,3
39:19 40:1,4 46:9
46:11 47:16 55:17
55:20 56:5 71:2
79:18 81:5,5,10
81:21 82:13,14
93:17 94:9 95:3,8
95:17 106:7,9
batons 3:9 29:10
80:20
bean 36:13 58:23
beat 37:12
began 36:12 37:15
begins 29:17
behalf 4:4,10 56:18
believe 12:8,23 14:4
14:23 20:5 38:3
39:5 53:1 71:11
71:21 73:9 82:20
82:20 84:4 85:8
85:18 87:15,18
97:14,15 98:7,11
belligerent 36:23
belong 57:19
Berg 25:17,18
Bessemer 35:3
best 11:6 12:1
15:15 38:4 63:7
66:23 71:14 72:6
BET 92:22
beyond 50:6 83:23
Bible 7:4
big 31:9 58:18
66:13
Birmingham 4:8,14
5:6 7:5
birth 6:18,20
bit 58:3
black 17:13 37:1
66:6
Blackburn 25:22
26:12 108:3
Blackburn's 26:22
block 35:15
board 57:5 76:2
board's 76:1
bodily 30:3 39:6,14
body 29:22 37:17
37:22
bog 45:16
booking 57:3,7,10
57:11,12 70:14

101:17 102:9,16
102:16
boss 94:6
bottom 37:14
bought 38:5
break 43:17 97:21
breakfast 61:5
breaking 37:18
107:9
Bridges 14:16
15:20 78:13 87:18
87:20 88:3 89:5
92:8,13 98:9
brief 11:21
bring 29:18 30:14
49:13,17 50:7
55:20 61:1 67:3
67:20
bringing 30:15
67:18,19 68:1,4
broad 29:11
broken 36:18
brought 10:10
66:13 90:23 94:1
94:3 97:1 107:7
BSL 7:9
building 26:4,21
built 104:10
business 75:4,6
76:6
B.A 7:3

**C**

C 109:1,1
cafeteria 58:19 68:3
91:10
call 14:7 50:16
98:20
called 49:16 50:8
92:15
calling 18:20 31:18
calm 43:17,21
calming 40:7
caloric 59:18
cameras 41:8
capable 63:5
capacity 64:19
69:20
Captain 69:7
car 84:20 85:9 86:2
87:23 88:3 89:9
cardiac 14:2
care 15:19 19:8
career 17:19 38:4
Carmichael 11:10
Carol 52:13
Carolyn 56:15,17
61:8 68:10

carried 34:9 36:7,8
  36:10 39:15 40:10
carry 28:5
carrying 36:20
carry-out 60:22
cars 84:9 87:22
  88:11 89:8,11
cartons 36:21
carts 59:2
case 10:23 11:5
  26:20,23 45:8
  65:5
cases 10:1 100:13
case-by-case 91:15
caught 37:13 86:9
cause 5:8 109:16
causes 103:2
caution 67:1
CCR 1:17 4:1 5:1
  109:20,21
cell 19:22 35:14,15
  35:21,22 36:5,6
  36:11,12,19 37:2
  39:7 49:23 102:12
  103:13 106:1
  107:1
Center 13:20 22:15
central 101:15
certain 18:8 29:15
  32:18 33:7 34:12
  42:11 47:7 82:14
certainly 71:5
  79:18,22 80:4
  82:1 96:21
certificates 7:6
certify 5:2 109:5,13
cetera 83:16
chain 54:4
chairman 84:18
chair's 88:3
chance 80:13,16
  89:19
change 34:1 47:21
  60:1 84:16
changes 57:6
changing 41:15
channel 92:21
Chapman 1:3 4:16
  6:2 7:19 20:20
  22:13 40:19 42:9
  46:9,9 64:8 73:13
  79:6 82:18 84:2
  90:6 93:12 102:20
  104:22 105:23
  106:7 107:13
Chapman's 42:1
  48:13 52:22 103:8
charges 85:16,21

85:21 88:13
Charles 11:11
  54:23 55:5 105:6
check 98:21
checks 106:20
chest 96:17
chief 8:9,10,11
  26:12 52:13,19
  78:16 83:19
chooses 92:5
chronology 107:16
cigarette 66:18
Cindy 12:10
circumstances 30:6
  40:13 71:7 82:15
cite 21:2 92:7
cited 90:13
Civil 1:5 5:4
claim 10:12 74:6,13
  76:14 91:9,11
claiming 67:4
claim's 74:9
clarification 55:1
  69:19
Clark 71:1,3
class 38:6
classification 19:6
classified 25:2
clearance 68:8,15
cleared 16:1,8 17:1
  21:14 22:21 78:11
  90:16,20 91:18,21
clearly 6:16 69:22
clears 78:13
clerk 52:13
Clifton 46:3,12,15
  46:18 72:19
Clifton's 78:20
  105:14
close 14:10 25:6
  50:1 86:19
closed 36:5,14
  104:14,15
coach 97:12
coffee 57:15
cold 55:21
Cole 28:23 29:1
collect 58:21
collecting 61:12
College 7:4
Collins 20:5
come 16:8 25:4
  38:17 85:2 91:20
  95:4
coming 45:17 75:20
command 30:15
commander 100:12
  100:13

commands 29:15
  29:17
commencing 1:19
commission 62:1
  88:3
commissioner 4:2
  5:2 109:22
Commission's
  84:19
Committed 86:11
commode 35:22
communicate 60:9
communications
  60:10
company 55:17
  56:4 75:5
comparing 95:23
complete 33:10
completed 21:22
  35:19
compliance 1:23
  29:19 30:14,16
complicate 33:13
comply 104:2
compromise 76:14
computer-aided
  109:9
concerning 63:8
  64:22
conclude 14:20
  22:4 96:5
concluded 15:7
  21:20 22:8,23
  93:5 108:13
concluding 94:10
conclusion 14:22
  15:8,9 22:18 92:9
  92:14 95:19
conclusions 93:23
concur 99:23
conducted 28:23
confidential 73:22
  74:7,13,19 75:16
  76:2
conflict 77:14
conflicting 51:5
confrontation 31:2
consent 26:19,21
  27:2 104:11 108:3
consideration 49:19
constructed 26:18
contact 15:1 42:20
  71:6
contacted 13:20,23
  23
content 59:18 69:14
  69:15
context 69:6

continue 46:20
continued 38:16
continuing 49:15
continuous 104:12
continuum 29:13
  106:8
contraband 66:12
  66:15 68:4 91:11
contract 58:2,5
  61:21
contracted 62:2
contracting 55:16
contractual 67:17
control 49:14 101:9
  101:14,16,17
  102:7,8
conversation 64:8
  64:10 67:10 69:2
  69:14
copy 21:23 42:18
  79:10 98:6,9,14
  98:18
correct 13:21 20:7
  20:13 22:23 23:1
  23:3,9 24:3 26:10
  27:1 33:22 35:20
  52:7 54:19 59:1
  61:20 68:13,17,20
  81:18,19 90:17
  100:6 109:10
correction 18:14
  19:9 20:16 22:13
  25:1,14 29:9
  43:20 70:5 101:8
correctional 49:12
corrections 24:17
  25:8,19 27:10,14
  27:21 34:20,21
  87:6 91:17 99:22
  100:21
correctly 58:4
counsel 1:15 2:5,6
  5:5 109:14
count 57:1
county 1:6 7:1,22
  9:15 12:16 20:23
  34:8 35:1 41:23
  51:18 61:22 62:1
  69:10 73:10,11
  74:10 79:16 80:20
  84:19 85:9 109:4
couple 25:3 63:18
  67:11 68:23 84:7
course 6:2 21:16
  26:12 30:2
court 1:1 2:1 5:14
  25:21 27:11 32:20
  104:12 108:2,7

courthouse 100:17
courts 41:20
covered 100:16
create 29:22
created 26:21
criminal 25:20
criteria 50:23
cuffed 71:5
cuffs 71:20,22
culmination 13:18
culpability 90:19
custody 34:11 38:2
cuts 59:7

