## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| **GEORGE R. CHAPMAN, JR.,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **vs.** | } | **CASE NO. 6:09-cv-1748-SLB** |
| | } | |
| **JOHN MARK TIREY; TRENTON** | } | |
| **MCCLUSKEY; and WALKER** | } | |
| **COUNTY, ALABAMA,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is presently pending before the court on Defendants' Motion for Summary Judgment. (Doc. 25.)[1] Upon consideration of the record, the submissions of the parties, and the relevant law, the court is of the opinion that Defendants' Motion for Summary Judgment, (doc. 25), is due to be granted.

## I.  <u>CASE OVERVIEW</u>

Plaintiff George R. Chapman Jr. ("plaintiff") asserts claims pursuant to Title VII of the Civil Rights Acts of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* and 42 U.S.C. § 1981, by and through 42 U.S.C. § 1983, against Walker County, Alabama, Sheriff John Mark Tirey, and Trent McCluskey.  (*See generally* doc. 13.)  Plaintiff alleges unlawful racial discrimination and retaliation.

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

## II. <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue for trial. FED. R. CIV. P. 56(c)(1); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in its favor. *See id.* at 255. Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every *reasonable* inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)).

## III. <u>STATEMENT OF FACTS</u> [2]

### A. BACKGROUND

Plaintiff, an African-American male, began working for the Walker County Jail as a part-time jailer on March 31, 2006. (Doc. 27-1 at 16:11-18; doc. 13 ¶ 5.)  McCluskey has been the jail administrator for the Walker County Sheriff's Department since 1999. (Doc. 27-3 at 7:20-8:1, 8:4-7.)  In this capacity,  McCluskey oversees jail operations and reports to the sheriff and/or chief deputy. (*Id*. at 8:2-3, 8:8-9.)   Tirey has served as the Walker County Sheriff since 1995. (Doc. 27-2 at 8:17-21, 9:9-11.)

Upon being hired, plaintiff attended training classes for the use of tasers, pepper spray, and batons.  (Doc. 27-1 at 23:4-11.)  He also reviewed the Walker County Jail Policies and Procedures Manual. (*Id.* at 48:18-49:10.)  The Walker County Use of Force and Restraints policy ("Use of Force Policy") reads, "Deadly force should be used only as a last resort and then only to prevent an act which could result in death or severe bodily injury to one's self or to another person." (Doc. 28-5 at 3.)  The Use of Force Policy allows officers to use non-deadly force "[i]n defending one's self or others against any physical assault." (*Id.*)   The Walker County policy regarding baton use ("Use of Baton Policy") defines "deadly force" as "Deliberate strikes" to the head, throat, spinal column, or lower intestines.  (Doc. 28-7 at

---

[2]As required when determining a motion for summary judgment, the court has construed the facts in the light most favorable to plaintiff, the non-moving party.  All disputed facts are resolved in his favor, and all reasonable inferences arising from those facts are drawn in his favor. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990); *Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1455 (11th Cir. 1997).

3.)  During his part-time employment, Lieutenant Miller gave a memo to McCluskey in which Miller noted that he had told plaintiff that plaintiff had been doing a "good job." (Doc. 35-2.)

In September 2008, Tirey hired plaintiff on a full-time basis. (*See* doc. 28-2.)  All newly-hired full-time employees are placed on probation for the first six months.  (Doc. 40-1 at 63:23-64:9.)  As a full-time jailer, plaintiff reported to Sergeant Rachel Harper and Lieutenant James Woodley.  (Doc. 27-1 at 22:8-12.)

## B.  INVESTIGATIONS INTO PLAINTIFF'S ALLEGED MISCONDUCT

As a part-time employee, plaintiff was the subject of two internal investigations.  (*Id*. at 29:1-29:22, 30:11-12, 30:16-31:2, 31:7-13.)  These investigations arose from complaints that plaintiff had used excessive force against inmate Daniel Ryan by striking him on the forehead with a baton, (*id*. at 30:19-31:6, 32:15-20), and that plaintiff had "groped" inmate George Bryant's cellmate, (*id*. at 29:16-30:10).  Each investigation exonerated plaintiff of any wrongdoing. (*Id*. at 30:11-15, 32:12-14.)

On October 9, 2008,  McCluskey received information that plaintiff, by then a full-time employee, had used excessive force against inmate George Larry Files, an elderly inmate hospitalized at Walker Baptist Medical Center. (*See* doc. 28-6.)  A nurse told McCluskey that plaintiff had "shoved Mr. Files back [into his] bed after Mr. Files changed the channels on the T.V." (*Id*.; *see* doc. 27-3 at 13:19-14:3.)  Tirey believed that plaintiff had

slapped Files. (Doc. 27-2 at 66:11-15.)  An investigation into the Files incident was pending at the time of plaintiff's termination. (*Id*. at 66:20-67:5.)

## C. THE PAULA RICHARDSON INVESTIGATION

Paula Richardson, plaintiff's girlfriend at the time, worked in the kitchen at Walker County Jail. (Doc. 27-1 at 87:15-19.)  She was employed by ABL Management, a food service management company that the Walker County Commission employs to prepare meals for the inmates. (*Id*. at 89:13-18; doc. 27-2 at 38:14-39:1.)  In late October 2008, Richardson informed plaintiff that McCluskey had sent Officers Becky Kimbrell and Laura Tirey, both white, into the kitchen to question white female inmates about Richardson's treatment of them as compared to her treatment of African-American female inmates. (Doc. 27-1 at 87:12-88:7.)  Richardson told plaintiff that these officers attempted to induce the white female inmates into falsely accusing her of treating African-American female inmates more favorably. (*Id*. at 87:23-88:7.)

Following this conversation, plaintiff called McCluskey and asked him whether he knew anything about the Richardson investigation. (*Id*. at 88:8-10.)  McCluskey initially denied any knowledge of the investigation. (*Id*. at 88:11-12, 90:2-3, 104:16-17.)   When plaintiff began discussing the details of the investigation, McCluskey replied, "Are you her boss? Are you her union president? Well, you don't need to worry about what's going on in the kitchen." (*Id*. at 88:16-19; *see id*. at 90:3-7, 94:9-16, 104:19-105:1.)  McCluskey also asked plaintiff whether he was Richardson's lawyer. (*Id*. at 88:20, 94:15, 104:21.)

5

McCluskey then hung up the telephone. (*Id*. at 88:19-20, 90:6-7, 94:16-18.)  Plaintiff's testimony is unclear as to whether McCluskey's attitude towards him changed after this conversation. (*Compare id*. at 91:3-7, *with id*. at 147:17-148:6.)  However, for the purposes of deciding defendants' Motion for Summary Judgment, the court assumes that plaintiff began "having problems" with McCluskey following this conversation. (*Id*. at 91:3-7.)