_____

**D**

D 3:1 4:5,6
dad-gum 47:1
daily 20:23 57:9
  76:4
Darrell 12:13 21:22
  23:2,23 28:12,14
  41:2 42:12,21
  76:19,20 93:4
  98:16,20
Daryl 11:9 76:21
date 5:3 6:18 41:10
  44:8,9 92:12
  100:9
dated 79:7
day 23:17 35:11
  38:10 40:17 43:18
  43:21 55:18,21
  62:20 99:8,12
Dayron 14:16,18,19
  15:20,22 78:13
  87:17 89:5
days 22:5 67:11
  69:1 79:3
dead 23:22
deadly 30:3,9 82:11
deal 23:10 49:7
  56:17 57:11 73:1
death 7:6 10:22
Decatur 14:11
  21:17,20 22:22
  31:9,15 33:16
  40:19 44:20 46:10
  46:14,16 48:14,22
  61:11 73:1 77:13
  83:10,13 93:13
  94:9,11,22 95:19
  96:19 98:17
  102:21 106:5
  107:7
deceitful 77:18
decide 31:3 45:4
  57:23 58:13
decided 58:10

decides 57:21
deciding 32:23
decision 15:12
  17:10 30:20 48:12
  59:4 88:6,7 93:10
decisions 31:6
declared 8:15
decree 26:19,21
  27:2 104:17 108:3
defend 39:4 81:16
DEFENDANT 4:10
Defendants 1:8
Defendant's 3:12
  103:7 106:11,15
definitely 14:13
definitively 18:18
  33:2 78:21
degree 7:3 44:15
  83:21
delay 50:12
delegate 100:11
Deliberate 82:9
deliver 60:23
delve 83:5
department 7:22
  27:21 34:21 52:9
  61:23 73:12
Depending 30:18
depends 74:23
deployed 34:14
  48:4
DEPONENT
  108:12
deposition 1:10,15
  1:21,22 2:9 6:2
  9:17 10:23 11:2,5
  11:13 24:2 32:22
  45:20 80:13 98:3
  103:8 106:16
  108:13 109:6
depositions 2:2
  10:17,19
deputies 49:16
  50:10
deputy 8:9,10,11
  51:10 52:19 78:16
  83:19
desk 25:4 51:2 94:3
details 23:11
determine 30:22
determined 18:13
  18:15 19:1
devices 47:18
diet 59:11 60:3,3
dietary 60:6
dieticians 59:13
difference 94:21
differences 46:3,22

different 28:14
  47:22 48:2
digital 41:14 45:1
digitally 43:7
dinner 61:5
direct 53:22 54:1
  54:18 64:23
directive 42:5,14
directly 54:3,13,15
  55:3,19 56:3 60:9
  69:10
director 56:11
disciplined 88:19
discrepancies 46:4
discretion 50:4 51:1
discriminatory
  63:9
discuss 64:21 65:20
  74:8,15 75:9 77:2
  83:9
discussed 18:7 53:4
  77:2 89:3 100:18
discussing 65:1
discussion 17:12,18
  47:19,23 53:2
  62:11
discussions 17:20
  46:7 84:1
disk 41:14 43:5,8
dismissal 90:7
disputed 76:14
distance 29:22
District 1:1,1 26:13
DIVISION 1:2
divorced 9:4
doctor 60:8
Doctorate 7:5
document 80:15
  89:20
documents 11:12
  11:21 12:7
doing 59:7 61:11
  72:22 105:16
Donaldson 34:23
door 35:22 36:5,12
  50:1 103:14 106:1
  106:1 107:1
doors 36:13 101:12
  101:20 102:22
  104:1,7 107:12
dorm 103:5,15,17
  103:19 104:1
  107:11
Dowdy 3:4 4:11,12
  5:17 51:16 53:17
  73:21 74:1,5,12
  74:18,23 75:7,13
  75:19 76:7,16

77:1 78:6 89:13
  96:11 97:8,21
  100:2 105:21
  106:14 107:22
downstairs 36:7
Dr 25:17,19 108:5
draft 89:22
drafted 103:12
dripping 36:21
duck 96:9,23
duly 5:12
duties 8:2
duty 99:2
DVD 43:5
D's 69:8
D.J 105:11

_____

E

E 3:1,7 34:23 109:1
  109:1
earlier 20:20 48:1
  76:12 105:22
eat 58:19 60:19
  61:4
eating 60:20
educational 7:2
effect 1:23 16:4
  58:6 68:18
effort 20:8 46:19
  67:20 95:12 96:3
  97:16
either 77:3
elective 28:4
eliminate 49:11
eliminating 60:2
else's 64:21
eminent 30:3 39:5
  39:13 50:16
employ 31:8 95:8
employed 7:21 29:2
  72:19 94:4
employee 16:15
  17:4 29:4 51:4
  60:14 61:9 64:23
  68:7 69:5 92:3
employees 55:18
  60:11,17 67:18
employing 30:10
employment 9:23
  16:16 91:2
encountered 85:9
endorsed 103:9
engage 31:6
enhancement 41:11
entire 24:19 28:18
entity 1:7 74:3,10
  76:6

entrusted 49:14
equation 49:5
equipment 40:9
escalate 30:21 31:1
  49:15
escalation 29:17
escaped 84:8
  107:15
escort 35:12
escorted 37:2
et 83:16
evaluated 59:18
evening 58:15
event 85:22
events 13:18 21:12
  22:14
everybody 76:5
  83:23
evidence 2:9 19:3
  41:19 42:10 97:1
  97:2
evidenced 90:13
exact 16:3 26:2
  41:10 73:20
exactly 67:12 73:7
  107:11
examination 3:2 5:8
  5:19 105:21
examined 5:12
exams 19:2
excessive 14:1
exercise 35:15
exercises 47:13
Exhibit 3:8,12 46:1
  80:8,12 89:14,18
  98:2 103:7 106:11
  106:16
exhibits 45:21
existence 44:10
exists 41:1,4 43:14
exit 35:14
exited 35:12 36:19
exonerated 91:18
experience 102:1
Expires 109:21
exposed 16:4
exposing 104:8
extension 37:6
extensive 21:3
extensively 11:20
extent 63:11 69:21
  78:17 88:1
extremities 29:23
  30:1
ex-brother-in-law
  51:23
eyes 48:10

_____

F

F 109:1
fabricate 16:18
face 36:20
facilities 104:13
facility 19:21 25:23
  26:15,17,18 34:22
  40:7 48:18 68:17
  68:20 84:8 85:14
  104:10
fact 16:12 32:8,11
  32:21 33:15 36:17
  49:10,11 63:14
  99:18 107:4
factor 49:4,9,19
factors 30:19
facts 64:20
failing 64:12
failure 77:23
fair 6:11 49:4,19
  88:15
faith 31:22
false 18:13
falsely 19:10,11
  80:19
familiar 61:16,18
families 10:11
family 51:15,18
far 40:7 43:10
  45:14 50:3 57:9
  60:10 77:5
fault 16:19
favorites 62:9 67:4
  67:22,22
favoritism 66:5
feces 36:21
federal 5:3 25:21
  32:20
feed 60:12
feet 37:17
fell 37:22
fellow 31:11 85:6
female 49:2,11,21
  50:9,18 63:18
females 63:14,17
fiberglass 34:9
field 33:19
fight 46:20 48:22
fights 43:19 59:8
figures 26:2
file 64:1,4 73:10
  74:5
filed 42:2 74:6,13
files 14:1,7,17 15:5
  15:16,21 21:12
  22:16 23:20 42:20
  92:18,18 93:1

filling 54:17
final 17:10 21:16
find 41:3 42:5
finding 43:10
findings 23:8 94:5
fire 17:12
fired 71:3
firing 53:21 91:1
first 5:12 12:18
  16:21 29:13 56:15
  66:10 68:9 89:22
  90:15 91:23 92:1
five 9:22 10:7 99:10
  99:13
floor 46:17,19 97:7
  101:8 106:6
Florence 7:3
Florida 86:13
folks 58:22
following 5:9 81:23
follows 5:13
follow-up 92:18
food 55:14,16,20
  56:11 59:2,8,12
  60:12,20 77:20
foot 86:8
footage 43:22
forbidden 96:18
force 1:23 14:1 21:3
  29:12,17,18 30:9
  30:13,21 40:16
  70:8 82:11 106:8
foregoing 5:4 109:6
  109:10
forehead 93:16
form 2:6 30:16
  51:16 53:18 71:6
formal 15:9 22:17
formed 17:2
former 70:5
forth 7:7 14:23 19:2
  41:21 42:20 43:11
  45:18 63:17 91:20
  104:13 107:9
forward 50:17
forwarded 32:15
  33:5 82:21 94:6
found 20:18
four 10:7 49:2,21
  99:21 100:5,16
  102:7 104:20
frame 86:17
frames 14:15
frequently 91:14
front 25:4 46:22
  47:3 52:11 94:15
fulfilled 104:16
full 1:23 5:20