**D.  THE JOSEPH DECATUR INCIDENT**

A few days before November 2, 2008, inmate Joseph Decatur, a sex offender incarcerated for an alleged rape, was having problems with other inmates in C-Dorm.  (*Id*. at 53:19-54:3, 106:12-17.)  The other inmates taunted Decatur, calling him "baby raper." (*Id*. at 54:3.)  An angry Decatur ripped the glass top off a dayroom table and shattered it.  (*Id*. at 54:6-9.)  A control room officer ordered plaintiff to remove Decatur from C-Dorm, and plaintiff escorted him to M-Dorm for protective custody. (*Id*. at 54:10-14, 55:10-13.)  M-Dorm is a segregated unit apart from the jail's general population that houses inmates convicted of capital charges, those with disciplinary problems, and inmates who need protective custody. (*Id*. at 40:8-41:12; doc. 38 at 20:22-21:13.)  M-Dorm inmates are kept "locked down" 23 hours a day. (Doc. 27-1 at 40:15-18.)

On the night of November 2, 2008, plaintiff was the only jailer working in M-Dorm. (*Id*. at 110:12-18.)  After plaintiff fed the inmates, Decatur requested a store form, which lists the commissary items available to inmates. (*Id*. at 56:17-18.)  Plaintiff had already passed out store forms to other M-Dorm inmates.  (*Id*. at 56:11-22.)  Plaintiff normally slid the store

forms underneath the inmates' cell doors. (*Id*. at 56:23-57:2.) However, plaintiff opted to hand-deliver the store form to Decatur because Decatur had obstructed the space underneath his cell door with a towel. (*Id*. at 57:5-13.) Plaintiff called for Officer Jerry Williams, who was stationed in the control room, to open Decatur's cell door. (*Id*. at 57:11-12, 58:6-16.) No other officer accompanied plaintiff when he requested that Decatur's cell door be opened, (*id*. at 110:12-18, 111:19-22), notwithstanding the fact that a notice posted on the M-Dorm entrance reads, "There are to be two officers present at all times when opening cell doors in m-dorm, no exceptions," (doc. 28-3; *see* doc. 27-1 at 57:17-58:2, 121:13-17). Plaintiff testified that the policy is not followed. (Doc. 27-1 at 109:15-110:7.)

As soon as his cell door opened, Decatur attacked plaintiff and the two began to fight. (*Id*. at 58:17-20.) Decatur, a "pretty good sized fellow," (doc. 27-3 at 31:9-12; *see* doc. 27-2 at 31:11-15), pulled plaintiff's shirt over his head, and plaintiff could not see Decatur as he pummeled plaintiff in the head and face, (doc. 27-1 at 58:21-59:3). Plaintiff sprayed Decatur with mace, which had no appreciable effect. (*Id*. at 59:6-8.) Williams, who witnessed the altercation from the control room, issued a "code red." (*Id*. at 59:20-21.) A "code red" alerts all on-duty officers that immediate assistance is needed because an inmate is fighting a guard. (*Id*. at 59:22-60:2.) Harper, along with Officers Tifney Clifton, Mary Phillips, and Killingsworth,[3] soon arrived on the scene. (*Id*. at 60:3-7; *see* doc. 28-8 at 2; doc. 29-2; doc. 29-3; doc. 29-4; doc. 29-5.) By this point, Decatur had completely ripped off plaintiff's shirt,

---

[3]Officer Killingsworth's first name is unknown.

7

and plaintiff had somehow managed to regain his balance and push Decatur off him. (Doc. 27-1 at 59:9-12.)

When the other officers arrived, plaintiff and Decatur were in "fighting stances," and Decatur appeared ready to attack plaintiff again. (Doc. 29-2.) Clifton immediately deployed an X26 taser on Decatur. (*Id.*; doc 28-8 at 2; *see* doc. 27-1 at 60:10-11; doc. 29-3; doc. 29-4; doc. 29-5.) This type of taser fires sharp "probes" that penetrate and affix into a person's skin. (Doc. 38 at 45:2-5.) The probes are connected by wires to a cartridge, which is attached to the taser held by the officer. (*Id*. at 45:9-10, 45:16-18.) Harper testified that as long as the probes are embedded in an inmate's skin and the cartridge is hooked up to the taser, an officer can "pull the trigger again" and deploy another cycle of the taser current. (*Id*. at 45:6-8; 45:16-18.)

The taser caused Decatur to collapse onto the floor in a seated position. (Doc. 27-1 at 60:11-12.) In a matter of seconds, plaintiff struck Decatur approximately three to four times with his baton. (*Id*. at 60:14-23; doc. 28-8 at 2.) Decatur was still attached to the taser probes. (Doc. 27-1 at 62:2-5; doc. 28-8 at 2.) The first strikes were to Decatur's knees and his midsection, (doc. 27-1 at 60:16-19), and the final blow struck Decatur on the forehead, (*id*. at 60:19-20; doc. 28-8 at 2; doc. 29-2). Decatur began to bleed from the head wound, and the officers escorted him to the nurse's office. (Doc. 29-2.) Officer Nicholas Harbin and McCluskey eventually took Decatur to the Walker Baptist Medical Center's emergency room for treatment. (*Id*.)

8

Plaintiff testified that his use of force was justified and necessary under the circumstances because, despite being tased, Decatur remained aggressive, he "was not subdued in any way," and he had attempted "to get up and come at [him]." (Doc. 27-1 at 60:13-15, 61:16-17, 73:4-10; 86:1-4.)  Plaintiff testified that he considered the use of force necessary because Decatur was a convicted sex offender, and other officers present during the altercation were female.  (*Id*. at 61:7-15.)  Plaintiff further testified that the taser initially "misfired," (*id*. at 62:2-6), and that Decatur had continued to fight until plaintiff struck the final blow, (*id*. at 61:2-3).

Following the incident, plaintiff and the officers present during the altercation prepared after-incident reports. (*See* doc. 35-5; doc. 29-2; doc. 29-3; doc. 29-4; doc. 29-5.)  Clifton's report noted that after deploying the taser, "I/M [inmate] Decatur started to stand up. [She] gave the verbal command to I/M Decatur to stay on the floor.  I/M Decatur still tried to stand up and curse at C/O [Officer] Chapman.  C/O Chapman then tried to restrain I/M Decature [sic] from getting up and advancing towards all officer's [sic]." (Doc. 29-4.)  Killingsworth's report stated, "Officer Clifton tazed [sic] I/M Decater [sic] and Decater [sic] slumped to the floor. C/O Chapman began to hit I/M Decater [sic] with [his baton].  I/M Decater's [sic] arms [and] hands were up still attempting to fight." (Doc. 29-3.)  Plaintiff stated in his incident-report that he was not trying to hit Decatur in the head.  (Doc. 35-5 at 2.)

9

Harper, the shift supervisor and the highest-ranking employee present during the incident, recalled the events differently. (*See* doc. 29-2; doc. 28-8.) Her report does not state that Decatur attempted to rise from the floor, nor does it state that Decatur continued to fight after plaintiff struck him with his baton. (*See* doc. 29-2.) In a letter to McCluskey dated November 4, 2008, Harper stated:

> Officer Chapman did not follow the proper escalation of force. The X26 taser had, only seconds before, been deployed on inmate Joseph Decatur. Inmate Joseph Decatur has ceased fighting and was lying on the ground at the time when he was struck in the head by Officer Chapman's blow with Officer Chapman's baton.
>
> . . . .
>
> When the X26 taser was deployed on inmate Decatur, he fell to the ground immediately. In the seconds that followed, inmate Decatur did not appear to attempt to get up. At that time inmate Decatur was struck approximately 4 times by Officer Chapman, the last blow striking inmate Decatur on the head. This occurred so imminently after the taser deployment that inmate Decatur was still attached via probes to the X26 taser. I do not feel that inmate Decatur was an imminent threat at the time he was struck by Officer Chapman.