full-time 107:14,18
  107:20
further 1:20 2:3
  108:12 109:13

_____ G _____

game 76:5
games 67:5,16
  75:18
gap 58:7
general 29:12 43:17
generally 100:11
generated 83:22
George 1:3 4:16 6:1
  7:18,19 13:13,23
  14:1 15:5,18 16:1
  16:19 17:16 21:11
  21:14 22:13,16,19
  23:20 40:18 44:19
  48:13,20 49:4,9
  49:20 52:21 53:4
  53:15 64:8,11,14
  64:16,22 65:3,6
  67:10 69:1,7,12
  69:16 73:6 79:6
  82:18 83:2,10
  84:2 90:4,6 92:18
  92:18,23 93:11
  94:7,21 95:1,15
  95:21,23 96:1,16
  104:22 107:6
George's 12:4
  31:15,21 33:1,16
  83:16
getting 58:11
Gina 9:9
Ginger 13:21 23:12
give 41:4 45:9 65:4
  80:13 89:19 91:10
  108:7
given 9:17 35:10
  38:18,22 49:8
  93:22 96:12
  106:19 109:11
gives 103:22
giving 101:22
glance 11:21
glanced 11:16
  12:12
go 10:5 30:16 35:15
  35:16 39:8 41:13
  46:23 49:23 57:1
  58:19,21 60:18
  61:7 63:16 67:6
  75:21 76:12 88:10
  89:7 96:9,10 97:9
  107:11
Godfrey 43:9

goes 17:9
going 6:3 21:4
  30:19,20,22 31:2
  31:5,8 33:19 34:1
  35:10 41:19 42:11
  44:18 45:10,11,13
  45:16 48:6 49:9
  50:17,19 51:6
  53:18 62:6 65:18
  65:19,20,22 68:19
  74:8,15 75:8
  79:10 82:2 84:5
  88:16 92:19,23
  95:7,11 96:11
  97:8 98:1 100:2
good 26:8 31:11,22
  61:1 62:23 92:20
gotten 43:13
Governmental 1:7
grab 49:22
graduate 7:8,13
groped 16:5 22:20
  91:11
groping 21:13
grounds 2:8
group 50:5,5
grow 6:22
guess 11:3 45:22
  59:7 67:11 77:21
  88:1 95:21 105:5
guessing 14:8
  104:21
guy 31:9 49:20 96:9
guys 16:17 85:10

_____ H _____

H 3:7
Hagler 10:21
half 36:20
hallway 70:22
  71:20 72:5
Ham 84:20
hand 16:6 37:14
  53:7 59:13
handcuffed 35:13
  70:14,20
handed 45:8
handled 18:4
handles 43:9
hands 36:8,14
Hang 98:13
hanging 10:21
hangings 10:4,8
Hannah 54:23 55:5
Hannah's 105:6
happen 14:6 38:19
  63:13 102:3
happened 65:15

68:21 73:6 83:15
  84:3 85:12 92:20
  95:20 99:18,23
  101:10 102:4
happening 16:22
happens 91:12,14
harm 30:3 39:6,14
harness 37:16
Harper 12:9 24:3
  32:9 46:8,13,15
  52:1 55:6,8 82:17
  83:9 97:5 98:23
Harper's 32:13
  33:8 45:20 83:1
head 21:1 30:2,8,11
  31:16 33:17,23
  38:10,14,20 39:11
  39:18,23 56:10
  81:23 82:5,10,15
  93:15,17 94:9,16
  95:6,13,17 96:4,8
  96:17,20
headquartered
  56:4
health 60:7 92:20
hear 6:15
heard 16:22 31:20
  39:17,20 62:11
  66:8 97:20
hearing 109:12
heated 59:2
height 94:13,21,23
help 49:17 59:11
helped 58:13
Herring 26:20
Herron 52:13,15
Hey 61:7
high 7:13
higher 95:2
hired 107:14
hiring 53:21 91:1
  92:2
hit 34:10 37:9 38:10
  39:11,18 46:10
  47:4 82:5,15
  92:21 95:5 96:10
  96:19
hitting 35:7 38:20
  46:11 48:22 96:3
holes 58:23
holiday 60:1
Home 76:4
hope 59:9 96:1,2
hopefully 21:5
hospital 15:2 23:4
  40:10
hostage 50:18
hour 27:15

hours 44:13 58:7,15
  84:22
housed 14:3 19:21
  102:15 107:5
how's 68:11
hung 10:11
Huntsville 76:18
hypothetically
  38:17

_____ I _____

identification 80:10
  89:16 106:13
III 82:8
illness 6:14
immediate 30:4
  80:1
immediately 21:8
  73:8
impair 6:14
incapacitates 48:3
incidences 94:2
incident 11:3 13:19
  14:5,7,10,12,17
  15:6,16,21,23
  16:9 18:17 21:12
  21:14,16,20 22:15
  22:22 31:20 32:4
  34:13 38:4 41:16
  44:3,14,17 64:9
  78:20 83:10,13
  90:6 92:6,7 93:13
  93:20 98:17 100:5
  103:2
incidents 15:17
  45:7,10,12 62:19
include 82:10 91:23
  91:23
included 12:8
including 80:6
independent 51:7,8
  52:4
indicate 17:2 93:4
  106:22
indicated 13:23
indicates 104:3
indicating 25:7
  37:6 94:19 95:4
  104:8
individually 73:2
Individuals 1:8
influence 105:12
inform 79:14
information 15:12
  17:9 45:13,15
  57:2 80:1 83:8
initial 11:16,18,22
initiated 63:7

injuries 37:5
injury 37:7 51:5
  94:18
inmate 10:11,20
  14:2 19:12,17,18
  19:20,22 20:17
  22:20 23:21 25:14
  34:10 35:4 36:6
  38:2 39:11 43:20
  43:20,20 47:14
  50:22 60:6 63:9
  67:5 70:8,23 71:5
  71:19,20,23 72:5
  87:12 91:11
  107:15
inmates 16:2,18
  18:12 39:18 40:2
  57:21 58:11,19,22
  62:9 66:6,19
  67:16,17,19,21
  77:8 91:6 107:5
inmate's 95:12
inquiry 62:7,17
  63:8 65:19
inside 25:6
instance 38:1 90:15
  102:18
instances 70:12
  90:13
instinct 66:10
Institute 25:18
  27:10
instruct 74:16,18
insurance 75:4
interacted 69:11
  83:20
interacting 57:10
interaction 62:12
  62:21
interested 109:15
interfere 33:14
International 7:4
intervening 70:1
interview 84:5
investigate 45:7
  50:21
investigated 18:15
  19:5 20:17 22:17
  22:20 33:11 90:20
  91:15 94:4
investigating 80:6
  83:7
investigation 20:7
  20:19 21:22 23:3
  33:9 42:9 51:3
  62:8 93:5 98:6,10
  98:14,17
investigations 7:7

23:10 98:3
investigative 22:18
investigator 14:5
  14:16 15:7,16,19
  16:7 19:7 21:21
  23:6 31:18 32:16
  33:6 41:2 42:12
  43:12 45:1,6,14
  45:16 51:7,11
  52:5 53:9,12
  78:15 79:1 83:4
  83:20,21 84:5
  87:17 93:22,23
  98:5,8
investigators 16:14
  41:20 89:3
investigator's 15:9
  31:23
involve 66:2
involved 9:23 10:3
  15:19 66:3 75:10
involving 20:20
  22:16,19 90:6
  102:20
in-custody 10:22
in-house 28:8,21
irrelevant 49:18
issue 66:22 81:7
item 66:13

_____ J _____

jabs 29:22
jail 8:1,3 10:1,4
  12:16 18:11 20:23
  24:6,9,19,21,22
  25:3,6 27:16
  28:15,18 30:5
  41:23 43:2,10
  49:14 50:6,19,21
  51:9 52:6 55:15
  56:18 57:6,13,19
  59:10,21 60:11
  68:16 70:4 72:9
  72:20 73:3,5
  74:10 77:6,11
  78:7 79:16 80:23
  87:2 94:5 98:23
  102:2 104:12
  105:14 106:23,23
jailer 12:19,22
  19:16,23 20:3,4
  20:11 34:5 55:9
  72:14
jailers 47:11
jail's 41:7,18 43:15
James 8:12 20:5
Jasper 1:2,18 6:21
  6:23

Jax 27:19
Jefferson 35:1 85:8
  109:4
Jerome 5:22
Jerry 12:11 50:7
Jesus 54:21 105:10
Jim 8:11 78:12,15
job 8:4,18 34:19
John 1:7 4:5,6 6:1
  13:10 75:16
Jonathan 10:21
Joseph 48:14 93:12
  94:11,21
Jr 1:3 4:16 14:4
judge 25:22 26:11
  26:12,22,22 108:3
judgment 15:15
  88:4
Juris 7:4
justice 25:20
justified 21:6 30:10
  38:9,13,20
justifies 90:21
Justin 85:23 86:2
  88:10,12,20
juvenile 18:23 19:6
  19:14,19,20 20:12