(Doc. 28-8 at 2.) This letter recommended plaintiff's termination. (*Id.* at 3.) Harper later testified that she "saw [Decatur] lift, but he did not get off the ground." (Doc. 38 at 53:12-13.) Harper also testified that when Clifton stated that Decatur ignored her command to "stay on the floor," it did not "necessarily mean that he was striking. It just means that it looked like he was a threat." (*Id.* at 52:8-11.)

Sergeant Mark Pendley collected statements from several M-Dorm inmates who had witnessed the altercation. (*See* doc. 29-6; doc. 29-7; doc. 29-8; doc. 30-1; doc. 30-2; doc. 30-

3; doc. 30-4; doc. 30-5.)  Some of the M-Dorm inmates who witnessed the prelude to the fight stated that Decatur taunted plaintiff immediately prior to plaintiff opening Decatur's cell door. (*See* doc. 30-1; doc. 30-4; doc. 30-5.)  Another inmate stated that "I/M Decatur told C/O Chapman that he 'had papers on [him].'  I/M Decatur told C/O Chapman to open [his] door and C/O Chapman opened [the] door . . . ." (Doc. 29-6.)  Of the inmates who saw plaintiff strike Decatur with his baton, none of their statements indicate that Decatur was combative or attempting to "get up." (Doc. 29-6; doc. 29-7; doc. 29-8; doc. 30-1; doc. 30-2; doc. 30-4.)

## E.  PLAINTIFF'S TERMINATION

On November 3, 2008, McCluskey recommended to Tirey, who is responsible for hiring and firing Walker County Jail officers, that plaintiff be terminated. (Doc. 29-1; *see* doc. 27-2 at 80:22-81:3.)  McCluskey based his recommendation on the following:  (1) plaintiff's use of "excessive force" against Decatur; (2) the then-pending Files investigation; and (3) the investigation into allegations made by George Bryant of which plaintiff was subsequently cleared of any wrongdoing.[4]  (Doc. 29-1.)  McCluskey testified that he "probably" read all the reports of the officers present during the incident prior to

_____

[4]McCluskey's letter recommending plaintiff's termination states that he based his recommendation, *inter alia*, on the investigation into the allegations of "George Bryant and Dometrius Buckley."  (Doc. 29-1.)  There is no other reference to Dometrius Buckley in the record.

recommending plaintiff's termination, but he only specifically recalled reading Harper's report. (Doc. 27-3 at 32:1-11.)

After receiving McCluskey's recommendation, Tirey ordered Sergeant Darrell Mote to conduct an investigation into the Decatur incident in order to gather "everything" related to the altercation. (Doc. 27-2 at 22:14-23:4.) Mote later presented Tirey with a file of all the materials he had collected, which included some statements that Tirey had already seen. (*Id*. at 23:19-24:1.) Tirey reviewed all the materials presented to him, and considering the totality of the circumstances, he determined that plaintiff had violated the Use of Force Policy. (*Id*. at 50:14-22.) That is, Tirey concluded that Decatur was subdued, non-combative, and posed no threat of harm when plaintiff struck him on the head with his baton.  (*Id*. at 19:6-23, 50:18-22.)  Harper told Tirey that she thought plaintiff "may have" used excessive force against Decatur.  (*Id*. at 23:5-11.)

On November 7, 2008, McCluskey handed plaintiff a letter, signed by Tirey, terminating his employment. (Doc. 27-1 at 69:13-20; *see* doc. 30-6.)  The letter stated that he was being terminated due to unsatisfactory work performance. (Doc. 30-6.)  The letter made no reference to any specific instances of misconduct or unsatisfactory work performance. (*See id*.) Tirey testified that he based his termination decision on the following: (1) plaintiff's use of force against Decatur; (2) plaintiff's violation of the M-Dorm notice

prohibiting employees from opening M-Dorm cell doors without another officer present; and (3) the Files investigation.[5] (Doc. 27-2 at 74:9-75:17.)

## F. ALLEGED COMPARATORS

Plaintiff believes his termination stemmed from, *inter alia*, racially-related discriminatory and retaliatory animus. Plaintiff testified that both Tirey and Lieutenant Randy Brown, both white, had told him that they had struck inmates in the head with their batons. (Doc. 27-1 at 73:21-74:4, 74:19-76:7, 101:14-19.) Neither were terminated for their conduct. (*Id*. at 73:21-74:4, 76:3-4.) Plaintiff also testified that co-workers had told him that Sergeant Sam Sherrer, also white, struck inmates with his baton but was suspended and afforded the opportunity to attend anger management classes. (*Id*. at 76:5-18, 77:1-2.) According to plaintiff, his co-workers had told him that Sherrer was terminated only after "he literally sat on top of an inmate and took his baton and beat the inmate in the head repeatedly." (Doc. 27-1 at 76:15-18.) Tirey recalled Sherrer striking an inmate repeatedly with his baton, (doc. 40-1 at 61:12-15), but he could not recall whether he had terminated Sherrer or if Sherrer had resigned following the incident, (doc. 27-2 at 77:23-78:6). Tirey testified that, regardless, he "was headed down that road to terminate" Sherrer." (*Id*. at 68:15-16.) McCluskey testified that Sherrer had slapped inmates on two occasions, including an

---

[5] The cited portion of Tirey's deposition does not specifically state that the Files investigation factored into his decision, but the cited excerpt states that Tirey considered "the other complaint of excessive force [which] came from an absolutely independent source." (Doc. 27-2 at 75:6-17.) Other portions of the deposition reveal that the only other pending investigation into plaintiff's use of force was the Files investigation. (*Id*. at 65:13-67:5.)

13

inmate who was handcuffed, and was not terminated. (Doc. 27-3 at 70:3-70:23, 71:19-22.)
McCluskey had recommended that Sherrer be terminated after he slapped the handcuffed
inmate, but Tirey did not terminate him at that time. (*Id*. at 71:4-15.)

Officer Albert Steadman and Pendley, both white, struck inmates with their batons,
yet they were not terminated. (Doc. 38 at 36:7-12, 36:16-18, 38:6-8, 39:4-16.)  Pendley had
struck an inmate in the leg, (*id*. at 38:14-39:1), and Steadman struck an inmate in either the
"leg or arm," (*id*. at 38:3-5).

Sergeant Ron Pearson, also white, knowingly violated jail policy by scheduling only
four corrections officers for a shift. (Doc. 27-3 at 100:4-17, 100:23-101:5.)  By policy, there
must be, at minimum, five corrections officers scheduled for each shift. (*Id*. at 99:6-10.)
Pearson was not terminated. (*Id*. at 100:19-22.)