_____ K _____

Katherine 9:9
keep 17:12 43:22
  44:5 58:11
Kelly 43:8
kept 43:3,7
keys 84:20
Kilgore 13:22 23:12
kill 39:8
killed 86:10
Killingsworth
  12:10,10
kin 109:14
kind 17:17 24:7
  27:13 43:21 60:21
  62:7 66:5 69:22
  95:11 96:2 99:3
  108:4
kinds 46:21
kitchen 56:7,9
  66:11
know 9:21 15:6,8
  16:13 19:11 21:2
  22:17 23:12,14,20
  23:21 26:9 29:4
  32:5,8,10,14,18
  32:20 33:7 37:11
  40:14,15,21 41:13
  41:16 43:6,8 44:2
  44:7 46:23 48:7

52:3 56:14 61:13
  62:4,5,10,18,23
  65:11 67:11 69:19
  72:22 73:7,20,21
  74:12 75:1,7,16
  75:19,23 76:17
  77:5,23 79:2 86:5
  86:6,8 92:10,13
  92:15,17 93:1,21
  100:5 105:2,5,17
knowledge 38:5
  45:12 61:15 71:14
  83:4 99:15 102:19
knows 100:16
Kristi 4:11,12

_____ L _____

lady 56:15
lady's 56:14
Lane 35:2
Large 1:17 5:2
  109:23
Latino 105:12
law 4:12 7:5 60:13
laws 2:1
lawsuit 26:14 32:19
  42:1 73:11 74:6
lawyer 41:4 64:18
  69:18 75:10
  105:19
lawyers 42:19
  78:10 89:11
leading 2:6
learned 99:17
leave 16:7 86:18,21
leaving 86:6
led 20:2 23:6 26:18
Lee 19:15
leeway 58:3
left 84:20 86:2,5,7
  102:9
legitimate 67:23
  68:3
legs 30:1
lengthy 104:15
letter 3:10 11:17,19
  11:19 12:2 14:22
  15:11 16:23 33:4
  52:20 79:6,11,23
  80:5 82:21 89:23
  90:2 92:13 98:4
letting 77:5
let's 21:18
level 29:15 30:22
  50:23 103:20
lieutenant 12:21
  13:1,6 54:10,12
  100:13,14

lieutenants 54:6,9
  54:15,20 55:2
life 38:23 39:1,4,5
  39:16
light 66:21
liked 77:20
Likewise 6:9
  101:16
limited 45:12 82:10
lines 69:3
listening 46:6
literally 51:17
litigation 42:15
little 24:8,16 58:3
  95:1
live 9:14
local 88:13
locally 56:2
locating 43:10
long 8:4 12:15,22
  13:1 43:3,16 44:4
  58:5 67:10 73:8
  77:19
longer 39:8 46:16
look 21:5 46:23
  51:7 63:19 64:1,4
  75:23 80:13,16
  83:7 89:19 92:2
  94:13 97:9 104:20
looked 10:22
  45:3 47:7 63:10
  66:21 74:14,20
looking 23:7 38:18
  79:1 85:10
loose 58:9
loosely 107:12
Lorenzo 34:17 35:4
  35:21 36:12 38:10
lose 67:15
loss 68:15
lost 68:8
lot 51:19
loud 29:16 30:15
Louisiana 55:17
  56:4
Lovelace 25:22
lunch 64:5
lying 97:6

_____ M _____

magnified 103:3
maiden 9:10
maintain 25:15
major 17:20 63:12
making 30:20 31:6
  48:12 65:18 97:16
  103:3
male 37:1

man 15:2 23:5 38:6
  47:4 77:14 92:16
  92:21 93:15 94:14
  96:2,3,23
management 27:16
  35:9
manner 18:4
manpower 50:7
man's 33:21,22
March 12:17
mark 1:7 13:10
  61:9 106:15
marked 3:8,12 80:9
  89:15,18 106:12
marking 80:12
marriage 9:6
married 9:8
martial 9:3
Mary 12:9
master 108:4
Masters 11:9 76:21
materials 43:9
matter 23:7 64:17
  65:1,2,3 74:21
  75:4,5 95:14
mayor 88:23
McCLUSKEY 1:8
  1:10,16 3:10 5:7
  5:11,22,23 9:9
  106:18
Meadowbrook
  73:19 74:7
meal 58:15,16
  60:14,15 61:8,9
meals 55:18 56:21
  57:22 58:8 61:3
  61:13
mean 23:15 48:5,7
  48:21,23 51:15,18
  52:5 60:21 67:14
  74:3 75:13 76:4
  77:4 88:23 96:10
  96:12
meaning 48:10 80:4
means 68:18 109:8
mediation 11:1
mediator 11:7
medical 13:20 19:2
  22:15 40:11 51:6
medically 60:3
medication 6:13
medium 43:4
meeting 18:9 40:16
  53:7 76:3 88:22
meetings 18:3
members 50:20
memo 3:9,13 52:21
memory 12:1 13:21

14:4 18:19 20:7
  58:4 63:7 64:12
  69:21 70:13 72:6
memory's 35:20
memos 106:20
men 94:14
mention 16:13
  46:10,14 81:23
  92:8
mentioned 26:11
  65:9 66:9 98:3
  108:6
mentioning 65:14
menus 59:15,16,20
  59:22
merit 18:16 20:18
met 5:23 23:16,17
  53:12 69:7
Mike 25:17,17
  28:23 29:1
military 9:1
milk 36:20
Miller 54:21 105:8
mind 39:12 49:20
mine 82:22
minimum 27:5,21
  29:18 30:13
  100:20
minor 88:14
minute 8:6 53:17
  62:14 98:13
misclassification
  19:23
misclassifying
  19:12
mislead 29:7 34:15
  80:3
mistaken 28:13
mistreated 91:12
mode 86:6
money 61:12 73:16
  75:1
monitor 25:21
  27:11 108:7
monitoring 104:12
  104:16,18 108:2
monitors 41:8
Montgomery 25:20
months 14:9,11
  37:5
morning 6:1 58:15
  64:5,6 66:8
Mote 21:22 22:3,22
  23:23 28:12 41:2
  42:12 51:10 76:20
Motes 98:16
Mote's 12:13 23:2
  93:5

move 24:8 82:4
  96:19
moved 26:4
moving 40:6
M-dorm 101:7,9,12
  101:20 102:22
  106:2,17 107:5,10

N

N 3:1
name 5:20 9:10,11
  10:20 56:15 65:15
  65:15
named 56:15 70:5
  84:12
National 25:18 27:9
nature 16:6 18:10
  62:16
necessary 2:4 82:12
neck 96:17
need 46:23 56:22
  77:1 103:23
needed 25:6 50:7,10
  84:16
needs 60:7
negative 66:21
neither 109:13
never 39:20 58:7
  61:6 62:23 63:7
  68:21 75:15
  101:11,13,13
nice 58:18
night 32:4 42:6
  43:18 84:3 93:12
  102:5
noncompliance
  31:1
normally 54:14
North 4:7,13
Northeast 27:17
Northern 1:1 26:13
noses 57:1
notes 64:2
noteworthy 64:3
notice 106:17
November 24:13
  25:11 32:3 40:19
  42:7 79:7 81:2
  94:8 102:20
  105:23
number 24:17
  25:10 30:21 35:10
  46:1 80:9 81:20
  82:8 89:15,18
  98:2 99:4,8
  100:20 103:7
  106:12 108:8
numbers 26:2
numeral 82:8

numerous 20:22
nurse 13:22 23:4
  92:15
nutrition 66:16
nutritional 59:18
nutritionist 59:11
nutritionists 58:12