## IV. <u>DISCUSSION</u>

## A.  CLAIMS AGAINST WALKER COUNTY:  RACE DISCRIMINATION AND RETALIATION IN VIOLATION OF TITLE VII

The Amended Complaint, (doc. 13), asserts race discrimination and retaliation claims
against Walker County brought pursuant to Title VII.   Defendants move for dismissal of
these claims on the basis that Walker County was not plaintiff's "employer" within the
meaning of Title VII, and therefore, it cannot be liable under Title VII for plaintiff's
termination.  (Doc. 26 at 15.)  Plaintiff contends that Walker County is his "employer"

14

because (1) Tirey and McCluskey are employed by Walker County, and (2) "Walker County ultimately controls the purse strings of the Sheriff's Department."[6] (Doc. 34 at 20.)

Title VII affords relief against *employers* whose actions constitute a violation of the statute. *See* 42 U.S.C. § 2000e-2(a). An "employer," as defined by the statute, is "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year . . . ." 42 U.S.C. § 2000e(b). The term "person" encompasses, *inter alia*, "individuals, governments, governmental agencies, [and] political subdivisions . . . ." 42 U.S.C. § 2000e(a). "A person or entity's status as an employer is a matter of federal law, but state law is relevant insofar as it informs the analysis of the employment relationship." *Martin v. Peach County*, No. 5:10–CV–236 (MTT), 2011 WL 4830176, at *6 (M.D. Ga. Oct. 12, 2011) (citing *Calderon v. Martin County*, 639 F.2d 271, 273 (5th Cir. 1981)) (footnote omitted).

In *Lyes v. City of Riviera Beach*, the Eleventh Circuit addressed the appropriate test for determining when two governmental bodies should be considered a "single employer" for the purposes of satisfying Title VII's "fifteen or more employees" threshold. 166 F.3d 1332, 1340 (11th Cir. 1999). Although the aggregation of entities is not the issue in this

---

[6] *See* ALA. CODE § 36-22-18 (requiring the county commission to "furnish the sheriff with the necessary quarters, books, stationery, office equipment, supplies, postage and other conveniences and equipment, including automobiles and necessary repairs, maintenance and all expenses incidental thereto, as are reasonably needed for the proper and efficient conduct of the affairs of the sheriff's office.")

case, the Eleventh Circuit's analysis provides guidance.  The Eleventh Circuit noted that

while –

> "[c]ourts have used numerous formulations in assessing whether a defendant
> is an 'employer' within the meaning of Title VII . . . they all share a common
> focus: all of them seek to determine who (or which entity) is in control of the
> fundamental aspects of the employment relationship that gave rise to the
> claim."

*Id*. at 1345 (internal quotations and citations omitted).  *Lyes* is frequently cited for

determining when a person or entity can be considered an "employer" under Title VII. *See*,

*e.g.*, *Martin*, 2011 WL 4830176, at *6; *Hart v. Edwards*, No. 3:07-CV-64(CDL), 2009 WL

691069, at *5 (M.D. Ga. Mar. 11, 2009); *Redding v. Tuggle*, No. 1:05-cv-2899-WSD, 2006

WL 2166726, at *9 (N.D. Ga. July 31, 2006); *Crosby v. Mobile County*, No. 04-0144-CG-M,

2005 WL 6133115, at *9 (S.D. Ala. Sept. 15, 2005), *vacated in part on other grounds by*

*Crosby v. Mobile County Personnel Bd.*, No. 05-17039, 2007 WL 245126 (11th Cir. Jan. 30,

2007).

In *Martin v. Peach County*, the plaintiff, an African-American Detention Officer at

the Peach County Sheriff's Office ("PCSO"), asserted, *inter alia*, Title VII discrimination

and retaliation claims against Peach County and the county sheriff in his official capacity.

2011 WL 4830176, at *6.  The Middle District of Georgia granted summary judgment in

favor of Peach County, concluding "that Sheriff Deese in his official capacity, and no other

entity, is [plaintiff's] employer for Title VII purposes." *Id*.  As here, the plaintiff in *Martin*

argued that Peach County constituted her Title VII employer because the county financed the

salaries and expenses of the PCSO as required by Georgia law. *Id*. at *7.  The plaintiff further produced evidence that the Peach County Human Resources Director signed her separation notice, which listed her employer as the "Peach County Board of Commissioners." *Id*.  While the court acknowledged an "occasional interrelation" between Peach County and the county sheriff, the court decided that "the aspects of the employment relationship from which [plaintiff's] claims arise – employment and personnel decisions – do not involve sufficient county involvement for Peach County to be liable as her employer." *Id.* at *6-*7.  The court arrived at this conclusion by examining state law. That  is, under the  Georgia Constitution, "the office of Sheriff is an elected constitutional office, independent from the county and its governing body," and in this capacity, "[s]heriffs have the sole responsibility to hire and fire employees and to direct and control their duties and daily activities." *Id*.

Alabama law mirrors Georgia law in this regard.  The Alabama Constitution denominates Alabama county sheriffs as officers of the ***state*** executive department, along with the "governor, lieutenant governor, attorney-general, state auditor, secretary of state, state treasurer, superintendent of education, [and] commissioner of agriculture and industries." ALA. CONST. art. V, § 112; *See Fowler v. Johnson*, 961 So. 2d 122, 134 (Ala. 2006) ("A suit against a sheriff 'essentially [is] a suit against the state.'" (quoting *Parker v. Amerson*, 519 So. 2d 442, 445 (Ala. 1987))).  The Alabama Code provides that, as a state official, "[t]he sheriff has the legal custody and charge of the jail in his or her county . . . [and] may employ persons to carry out his or her duty to operate the jail and supervise the

inmates housed therein for whose acts he or she is civilly responsible." ALA. CODE § 14-6-1.

As noted by the Eleventh Circuit:

> The Alabama Supreme Court has held that § 14-6-1 demonstrates that "the sheriff's authority over the jail is totally independent of the [county commission]." *King v. Colbert County*, 620 So. 2d 623, 625 (Ala. 1993). ***The sheriff appoints, directs, and controls the deputies and jailers who work at the jail***. Ala. Code § 14-6-105. ***The County has no authority to manage the sheriff's employees***. *See Lockridge v. Etowah County Comm'n*, 460 So. 2d 1361, 1363 (Ala. Civ. App. 1984); *see also Terry v. Cook*, 866 F.2d 373, 379 (11th Cir. 1989) (finding that Alabama county commissioners have no authority to hire or fire deputies or jailers).

*Turquitt v. Jefferson County*, 137 F.3d 1285, 1289 (11th Cir. 1998) (emphasis added).

Pursuant to this law and the evidence presented, the court finds as a matter of law that Walker County cannot be considered plaintiff's employer for purposes of Title VII because it did not exercise sufficient "control of the fundamental aspects of the employment relationship that gave rise to [plaintiff's] claim." *Lyes*, 166 F.3d at 1345. Plaintiff has not directed the court to any persuasive legal authority or any fact suggesting that Walker County exerts any influence over the ***employment and personnel decisions*** at the Walker County Jail. Although Walker County may "control the purse strings" of the sheriff's office, *see* ALA. CODE § 36-22-18, this fact does not impart or imply any control over the Sheriff's decision to terminate an employee. *See Turquitt*, 137 F.3d at 1290; *cf. McMillian v. Monroe County*, 520 U.S. 781, 791-92 (1997) (finding that an Alabama county commission's discretion to limit a sheriff's operational funds to that which is reasonably necessary, at most, demonstrates "an attenuated and indirect influence over the sheriff's operations"). Control

18

over employment decisions in the Sheriff's Office rests solely with Tirey, a **state**, not county, official as set forth in the Alabama Constitution. ALA. CONST. art. V, § 112; *See* ALA. CODE § 14-6-1.