O

Oakman 6:23
oath 32:19
object 51:16 53:18
  96:11 97:8,11
  100:2
objections 2:4,7
obstruct 33:18
obviously 34:4
  41:18 83:18
OC 47:16 48:1,1
occasion 40:12,14
  68:2 69:13 70:10
  100:15 102:4
  106:20
occasionally 63:2
occasions 16:15
occupy 56:7
occurred 15:18
  107:18
occurring 99:15
October 6:19 11:2
  24:13 25:11 62:6
  92:7 105:1
offender 48:15 49:3
  77:6
offenders 78:5,11
  107:5
offenses 48:17
offered 2:9
office 17:23 18:1,5
officer 18:14 19:4,9
  20:16 22:13 25:14
  28:13 29:20 30:7
  31:4 33:20 34:20
  36:17 43:20 46:2
  46:3,9,12,12,15
  48:3,22 57:12
  70:5 78:19 80:7
  81:6,17 82:2 83:7
  85:9 87:6 101:8
  102:16,20,21,22
  106:2
officers 24:18 25:1
  25:8 27:14 28:10
  29:10,13 30:13
  32:3 49:2,10,12
  49:22 50:9,18
  63:18 81:22 85:6
  89:10 91:17 99:2

100:21 101:21
  103:4,12
officer's 29:14,14
  30:19,22 33:18
  49:7
Offices 4:12
off-duty 85:8
Oh 67:9 70:1 87:4
okay 5:23 6:18 7:8
  10:15 12:6 16:10
  18:6 20:1,15
  23:12,20 24:5,12
  24:15 25:8,10,13
  26:11 27:19 31:13
  33:12,15 34:16
  36:3 39:12 40:21
  42:4,13 44:11
  46:8 47:11 49:2
  51:22 52:4,8,12
  52:15,20 54:14,20
  55:5,11 56:9,17
  56:20 57:4,8,14
  57:19 58:18,21
  60:21 61:2,10
  65:5 71:9,16,23
  72:7 74:1 75:11
  76:9,12,22 77:11
  77:13,16 79:5,13
  80:22 81:4,13,20
  82:7 85:5,23
  86:11,18 87:9,13
  88:2 89:4 90:18
  91:22 92:11 93:7
  94:20 98:16,22
  99:17,22 100:8,19
  102:5,12,18
  103:11,18 106:14
  107:22
old 26:17 41:12
  44:12
once 21:21 93:21
  100:1
ones 10:5 28:14
  32:18,20 33:3
  59:22 66:6
ongoing 83:5
on-site 56:10
open 36:13 54:8
  104:1 107:12
opened 35:22
  101:21 102:13,21
  106:1 107:1
opening 101:12
  104:7
operation 55:15
  60:12 102:6
operations 8:3
  20:23 101:22

opinion 96:13
opposed 54:4 96:7
optimal 99:3
oral 5:8
order 8:20 87:13
  104:11
ordered 60:3
orders 29:19,20
  87:11
Ordinarily 100:12
Osterhoff 25:17,19
  108:5
outcome 23:2
outside 18:21 21:5
  51:8 106:17
ovens 57:14
overcrowding
  26:15,16
Oversee 8:3

**P**

page 3:2 81:4
paid 73:15,19 74:2
  75:1,5
Painter 8:12 78:12
  78:16
pans 57:15
paper 17:13 101:23
  104:3
papers 78:22
paperwork 29:3
paragraph 81:20
  82:7 90:8
part 16:10 26:18
  51:1,2 53:2 57:17
  58:1 76:17 78:3,7
  79:19,22 90:21
  107:4
partake 60:14
particular 8:5 14:5
  31:4 41:12 47:20
  53:6 60:6 83:18
  93:20
particularly 101:22
particulars 16:3
  31:19 62:18
parties 1:14 2:7
  109:14
party 61:21 64:21
  65:12 81:17
party's 39:16
part-time 107:18
passed 44:23
passionate 17:11
pattern 90:9,12,21
  91:19,22
Paula 62:5,22 63:1
  64:9 65:9 66:4,21

67:8 68:22 69:1,5
  69:7,9 104:23
Paula's 64:23 65:14
pay 76:9
peaceful 43:21
Pearson 100:10
  101:1 102:6
pendulum 50:2
people 31:20 40:6
  54:3,4 56:2 67:21
  68:1 87:10,23
  89:7 96:1 100:6
  100:16,21 102:7
  104:5,8
perceived 39:10
performance 68:12
  79:15,16,19
permissible 82:3
permit 30:6
permitted 30:7
perpetrator 30:4
  31:3
person 17:21 21:6
  35:18 48:4 56:10
  60:13 64:14 70:16
  70:17 91:10 94:4
  101:12 107:12
personally 23:13
  31:18 63:16
personnel 24:21,22
person's 91:2
  101:14
Persuade 17:12
Phillips 12:9
phone 17:21 64:13
  64:15,15 108:7
phrase 27:8 54:1
physical 30:17 31:2
  31:3 39:1 57:17
  71:6
physically 40:5
pick 50:9 60:21
  61:3
picked 86:7
piece 104:2
pieces 15:12 93:9
pint 36:20
place 6:20 44:2,9
  60:17 62:17 65:7
  72:11,13 85:4
  107:3
placed 19:22 37:3
places 27:17
plainly 81:12
Plaintiff 1:4 4:4
Plaintiff's 3:8 45:23
  80:8,12 89:14,18
  98:2

Planet 92:22
plant 57:17
play 75:18
played 76:17
playing 62:9 67:4
  67:16,21,22 76:7
plays 76:5
pleasant 62:22
please 5:16,21
pod 101:17 102:7
point 13:3 18:20
  31:13 38:12,17,21
  38:22 39:3,7,9
  41:12,15,22 45:6
  53:9 65:10,20
  71:15 92:12
  104:14
Police 27:18
policies 30:5 107:3
policy 41:7,18 43:2
  43:15 44:17 80:19
  80:22 81:11,14
  82:13 99:10
  100:20 102:14
  103:3,6,8,10
  104:2 106:3,9,23
poor 88:4
population 24:9
  56:21 57:6
posed 30:23
posing 47:5
position 7:23 8:5
  12:18,20 19:16
  72:8
possession 42:10
possible 82:1
post 60:20 87:7
posted 104:3
  106:17
posts 101:18
potatoes 66:16
potentially 54:7
pots 57:15,15
pounds 36:23
preparation 11:13
  32:22
prepare 56:22 61:8
presence 29:14
present 4:16 8:10
  24:18 32:3 39:14
  53:4 100:6 101:21
  106:2
presently 7:21
  56:14
preserve 41:19 42:6
preserved 42:14
  44:21
pressed 85:16

pretty 10:5 29:11
  31:9,11 58:2,8
  65:9 69:21 87:18
  88:14 94:23
prevented 10:12
preventive 66:23
  67:13
Price 36:17
prior 2:9 26:3 33:9
  36:15 41:16 67:9
  72:14 107:13
prison 26:15 85:13
  85:15 92:20
prisoner 35:13,16
privilege 35:11
privy 45:16
probably 24:11
  32:6 53:8,10
probationary 16:15
  17:4 91:3 92:3
probe 106:6
probes 46:13
problems 14:2
  36:15
Procedure 5:4
proceedings 5:9
process 35:18 96:22
produce 41:5
produced 42:14
promoted 12:23
  13:6 55:8
properly 36:8
protect 39:15 103:4
provide 27:14
  55:18 98:14
provided 28:2
  45:13
provider 59:12
provides 57:14
proximity 86:19
public 74:3,10,22
  75:3,6 76:5,6
publicly 76:3
pull 29:3 37:15
  101:19
pulled 25:5 31:15
  33:16,23 37:15
  44:15 88:12
pursue 92:23 93:2
put 20:12 27:15
  33:4 44:8 86:16
  88:16 95:11 96:2
puts 92:4
putting 69:6
puzzle 93:9
P-a-i-n-t-e-r 8:12
P.C 4:6
p.m 1:19 108:13

**Q**

qualified 28:20
  31:7
qualify 28:5
question 6:4,10
  29:12 63:4,6 66:4
  76:13 105:19
questions 2:5,6 6:3
  24:5 78:10,10
  107:23 109:7
quickly 24:8
Quinton 85:10,11
quite 20:9

**R**

R 1:3 109:1
race 23:18,21,23
  72:17 89:5 101:4
  105:6
Rachel 12:9 97:5
radios 50:6
radio's 98:21
rail 37:14
Ralph 14:4 98:5,13
ram 37:23
ran 102:6
Randall 26:19
Randy 26:19
rank 27:4
rape 48:18 49:21
raped 19:1,3 50:18
rapid 30:20
rapidly 31:6
raping 19:13,19
ratified 53:14
ratio 25:13 26:1,5,9
  27:3
reached 26:3
reaches 50:6 51:2
reacted 33:20
read 12:12 22:1,5
  32:1,5,9,12,14,18
  32:21 33:3,8 58:5
  75:9 97:19
reading 1:21
really 12:12 17:19
  18:2 59:21 66:7
  107:21
reason 99:12 102:3
  102:13 104:6
reasonable 29:19
reasons 104:5
recall 11:8 12:13
  14:21 16:2 18:6
  18:17,21 19:7
  21:7 22:8,22 23:2
  26:1 27:8 37:23