Therefore, the court finds that Tirey in his official capacity served as plaintiff's only Title VII "employer." *See*, *e.g*, *Martin*, 2011 WL 4830176, at *6; *Hart*, 2009 WL 691069, at *5 ("[T]he Court concludes that Sheriff Edwards in his official capacity, and no other entity, is Plaintiff's employer for Title VII purposes. . . . Plaintiff points to no evidence that the County exercises control over the employment decisions of Sheriff Edwards."); *see also Redding*, 2006 WL 2166726, at *9 (defendant county did not exercise sufficient control over a sheriff's employment decisions to constitute a Title VII employer).  Because Walker County did not make the decision to terminate the plaintiff, it cannot be held liable for violations of Title VII.  Plaintiff did not bring his Title VII claims against Tirey in his official capacity.  Accordingly,  Defendants' Motion for Summary Judgment, (doc. 25), is due to be granted as to plaintiff's Title VII claims, Counts One and Two of his Amended Complaint, and such claims will be dismissed.

## B.   CLAIMS AGAINST SHERIFF TIREY AND JAIL ADMINISTRATOR McCLUSKEY IN THEIR INDIVIDUAL CAPACITIES – SECTION 1983 CLAIMS FOR VIOLATIONS OF SECTION 1981

Plaintiff alleges that Tirey and McCluskey discriminated against him on the basis of his race and retaliated against him in violation of 42 U.S.C. § 1981; he brings these claims pursuant to 42 U.S.C. § 1983.  "[A] plaintiff must use the remedial provisions of § 1983 to

enforce against state actors the rights create by § 1983." *Butts v. County of Volusia*, 222 F.3d 891, 892 (11th Cir. 2000).  However, the elements of race discrimination and retaliation claims in violation of § 1981 are the same as Title VII and Equal Protection claims.  *See Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009)("Absent direct evidence of discrimination, when analyzing claims for race-based retaliation brought under § 1981, we employ the tripartite analytical framework developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and subsequently modified in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)."); *see also Vessels v. Atlanta Independent School System*, 408 F.3d 763, 767 (11th Cir. 2005)(noting, in a failure to promote case, that "disparate treatment claims, brought under Title VII, § 1981, and § 1983, all require proof of discriminatory intent," and, when the plaintiff relies on circumstantial evidence of intent, "his claims are subject to the *McDonnell Douglas* methods of proof.")(citations omitted).

Tirey and McCluskey contend that they are entitled to qualified immunity as to plaintiff's § 1983 claims against them in their individual capacities.  (Doc. 26 at 26-29.); *See Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010) (noting that, when applicable, qualified immunity shields government officials sued in their individual capacities from liability).

> When government officials act in a way that knowingly violates a clearly established statutory or constitutional right of which a reasonable person would have known, they are not immune from suit and may be held liable for the damage their actions caused. *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19,

102 S. Ct. 2727, 73 L.Ed.2d 396 (1982).  But when these same officials make decisions that do not knowingly violate such rights, they are not required to defend themselves in a lawsuit seeking damages.  *Id*.  They are "immune" from suit.  *Id*.  We call this defense "qualified immunity" because the official is immune from a damage lawsuit, qualified upon his ability to show that he did not knowingly violate the plaintiff's clearly established constitutional right.  *Id*.

*Ray v. Foltz*, 370 F.3d 1079, 1081-82 (11th Cir. 2004).

The Eleventh Circuit uses a two-step analysis to determine whether a public official has qualified immunity: (1) the public official must establish that he was acting within the scope of his discretion; and (2) if the public official establishes that he was acting within his discretion, the plaintiff must show that the public official violated clearly established statutory or constitutional law. *Wood v. Kesler*, 323 F.3d 872, 877-78 (11th Cir. 2003); *Sims v. Metro. Dade County*, 972 F.2d 1230, 1236 (11th Cir. 1992).  There is no dispute that Tirey and McCluskey acted within the scope of their discretionary authority at the time of their actions. (*See* doc. 34 at 31.)

Whether their actions violated clearly established constitutional law also consists of a two-part inquiry: "(1) do the alleged facts show that the government actor violated a constitutional [or federally-created] right[, privilege, or immunity]? and (2) was that constitutional right clearly established?" *Boyce v. Andrew*, 510 F.3d 1333, 1341 (11th Cir. 2007) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *see also* 42 U.S.C. § 1983.[7]

---

[7]The Supreme Court has limited *Saucier's* mandate that a district court **must** decide the question of qualified immunity by deciding first if their has been a constitutional violation.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("On reconsidering the procedure

Because, for the reasons set forth below, the court finds that plaintiff cannot prove a claim of race discrimination or retaliation, the court finds defendants' Motion for Summary Judgment is due to be granted and the court pretermits any discussion of whether the law was clearly established.

### 1.   Jail Administrator McCluskey

The court finds McCluskey cannot be said to have violated plaintiff's right to be free from race discrimination and retaliation in violation of § 1981 because McCluskey did not terminate, nor did he have the authority to terminate, plaintiff's employment at the Walker County Jail, the only adverse employment action alleged by plaintiff.[8]  (Doc. 27-2 at 80:22-81:3.); *see also* ALA. CODE § 14-6-1; *Kamensky v. Dean*, 148 Fed. Appx. 878, 879 (11th Cir. 2005) ("A 'decisionmaker' is someone 'who has the power to make official decisions and, thus, be held *individually* liable.' *Quinn v. Monroe County*, 330 F.3d 1320, 1326 (11th Cir.2003) (emphasis in original). . . .  In the termination context, a "decisionmaker" has the power to terminate an employee, not merely the power to recommend termination. *Id*. [at

---

required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.  The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.")

[8] The court recognizes that "a biased discharge recommendation by an individual with no actual power to discharge may be actionable if the plaintiff can prove the biased recommendation directly resulted in the plaintiff's discharge." *Hanford v. Geo Group, Inc.*, 345 Fed.Appx. 399, 406 (11th Cir. 2009) (citing *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir.1999)).  Plaintiff, however, has not presented evidence, nor has he argued, that McCluskey's recommendation directly resulted in his termination.

1328]."); *Bluitt v. Houston Independent Sch. Dist.*, 236 F.Supp.2d 703, 729-30 (S.D. Tex. 2002) ("Bluitt has adduced no evidence that Amstutz violated her constitutional rights. In fact, the record reflects that Amstutz did not discharge Bluitt but merely recommended her termination to the Board, which made the final decision.  As the Fifth Circuit explained in a similar factual scenario in [*Beattie v. Madison County Sch. Dist.*], if Amstutz 'did not cause the adverse employment action, [he] cannot be liable under § 1983, no matter how unconstitutional [his] motives.'"[254 F.3d 595, 605 (5th Cir. 2001].).