38:5 41:10 53:11
64:10 65:15 66:1
**receive** 42:18 47:12
59:23
**received** 42:16
63:19,22 78:22
82:22 83:3 92:10
**receptionist** 52:10
**recess** 97:23
**recognizes** 82:14
**recommend** 32:23
48:13 91:16
**recommendation**
11:20 12:2 13:13
13:17 14:23 16:11
17:14 22:12 45:5
45:9 51:3 53:13
55:12 82:18 88:8
88:10 90:3,7 95:9
**recommendations**
22:1
**recommended**
21:10 26:1,8 27:7
71:11 105:4
**recommending**
12:4 15:5 17:3
52:21
**record** 5:20 74:22
77:17 89:4
**recorded** 41:8
**recycled** 44:14
**reference** 69:9
**referred** 79:20
**reflect** 66:11
**reflected** 103:6
**registered** 59:13
**regret** 79:13
**relating** 2:2
**relationship** 65:4
65:11
**relatively** 14:10
**relatives** 51:19,19
52:1
**release** 107:15
**released** 78:12,18
**rely** 31:22
**remarried** 9:11
**remember** 6:15
11:6 14:21 17:20
17:22 18:2,8 23:9
34:12,13 53:6
62:12 63:14,21,23
64:16 65:6,8,8,10
65:16 66:3,7,20
66:22,23 67:1,7,9
68:23 69:4,13,14
69:15 71:17 72:2
72:3,12 76:11,16

77:4 83:17 84:1,7
85:11 86:20,22
87:1 98:19 100:9
107:21
**remind** 92:4
**remove** 35:16
**removed** 36:10
**rephrase** 6:6
**replace** 55:5
**report** 8:8 11:16,18
11:22 12:11,14
15:9 17:13 22:18
31:23 46:1,2,2
51:13 52:12,16,18
54:3,4,15,18 55:3
70:17,21 78:1,20
93:8,22 97:10
**reported** 23:8 49:1
83:18 85:5
**reportedly** 70:16
71:2
**REPORTER** 5:14
**reporting** 45:17
**reports** 12:8 46:18
47:2,3,7 53:23
54:2,13 63:8
70:13 80:6 83:22
97:4,19
**represent** 6:1
**represented** 11:9
**represents** 109:10
**request** 87:16,17
**requested** 90:5
**require** 50:19
**required** 27:8 28:5
29:18
**requirements** 66:17
104:17
**requires** 51:6
**resigned** 8:20 20:6
105:15
**resisting** 81:7,9
**resources** 17:5
**respect** 29:16
**respective** 1:14
**respond** 47:13
49:12 52:22
103:23
**responding** 69:16
**responds** 34:2
**responsive** 20:9
**restless** 58:11
**restraint** 30:17
**result** 19:5 20:6
104:11 109:15
**retained** 59:10
**return** 36:3 85:1
**review** 11:12 22:6

31:13 78:19 90:5
**reviewed** 27:9 91:3
**reviews** 80:15 89:20
**reword** 6:5
**RE-EXAMINAT...**
108:1
**Richard** 4:13 54:21
105:10
**Richardson** 62:4
64:9 66:5 69:2
104:23
**rick** 84:20
**rid** 68:5,6
**right** 11:22 13:12
15:14,21 20:4,8
21:9,18 22:3,10
24:9,11,22 26:5,7
27:13 32:8,12,17
37:14,23 41:17
43:15 44:4 48:23
50:13 51:11,15
53:11 54:6,11,16
55:7 56:13 62:3
64:7 68:16,19
71:4,7,8 74:10
77:12,21 81:8,14
87:19 88:9 90:15
90:16 93:11,19
94:7 95:15 99:11
100:4 101:6
102:10,11,14
103:6 105:4
**riot** 40:3
**ripped** 107:8
**rise** 50:23
**risk** 88:16
**role** 64:17 69:17,18
69:23 70:1 83:16
**roll** 36:13 59:2
**rolled** 35:22
**rolling** 59:1
**Roman** 82:8
**Ron** 100:9,15 101:1
**Ronnie** 36:6 37:1
39:2,4
**room** 101:9,14
102:8
**Rouge** 55:17,21
56:6
**routine** 21:4 43:21
57:9 101:22
**routinely** 18:3,9
57:10
**rove** 49:16 50:10
**rover** 102:9
**rovers** 101:19
**RPR** 1:17 4:1 5:1
109:20

**Ruby** 68:11
**rules** 2:1 5:4
**run** 25:4 88:17
**running** 88:13
**runs** 76:4

**S**

**s** 3:7 109:18
**sacrificed** 50:20
**SAITH** 108:12
**Sam** 70:5 71:19
72:7 79:2
**Samford** 28:23 29:1
29:2,5,6
**Sanford** 84:12,13
84:14,18 85:12
86:21 87:11,20
88:2
**saw** 46:8
**Saxon** 3:3,5 4:5,6
5:16,19 6:1 7:20
51:17 53:22 74:2
74:9,16,21 75:3
75:11,17,21 76:9
76:20 78:9,14
80:11 89:17 96:15
97:11,18,22 98:1
100:4 105:18
108:1,9
**saying** 42:19 44:6
64:16 65:6,15,16
66:3 69:16 97:2
**says** 46:8,13,16
58:6 64:14 75:22
79:13 81:5,12,21
97:1,6,13,14
**scenarios** 47:22
**scene** 29:15 49:3,6
49:8
**scenery** 84:17
**scheduling** 100:11
100:11
**school** 7:5,14 27:16
75:23
**schools** 28:1
**Scott** 1:16 4:1 5:1
109:18,20
**search** 42:22
**seated** 35:21 93:17
94:10,11 95:17,19
96:2 97:3,5,14,17
**second** 21:13 22:19
29:16 81:4 92:6
98:8 102:22
**secure** 35:14,17
36:14 103:4
107:10
**secured** 36:7 39:7

**security** 68:8,15
104:5
**see** 22:10 31:16
33:19,23 40:5
53:8 68:14 79:11
90:9 94:14 98:5,9
98:18
**seeing** 98:19
**seen** 39:22 40:1,20
68:12 75:15 93:14
**segregation** 104:4
**self-defense** 81:14
**send** 15:2 27:23
42:4,13 59:16
**sensitive** 18:4
**sent** 11:17,19 12:2
52:20 78:23 79:5
**sentence** 78:3 90:10
**separate** 95:14
**separated** 104:5
**September** 26:3
34:17
**sergeant** 32:9,13
33:8 46:8,12 54:7
54:12,17,22 55:6
55:8 72:9,15
82:17 83:1,9
98:23 100:10,15
101:2 102:6
**sergeants** 55:3,4
**serious** 30:3 39:6
**served** 8:23 41:23
42:8 57:22 59:5
**serves** 58:4
**service** 55:14,16
56:11 59:12 60:12
**set** 58:2
**setting** 47:21 51:9
53:8 69:6
**settle** 76:13
**settled** 10:23 11:1
73:15
**settlement** 73:22
74:8,14,20 75:8
75:16 78:4,8
**settling** 75:23 76:1
**severe** 37:4
**sex** 48:14 49:3 77:5
78:5,11
**Sharon** 25:22
**sheriff** 1:7 8:9
11:17 12:3 13:7,9
13:10,13 15:1,10
15:11 16:13 17:8
17:10,14 18:7
22:12 23:8 39:17
40:4 45:5 51:10
51:13 52:18,21

53:3,9,12,14,20
55:10,11 71:12
74:11 79:5 83:6
83:19 89:1,2 90:3
90:5 93:6,8 94:1,6
98:4 103:10,10
**sheriff's** 7:22 45:10
51:11,19 53:20
61:22 73:11 79:23
80:4 94:2
**Sherrer** 70:5,16,22
71:2 79:2
**Sherrer's** 72:7,17
**she'll** 56:22
**shift** 83:23 99:5,7,9
99:12 100:6,10,12
100:13,21 102:13
**shifts** 99:7
**shipped** 83:6
**shirt** 31:15,21
33:16
**shirt's** 33:22
**short** 16:16
**shorthand** 24:8
**shortly** 86:14,16
107:19
**shoulder** 82:4 96:16
**shove** 58:23
**show** 49:2 80:11
89:17 106:15
**showed** 45:20
**shower** 35:11,14,17
35:19 36:1,8
**showing** 66:5
**shown** 39:2
**shows** 39:1 79:10
**Shumate** 9:9,12
**side** 11:10 75:22
96:7
**sign** 59:20,22,23
**signature** 1:21
**signed** 59:17
**silverware** 57:16
**similar** 86:1 94:23
**Simmons** 9:10
**simply** 17:13 31:22
68:7 94:1
**single** 62:20
**sir** 5:21 6:8,12,17
7:12,17 8:7,14,16
8:19,22 9:2,7,13
9:16,19,21 10:2,9
10:14,18 11:15
12:5,12 13:5,15
14:8,13,19 16:12
16:20,20,23 17:6
17:22 18:21 19:17
19:20 20:14 21:1