The undisputed evidence shows that Tirey decided to terminate plaintiff based on an independent investigation conducted after McCluskey's recommendation.  Therefore, any discriminatory or retaliatory animus that may have motivated McCluskey to recommend that Tirey terminate plaintiff was not the cause of plaintiff's termination.  *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999).

Under the facts of this case, plaintiff has not proven that McCluskey caused any deprivation of plaintiff's right to be free from race discrimination and retaliation.  Therefore, defendants' Motion for Summary Judgment is due to be granted and the claims against McCluskey are due to be dismissed.

### 2. Sheriff Tirey

#### a.      Race Discrimination

Defendants contend that plaintiff's race discrimination claim against Tirey in his individual capacity is due to be dismissed on the grounds that plaintiff cannot satisfy his

prima facie burden, and, in the alternative, he cannot show that Tirey's legitimate, non-discriminatory reasons for plaintiff's termination are unworthy of credence. (*See* doc. 26 at 15-23.)

When there is no direct evidence of race discrimination, as here, a plaintiff may establish race discrimination through circumstantial evidence under the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008).  Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802.  If the plaintiff makes the requisite prima facie showing, the burden of production shifts to the defendant to produce "legitimate, non-discriminatory reasons for its employment action." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)).  If the defendant meets this burden, the plaintiff then bears the ultimate burden of proving that the employer's proffered explanation is in fact pretext for unlawful discrimination. *Id.* at 1565 (citations omitted).

To establish a prima facie case of racial discrimination through circumstantial evidence, a plaintiff must show: "(1) [he] was a member of a protected class, (2) [he] was subject to an adverse employment action, (3) [his] employer treated similarly situated employees who were not members of [his] protected class more favorably, and (4) [he] was qualified to do the job." *Santillana v. Fla. State Court Sys.*, No. 11–11333, 2012 WL 11013, at *2 (11th Cir. 2012) (citing *Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th

24

Cir. 2006)) (footnote omitted).  A plaintiff can establish that his employer treated similarly-situated employees outside his protected class more favorably by showing either that he was "replaced by one outside the protected class" or that he was disciplined more harshly than one outside the protected class for nearly identical conduct.  *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984).  Plaintiff contends other, white employees were treated more favorably

Defendants concede that plaintiff has met three of the four prima facie elements: he belongs to a racial minority (African-American); he suffered an adverse employment action (termination); and, he was qualified to do his job.  (Doc. 26 at 17.)  Only the third element is in dispute.   Plaintiff contends that because Tirey treated similarly-situated white employees more favorably, "and because [p]laintiff did not violate the workplace rule in question, he has made out a prima facie case." (Doc. 34 at 22-23.)

In *Jones v. Gerwens*, 874 F.2d 1534 (11th Cir. 1989), the Eleventh Circuit held that:

> in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.

*Id*. at 1540.  Plaintiff contends that he can establish the third element of the prima facie case by demonstrating that his use of force against Decatur did not violate the Sheriff's Use of Force Policy. (*See* doc. 26 at 17-19.)

25

However, in *Jones v. Bessemer Carraway Med. Ctr.*, the Eleventh Circuit noted that the holding in *Gerwens* – that a plaintiff can establish a prima facie case of discrimination by showing that he did not violate a work rule – was dicta:

> Considering the facts in [*Gerwens*], our impression is that words about "did not violate the work rule" are unnecessary to the decision . . . and are dicta; but we will discuss them. The pertinent words in [*Gerwens*] demand not two, but three, elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff has engaged – either (a) disputedly or (b) admittedly – in misconduct similar to persons outside the protected class; and (3) that similarly situated, nonminority employees (that is, persons outside the protected class) received more favorable treatment.
>
> We stress that, under the [*Gerwens*] formulation, no plaintiff can make out a prima facie case by showing just that [he] belongs to a protected class and that [he] did not violate [his] employer's work rule. The plaintiff must also point to someone similarly situated (but outside the protected class) who disputed a violation of the rule and who was, in fact, treated better.

137 F.3d 1306, 1311 n.6 (11th Cir.), *superseded in part on other grounds*, 151 F.3d 1321 (11th Cir. 1998). "[I]t is not enough for a plaintiff merely to deny he committed the alleged infraction" for prima facie purposes. *Melton v. Nat'l Dairy LLC*, 705 F. Supp. 2d 1303, 1318 (M.D. Ala. 2010) (citing *Bessemer Carraway Med. Ctr.*, 137 F.3d at 1311 n.6)). Plaintiff has not presented any evidence of similarly-situated white employee that disputed violating a work rule and was treated more favorably. Therefore, he must rely on evidence that he was treated more harshly than similarly-situated white employees for nearly identical conduct. *Nix*, 738 F.2d at 1185.

"In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or

accused of the same or similar conduct and are disciplined in different ways." *Holifield*, 115 F.3d at 1562 (citing *Williams v. Ford Motor Co.*, 14 F.3d 1305, 1309 (8th Cir. 1994)). The alleged comparator must be "similarly situated in all relevant respects." *Id.* (citations omitted). In a discriminatory discharge case, "the quantity and quality of the comparator's misconduct [must] be ***nearly identical*** to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (citing *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989) *overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61 (1st Cir. 2004)) (emphasis added). "Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples." *Dartmouth Review*, 889 F.2d at 19. "[T]he most important variables in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishments imposed." *Gerwens*, 874 F.2d at 1539-40 (quoting *Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir.), *cert. denied*, 472 U.S. 1021 (1985)).

Moreover, plaintiff must do more than simply allege that employees outside his protected class engaged in "nearly identical" conduct. The burden is on the plaintiff to "provide sufficient evidence upon which a reasonable trier of fact could rely in concluding that the employees with whom [he] aligns [himself] are similarly situated." *Cannon v. Dyncorp*, 462 F. Supp. 2d 1190, 1199 (M.D. Ala. 2005) (citing *Gerwens*, 874 F.2d at 1541; *Keel v. U.S. Dep't of Air Force*, 256 F. Supp. 2d 1269, 1285 (M.D. Ala. 2003)). While

27

plaintiff need not demonstrate "virtually identical circumstances," he "certainly must provide facts necessary to determine with relative certainty the degree to which [his] circumstances were similar to those of [his] alleged comparators." *Id*. at 1201.

Additionally, because the court must determine whether the decisionmaker disparately applied the workplace rules at issue, those decisionmakers must be aware of a comparator's "nearly identical" conduct.  In the Eleventh Circuit, "[e]mployees are not 'similarly situated' if management is aware of one's improper conduct, but not aware of the others' conduct." *Amos v. Tyson Foods, Inc.*, 153 Fed. Appx. 637, 647 (11th Cir. 2005) (citations omitted). For prima facie purposes, plaintiff must adduce evidence that his proffered comparators' "***known*** violations were consciously overlooked." *Gerwens*, 874 F.2d at 1542 (emphasis added; footnote omitted).