22:9 23:14,17
24:4,20,23 25:9
25:16 27:20 28:4
28:9 29:4 30:9
32:10 34:3,4,15
34:15 35:2,5 37:8
39:6,15,20,23
40:8,15,20,23
41:6,6 42:3,8,16
43:1,7 44:6,22
46:7 48:11,19
50:2 51:14,21
53:16 55:1,13
56:3,12,23,23
57:20 58:1,17,20
59:6,16,21 60:19
61:15,16 63:14,23
66:1 70:7,9,11,19
70:21 71:1,8 72:2
72:6,13,16,21,23
73:4,7,14,17 77:4
77:10,12,21 78:22
79:4,12 80:17,18
80:21 81:1,3,11
81:15 82:16,20
83:11,11,15 84:10
84:15,23 85:3,4
85:18 86:2,5,10
86:22 87:4,7
88:18,18 89:2,9
89:12,21 90:1,7
90:11,14 91:4,14
94:18 95:22 97:20
98:13,15,20 99:16
100:7,22 101:3
103:1,9,16,22
104:20 105:2,5,15
105:18
**sit** 17:11 53:10
107:20
**site** 56:8
**sitting** 15:14 22:7
32:19 50:8 63:21
106:5
**situation** 19:8 30:18
34:2 40:3 47:20
49:8,13,15 65:17
93:2
**situational** 47:12
**situations** 10:4 21:7
47:14 82:11
**six** 9:22 84:22
**six-foot-five** 36:22
**size** 31:3
**sized** 31:11
**slap** 71:23
**slapped** 70:16,18
71:4,19

**slapping** 70:22 72:4
**slot** 54:12
**slots** 54:8,10
**Smith** 19:15
**SMU** 35:16,18,20
36:9
**somebody** 21:4 51:8
52:5 67:16 73:12
78:7 87:5,7 90:19
91:9 101:15,17,18
102:7,8,8
**sorry** 9:10 19:18
21:8 78:8 79:9
87:16 99:6
**sort** 70:2
**sounds** 20:10
**speak** 6:15
**special** 35:9 60:3
108:4
**specialized** 47:15
**specific** 85:20
**speculate** 96:21
**spending** 61:12
**spray** 47:16 48:1,1
**staff** 25:3 28:18
50:19 52:6 57:13
59:22 94:5
**staffing** 25:16 27:9
98:22
**stand** 97:16
**standards** 27:6,22
**standing** 102:23
103:13
**stands** 17:19
**start** 68:9
**started** 38:13
**State** 1:17 5:1,20
27:19,20 34:9,21
85:15 109:3,23
**stated** 93:16
**statement** 29:12
32:6
**statements** 32:2
**STATES** 1:1
**status** 9:3 91:4
**stenotype** 109:7
**step** 16:6 29:14,16
**steward** 64:18
69:17
**stick** 63:11
**STIPULATED**
1:13,20 2:3
**stipulations** 1:12
5:5,15
**Stokes** 34:18 35:4,6
35:10,21,23 36:12
36:15,18,19,22
38:10,23 39:8,10

**stolen** 85:5
**stomped** 37:18
**stood** 94:15
**stop** 6:5 74:1
**stopped** 85:4,6
**stories** 51:5
**straight** 83:6 96:6
**strictly** 14:8 43:7
104:21
**strike** 30:2,8,11
82:2
**strikes** 82:9
**striking** 29:23
38:14 40:5,8
81:21,22 93:15
94:8 95:12,16
**strong** 50:16
**struck** 94:12,15
106:7
**structure** 27:4
**style** 63:15
**subdue** 81:6
**subject** 81:7,9 82:4
**substantially**
104:16
**succeed** 37:9
**sue** 73:2
**sued** 74:3
**suffered** 37:4
**suffering** 6:14
**sufficient** 103:23
**suggest** 40:23 46:18
**suggested** 33:16
**suicide** 86:11,13
**Suite** 4:13
**Sumiton** 79:3
**supervising** 23:4
**supervision** 28:1
**supervisor** 13:22
51:4
**supervisors** 27:23
80:1
**supervisor's** 32:6
33:4
**supplied** 32:2,15
**support** 50:4,5
**Suppose** 47:19
**supposed** 79:10
**supposedly** 14:6
**sure** 14:14 17:17
20:21 21:23 22:16
29:5 33:21 38:15
43:7,14 48:16,19
55:7 61:6 62:1,15
63:3,5 79:12 82:6
83:20,21 85:20
87:18 97:22
107:16,17,17

**surely** 75:13
**surpass** 26:1,8
**surpassed** 27:11
**suspended** 19:4
71:17
**suspension** 20:2
**suspicion** 66:3
**sustains** 17:5
**swing** 50:3
**swinging** 96:16,23
**switched** 92:21
**sworn** 5:12
**system** 41:12 43:23
44:1,2,8,10,13,23
45:2

**T**

**T** 3:7 109:1,1
**tabletop** 107:8
**take** 15:19 30:12
36:1 38:23 39:1
58:14,22 81:7
82:12 95:3 97:21
**taken** 1:16 50:18
97:23 109:6
**takes** 107:9
**talk** 17:15 21:18
44:19 63:1 68:13
83:12 84:2 90:8
**talked** 44:18 69:1
69:12 104:22
**talking** 61:14,16
62:10 66:22 67:7
69:20 90:12
**tall** 95:21,23
**Talladega** 76:4
**taller** 95:2
**tape** 42:23 44:15,20
47:1
**tapes** 43:3
**tased** 46:17
**taser** 28:5,13 46:13
47:17 78:20 106:6
**tasers** 28:3,11
**Tatum** 11:11
**taught** 28:6
**teach** 28:10 29:9,13
**teaches** 29:22,23
**tell** 10:20 16:8 18:3
18:18 32:17,20
33:2 55:14 56:20
60:5 61:4 62:20
64:10 65:22 66:9
68:6 80:3 105:13
107:20
**telling** 22:11 42:5
42:17 79:6 97:12
**temporarily** 54:17

term 16:16
termed 27:12
terminate 53:19
  71:12
terminated 8:17
  13:14 15:5 17:4
  17:16 21:11 22:14
  53:5,14 71:9 72:4
  79:7 82:19 83:2
  88:4,19,21 90:4
  100:19
termination 8:21
  12:4 33:1 48:13
  52:22 90:22 91:16
  105:4
terms 62:7 73:21
  75:8 81:5
Terrell 26:19,20
terrible 62:23
testified 5:13 98:23
  99:22 107:7
testify 75:14
testimonies 97:15
testimony 22:11
  30:12 100:3
  109:11
test-drive 84:21
theft 85:19
thereto 2:10 109:8
thing 43:19,23 47:1
  56:1 62:23 67:1,1
  67:8,13 69:15
  83:18 95:16
things 20:22 38:16
  40:7 49:17 67:18
  67:19,20 68:1
  72:3,10 91:18,20
  96:18
think 6:15 11:4
  15:21,21 20:6
  28:12,14 31:17
  34:7 49:4,6 54:7
  69:8 76:15 87:15
  90:23 95:1 96:1
  97:4,18,20 100:3
  107:19 108:9
thinking 65:10 83:2
  107:6
third 22:21 39:16
  64:21 65:12 81:17
  98:12
thought 63:17
  64:13 87:20 88:15
threat 30:23 39:5
  39:13 46:16 47:5
  50:15
threatening 37:1
  38:23 39:10

three 14:9,11 15:17
  16:15 22:14 47:9
  54:10,15 55:4,18
  55:21 61:3 72:3
  72:10,13 90:13
  98:3 99:7 101:18
  104:19
threw 37:13,16
throat 56:18
throwing 37:19
tied 16:14
tier 37:13,14
Tifney 105:14
time 2:8,8 6:4 14:14
  16:21 18:11 21:23
  28:22 30:2 32:21
  32:23 34:7,19
  35:17 41:17 42:8
  44:2 49:8 50:5,12
  55:22 58:5 68:10
  75:22 78:5 80:5
  86:15,16 88:13
  91:13 92:19 99:3
  99:18,19 102:3,3
  103:23 106:7
  107:1
times 9:20 18:12
  21:3 55:21 58:2
  82:13 86:20 101:7
Tirey 1:7 13:11
  39:17 40:4 52:8
  79:5
toasters 57:15
today 6:16 15:14
  22:7 23:1 24:11
  32:19 44:4 61:5
  63:21 64:1 77:9
  97:20 99:23 107:6
today's 11:14 44:5
told 15:2 17:7 20:19
  44:10 47:6 91:5
  92:19 95:16
Tommy 11:10
  26:20 54:21 105:8
tomorrow 61:5
top 21:1 93:15,16
  94:9,15 95:6,12
  95:17 96:3,8,19
totally 49:18 90:16
touch 42:17 47:22
towed 85:3
Townsend 36:6,7
  36:10 37:1 39:2,7
Townsend's 39:4
trained 45:7 49:12
training 7:6 27:5,6
  27:13,22 28:2,12
  28:15,17,18 29:6