Plaintiff alleges that five white Walker County Jail employees and Tirey engaged in "nearly identical" conduct and were treated more favorably.  He alleges that: (1) Tirey and Brown struck inmates in the head with their batons but were not terminated; (2) Pendley and Steadman struck inmates with their batons but were not terminated; (3) Sherrer struck inmates with his baton, but he was suspended and afforded the opportunity to attend anger management classes; and (4) "Ron Pearson violated jail policy by scheduling a mere four officers for a shift, when policy required five, and he was not terminated." (Doc. 34 at 26- 27.)  Plaintiff also contends that officers routinely violated the M-Dorm notice without reprimand. (*Id*. at 27.)

28

The closest plaintiff comes to comparing "apples to apples" is his evidence relating to Tirey[9] and Brown striking inmates in the head with their batons, thus violating the same work rule as plaintiff. (Doc. 34 at 26.)  Plaintiff, however, provides no evidence detailing the circumstances underlying Tirey or Brown's use of force.  In the absence of such facts, the court cannot determine whether Tirey or Brown were involved in or accused of engaging in "nearly identical" conduct.  *See Cyprian v. Auburn Univ. Montgomery*, 799 F. Supp. 2d 1262, 1282 (M.D. Ala. 2011) ("Cyprian's short and generic descriptions of the comparators' misconduct falls short of demonstrating that the comparators were engaged in misconduct that was of the same quality and quantity as Cyprian's.")  The court's conclusion is bolstered by the Eleventh Circuit decision of *Roy v. Broward Sheriff's Office*, 160 Fed. Appx. 873 (11th Cir. 2005).   In that case, the plaintiff offered evidence regarding six possible comparators, each charged with violating the same work rules as the plaintiff. *Roy*, 160 Fed. Appx. at 874.  The Eleventh Circuit concluded that two of the comparators, despite violating the same work rules as the plaintiff, were not similarly situated because:

> [Plaintiff's] evidence tells us nothing about the seriousness or the nature of either [comparator's] misconduct. We only know that these employees violated the same general provisions of the BSO Manual as [plaintiff] did.  We know nothing of their specific misconduct. Consequently, we cannot find them to be similarly situated comparators.

---

[9]The court assumes that Tirey may be a proper comparator for purposes of discussion only.  Tirey is an elected official who cannot simply be terminated for violation of a work rule.

*Id*. at 876 (footnote omitted).  Here, plaintiff has offered even less evidence than the plaintiff in *Roy.*  Not only has plaintiff not offered ***specific*** evidence about Tirey or Brown's conduct, he has not offered any evidence that Tirey and Brown were charged with violating the Use of Force Policy.  Accordingly, there is insufficient factual information regarding the "quantity and quality" of Tirey and Brown's use of force to allow a reasonable fact finder to conclude that they are similarly situated to the plaintiff for purposes of establishing a prima facie case of disparate treatment.  Moreover, there is no evidence indicating that Tirey was aware of Brown's allegedly "nearly identical" conduct.

Plaintiff compares "apples to oranges" with his evidence regarding Pendley and Steadman.  First, plaintiff has presented no evidence that Pendley or Steadman violated or were accused of violating the Use of Force Policy.  And even assuming he had, the nature of Pendley and Steadman's use of force is of a different "quantity and quality" than plaintiff's use of force against Decatur.  Pendley struck an inmate in the leg, and Steadman struck an inmate in either the "leg or arm." (Doc. 38 at 38:3-5, 38:14-39:1.)  According to the Use of Baton Policy, deliberate strikes to the head are considered deadly force. (Doc. 28-7 at 3.)  Thus, Pendley and Steadman's baton strikes to an inmate's leg or arm, non-deadly force, cannot be considered "nearly identical" to plaintiff's baton strike to Decatur's head.  Additionally, there is no evidence that Tirey was aware of Pendley and Steadman's use of force.

Sherrer is also not a proper comparator.  Plaintiff testified that he learned of Sherrer's alleged misconduct through conversations with unnamed co-workers. (Doc. 27-1 at 76:5-23.) Thus, his testimony is inadmissible as hearsay and not based on personal knowledge. "[When a plaintiff] [does] not personally witness anything that substantiates [his] position, relying entirely on the statements of other workers[,] [s]uch testimony is insufficient as a matter of law to establish a comparator for [prima facie purposes]." *Amos*, 153 Fed. Appx. at 647-48 (citing *Bogle v. Orange County Bd. of County Comm'rs*, 162 F.3d 653, 658-59 (11th Cir. 1998); *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996)) (footnote omitted); *see* FED. R. CIV. P. 56(c)(4) (to be considered at the summary judgment stage, supporting declarations must be based on personal knowledge and present evidence that would be admissible at trial).  Even assuming such evidence was admissible, plaintiff's deposition testimony provides no specifics regarding the circumstances of Sherrer's alleged baton strikes for which he received a suspension and the opportunity to attend anger management classes. (*See* doc. 27-1 at 76:11-18.)  McCluskey testified that the excessive force violations for which Sherrer was suspended, "slapping" inmates, did not involve deadly force. (Doc. 27-3 at 70:3-70:23, 71:9-15, 71:19-72:6.)  Clearly, slapping an inmate is a dissimilar and less egregious use of force than striking an inmate in the head with a baton. For these reasons, the court finds that Sherrer is not a proper comparator.

Plaintiff compares "apples to avocados" with his evidence regarding Pearson.  Pearson violated a jail policy by knowingly under-staffing a shift. (*Id*. at 100:4-22.)  Violations of the

31

jail's staffing policy are of a substantially different "quantity and quality" than violations of the jail's Use of Force Policy.  Because Pearson was not involved in or accused of violating the Use of Force Policy, as was plaintiff, he is not a proper comparator. *See Roy*, 160 Fed. Appx. at 874 ("[Plaintiff] has now conceded that 27 of these employees are not true comparators because they were charged under different provisions of BSO's Policy and Procedures Manual.")

In addition, there is no evidence showing that any comparator committed another workplace violation in conjunction with their "nearly identical" conduct.  "Employees who have committed multiple policy violations are not similarly situated to employees who committed only one such violation." *Bush v. Houston County Comm'n*, 414 Fed. Appx. 264, 267 (11th Cir. 2011) (citing *Maniccia*, 171 F.3d at 1369); *See also Bessemer Carraway Med. Ctr.*, 137 F.3d at 1313 ("Plaintiff's multiple instances of misconduct on the same day may simply have been the straw that broke the camel's back." (internal quotations and citation omitted)).  Tirey terminated plaintiff not only for violating the Use of Force Policy, but also for violating the M-Dorm notice policy that prohibits jail employees from opening M-Dorm cell doors without another officer present.[10]   Therefore, the court finds that plaintiff's

---

[10]Tirey testified that plaintiff's use of force against Decatur and his violation of the M-Dorm notice, coupled together, "compounded" one another.  (Doc. 27-2 at 74:14-75:5.) Although he admitted that other officers have violated the M-Dorm notice and retained their employment, (*id*. at 74:22-75:2), plaintiff opening Decatur's cell door without another officer present "may simply have been the straw that broke the camel's back," *see Bessemer Carraway Med. Ctr.*, 137 F.3d at 1313 (quotations and citation omitted).

proffered comparators, who plaintiff contends violated a single work rule, are not similarly situated "in all relevant respects."