29:21 38:8 47:11
  47:12,17,21
trainings 47:16
transcribed 109:8
transcript 109:11
transcription 109:9
transferred 43:8
transitioned 25:23
tray 36:13
treatment 40:11
  51:6
Trent 92:19
Trenton 1:7,10,15
  5:7,11,22
Trent's 63:15
trial 2:8
tried 98:20
true 109:10
truly 76:11
trustees 84:8
trustworthy 87:21
try 25:14 60:8 93:2
trying 21:7 34:12
  45:4 54:7 67:2
  75:12,17 83:17
  95:13
turned 43:12
two 27:16 35:10,18
  35:20 36:18,20
  37:4 43:17 46:11
  46:15,17 47:18
  48:2 54:6,9,16,20
  60:15 63:14 69:4
  69:10 82:7,8
  86:18 88:22 94:14
  95:23 99:18
  101:21 103:12
  104:1,19 105:3,19
tying 17:5
type 18:3 53:7
  65:18
typo 79:8

_____

U

ultimately 21:19
  54:5 86:9
umbrella 29:6
unattended 87:22
  88:1 89:8,9
unaware 80:2
uncuffed 36:9
underlying 62:16
understand 6:4
  22:11 33:22 38:15
  50:4 54:1 75:14
  75:20 94:17
understanding 79:4
understood 6:10

103:11
uneventful 43:18
unfair 47:9
union 64:18 69:17
unit 35:9 104:4,9
UNITED 1:1
University 25:20
  28:23 29:7
unquestionably
  48:21
unreasonable 55:23
unreported 36:16
unsatisfactory
  79:15,17
unsupervised 87:22
  88:11
upstairs 33:5 50:15
  78:23 82:23 87:11
  87:13
urine 36:21
use 29:10,18,21
  30:7,13 37:7
  38:18 40:1 42:15
  50:4 70:8 79:18
  80:20 81:5,10
  82:11
Usual 5:14
usually 28:7,9
  60:19 66:13,18

_____

V

v 26:19,20
vacancy 54:16
vacant 54:10,11
vague 27:7
valid 20:11
value 59:19
vehicle 86:4
venture 9:21
verbal 29:16 30:15
verbally 17:15
versus 31:4
VHS 41:12 43:3
  44:12,16,22
video 40:18,21 41:1
  98:21
videotape 42:6
Vikings 7:16
violate 66:16
violating 100:20
  106:23
violation 102:14
  106:3,8
violent 107:5
violently 81:6,9
vision 33:19
visit 92:17
visited 69:8

visiting 89:11
visits 69:4
volume 23:10
VS 1:5

_____

W

wait 8:6 53:17
waived 1:22
walked 84:17
Walker 1:6 7:1,15
  7:22 9:14 12:16
  13:20 14:3 21:13
  22:15 79:15 80:20
want 16:17,18 23:5
  24:6 29:7 33:13
  33:21 34:14 37:21
  59:15 61:4,5
  67:15 75:2 77:17
  80:2 92:16
wanted 61:3
wanting 69:9
wants 65:4
warrant 35:7
warranted 71:6
Warrior 35:2
wash 86:3 87:22,23
  88:11 89:8,9,11
washing 84:9,18
wasn't 17:18 30:15
  31:10 65:20 71:9
  73:8 75:10 77:19
  88:16,21
watch 40:18
way 17:3 33:13
  35:12 52:23 59:7
  60:9 80:3 88:20
  95:7 103:11
ways 43:19
weapon 31:7
weapons 48:2 49:13
week 86:17 105:3
weekends 55:1,2
weeks 36:18
weighed 26:14
weight 92:5
weird 69:15
welded 36:14
went 14:23 18:20
  28:19 36:5,9,9
  38:7 63:14 92:17
weren't 67:18,22
west 35:1
We'll 36:3
we're 41:18 44:18
  50:17 61:21 69:20
  75:23 95:23
we've 10:17 15:17
  44:9,18 49:14,21

66:18 67:17,21,23
97:4
**whatsoever** 90:19
**white** 17:13 23:19
23:22 24:1 66:6
72:18 89:6 101:5
105:7,9
**wife** 51:21
**wild** 91:6,6
**William** 25:17,19
34:23 108:5
**Williams** 12:11
14:4 46:2,12,15
46:18 50:8 98:5
**Williamson** 85:23
86:23 88:10,12,20
**Wilmeth** 1:16 4:1
5:1 109:18,20
**windows** 107:9
**wish** 89:13
**witness** 1:22 5:7
73:23 80:15 89:20
97:12 109:12
**witnessing** 40:8
**word** 91:6 101:13
**words** 92:11
**work** 55:19 56:3,9
59:11,14 69:9
79:14,16,19
107:15
**worked** 34:8 35:12
70:6 99:9
**worker** 87:12
**workers** 63:9 68:3
**working** 34:8 38:7
51:20 52:1 68:19
79:3
**works** 51:21
**wouldn't** 46:22
50:2 55:21 63:16
64:22 73:2 88:6
95:1,5 103:1
**wrist** 37:18
**writing** 52:23
**wrong** 93:12,18
94:8 95:15 105:23
**wronged** 76:15
**wrote** 80:5 92:12

_____ **X** _____
**X** 3:1,7

_____ **Y** _____
**yard** 35:15
**yeah** 7:19 31:20
49:7 60:16 63:10
63:15 96:22
**year** 79:8

**years** 10:9 104:20
**young** 38:6
**y'all** 10:7,12 43:22
53:4,14,18 58:18
58:21 59:14 60:5
61:18 76:9,13
85:16 89:7
**y'all's** 59:4

_____ **$** _____
**$10,000.00** 76:10

_____ **#** _____
**#392** 109:21

_____ **0** _____
**08** 11:2 24:13 25:11

_____ **1** _____
**1** 3:9,13 46:1 80:9
80:12 106:12,16
**10th** 8:6,7 12:17
**100** 35:2
**105** 3:4
**106** 3:13
**108** 3:5
**11** 1:18 5:6
**11-3-08** 3:10
**12** 58:7,14
**13** 35:21 58:7,14
99:1
**18** 37:5
**1961** 6:19
**1980** 7:15
**1991** 9:4
**1993** 26:20 34:17
**1995** 12:17

_____ **2** _____
**2** 3:10 89:15,18
94:8 98:2 103:7
**2nd** 1:18 5:6 32:3
40:19 42:7 102:20
105:23
**2-21-01** 3:13
**200** 4:13 24:11
**2000** 7:10 40:4
**2001** 1:17 5:6
**2008** 32:3 40:19
42:7 62:7 79:9,10
81:2 92:7 94:8
102:20 105:1,23
**2011** 1:18 5:7 23:1
**208** 79:9
**2119** 4:7
**24** 44:13
**24/7** 101:15
**25th** 34:17

**26** 37:17

_____ **3** _____
**3rd** 4:7 6:19
**300** 4:13 36:23
**35203** 4:8,14
**365** 101:15

_____ **4** _____
**4:03** 1:19
**41** 25:4
**43** 24:21 25:2,7,12

_____ **5** _____
**5** 3:3

_____ **6** _____
**6:09-cv-1748-SLB**
1:5
**6:25** 108:13

_____ **7** _____
**7** 79:7

_____ **8** _____
**80** 3:9 27:15
**89** 3:10

_____ **9** _____
**9** 92:7
**9/30/11** 109:21
**90** 9:4
**95** 8:6
**97** 12:23
**98** 26:3
**99** 8:7 13:2 40:3