It is also worth noting plaintiff's employment status at the time of the Decatur incident. As noted in his termination letter, plaintiff was a newly-hired ***probationary*** employee at the time of his termination. (*See* doc. 30-6.) "Although a comparator need not have the same job title as the plaintiff to be a sufficient comparator, 'material differences' in 'ranks and responsibilities' may render any comparison impossible without 'confusing apples with oranges.'" *Lane v. McKeithen*, 423 Fed. Appx. 903, 906 (11th Cir. 2011) (citing *Rioux v. City of Atlanta*, 520 F.3d, 1269, 1280 (11th Cir. 2008); *Maniccia*, 171 F.3d at 1369)); *see Martin v. City of Dothan*, No. 1:05-cv-1172-MEF, 2008 WL 541289, *18 (M.D. Ala. Feb. 25, 2008). Plaintiff has noted the rank of his comparators but he has offered no evidence regarding the responsibilities and employment status of his would-be comparators at the time of their alleged misconduct. An employer could choose to afford less leniency for workplace violations to probationary employees than to non-probationary employees. While not dispositive of the court's comparator analysis, the lack of evidence regarding plaintiff's would-be comparators' responsibilities and employment status weighs against a finding that these comparators are similarly situated to plaintiff "in all relevant respects."

Because plaintiff has not demonstrated the existence of a similarly situated comparator, he cannot establish a prima facie case of race discrimination against Tirey. The court pretermits discussion on the issue of pretext. Accordingly, Defendants' Motion for

Summary Judgment, (doc. 25), is due to be granted as to plaintiff's section 1983 race discrimination claim, and such claim is due to be dismissed.

### b.    Retaliation

Defendants move for summary judgment on the § 1983 retaliation claims against Tirey on the basis that plaintiff cannot demonstrate the requisite elements of a prima facie case.  (Doc. 26 at 24-26.)

Just as with discrimination claims, § 1981 retaliation claims, brought pursuant to § 1983, have the same elements of proof and use the same analytical framework as Title VII retaliation claims. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001) (citations omitted).  That is, retaliation claims require that "[o]nce the plaintiff establishes a prima facie case, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action.   If the employer offers such legitimate reasons for the employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext for retaliation." *Holifield*, 115 F.3d at 1566 (internal citations omitted).

To establish a prima facie case of retaliation through circumstantial evidence, a plaintiff must show that: "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) [there is] a causal link between the protected activity and the adverse action." *Bryant v. Jones*, 575 F.3d 1281, 1307-08 (11th Cir. 2009) (citing *Raney v. Vinson Guard Serv. Inc.*, 120 F.3d 1192, 1196 (11th Cir. 1997); *Goldsmith v. City*

34

*of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993)).  Defendants argue that plaintiff cannot show that he engaged in statutorily protected activity, and, even assuming he could, he cannot establish a causal connection between that activity and his termination.  Plaintiff counters, arguing that his telephone conversation with McCluskey regarding his complaints about the investigation into the conduct of Richardson is statutorily protected activity and is causally related to his termination.

The court finds that the evidence before the court is insufficient to find that plaintiff engaged in statutorily protected activity.  In order to engage in protected activity, "the employee must . . . , at the very least, communicate [a] belief that [racial] discrimination is occurring . . . ." *Demers v. Adams Homes of Nw. Fla., Inc.*, 321 Fed. Appx. 847, 852 (11th Cir. 2009) (quoting *Webb v. R & B Holding Co.*, Inc., 992 F. Supp. 1382, 1389 (S.D. Fla. 1998)).  There is no evidence before the court that plaintiff told McCluskey that he believed the investigation into Richardson's treatment of inmates was race discrimination.  (*See* doc. 27-1 at 94:6-18.) Accordingly, plaintiff cannot establish the first element of a prima facie retaliation case.

However, even assuming plaintiff did engage in protected activity, he has not offered sufficient evidence on which a reasonable jury could find a causal relationship between his termination and his complaint related to the Richardson investigation.  To show a causal connection between an adverse action and protected activity, a plaintiff must prove "that the protected activity and the adverse action are not completely unrelated." *Wideman v. Wal-*

*Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998) (quotations and citation omitted). While the causal link requirement is interpreted broadly, *EEOC v. Reichhold Chems., Inc.*, 988 F.2d 1564, 1571 (11th Cir. 1993), "merely showing that the alleged adverse action occurred sometime after the protected expression does not establish the causation element – for temporal progression to be enough, the events must be in 'very close' proximity," *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n.52 (11th Cir. 2008)(citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

Plaintiff contends that his termination stemmed from his complaint to McCluskey about the Richardson investigation. (Doc. 34 at 29-31.)  This conversation occurred around the end of October 2008, (doc. 27-1 at 87:11-12), and Tirey terminated plaintiff on November 7, 2008, (*see* doc. 30-6).  The close temporal proximity of this activity and plaintiff's termination, standing alone, could give rise to an inference of causation. *Henderson v. FedEx Express*, 442 Fed. Appx. 502, 507 (11th Cir. 2011) (noting that a two week lapse between an employee's protected activity and an adverse employment action normally demonstrates that the two events are causally related).

However, "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (citing *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1355-56 (11th Cir. 1999)).  "It is not enough for the plaintiff to show that

someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression." *Bass v. Bd. of County Comm'rs, Orange County*, 256 F.3d 1095, 1119 (11th Cir. 2001) *overruled in part on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008) (citation omitted).  This requirement appeals to common sense – "A decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart*, 231 F.3d at 799.  "As with most facts, the defendant's awareness can be established by circumstantial evidence." *Id*. (citing *Goldsmith*, 996 F.2d at 1163).

As noted *supra*, Tirey, and Tirey alone, had the authority to make the employment and personnel decisions at the Walker County Jail.  McCluskey did not terminate plaintiff, nor did he have the power to do so. *See Kamensky v. Dean*, 148 Fed. Appx. 878, 879 (11th Cir. 2005) ("In the termination context, a 'decisionmaker' has the power to terminate an employee, not merely the power to recommend termination." (citing *Quinn v. Monroe County*, 330 F.3d 1320, 1328 (11th Cir. 2003))).  Thus, the issue is whether, at the time he terminated plaintiff on November 7, 2008, Tirey had knowledge of plaintiff's conversation with McCluskey.  Although McCluskey was obviously aware of his conversation with plaintiff at the time he recommended plaintiff's termination, his awareness is irrelevant as he was not the official decisionmaker.

Tirey testified in his deposition that he does not recall ever being made aware of plaintiff's complaint to McCluskey regarding the Richardson investigation, (doc. 27-2 at

37

38:2-8, 39:2-13), and plaintiff has offered no evidence suggesting he did.  Having failed to produce evidence that Tirey, the sole decisionmaker, was aware of his conversation with McCluskey, plaintiff cannot demonstrate a causal link between his statutorily protected activity and his termination.

Therefore, plaintiff has failed to establish a prima facie case of retaliation against either Tirey or McCluskey.  Accordingly, Defendants' Motion for Summary Judgment, (doc. 25), is due to be granted on plaintiff's § 1983 claim based on retaliation in violation of § 1981, and such claim is due to be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment, (doc. 25), is due to be granted.  An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE**, this the 31st day of March, 2012.

SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE